1

2

3

4

**SAXENA WHITE P.A.**
David R. Kaplan (SBN 230144)
505 Lomas Santa Fe Drive, Suite 180
Solana Beach, CA 92075
Telephone: (858) 997-0860
Facsimile: (858) 369-0096
dkaplan@saxenawhite.com

5

*Lead Counsel for Lead Plaintiffs and the Class*

6

*[Additional Counsel Listed on Signature Page]*

7

8

9

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

10

11

CITY OF HOLLYWOOD FIREFIGHTERS'
PENSION FUND, Individually and on Behalf
of All Others Similarly Situated,

12

Plaintiff,

13

vs.

14

15

16

ATLASSIAN CORPORATION, ATLASSIAN
CORPORATION PLC, MICHAEL
CANNON-BROOKES, SCOTT FARQUHAR,
ANU BHARADWAJ, and CAMERON
DEATSCH,

17

Defendants.

Case No. 3:23-cv-00519-WHO

**CLASS ACTION**

**AMENDED CLASS ACTION**
**COMPLAINT FOR VIOLATIONS OF**
**THE FEDERAL SECURITIES LAWS**

**DEMAND FOR JURY TRIAL**

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

I.    NATURE OF THE ACTION ........................................................................... 1

II.   INTRODUCTION ........................................................................................... 2

III.  JURISDICTION AND VENUE ...................................................................... 5

IV.  PARTIES ........................................................................................................ 6

     A.    Lead Plaintiffs ..................................................................................... 6

     B.    Defendants ........................................................................................... 7

V.   FACTUAL OVERVIEW OF DEFENDANTS' FRAUD .............................. 11

     A.    "Open Company, No Bulls\*t": Background Of Atlassian And Its Purported Commitment To Shareholder Transparency ........................ 11

     B.    Atlassian's "Land-And-Expand" Business Strategy Relies On Expanding Revenue From The Company's Existing Paying Customers ................. 12

     C.    Defendants Repeatedly Touted Atlassian's "Linear Sales Cycle"—Which Defendants Claimed Provided The Company With Great "Predictability Of Sales" That Differentiated It From Its Software Industry Peers—And Personally Monitored Atlassian's Operational Metrics "*Like A Hawk*" .............. 13

     D.    In Direct Response To Analyst Concerns That Poor Macroeconomic Conditions Could Negatively Impact Atlassian's Business, Defendants Repeatedly Deny That The Company Was Experiencing Any Adverse Trends ................................................................................................. 18

     E.    The Market Credits Defendants' Representations Denying Macroeconomic Impacts And Specifically Highlighted That Defendants' Positive Statements Differentiated Atlassian From Its Competitors .................... 21

     F.    Defendants Conceal Negative Trends Throughout the Remainder of Q1 2023, Specifically Representing To Investors That They "*Haven't Really Seen Any Discernible Trend*" Negatively Affecting *Any* Part Of Atlassian's Business ................................................................................ 22

     G.    The Truth Is Revealed: Atlassian Discloses Poor Financial Results, Missing EPS Guidance For The First Time In Its History, Which Defendants Directly Attribute To "Trends" From "Macro Headwinds" That They Saw *In July 2022* ...................................................................... 25

     H.    SEC Regulations Required Defendants To Disclose What They Admitted Were Known Adverse Material Trends or Uncertainties ....................... 29

VI.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ........ 32

    A.   The August 4, 2022 Conference Call .................................................... 33

    B.   The August 19, 2022 Annual Report .................................................... 35

    C.   The September 14, 2022 Goldman Sachs Conference ........................... 35

    D.   The October 4, 2022 Post-Effective Amendment ................................. 38

VII.   ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER ............................ 38

VIII.   LOSS CAUSATION ......................................................................................... 42

IX.   PRESUMPTION OF RELIANCE ...................................................................... 43

X.   INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE .................................................................. 44

XI.   CLASS ACTION ALLEGATIONS ..................................................................... 45

XII.   CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT ........................................... 46

    COUNT I ................................................................................................... 46

    COUNT II .................................................................................................. 48

XIII.   PRAYER FOR RELIEF .................................................................................... 50

XIV.   JURY DEMAND ............................................................................................. 50

## I.      NATURE OF THE ACTION

1.      Court-appointed Lead Plaintiffs City of Hollywood Firefighters' Pension Fund and Oklahoma Firefighters Pension and Retirement System ("Lead Plaintiffs" or "Plaintiffs"), on behalf of themselves and all others similarly situated, allege the following against Defendants (as defined below) upon personal knowledge as to themselves, and upon information and belief as to all other matters, based upon the ongoing investigation of the undersigned Lead Counsel.

2.      Lead Counsel's investigation included, among other things, review and analysis of: (i) the public filings of Atlassian Corporation ("Atlassian U.S.") and Atlassian Corporation Plc ("Atlassian UK," and, together with Atlassian U.S., "Atlassian" or the "Company") with the U.S. Securities and Exchange Commission (the "SEC"); (ii) interviews with former Atlassian employees; (iii) in-depth research reports by securities and financial analysts; (iv) transcripts of Atlassian's conference calls with analysts and investors; (v) presentations, press releases, and media reports regarding Atlassian; (vi) consultation with various experts; (vii) data reflecting Atlassian's stock price; and (viii) review of other publicly available information concerning the Company and the Individual Defendants.  Lead Plaintiffs believe that substantial additional evidentiary support for their allegations will be developed after a reasonable opportunity for discovery, as many of the facts related to Lead Plaintiffs' allegations are known only by Defendants, or are exclusively within Defendants' custody or control.

3.      Lead Plaintiffs assert claims under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder, against Atlassian and its co-founder and co-Chief Executive Officer ("co-CEO") Michael Cannon-Brookes ("Cannon-Brookes"); co-founder and co-CEO Scott Farquhar ("Farquhar"); President Anu Bharadwaj ("Bharadwaj"); and Chief Revenue Officer ("CRO") Cameron Deatsch ("Deatsch" and, collectively, "Defendants"), and under Section 20(a) of the Exchange Act against the Individual Defendants (defined below), on behalf of all investors who purchased Atlassian ordinary shares and/or common stock between August 5, 2022 and November 3, 2022, inclusive (the "Class Period"), and who were damaged thereby (the "Class").

## II.  <u>INTRODUCTION</u>

4.     Atlassian develops, sells and licenses collaboration and project management software.  In the years following the Company's December 2015 IPO, Atlassian experienced considerable growth, and Defendants touted to the market that this trajectory would continue into the Class Period, projecting over 50% growth in its all-important cloud revenue for 2023 and 2024.[1] However, in the spring and summer of 2022, analysts and investors were deeply concerned that poor global macroeconomic conditions would negatively affect the Company's performance.

5.     Accordingly, to assuage investors' concerns, at the beginning of the Class Period, Defendants emphatically and repeatedly denied that these factors were having any negative impact on Atlassian's business.  Specifically, on August 4, 2022—in direct response to analysts' inquiries as to whether macroeconomic conditions were affecting Atlassian's performance and outlook—Defendants told shareholders the "***good news***" that "***we have yet to see any specific trend geographically or even in industry segments or in customer size that gives us pause or worry to date***," and that "***there is no new news to share today***."[2]  In fact, Defendants claimed that the global macroeconomic conditions that were hindering the performance of Atlassian's industry peers provided the Company with a significant competitive opportunity, stating: the "turbulent economic environment[] offer[s] a chance … to gain market share – to shake up the leaderboard.  Atlassian intends to seize this moment . . . ."  Similarly, in Atlassian's Annual Report issued two weeks later on August 19, 2022, Defendants doubled down on their assurances that the Company was not being impacted by macroeconomic issues, stating in no uncertain terms that Defendants were "***not aware of any trends . . . for the current fiscal year that are reasonably likely to have a material effect on our revenues, income, profitability, liquidity or capital reserves***."

6.     Even as late as September 14, 2022—during a Goldman Sachs conference held just ***two weeks*** before the end of Atlassian's Q1 2023—Defendants reiterated to investors that they were not seeing any trends whatsoever that would have a material impact on Atlassian's business, and

---

[1] Atlassian's fiscal year begins on July 1 and ends on June 30.  The Company identifies each fiscal year based on the year in which it ends.  For instance, Atlassian's fiscal year 2022 ended on June 30, 2022, and fiscal year 2023 started on July 1, 2022.

[2] Unless otherwise noted, all emphasis is added.

that the macroeconomic environment provided distinct advantages to the Company. Indeed, Defendants emphasized that because the Company provided purportedly "mission-critical" software at a "highly, highly competitive" price point, Atlassian enjoyed "a few advantages in the overall macroeconomic climate." Accordingly, when asked directly whether macroeconomic conditions were having a negative impact on demand for the Company's products, Defendants expressly represented that there were no material adverse trends affecting the Company's business: "*We're not seeing any trends there. So across the board, across existing and new [customers], that's overall what we are seeing in different parts of our business*." To make this point crystal clear, Defendants reiterated, in no uncertain terms, that "*[we] haven't really seen any discernible trend there in terms of the macroeconomic impact*."

7. Significantly, Defendants also made clear that they had complete, real-time visibility into the Company's operations and financial performance—in Defendants' own words, they watched the impact of macroeconomic conditions on the Company's business "like a hawk." Indeed, Defendants stated that they were being "*exceedingly vigilant across watching all stages of our funnel*"; they would "*remain vigilant in this [challenging] environment*"; and they would "*continue to scan the horizon for warning signs and be candid with investors as we have throughout our six+ years as a public company*." To drive this point home, Defendants repeatedly assured the market that they *personally* monitored trends and subscriber metrics closely, which they would "*continue to watch like a hawk*."

8. Analysts and investors relied heavily on Defendants' representations, specifically highlighting that Defendants' positive statements differentiated the Company from its competitors, and that, as a result, Atlassian was insulated from the macroeconomic conditions affecting the software industry. For example, Raymond James emphasized that Atlassian was "*feeling little impact from macro uncertainty that is causing budget tightening around the broader technology space*." Similarly, Macquarie highlighted the fact that Atlassian was supposedly experiencing "*little to no impacts from the macro environment*," and SMBC concluded that Atlassian "*[m]anagement has 'yet to see any trend' in geographies or customer segments that indicate*

*macro-driven weakness*."  Fueled by these representations, Atlassian's share price soared, reaching a Class Period high of $289.36 per share on August 16, 2022—a 25.6% increase from the Company's stock price just prior to the Class Period.

9.      As would soon be revealed, Defendants' statements were utterly false.  Specifically, on November 3, 2022, Atlassian stunned the market by issuing a press release and shareholder letter in which the Company disclosed poor financial results for Q1 2023, including missing its earnings per share guidance for the first time in its history as a public company.  Significantly, while Defendants had repeatedly stated throughout the quarter that they were not seeing "*any discernible trend [] in terms of the macroeconomic impact*," they now admitted that the exact opposite was true: Atlassian's Q1 financial results *had* been materially and adversely impacted by negative "*trends*" from "*macro headwinds*."  Defendants also made clear that they knew that these "trends" had existed *by the end of July* (the first month of Atlassian's Q1).  In Defendants' own words, "the timing of things that we saw" with regard to these negative trends was "*July and August*"—*i.e.*, the exact same time Defendants were repeatedly assuring investors that no such trends existed.

10.      In response to Defendants' stunning revelations, Atlassian's stock price collapsed, falling over $50 per share in a single trading day, from a closing price of $174.17 on November 3, 2022 to $123.73 on November 4, 2022—a decline of nearly 30%, wiping out over $7 billion in shareholder value.

11.      Analysts excoriated the Company, highlighting management's apparent about-face and noting in particular that Defendants' disclosures directly contradicted their repeated assertions throughout the quarter.  For example, Wolfe Research highlighted Defendants' reversal, stating that the slowdown "*took us and investors by surprise*," and that "*this abrupt change in tone and outlook [] puts shares in the penalty box*."  As Wolfe Research put it: "*With shares indicating down ~25% AH [after hours] it is safe to say that the rate of change and surprise factor is high*."  Citi also emphasized that the news stood in stark contrast to Defendants' prior statements, noting the "*significant and unexpected pivot in demand tone*."  Oppenheimer concluded that Atlassian's

"*pronounced reset*" would "*weigh sharply on the shares as investors realign expectations*." Both Piper Sandler and Macquarie likewise downgraded Atlassian's rating to "neutral."

12.     In an effort to deflect the market's sharp criticisms, Defendants attempted to blame Atlassian's poor financial results, and their prior misrepresentations, on the purported "seasonality" of the Company's sales, claiming that while sales were poor in July and August, Defendants expected them to bounce back in September, when people ostensibly returned from "vacation." However, this purported explanation was *directly contradicted* by the statements Defendants had made for *years* to investors—including in Atlassian's filings with the SEC and during earnings conference calls—which made clear that the Company's business was *not* seasonal, but *linear*. Indeed, from its inception as a public company, Atlassian's IPO Prospectus highlighted that, "[u]nlike traditional enterprise software businesses, *we have historically experienced a linear quarterly sales cycle with approximately a third of our quarterly sales occurring within each month of the respective quarter*." Thereafter, in each and every one of Atlassian's Annual Reports, Defendants emphasized that Atlassian's "*linear quarterly sales cycle*" provided the Company with great "*[p]redictability of sales*." Atlassian management even claimed that this linearity gave Atlassian a competitive advantage, because it "*really helps us in-quarter to understand where we're at financially*" and meant that management was never "*sweating the last 2 or 3 weeks of a quarter trying to figure out whether or not people had forecasted things correctly*."

13.     Investors who purchased Atlassian ordinary shares and common stock at artificially inflated prices during the Class Period have suffered substantial losses from Defendants' violations of the federal securities laws. This action seeks redress on behalf of these aggrieved shareholders.

## III.   <u>JURISDICTION AND VENUE</u>

14.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 27 of the Exchange Act (15 U.S.C. § 78aa).

15.    Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b), Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts and omissions charged herein, including the dissemination of materially false and misleading information to the investing public, and the omission of material information, occurred in substantial part in this Judicial District, as Atlassian had a large employee presence and operations at its U.S. headquarters in San Francisco throughout the Class Period, and the Company's headquarters have been in this District since at least October 3, 2022.  In connection with the acts, transactions, and conduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## IV.    PARTIES

### A.    Lead Plaintiffs

16.    Lead Plaintiff City of Hollywood Firefighters' Pension Fund ("Hollywood Firefighters") is a defined benefit public pension fund that provides pension and other benefits for city firefighters. Hollywood Firefighters manages approximately $340 million in assets for the benefit of its nearly 500 active and retired participants and beneficiaries. As reflected in its certification, Hollywood Firefighters suffered a substantial loss as a result of its investments in Atlassian shares during the Class Period.  *See* ECF No. 23-1.

17.    Lead Plaintiff Oklahoma Firefighters Pension and Retirement System ("Oklahoma Firefighters") is a defined benefit public pension fund that provides pension and other benefits for firefighters in Oklahoma. Oklahoma Firefighters provides retirement income to these firefighters and their beneficiaries. Oklahoma Firefighters manages approximately $3.3 billion in assets for the benefit of its approximately 25,000 active and retired participants and beneficiaries. As reflected in its certification, Oklahoma Firefighters suffered a substantial loss as a result of its investments in Atlassian shares during the Class Period.  *See* ECF No. 23-1.

**B.     Defendants**

18.     Defendant Atlassian U.S. is incorporated under the laws of Delaware, with its principal executive offices located in San Francisco, California.  Atlassian U.S. was incorporated by the filing of its original Certificate of Incorporation with the Delaware Secretary of State on July 1, 2022.  Since October 3, 2022, Atlassian U.S.'s common stock has traded on the Nasdaq Global Select Market (the "NASDAQ") under the ticker symbol "TEAM."  Atlassian U.S. is the ultimate parent company of Atlassian UK.

19.     Defendant Atlassian UK was a public limited liability company incorporated under the laws of England and Wales and was parent of the Company's operating subsidiary, Atlassian, Inc.  Atlassian UK changed its corporate domicile to the United States effective September 30, 2022.  According to Atlassian, the re-domiciliation to the United States was to "increase our access to a broader set of investors, support inclusion in additional stock indices, improve financial reporting comparability with industry peers, streamline [the Company's] corporate structure, and provide more flexibility in accessing capital."  The re-domiciliation would not have an "impact on employees, day-to-day business and operations, or services to customers."

20.     Atlassian UK's Class A ordinary shares were listed on the NASDAQ and registered pursuant to Section 12(b) of the Securities Exchange Act of 1934 following an initial public offering on or around December 10, 2015.  The last day of trading in the Atlassian UK Class A ordinary shares on the NASDAQ was the effective date of the re-domiciliation – Friday, September 30, 2022.  Upon the change of domicile, each outstanding Class A ordinary share of Atlassian UK was exchanged for one share of common stock of Atlassian U.S., and Atlassian UK became a subsidiary of Atlassian U.S., thereby completing the change in domiciliation to the United States.  The Company's shares both before and after the re-domiciliation traded on the NASDAQ under the ticker symbol "TEAM."

21.     Defendant Michael Cannon-Brookes is Atlassian's co-founder and has been the Company's co-CEO and a member of the board of directors (the "Board") since October 2002.  As stated on the Company's website, Cannon-Brookes is a technology investor in the areas of software,

1   fintech, agriculture, and energy.  Cannon-Brookes reviewed, made, approved or adopted numerous

2   false statements that caused artificial inflation of Atlassian's share price, including statements in

3   Atlassian's 2022 Annual Report on Form 20-F ("2022 Annual Report"), which he signed, and

4   statements in an October 4, 2022 Post-Effective Amendment to the Registration Statement.

5     22. Cannon-Brookes is subject to the personal jurisdiction of the Court because he has

6   availed himself of the laws of the United States through his management and control over Atlassian,

7   including Atlassian U.S. and Atlassian UK, as well as the design, distribution, testing, and sale of

8   Atlassian products sold, downloaded, and used across the United States.  Further, Defendant

9   Cannon-Brookes has frequently travelled to the United States to attend and make presentations at

10  various shows across the country in order to promote the sales of Atlassian products.

11    23. Defendant Scott Farquhar is Atlassian's co-founder and has been the Company's

12  co-CEO and a member of the Board since October 2002. Farquhar served as Chair of the

13  Company's Board from December 2016 to April 2018.  From July 1, 2022 through September 5,

14  2022, Defendant Farquhar also served as Interim Chief Financial Officer of the Company. At

15  Atlassian, Defendant Farquhar supervises legal, human resources, finance, sales, marketing and

16  customer-support teams.  Under Atlassian's dual CEO structure, both Defendant Cannon-Brookes

17  and Farquhar have run the entire Company at different times. Defendant Farquhar is also a co-

18  founder of Skip Capital, a private fund investing in technology and infrastructure. Farquhar

19  reviewed, made, approved or adopted numerous false statements that caused artificial inflation of

20  Atlassian's share price, including statements in Atlassian's 2022 Annual Report, which he signed,

21  and statements in an October 4, 2022 Post-Effective Amendment to the Registration Statement.

22    24. Farquhar is subject to the personal jurisdiction of the Court because he has availed

23  himself of the laws of the United States through his management and control over Atlassian,

24  including Atlassian U.S. and Atlassian UK, as well as the design, distribution, testing, and sale of

25  Atlassian products sold, downloaded, and used across the United States. Further, Farquhar has

26  frequently travelled to the United States to attend and make presentations at various shows across

27  the country in order to promote the sales of Atlassian products.

28

1      25.    Defendant Farquhar and Defendant Cannon-Brookes collectively own

2  approximately 40% of Atlassian's outstanding shares which represents approximately 87% of the

3  voting power of the outstanding share capital.

4      26.    Defendant Anu Bharadwaj is currently the Company's President and has led various

5  projects across product lines at Atlassian, including the enterprise business, cloud platform teams,

6  and operations.  Bharadwaj served as Atlassian's Chief Operating Officer ("COO") from August

7  2021 to February 2023.  From January 2014 to July 2021, Bharadwaj served in multiple roles at

8  Atlassian, including Vice President of Product, Head of Product, Atlassian Cloud, Head of Product

9  Strategy, Atlassian and Head of Product, Jira.  Before Atlassian, she held various leadership roles

10  at Microsoft.  Bharadwaj reviewed, made, approved, or adopted false statements that caused

11  artificial inflation of Atlassian's share price, including statements during a conference with analysts

12  and investors on September 14, 2022.

13      27.    Defendant Cameron Deatsch has served as the Company's Chief Revenue Officer

14  since March 2020.  In his role as CRO, Deatsch runs Atlassian's marketing, sales, customer success,

15  and support organizations.  In December 2021, Deatsch called "sales and marketing customers" his

16  "day-to-day."  Deatsch stated in April 2023 that "a big part of [his] job over the last two years

17  [involves] talking to server and data center customers" and "getting them to start the journey

18  towards" cloud.  From October 2012 to March 2020, Deatsch served in multiple roles at Atlassian,

19  including Senior Director of Advocacy, Head of Server Business, Head of Corporate Development,

20  Head of Server and Enterprise Marketing and Head of Growth and Online Sales.  Prior to joining

21  Atlassian, Deatsch worked in leadership positions across sales and marketing at Jive Software.

22  Deatsch reviewed, made, approved, or adopted numerous false statements that caused artificial

23  inflation of Atlassian's share price, including statements during an August 4, 2022 call with

24  analysts.

25      28.    Defendants Cannon-Brookes, Farquhar, Bharadwaj, and Deatsch are collectively

26  referred to herein as the "Individual Defendants."

27

28

29.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Atlassian, were privy to confidential, proprietary and material adverse non-public information concerning Atlassian, its operations, finances, financial condition and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being actively concealed from, the investing public.

30.     The Individual Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Atlassian's business.

31.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts, and through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and publicly disseminated documents alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

32.     As senior executive officers and/or directors and as controlling persons of a publicly traded company whose securities were, and are, registered with the SEC pursuant to the Exchange Act, and were traded on the NASDAQ and governed by the federal securities laws, the Individual Defendants had a duty to disseminate promptly accurate and truthful information with respect to Atlassian's financial condition and performance, growth, operations, financial statements, business,

products, markets, management, earnings, and present and future business prospects, to correct any previously issued statements that had become materially misleading or untrue, so the market price of Atlassian's ordinary shares and common stock would be based on truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

## V.    FACTUAL OVERVIEW OF DEFENDANTS' FRAUD

### A.    "Open Company, No Bullsh*t": Background Of Atlassian And Its Purported Commitment To Shareholder Transparency

33.    Founded in Australia by Defendants Cannon-Brookes and Farquhar in 2002, Atlassian is a software company that develops collaboration products that help business teams work together.  On or around December 10, 2015, Atlassian went public via an initial public offering ("IPO") on the NASDAQ stock exchange, under the symbol "TEAM."  At the time of its IPO, Atlassian's market capitalization was under $4.5 billion, but the Company's market capitalization grew to over $40 billion by the beginning of the Class Period.

34.    Atlassian purports to "value transparency and openness as an organization," particularly with respect to shareholder communications.  In its Annual Reports and, on its website, Atlassian touts its "core values" as a key to its success, depicted through the following image:

    

**Open company,**    **Play,**    **Build with heart**    **Be the change**    **Don't #@!%**
**no bullshit**    **as a team**    **& balance**    **you seek**    **the customer**

35.    As part of its claimed commitment to transparency, Atlassian issues a shareholder letter each quarter to inform the market about the Company's performance, goals, and expectations. As Defendant Cannon-Brookes made clear in an August 2018 interview, the shareholder letter is what he "spend[s] the most amount of time on in communicating what we're thinking, [and] where

AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:23-CV-00519-WHO

we're going."  Furthermore, Cannon-Brookes insisted that the shareholder letters stay true to the Company values as Atlassian remains "open and no bull**** when we write the shareholder letter."

**B.    Atlassian's "Land-And-Expand" Business Strategy Relies On Expanding Revenue From The Company's Existing Paying Customers**

36.    Atlassian deploys a unique "land-and-expand" growth strategy.  Atlassian does not have a traditional commissioned direct sales team that is otherwise common in the software industry.  Instead, Atlassian relies on its website to generate sales, with an increasing number of the Company's customers in recent years using its products via the cloud.[3]  Once a group within an organization commences use of a product, Atlassian's goal is to have the product "spread to other technical and non-technical teams through cross-functional collaboration."

37.    There are two key elements to growth in Atlassian's business.  First, because the Company offers standard versions of its products for free to the first ten users of an organization, Atlassian generates revenue (i) when a free user pays for a premium version of one of its products; or (ii) when additional members of an organization beyond the first ten users begin using the Company's products.  Atlassian refers to growth in this area as "free to paid conversions."

38.    Second, the Company separately tracks growth from its *existing* paying customers.  Specifically, when a paying customer requires additional members of its organization to use Atlassian's products—either through an increased headcount or increased adoption of Atlassian products across existing team members—the customer will pay for those additional users within its organization.  In Atlassian's words, "[o]nce we have landed within a customer team, the networked nature and flexibility of our products tend to lead to adoption by other teams and departments, resulting in user growth, new use cases, and the adoption of our other products."  Atlassian refers to growth in this area as "paid seat expansion."

---

[3] In October 2020, Atlassian announced that by February 2022, the Company would completely cease selling "on premises" server-based products—meaning products that are not housed in the cloud but on customers' own servers and hardware—and would cease maintenance and support for on-premises versions of its products by February 2024.  As a result, the vast majority of new customers would have to use Atlassian products via the cloud (or via a data center) and current customers using on-premises server products were forced to transition to the cloud or risk having their products go un-serviced.  For this reason, the market was laser-focused on growth in Atlassian's cloud-based revenue.

39.     Of these two elements, paid seat expansion is by far the most significant, representing the primary driver of the Company's growth.   Indeed, ***approximately 90%*** of Atlassian's revenues come from existing customers (*i.e.*, paid seat expansion), and "seat expansion within existing customers within existing products . . . ***[has] always been the biggest driver of growth across all products***," as recently made clear by Atlassian's Head of Investor Relations during a June 1, 2023 analyst call.   Accordingly, by the Company's own admission, Atlassian's financial "success is dependent on our ability to expand the relationship with our existing base of customers through the addition of more users, teams and products."

40.     Leading up to the Class Period, Defendants highlighted to investors the Company's growth in paid seat expansion revenue, which provided "a lot of runway for long-term growth." For example, on June 28, 2021, Defendant Deatsch explained that Atlassian's "short term revenue" comes from "expanding" its relationships with existing customers, explaining that "the bulk of Atlassian's revenue has nothing to do with the customers we acquire this year, it is about all the customers that have been with us, 2, 3, 5, 10 years and how we continue to expand our footprint with those accounts."   Similarly, on Atlassian's April 28, 2022 earnings call discussing the Company's Q3 2022 results, former CFO James Beer explained: "we land small and expand very significantly over time . . . we gradually get larger and larger in terms of what we do for our customers. And I think that altogether gives us a lot of runway for long-term growth."

**C.    Defendants Repeatedly Touted Atlassian's "Linear Sales Cycle"—Which Defendants Claimed Provided The Company With Great "Predictability Of Sales" That Differentiated It From Its Software Industry Peers—And Personally Monitored Atlassian's Operational Metrics "*Like A Hawk*"**

41.     Significantly, Defendants repeatedly trumpeted, from Atlassian's first day as a publicly-traded company, that the Company's business strategy and sales structure produced a "linear sales cycle," which was "unique" in the industry and set the Company apart from its competitors in the enterprise software industry.   Specifically, in Atlassian's IPO Prospectus, filed with the SEC on December 10, 2015, Defendants touted the Company's "[p]redictability of [s]ales" by explaining "[s]ince we do not rely on an expensive salesforce and complex pricing negotiations to add new customers but focus on a high-velocity online distribution model with affordable

pricing, our sales have **_grown linearly_** as we have attracted new users for our products."  Thus, "[u]nlike traditional enterprise software businesses, we have historically **_experienced a linear quarterly sales cycle with approximately a third of our quarterly sales occurring within each month of the respective quarter_**."  The prospectus included a graphic depicting this linearity, which showed no seasonal impact on revenue generation in any quarter:



42.     From that point forward, Defendants repeatedly and specifically highlighted this "predictability of sales" to investors, including in investor conferences and the Company's SEC filings.  For example, in every one of the Company's Annual Reports thereafter—including the 2022 Annual Report filed with the SEC on Form 20-F during the Class Period on August 19, 2022—Atlassian boasted about its advantage of having the same "[p]redictability of sales," explaining that because "we are not dependent on a traditional sales force… **_we have historically experienced a linear quarterly sales cycle_**."  During a September 13, 2017 Analyst Day conference, Atlassian's former CFO, Murray Demo, highlighted his "favorite slide"—reproduced below, depicting the Company's "[p]redictable sales model" due to its "linearity of sales"—and specifically emphasized to analysts "**_that's how linear our business is_**," which "**_really helps us in-quarter to understand where we're at financially_**" and "puts us in a position where we're really in a **_no-surprise environment_** from a top line perspective":

1
2
3
4
5
6
7
8
9
10
11
12
13



14      43.    According to Atlassian's former President, Jay Simons, the linearity of sales provided great comfort to management because there was no need to "sweat" the Company's quarter-end period in terms of meeting sales forecasts, as Defendants would know throughout any given quarter how Atlassian was trending operationally and financially.  Indeed, during a UBS Global Technology Conference on November 13, 2017, Simons described Atlassian as "***pretty radically different***" from other companies precisely because it did not have seasonality in its sales. In his words, Atlassian "plots the linearity of billings, not revenue, but actual billings," and through "the last 8 quarters…***they're just basically straight lines***, like up and to the left."  As a result, the "***leaders of the company [are] not sweating the last 2 or 3 weeks of a quarter trying to figure out whether or not people had forecasted things correctly or if one deal slipped***, trying to figure out how we can pull next deals quarters in to kind of offset."

    44.    Similarly, during an "Atlassian's Summit" event held on April 10, 2019, the Company's former CFO, James Beer, also touted a slide emphasizing that Atlassian's "***business within a given quarter continues to be remarkably linear***." Significantly, Beer specifically noted

that the "relatively smooth levels of activity *during a quarter*" was "really quite different to the case of so many other enterprise software companies" and "*helps us with predictability*":



45.     Even as macroeconomic conditions worsened leading up to the Class Period, Atlassian management continued to reassure investors that the Company's linear sales cycle insulated it from any global macro concerns.  Indeed, just before the Class Period, on June 2, 2022, an analyst asked Atlassian's Head of Investor Relations, Martin Lam, about the "elephant in the room [that] has been the macro."  To assuage investor concerns in that regard, Lam responded that "we have this *beautiful linearity throughout our quarter* given the bookings on our board," which allows the Company to "look at bookings on an ongoing basis" and thus remain current with its trends throughout its quarters.

46.     Additionally, Confidential Witness[4] ("CW") 1, a former Senior Support Engineer for Atlassian,[5] also confirmed the linear nature of Atlassian's sales and that there was no "seasonality" in the Company's software business. As CW 1 reported, "there is no more or less work done in any month of the year and companies are constantly improving their software."  CW 1 laughed when asked about "software seasonality," stating that in his over 15 years as a software engineer, he has never heard of nor ever experienced software seasonality.

47.     In addition to the "predictability" that Atlassian's linear sales cycle provided, Defendants also made clear to investors that they had complete and "tremendous" real-time visibility into Atlassian's business and operations, going so far as to state that they could identify sales issues "*with surgical precision*" and that they personally monitored the effects of macroeconomic conditions on the Company's business "*like a hawk*." For example, in the Company's shareholder letter for Q4 2022 ("Q4'22 Shareholder Letter") filed on August 4, 2022, Defendants Cannon-Brookes and Farquhar boasted that "[o]nce customers land with us, we can identify those with the highest expansion potential with surgical precision and focus our high-touch tactics on those organizations."  Defendants also reassured investors that they would "remain vigilant in this environment. . . Again, *we'll continue to scan the horizon for warning signs and be candid with investors as we have throughout our six+ years as a public company*."

48.     Similarly, during an August 4, 2022 earnings call, Defendant Deatsch assured investors that Defendants were "*being exceedingly vigilant across watching all stages of our funnel*, whether that's migrations funnel, the additions upgrades, retention rates and, of course, our new customers coming in."  Indeed, making sure that investors *knew* that Atlassian's most senior officers were closely and carefully monitoring the impact of macroeconomic conditions on every part of the Company's business was so important to Deatsch, he again personally assured them that

---

[4] The terms "Confidential Witness" and "CW" refer to the former employees of Atlassian or other individuals with relevant inside information whose reports are discussed in this Complaint. In order to preserve the CWs' anonymity while maintaining readability, the Complaint uses the pronouns "he," "his," and "him" in referring to CWs, regardless of their gender.

[5] CW 1 worked as a Senior Support Engineer for Atlassian from March 2022 until March 2023, when Atlassian cut 5% of its workforce.  CW 1 and his team of approximately 25 individuals were responsible for onboarding expansion and net new customers.

AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:23-CV-00519-WHO

the Company would "***continue to watch [these metrics] like a hawk***."  Likewise, Defendant

Bharadwaj boasted on September 14, 2022 that Defendants would "***continue to monitor***" trends in

"user expansion," and confirmed that Defendants felt that this metric was "***an important one to***

***look at in the current climate***."

49.    Moreover, according to CW 2, a former contractor within the Marketing and

Analytics Department at Atlassian from November 2020 to November 2021,[6] "Atlassian had one

of the best data monitoring systems" he ever experienced.  As CW 2 reported, Atlassian held weekly

video conference meetings every Monday, headed by Amy Ren, the Head of Marketing Analytics.

The meetings discussed the Company's trends, including incremental revenue, top line revenue,

how many seats were being purchased, and the growth of paying customers in general.  In addition

to weekly meetings, each quarter—and sometimes more often—Chief Marketing Officer Robert

Chatwani held all-hands meetings with the Sales and Marketing teams to discuss the same topics.

CW 2 further explained that the Company metrics were extremely up to date as they were

instantaneously updated in the internal dashboard system used by Atlassian, which was accessible

to management.

        **D.**      **In Direct Response To Analyst Concerns That Poor Macroeconomic Conditions Could Negatively Impact Atlassian's Business, Defendants Repeatedly Deny That The Company Was Experiencing Any Adverse Trends**

50.    In early 2022, the broader global economy took a downturn.  Inflation took hold

across the globe as the world emerged from the COVID-19 pandemic.  As the year progressed,

Russia's invasion of Ukraine, disruptions in the global supply chain, and unexpected lockdowns in

China all contributed to a challenging macroeconomic environment for businesses globally.

Against this backdrop of macroeconomic turmoil, analysts and investors were clamoring for

reassurance from Atlassian that its business would not be impeded by these global conditions.

51.    In order to assuage investor concerns, Atlassian issued its Q4'22 Shareholder Letter

and its Fourth Quarter and Fiscal Year 2022 Earnings Release ("Q4'22 Earnings Release") after

---

[6] CW 2 worked as a Data Analyst, and reported to the following managers during his tenure: Vivian Wran, Leslie Chaney, and Dylan Lewis, all of whom reported to Amy Ren, Head of Marketing Analytics at Atlassian.

AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:23-CV-00519-WHO

markets closed on August 4, 2022, which made clear that the broader economic decline was not impacting Atlassian, and that, to the contrary, the Company was "uniquely positioned" with its "differentiated business model."  For example, the Q4'22 Shareholder Letter, filed with the SEC on Form 6-K, stated that strong "*secular trends*" reinforced the Company's growth, and that Atlassian would not be impacted by macro factors because it was "uniquely positioned [with] deep-seated momentum and a differentiated business" as compared to its industry peers.  The Q4'22 Earnings Release similarly quoted Defendant Cannon-Brookes as stating "Atlassian is uniquely positioned, with great momentum and a differentiated business model."  Defendants even went so far as to state that the deteriorating macroeconomic environment gave Atlassian a competitive advantage in the industry: the "turbulent economic environment[] offer[ed] a chance . . . to gain market share – to shake up the leaderboard.  Atlassian intends to seize this moment…."

52.     Significantly, the Q4'22 Shareholder Letter expressly and affirmatively represented to the market that—five weeks into Q1 2023—***there were no negative trends affecting Atlassian's current quarter***.  Indeed, Defendants assured investors that "over 90% of our revenue in FY22 was derived from existing customers and this dynamic has been consistent in our business over the years," and that, as a result, Defendants were "reiterating what we've said previously: approximately 50% year-over-year [growth] for both FY23 and FY24."  To drive home the point that there were no material adverse trends impacting Atlassian's business, the Q4'22 Shareholder Letter confirmed that "***nothing we are seeing right now is changing our outlook***," and, in fact, that the opposite was true:  Defendants "never felt more confident about our strategies . . . ***and the secular trends that reinforce them***."

53.     During the ensuing earnings call held that day, analysts specifically and directly questioned Defendants regarding these assertions, including whether the macroeconomic conditions were affecting Atlassian's performance and outlook and whether Defendants saw any "weakness" in customer demand in any particular geographic area in light of those conditions.  Significantly, in response, Defendants again denied that the Company was experiencing any negative trends in any part of its business (either free-to-paid or existing customers) brought about

by the larger macroeconomic environment.  For example, Defendant Deatsch claimed that since the start of the Russian-Ukraine war in February, the Company was "***exceedingly vigilant across watching all stages of our funnel***," including "the additions upgrades, retention rates, and of course, our new customers."  As a direct result of their vigilance, Deatsch was in a position to report the "***good news***" that "***we have yet to see any specific trend geographically or even in industry segments or in customer size that gives us pause or worry to date***," and that "***we have not seen any significant shift in customer demand across our product lines***."  Deatsch promised investors that the business trends were something Atlassian would "***continue to watch like a hawk***," and that "***there's no new news to share today***."

54.     While Atlassian had reported a "modest decrease in the conversion rates of Free instances upgrading to paid plans"—the "free to paid" segment that represented just ***10%*** of the Company's business—Defendants made clear that this "modest decrease" was inconsequential in scope and in no way was an adverse trend that could materially affect Atlassian's business.  Indeed, when an analyst from Wolfe Research pointedly asked on the call why—other than the "slightly slower conversion of free customers to paid customers" that Defendants had minimized—Atlassian was not "***seeing kind of some of the other impacts [] other companies are seeing***?," Defendants characterized the "slightly slower rate" of conversions as inconsequential and in no way constituted a trend indicative of a negative impact on the Company's business.  Specifically, Defendant Deatsch quashed any macroeconomic-based fears by noting that the "***slight thing***" the Company saw in free-to-paid conversions "***does not take away from the continued growth we see in our existing customer base that also drives more than 90% of our revenue in the existing year***."  Deatsch confirmed that Atlassian's "overall retention continues to be exceedingly strong" "across the many funnels we operate," which had "been supporting our net expansion rate."  Thus, Defendant Deatsch made clear to investors that the slowdown in free-to-paid customers was insignificant and in no way constituted a trend.

**E.      The Market Credits Defendants' Representations Denying Macroeconomic Impacts And Specifically Highlighted That Defendants' Positive Statements Differentiated Atlassian From Its Competitors**

55.      Defendants' representations had their intended effect, as a plethora of analysts relied on and repeated Defendants' claim that the Company had experienced no significant macro effects, and specifically noted that this dynamic differentiated Atlassian from its peers.  For example, on August 4, 2022, Raymond James wrote that Atlassian was "***feeling little impact from macro uncertainty*** that is causing budget tightening around the broader technology space" and "[w]hile top of the funnel free users may not convert to paid users as readily right now, the vast majority of sales come from existing customers and TEAM has world-class retention."  Wolfe Research provided the same message, noting on August 4, 2022 that the "***cherry on top was reaffirmation of basically zero impacts from macro*** (outside of slight decrease in free to pay conversion rates)"; and that as a result, Wolfe Research "believe[d] the after hours premium to peers is justified."  Oppenheimer & Co. similarly left the earnings call feeling "bullish" because "***the company is seeing minimal macroeconomic weakness***."

56.      Significantly, analysts specifically highlighted Defendants' claim that the Company had not experienced or seen any negative "trends" caused by the macroeconomic environment.  For example, SMBC Nikko Securities ("SMBC") emphasized that Atlassian's "***narrative was unabashedly positive***" as "***[m]anagement has 'yet to see any trend' in geographies or customer segments that indicate macro-driven weakness***," and highlighted that Atlassian "***has not seen any broader slowdowns*** among specific products, geographies, industries, or customer sizes."  Truist was also reassured by Defendants' representations, noting that Atlassian was "***one of the key companies that we look to for macro commentary***" and that, "[w]hile other companies in our coverage have discussed headwinds by geography, vertical, or customer size, ***[Atlassian] did not indicate any difference in buyer behaviors***."  Cowen emphasized that Atlassian saw "consistent demand trends," and "is not seeing any notable macro pressures in pipelines/close rates."  Canaccord Genuity likewise described that for Atlassian "all regions, industry segments, product segments, and customer segments remain healthy and are behaving normally."

57.     Similarly, Macquarie concluded that Atlassian was "resilient in a downturn" because the Company showed "little to no impacts from the macro environment." Macquarie noted that Atlassian "**provided the strongest print** of this software earnings season in our coverage as the company handily beat expectations, raised vs. FQ1'23e consensus, reiterated strong cloud growth outlook, and **provided reassuring commentary about its positioning for a recession**."

58.     William Blair also underscored that "[m]acro impact on demand and pipeline was minimal," and emphasized as a "**key highlight[]**" that the Company reported "**No material macro impact coming through the business**." (emphasis in original).   William Blair also echoed Defendants' representations concerning their personal monitoring of these issues, stating that Atlassian "has been vigilant in monitoring the macroeconomic environment and **has not seen any material signs of a slowdown in its data yet**."

59.     As a result of Defendants' wholly positive statements, Atlassian's share price skyrocketed to a Class Period high of $289.36 per share on August 16, 2022—a 25.6% increase from the price on August 4, 2022, just prior to the Class Period.

**F.      Defendants Conceal Negative Trends Throughout the Remainder of Q1 2023, Specifically Representing To Investors That They "*Haven't Really Seen Any Discernible Trend*" Negatively Affecting *Any* Part Of Atlassian's Business**

60.     Throughout the remainder of Q1 2023, Defendants continued to affirmatively represent to investors that there were no negative trends from the macroeconomic environment impacting the Company.  For example, on August 19, 2022, Atlassian filed with the SEC its 2022 Annual Report on Form 20-F, which was signed by Defendants Cannon-Brookes and Farquhar.  The 2022 Annual Report made clear that there were **no current trends** affecting operations, stating—in no uncertain terms—that Atlassian was "**not aware of any trends, uncertainties, demands, commitments or events for the current fiscal year that are reasonably likely to have a material effect on our revenues, income, profitability, liquidity or capital reserves, or that caused the disclosed financial information to be not necessarily indicative of future results of operations or financial conditions**."  Moreover, the 2022 Annual Report once again touted Atlassian's "[p]redictability of [s]ales" due to the Company's unique linear sales cycle, explicitly noting that

1  the Company "historically experienced a linear quarterly sales cycle" and "steady and predictable

2  revenue."

3    61.    Remarkably, even as late as September 14, 2022—just two weeks before the end of

4  Atlassian's Q1 2023—Defendants remained steadfast in their representations to investors that there

5  were no adverse trends materially affecting the Company's finances or performance.  Specifically,

6  at the Goldman Sachs Communacopia + Technology Conference held on that date, a member of

7  Goldman Sachs' Research Division noted that an attendee was "***dying to ask***" Defendants about

8  "the macroeconomic conditions [that] are not that cooperative," and specifically "[w]hat are you

9  seeing out there with the demand environment?"  In response, Defendant Bharadwaj highlighted

10 that Atlassian was well-insulated from any macroeconomic issues, stating that it possessed several

11 "advantages in the overall macroeconomic climate" that protected its business from the global

12 conditions, including that Atlassian provided "mission-critical" software for its customers at a

13 "highly, highly competitive" price point.

14    62.    Then, Defendant Bharadwaj proceeded to discuss "what different parts of our

15 business are seeing what impact."  With respect to Atlassian's "conversion of users from free to

16 paid," Defendant Bharadwaj again unequivocally assured investors that the "slight" slowdown in

17 free-to-paid conversions remained only a "bit of softness over the past couple of months"; that the

18 slight decrease in no way constituted a trend or had a material impact on the Company; and that it

19 was "important to illustrate" that free-to-paid was "really a very small part of our business," with

20 over 90% of the Company's revenue derived from existing customers.  Significantly, Defendant

21 Bharadwaj assured investors that, "across the board, across existing and new" customers, Atlassian

22 was not experiencing a material adverse trend as a result of the macroeconomic environment:

23
24    [W]e look at various different parts, cohorts of a funnel to think about, hey, what
       different parts of our business are seeing what impact?

25    Just in the last shareholder letter, we talked about conversion of users from free to
       paid. We are seeing a ***bit of softness*** over the past couple of months. But it's
26    important to illustrate that point in the overall picture as over 90% of our revenue
       comes from existing customers. ***So the conversion from free to paid is really a very
       small part of our business***. And also, the number of free users that are coming in
27    that create new free instances continues to grow steadily. ***We're not seeing any
       trends there. So across the board, across existing and new, that's overall what we***

28

*are seeing in different parts of the business*.

63.    Indeed, when analysts asked whether the slowdown in free to paid conversions would require Atlassian to "catch up" in the future when the "demand environment is more stable," Defendant Bharadwaj affirmatively and unequivocally reiterated that the Company was not experiencing ***any*** such issues relative to the demand environment, and that, with respect to ***any*** part of the Company's business, Defendants "***haven't really seen any discernible trend there in terms of the macroeconomic impact***":

> Yes. So from a product perspective, again, I want to reiterate that we think of it as both new and existing and over 90% of the revenue comes from existing. So there's a corresponding weightage we think about when we think about, hey, which parts of the funnel should we look at and what to optimize from a product perspective? So in the over 90% bucket, which is where most of the revenue comes from, there are several different parts of the funnel we look at. So we look at migrations, which is currently on year two of a multiyear journey. That continues to go steadily. It is where we would expect to be at this point in the journey. So we monitor the rate of migration, what kinds of customers are migrating and we're pretty pleased with where we are there. . . we look at upsell or upgrades. So the people that started out with a free when they switch to standard, what happens?
>
> So to address your question, the way our pricing model works is the first 10 users are free, and then the 11th user onwards, it's paid. . . ***So we think of upsell as really across free to standard, standard to premium, premium to enterprise. And we've seen some very encouraging progress there over the last four quarters. And I haven't really seen any discernible trend there in terms of the macroeconomic impact.*** And user expansion, which is unique to the Atlassian model of organic growth, user expansion is a place where we don't go off and try to do – try to influence that using a bunch of levers. We let that happen organically because that's how we believe we construct our long-term sustainable business model with low CAC. That's an area that we continue to monitor. That's not an area where we try to do a lot of product interventions, but that's going to be an important one to look at in the current climate.

64.    Again, Defendants' repeated assurances had the intended effect, as analysts specifically credited Atlassian's representations.  For example, on September 15, 2022, Morgan Stanley reported that "***Atlassian has seen little impact from the weakened macro environment***."

65.    On October 4, 2022, Atlassian, as part of its domiciliation in the United States, filed a Post-Effective Amendment to its Registration Statement signed by Defendants Cannon-Brookes and Farquhar.  The amendment expressly incorporated the Company's 2022 Annual Report.  Thus, as of October 4, 2022—***after Q1 had concluded***—Atlassian reconfirmed that it was "***not aware of any trends, uncertainties, demands, commitments or events for the current fiscal year that are***

*reasonably likely to have a material effect on our revenues, income, profitability, liquidity or capital reserves, or that caused the disclosed financial information to be not necessarily indicative of future results of operations or financial conditions*."

**G.    The Truth Is Revealed: Atlassian Discloses Poor Financial Results, Missing EPS Guidance For The First Time In Its History, Which Defendants Directly Attribute To "Trends" From "Macro Headwinds" That They Saw *In July 2022***

66.    Defendants' fraud was revealed after the market closed on November 3, 2022, when Atlassian stunned investors by announcing poor financial results in its Q1 2023 Shareholder Letter, filed with the SEC on Form 8-K ("Q1'23 Shareholder Letter").  The Q1'23 Shareholder Letter disclosed that Atlassian's Q1 2023 cloud growth came in at just 49%—well below analysts' consensus of up to mid-50s percentage growth—and that Atlassian had missed its guidance for earnings per share for the first time in its history as a public company. Further, Atlassian walked back its full year cloud growth guidance issued just one quarter prior.

67.    Significantly, in direct contrast with Defendants' prior statements—including from just *two weeks* earlier—that the Company was *not* facing *any* material negative macroeconomic trends, the Company now disclosed that the exact opposite was true: that *both* elements of the Company's business had been materially impacted by macroeconomic trends throughout Atlassian's quarter.  Indeed, in the Q1'23 Shareholder Letter, Defendants acknowledged that they needed to address "the topic that's *top of mind for shareholders: macro impacts*."  Defendants then admitted that Atlassian's poor financial results were the direct result of "*two trends* [that were] the result of companies tightening their belts and slowing their pace of hiring." These trends were (i) "a decrease in the rate of Free instances converting to paid plans," and (ii) "a slowing in the rate of paid user growth from existing customers."   In the Q1'23 Shareholder Letter, Defendants continued to expand on these two trends, making clear that these trends were the result of the macroeconomic environment, and that they had materially and adversely impacted Atlassian's financial results during the quarter:

> [W]e encountered two primary revenue headwinds during the quarter from changes in the macroeconomic environment: 1) We saw a more pronounced continuation of the trend discussed last quarter, where fewer Free instances converted to paid plans; and 2) we also saw the growth of paid users from existing customers slow in the second half of Q1, largely due to customers slowing their rate of hiring.

68.     Tellingly, while Defendants initially tried to claim that these trends did not exist until "towards the end of the quarter," the market was having none of it.  Indeed, during the ensuing earnings call, an analyst noted that "[i]nvestors were pretty surprised to see results like this from Atlassian," and opined that he "*[had] to believe that [Atlassian] had a very early warning*" regarding the trends precisely because Defendants had previously represented that Atlassian's business was completely ***linear***—which provided a "predictable sales model" that differentiated Atlassian from its peers—and that the Defendants had "***tremendous visibility***" into sales patterns:

> Gregg Steven Moskowitz
> Mizuho Securities USA LLC, Research Division
>
> So I think of Atlassian as an unusual software company in a good way, a couple of the reasons being that one, ***your quarters are typically very linear***. And two, ***you have tremendous visibility into customer buying and usage patterns***. And so ***I'd have to believe that you had a very early warning of the paid user growth slowdown*** that began midway through the quarter.

69.     In response to this questioning, Defendant Deatsch was forced to clarify "***the timing of things that we saw***."  With respect to the free-to-paid slowdown, Deatsch admitted that this "***trend definitely came through throughout the quarter***," and conceded that Defendants had seen the trend "***going into August***" —*i.e.*, ***July 2022***.  And with respect to the decrease in existing "user growth," Deatsch acknowledged that Defendants had seen this material trend ***in July***—*i.e.*, the first month of Atlassian's quarter, and even before the Class Period began—and that the trend continued in August, with "user growth slow[ing] down across [Atlassian's] customer base":

> Cameron Deatsch
> Chief Revenue Officer
>
> I can also add on to just the timing of things that we saw. As we mentioned in August, what we were seeing in the August time frame was the net new customers, ***the free customers converted to paid was slowing down going into August***. We normally through our summer season, the ***July and August tend to see user growth slow down across our customer base***, largely due to seasonality, vacations and holidays.

70.     Recognizing that this admission undermined Defendants' prior assertions that they had not seen any trends in Atlassian's business, Defendant Deatsch came up with a new excuse: that rather than being linear, as Defendants had constantly stressed to investors, Atlassian's

business was suddenly completely "seasonal," and that Defendants expected Atlassian's business to rebound in September when individuals came back from vacation:

> It just tends to be a normal seasonal trend where July and August are slower as people are not upgrading instances, adding more users. What we noticed is usually most years when you come back in September, everyone is coming back to work, the holidays wear off and people start adding users and upgrading their instances again and that's when we actually ***did not see that normal user growth uptick that we normally do in September***.

71.     Significantly, however—and as the analyst had made clear during the earnings call—Defendants' claim that their business was seasonal was completely contradicted by the numerous prior representations discussed above in Atlassian's SEC filings.   Indeed, these representations ***dated back to Atlassian's IPO Prospectus***—where the Company represented that "[u]nlike traditional enterprise software businesses, we have historically ***experienced a linear quarterly sales cycle with approximately a third of our quarterly sales occurring within each month of the respective quarter***"—and included the 2022 Annual Report filed during the Class Period, which continued to make clear that Atlassian's business was ***not*** seasonal and that, in fact, the Company had a perfectly "***linear quarterly sales cycle***" that provided "***[p]redictability of [s]ales***," and "***steady and predictable revenue***."

72.     Indeed, on numerous occasions, Atlassian's management specifically touted its "linearity of sales" as providing a "predictable sales model" that gave the Company a competitive advantage, emphasizing that this dynamic "***really helps us in-quarter to understand where we're at financially***" and produced a "***no-surprise environment*** from a top line perspective."  In fact, just prior to the start of the Class Period, on June 2, 2022, Atlassian's Head of Investor Relations claimed—in direct response to a question about the "elephant in the room [that] has been the macro"—that the Company had a "***beautiful linearity throughout our quarter***," which would insulate the Company from negative macro trends.  Similarly, on June 8, 2022, Defendant Deatsch was unequivocally positive in his remarks about the upcoming summer season, representing to investors that the "next coming months" would see "business as usual, ***if not stronger***."  And even on the very same November 3, 2022 earnings call in which Deatsch advanced this seasonality

excuse, Defendant Farquhar confirmed that Atlassian's sales have always been "*linear*," while stating "there are not many things we do within a quarter to affect the quarter's results, *which is why you see the linearity that you've seen over the years*."

73.     Defendants' excuses were not limited to timing or seasonality.  Defendants also attempted to claim that they had previously informed investors that the "modest decrease" in free-to-paid conversions was in fact a material trend, stating "[w]e saw a more pronounced continuation of the *trend discussed last quarter*."  But that is most certainly *not* what Defendants represented to the market.  Rather, throughout the Class Period, Defendants had made crystal clear to investors that this slowdown was decidedly *not* a "*discernible trend*," and was, in fact, inconsequential, characterizing it as just "*a bit of softness*"; a "*modest decrease*"; a "*slight thing*"; and "*really a very small part of our business*."

74.     As a result of Defendants' stunning disclosures, Atlassian's stock price plummeted over $50 per share in one trading day, or nearly 30%, declining from a closing price of $174.17 on November 3, 2022 to close at $123.73 on November 4, 2022, wiping out over $7 billion in shareholder value.  Atlassian's share price continued to fall the next trading day as the market continued to digest the news, dropping an additional 4% on November 7, 2022, to close at $119.23.

75.     Analysts were stunned by Defendants' disclosures, and pointedly noted that they directly contradicted Defendants' representations to investors.  BMO Capital lowered its target price for Atlassian by 45%, while noting it was "*surprised by the magnitude of the slowdown* in consolidated growth and *cloud growth more particularly*," and highlighting that this was "the first time Atlassian has not exceeded upper-end of guidance in at least five years." Wolfe Research, who just three-months earlier raved about Defendants' "reaffirmation of basically zero impacts from macro," lowered its price target for Atlassian's shares by 40%, from $290 to $175 per share, while noting the "*abrupt change in tone and outlook likely puts shares in the penalty box*."  Wolfe Research further underscored that management's disclosure of "headwinds from both free to pay conversion and a slowing rate of paid user growth at existing customers" "*took us and investors by surprise, sending shares down ~25% AH [after hours]*."  Citi likewise placed Atlassian "*in the*

*penalty box*" for its "*significant and unexpected pivot in demand tone*," and stated that the "*unfortunate surprise*" regarding negative trends would put "significant pressure" on Atlassian shares, and that the slash in full-year Cloud growth guidance was "*another unfortunate surprise*."

76.     Other analysts similarly drastically cut their target price for Atlassian shares.  Piper Sandler downgraded its rating for Atlassian to neutral and lowered its price target by $135 per share, or 48%.  Oppenheimer & Co. lowered its price target to $200 per share down from $320, as it "expect[ed] the *pronounced reset of Atlassian's near-term performance… to weigh sharply on the shares as investors realign expectations*."  Morningstar lowered its price target for Atlassian by 44% due to the "worsening conversions of free users" and "decelerating seat growth."  FBN Securities slashed its Atlassian price target by a whopping 57% from $350 to $150, given the now disclosed "*macro headwinds*."

### H.     SEC Regulations Required Defendants To Disclose What They Admitted Were Known Adverse Material Trends or Uncertainties

77.     Throughout the Class Period, Defendants' affirmative misrepresentations about the absence of any material adverse trends were highly material to investors.  For example, Atlassian's 2022 Annual Report, filed on August 19, 2022 on Form 20-F, which was also incorporated in the October 4, 2022 Post-Effective Amendment to the Registration Statement, not only failed to alert investors to material negative trends affecting the Company's operations and revenues, but also affirmatively misrepresented that none existed.  Indeed, Defendants represented to investors that they were "*not aware of any trends, uncertainties, demands, commitments or events for the current fiscal year that are reasonably likely to have a material effect on our revenues, income, profitability, liquidity or capital reserves, or that caused the disclosed financial information to be not necessarily indicative of future results of operations or financial conditions*."  Defendants repeated these assurances throughout the Class Period, in SEC Filings and in investor and analyst conferences and earnings calls.  As discussed below, SEC regulations required Defendants to disclose known adverse material trends to investors.

78.     On January 30, 2020, the SEC proposed amendments to Regulation S-K, and related rules and forms to, in part, "enhance the disclosure requirements in" Management's Discussion and

Analysis ("MD&A") of reported financial information.[7]   The new rules went into effect on February 10, 2021, when the SEC officially amended Item 303 of Regulation S-K, 17 C.F.R. §229.303 ("Item 303")—and made corresponding changes to Item 5 of Form 20-F.  Defendants' representations about the absence of any known trends were extraordinarily material to investors.  While historically management only had to disclose uncertainties and trends that "will cause" a material change in a company's operations, under the amendments to Item 303 of Regulation S-K, companies must disclose trends that are "***reasonably likely***" to affect a company's "future financial condition."[8]

79.     In explaining the objective of the amended Item 303 and Form 20-F, the SEC "emphasiz[ed]" that financial disclosures should "enable[] investors to see a registrant through the eyes of management," and therefore the amendments were "expected to better allow investors to view the registrant from management's perspective."[9] Importantly, the SEC stressed that the "amendments are intended to remind" management to "provide an analysis that encompasses ***short term results*** as well as future prospects."[10]

80.     The amended "objective" to Item 303(a) states the following:

> The discussion and analysis must focus specifically on material events and ***uncertainties*** known to management that are ***reasonably likely*** to cause reported financial information not to be necessarily indicative of future operating results or of future financial condition. This includes descriptions and amounts of matters that have had a material impact on reported operations, as well as matters that are ***reasonably likely*** based on management's assessment to have a material impact on future operations.

81.     Item 303 accordingly requires companies to "[d]escribe any known trends or uncertainties that have had or that are ***reasonably likely*** to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. §

---

[7] *See* Management's Discussion & Analysis, Selected Fin. Data, & Supplementary Fin. Info., Release Nos. 33-10890; 34-90459 (Nov. 19, 2020) ("SEC 2020 Guidance") at 5.  According to SEC 2020 Guidance, the disclosure requirements of Form 20-F are "substantively comparable to the MD&A requirements under Item 303 of Regulation S-K," and Item 5 of Form 20-F is intended to "mirror the substantive MD&A requirements in Item 303." *Id.* at 91, 95.

[8] *See id.* at Section II.C.3.

[9] *Id.* at 30, 93.

[10] *Id.* at 31.

229.303(b)(2)(ii).  SEC guidance on Item 303 explains that the "analysis in this area should be based on ***objective reasonableness***."[11]  As the SEC explained, "when applying the 'reasonably likely' threshold, registrants should consider whether a known trend … is *likely* to come to fruition" (emphasis in original).[12]  If the trend "would reasonably be likely to have a material effect on the registrant's future results or financial condition, ***disclosure is required***."[13]

82.     Even if management cannot determine whether the trend will "have a material effect," it nevertheless "should be disclosed if a reasonable investor would consider omission of the information as significantly altering the mix of information made available in the registrant's disclosures."[14]  According to the SEC,"[t]his analysis should be made objectively and with a view to providing investors with a clearer understanding of the potential material consequences of such" trends.[15]  In other words, "[t]he 'reasonably likely' threshold, which requires that management evaluate the consequences of the known trend … is grounded in whether disclosure of the event or uncertainty would be material to investors."[16]  As part of this disclosure obligation, the SEC demands that companies "determine and carefully review what trends … or uncertainties are known to management."[17]

83.     Rather than disclose what Defendants themselves admitted were "trends" affecting Atlassian's business in July and August 2022, as required by Item 303 and Form 20-F, the 2022 Annual Report and the Post-Effective Amendment to the Registration Statement expressly denied that any negative trends existed.  The filings did not disclose that macroeconomic pressures were "reasonably likely" to affect Company performance—as required under Item 303 and Form 20-F— but instead reported that the "weakening macroeconomic conditions" did ***not*** have any impact on Atlassian's operations.

---

[11] *Id.* at 45.

[12] *Id.* at 47.

[13] *Id.*

[14] *Id.*

[15] *Id.*

[16] *Id.* at 48.

[17] Management's Discussion & Analysis of Fin. Condition & Results of Operations, Release Nos. 33-6835; 34-26831 at *4 (May 18, 1989).

84.     At the time of these statements, Defendants knew that the slowdown in free to paid conversions was a full-blown negative trend affecting operations and that paid user expansion rates had greatly decelerated since July.  Furthermore, Defendants were fully aware that these trends would both affect the Company's short-term results and future prospects.  Indeed, the Post-Effective Registration Statement, which re-adopted the 2022 Annual Statement, was filed on October 4, 2022—*after Q1 2023 had already concluded*—yet it made no mention of these trends that were reasonably likely to have a material impact on revenue and income.  Just one month later, Defendants disclosed poor financial results that they directly attributed to two "macro-related trends," and that Defendants had seen these trends in July and August 2022.

85.     Accordingly, Defendants' material misstatements and omissions in the 2022 Annual Report and the Post-Effective Amendment to the Registration Statement had the cause and effect of creating in the market an unrealistically positive assessment of Atlassian and its business operations.

## VI.     DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

86.     As discussed herein, Defendants made false and misleading statements and material omissions during the Class Period in violation of Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder.  Throughout the Class Period, Atlassian's investor presentations and public filings made with the SEC included material misstatements and/or omissions concerning the Company's financial condition and growth, which included, among other misrepresentations, statements concerning material adverse trends that were significantly impacting the Company's business and future prospects.

87.     Defendants' representations set forth below were false.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Atlassian's business, operational status, and future growth prospects as, in truth, Defendants had falsely presented to investors a materially misleading portrayal of Atlassian's business throughout the Class Period.

A.      **The August 4, 2022 Conference Call**

88.     On August 4, 2022, Atlassian held a conference call with analysts and investors to discuss the Company's earnings and operations results for the fourth quarter and full fiscal year 2022.   During the call, Piper Sandler analyst Quinton Gabrielli specifically asked about any slowdown in any part of the Company's business.  In response, Defendant Deatsch highlighted that Defendants were personally monitoring all areas of the Company's business, stating: "we are being exceedingly vigilant across watching all stages of our funnel, whether that's migrations funnel, the editions upgrades, retention rates and, of course, our new customers coming in."

89.     Then, Defendant Deatsch explicitly represented that, despite the fact that Defendants were watching Atlassian's operational metrics "like a hawk," the Company was not seeing any material trend in any part of its business, stating: "***The good news as of to date is we have yet to see any specific trend geographically or even in industry segments or in customer size that gives us pause or worry to date***. ***So, something we continue to watch like a hawk, but there is no new news to share today***."  Deatsch later stated, "***we have not seen any significant shift in customer demand across our product lines***. … Jira Software, Confluence, Trello, you name it, continue to see strong demand across the board as we continue to see people embracing digital transformation and needing tools to help."  In short, Deatsch stated "***we continue to see demand for collaboration products that continue to be strong***."

90.     The statements in ¶89 were materially false and misleading, and omitted material facts when made.  Contrary to Defendants' wholly positive statements that they had "yet to see any specific trend geographically or even in industry segments or in customer size that gives us pause or worry to date"; that they had "not seen any significant shift in customer demand across our product lines"; and that there was "no new news to share today," in reality, the exact opposite was true.  Indeed, Defendants explicitly ***admitted*** at the end of the Class Period that, ***at the same time*** Defendants were making these statements, they were seeing significant material adverse "***trends***" as a result of "***macro headwinds***" in both key areas of their business: namely, the rate of free instances converting to paid customers, and the rate of paid user growth.

AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:23-CV-00519-WHO

91.     Also during the August 4, 2022 earnings call, Wolfe Research analyst Alex Zukin directly inquired about the "macro impact that you are seeing in the business," and specifically why "we're not seeing kind of some of the other impacts [that] other companies are seeing . . . what are you learning in real time as you analyze the data in the demand environment?"

92.     In response, Defendant Deatsch reiterated that the decrease in conversions from free customers to paid customers was a mere "*slight thing*" that "*does not take away from the continued growth we see in our existing customer base that also drives more than 90% of our revenue in the existing year*." Additionally, Deatsch reassured the market that Atlassian's "existing customers continue to have demand for what our products do to help their teams work more productively in the future," and that Defendants would "continue to be vigilant."

93.     The statements in ¶92 were materially false and misleading, and omitted material facts when made.  Contrary to Defendants' representation that the decrease in free-to-paid conversions was inconsequential and a mere "slight thing" that "does not take away" from the Company's primary business line, in reality, the exact opposite was true.  Indeed, Defendants explicitly *admitted* at the end of the Class Period that—*at the same time* Defendants were making these statements—they were seeing significant material adverse "*trends*" as a result of "*macro headwinds*" that were having a negative impact on the Company's business.  Specifically, Defendants admitted at the end of the Class Period that "a decrease in the rate of Free instances converting to paid plans" was a material "trend" that "became more pronounced in Q1" and would have an "impact" on "future revenue growth."  Furthermore, it was misleading for Defendants to point to "continued growth we see in our existing customer base" to assuage investors' concern over macroeconomic impacts, when in fact Defendants admitted that they were already seeing a "trend" of a "slowing in the rate of paid user growth" at the time of these statements.  Significantly, Defendants *admitted* that they had seen both of these palpable negative "trends" affecting the Company's business *since July 2022*.

1

**B.      The August 19, 2022 Annual Report**

94.      On August 19, 2022, Atlassian filed with the SEC its Annual Report on Form 20-F for the fiscal year ended June 30, 2022, which was signed by Defendants Cannon-Brookes and Farquhar and also contained certifications by the co-CEOs.[18]   Significantly, the 2022 Annual Report stated that "[o]ther than as disclosed elsewhere in this Annual Report, *we are not aware of any trends, uncertainties, demands, commitments or events for the current fiscal year that are reasonably likely to have a material effect on our revenues, income, profitability, liquidity or capital reserves, or that caused the disclosed financial information to be not necessarily indicative of future results of operations or financial conditions*."

95.      The statements in ¶94 were materially false and misleading, and omitted material facts when made.   Contrary to Defendants' strong statement that they were "not aware of any trends" in "the current fiscal year that are reasonably likely to have a material effect on our revenues" or "that caused the disclosed financial information to be not necessarily indicative of future results of operations or financial conditions," in reality, the exact opposite was true.   Indeed, Defendants explicitly *admitted* at the end of the Class Period that, *at the same time* Defendants were making this statement, they were seeing significant material adverse "*trends*" as a result of "*macro headwinds*" in both key areas of their business: namely, the rate of free instances converting to paid customers, and the rate of paid user growth.

**C.      The September 14, 2022 Goldman Sachs Conference**

96.      On September 14, 2022—approximately two weeks before Atlassian's first quarter ended—Defendant Bharadwaj participated in the Goldman Sachs Communacopia + Technology Conference. During the question-and-answer session, Goldman Sachs analyst Kasthuri Rangan noted that a conference attendee was "*dying to ask*" a question regarding "*the macroeconomic conditions [that] are not that cooperative*," and asked Defendant Bharadwaj specifically what the Company was "seeing out there with the demand environment."   In response, Defendant Bharadwaj touted the various "attributes" that gave Atlassian "*a few advantages in the overall*

---

[18]  Also on August 19, 2022, the Company filed its Form S-8 Registration Statement that incorporated the 2022 Annual Report.

AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:23-CV-00519-WHO

1    *macroeconomic climate*," including that the Company purportedly provided "mission-critical"

2    software at a price point that was "highly, highly competitive."

3           97.    Then, Defendant Bharadwaj stated that she would discuss "what different parts of

4    our business are seeing what impact."   While Bharadwaj noted the "***bit of softness***" in the

5    "conversion of users from free to paid" that the Company discussed in the Q4'22 Shareholder

6    Letter, Bharadwaj went to great lengths to assure the market that, even now with only two weeks

7    left in the quarter, this "bit of softness" was in no way a material trend and was inconsequential to

8    Atlassian's overall business, emphasizing: "***it's important to illustrate that point in the overall***

9    ***picture as over 90% of our revenue comes from existing customers. So the conversion from free***

10   ***to paid is really a very small part of our business***."   Then, in no uncertain terms, Defendant

11   Bharadwaj assured investors that Atlassian was not seeing any trends that would affect any part of

12   its business, stating: "***We're not seeing any trends there. So across the board, across existing and***

13   ***new, that's overall what we are seeing in different parts of the business***":

14          Just in the last shareholder letter, we talked about conversion of users from free to
             paid. We are seeing a ***bit of softness*** over the past couple of months. But it's
15          important to illustrate that point in the overall picture as over 90% of our revenue
             comes from existing customers. ***So the conversion from free to paid is really a very***
16          ***small part of our business***. And also, the number of free users that are coming in
             that create new free instances continues to grow steadily. ***We're not seeing any***
17          ***trends there. So across the board, across existing and new, that's overall what we***
             ***are seeing in different parts of the business***.
18
            98.    After an analyst asked a follow-up question regarding whether the slowdown in free-
19
     to-paid conversions in any way would require Atlassian to "catch up" in the future when the
20
     "demand environment is more stable," Defendant Bharadwaj proceeded to discuss the particulars
21
     of Atlassian's overall business.   Bharadwaj noted the "several different parts of the funnel we look
22
     at" and what Atlassian was seeing in terms of customer "upsell"—meaning, when users transitioned
23
     from the Company's free product to its standard paid level, and when existing users upgraded from
24
     standard to premium or premium to enterprise—and assured investors that "***we've seen some very***
25
     ***encouraging progress there over the last 4 quarters***."   Significantly, Defendant Bharadwaj then
26
     expressly and unequivocally represented to the market that Defendants had not seen "***any***
27
     ***discernible trend there in terms of the macroeconomic impact***," stating in no uncertain terms:
28

So to address your question, the way our pricing model works is the first 10 users are free, and then the 11th user onwards, it's paid. . . So we think of upsell as really across *free to standard*, standard to premium, premium to enterprise. And we've seen some very encouraging progress there over the last four quarters. ***And I haven't really seen any discernible trend there in terms of the macroeconomic impact***. And user expansion . . . That's an area that we continue to monitor. That's not an area where we try to do a lot of product interventions. But that's going to be an important one to look at in the current climate.

99.     The statements in ¶¶96-98 were materially false and misleading, and omitted material facts when made.  Contrary to Defendant Bharadwaj's wholly positive statements—with only two weeks left in Atlassian's quarter—that Defendants were "not seeing any trends" and had not "really seen any discernible trend" regarding "the macroeconomic impact," in reality, the exact opposite was true.  Indeed, Defendants explicitly *admitted* at the end of the Class Period that—*at the same time* Defendant Bharadwaj made these statements—Defendants were seeing significant material adverse "***trends***" as a result of "***macro headwinds***" that were having a negative impact on the Company's business.  With respect to "free to standard," rather than an inconsequential "bit of softness" that was not a "discernible trend"—as Defendant Bharadwaj claimed—Defendants ultimately admitted that, at the time of these statements, "a decrease in the rate of Free instances converting to paid plans" was a material "trend" that "became more pronounced in Q1" and would have an "impact" on "future revenue growth."   Furthermore, it was misleading for Defendant Bharadwaj to assert that there was no "discernible trend" regarding their existing customer base when in fact Defendants admitted that they were already seeing a "trend" of a "slowing in the rate of paid user growth" at the time of these statements.  Significantly, Defendants *admitted* that they had seen these palpable negative "trends" affecting the Company's business *since July 2022*.  Accordingly, it was false and misleading for Bharadwaj to claim that she disclosed all known macro impacts "***across the board, across existing and new***" and that she revealed "***overall what we are seeing in different parts of the business***," without disclosing these trends.  Given these known material adverse trends, Defendants had no basis whatsoever to portray to the market a wholly positive image of Atlassian's financial results and business prospects.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### D.   The October 4, 2022 Post-Effective Amendment

100.   On October 4, 2022, Atlassian, in connection with its domestication in the United States, filed the Company's Post-Effective Amendment to its Form S-8 Registration Statements, which was signed by Defendants Cannon-Brookes and Farquhar.  The Post-Effective Amendment incorporated the 2022 Form 20-F, which included the same misstatements discussed in ¶94, which were materially false and misleading for the same reasons alleged in ¶95.

## VII.   ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER

101.   As alleged above, numerous factors raise a strong inference that Defendants knew, or were severely reckless in disregarding, the true facts concerning negative trends affecting the Company's business.  In addition to the allegations set forth above, these particularized facts demonstrating Defendants' scienter include the following.

102.   *Defendants' admissions at the end of the Class Period confirm that they had seen material adverse trends as early as July 2022 and continued throughout the quarter, raising a strong inference of Defendants' knowing or reckless disregard regarding their Class Period false and misleading statements and omissions.*  Defendants admitted during the Company's November 3, 2022 earnings call that the "timing of things that we saw" began in July 2022.  By admitting to seeing July trends, Defendants implicitly acknowledged that their statements made in August, September and even as late as October 4, 2022, were ***knowingly*** false and misleading.

103.   *Defendants proclaimed that they personally monitored trends and subscriber metrics closely—"like a hawk"—thus confirming their direct and detailed knowledge of information contradicting their public statements at the time they were made.*  Both before and during the Class Period, Defendants affirmed their direct involvement in monitoring trends and customer expansion closely.  For example, Atlassian management represented to the market at an August 2021 conference that they had "visibility into every click," and would "study" trend "information very carefully," and in a May 27, 2021 presentation, Defendant Deatsch explained that he and Defendants Farquhar and Cannon-Brookes personally monitored "bookings," "customer numbers," and "usage and adoption metrics."  During the Class Period, Defendant

Deatsch avowed that Defendants were "being exceedingly vigilant across watching all stages of our funnel, whether that's migrations funnel, the additions upgrades, retention rates and, of course, our new customers coming in," and that they would "***continue to watch like a hawk***."  Defendants Farquhar and Cannon-Brookes reassured investors that they would "continue to scan the horizon for warning signs and be candid with investors as we have throughout our six+ years as a public company."[19]  Defendant Bharadwaj confirmed that Defendants would "continue to monitor" trends in "user expansion," which was "an important one to look at in the current climate."

104.    *Defendants repeatedly spoke about and touted the Company's unique "linear sales cycle," which made Defendants immediately aware of negative trends in the business.*  Since the Company's IPO, and in every Annual Report thereafter, Atlassian represented that Atlassian's "linear quarterly sales cycle" provided the Company with great "[p]redictability of sales" and "steady and predictable revenue," which made Atlassian "radically different" than other software companies and insulated it from macroeconomic pressures.  Indeed, just prior to the Class Period, in June 2022, Atlassian assured investors that the "elephant in the room" that was the poor macroeconomic environment was under control by citing the Company's "beautiful linearity throughout our quarter."

105.    *Defendants were acutely aware that the market was heavily relying on their statements, as both before and during the Class Period, analysts repeatedly asked about the macro impacts on Atlassian—and the fact that Defendants' representations were "diametrically opposite" from the Company's industry peers.*  Even prior to the Class Period, Defendants understood that the market and analysts were keenly interested in the macroeconomic environment's effects on

---

[19] During the Class Period, Defendants Farquhar and Cannon-Brookes materially benefited from Atlassian's inflated stock price.  Specifically, Defendants Farquhar and Cannon-Brookes collectively sold nearly 1 million shares of Atlassian stock (approximately 488,699 shares each) during the short three-month Class Period, collectively reaping ***more than $222 million*** from their insider sales.  These Defendants each sold 6,315 shares on August 16, 2022—the very day that Atlassian shares reached their Class Period high of over $289 per share—and proceeded to sell 8,614 shares on every single available trading day throughout the remainder of the Class Period.  While these sales are not dramatically out of line with these Defendants' prior trading practices, Defendants' fraud concealed material, adverse information about the Company's operations from the market, and thus maintained Atlassian's stock price at inflated levels—resulting in millions in additional proceeds for Defendants Farquhar and Cannon-Brookes.

1   Atlassian's growth.  Indeed, at a June 7, 2022 fireside chat, an analyst specifically wanted "to touch

2   on macro" as "it's something that's obviously on everyone's mind."  The next day, June 8, 2022, an

3   analyst opened another Atlassian discussion by explaining "I got to ask the question on the macro,

4   just to start."  This line of questioning only intensified during the Class Period.  For example, on

5   August 4, 2022, an analyst asked about whether Atlassian saw demand "weakness" given the then-

6   current environment.   During the same call, another analyst expressly asked about the "***macro***

7   ***impact that you are seeing in the business***."  Likewise, at the September 14, 2022 Goldman Sachs

8   investor conference, a participating analyst was "***dying***" to ask about how the "***macroeconomic***

9   ***conditions***" were affecting the "***demand environment***."  In response, not only did Defendants deny

10  any macro impacts, they also touted how Atlassian's "unique" and "differentiated" business model

11  distinguished the Company from its peers and gave Atlassian a competitive advantage.

12          106.    As expected, analysts responded favorably to Defendants' strong denials, relying on

13  and repeating Defendants' strident claims.  Furthermore, many of these analysts also emphasized

14  how the lack of macro impacts set Atlassian apart from the market, underscoring how important

15  those assurances were and how they stood out in the industry.  For example, Citi highlighted that

16  Atlassian's positive statements were "***diametrically opposite***" of most of its "***software peers***."

17  Truist emphasized that unlike "other companies in our coverage" who experienced macro

18  "headwinds," Atlassian "did not indicate any difference in buyer behaviors."  BMO praised

19  Atlassian for reiterating growth targets "at a time when peers are lowering guidance due to the

20  negative macro backdrop."  Wolfe Research deemed Atlassian's "premium to peers" "justified"

21  given this very dynamic, and Macquarie highlighted that Atlassian "provided the strongest print of

22  this software earnings season."  Raymond James emphasized that Atlassian was "feeling little

23  impact from macro uncertainty that is causing budget tightening around the broader technology

24  space."  Jefferies similarly commended Atlassian for being "more resilient" than its peers "given

25  the tepid start to cyber earnings" shown by other companies.

26          107.    *The reactions of prominent analysts to Defendants' disclosures highlighted the stark*

27  *contrast from Defendants' Class Period representations, supporting a strong, cogent, and*

28

1   *compelling inference of scienter.* After Defendants admitted on November 3, 2022 that

2   macroeconomic trends had been affecting Cloud growth beginning in July, market analysts reacted

3   with shock.  ¶¶75-76.  These sophisticated market participants were surprised by the news, and

4   many excoriated management for their prior contradictory representations, emphasizing that the

5   "significant and unexpected pivot in demand tone" had relegated Atlassian to the "penalty box."

6   The fact that Defendants lost credibility with the market as a result of their misrepresentations is

7   further indicative of their scienter.

8   108.   *90% of the Company's revenue in any given year comes from existing customers;*

9   *accordingly, there is no question that Atlassian's most senior officers were well aware of*

10   *Atlassian's core business*. Defendants repeatedly commented on the significance of Atlassian's

11   existing customers—"the over 90% bucket . . . where most of the revenue comes from."  The fact

12   that Atlassian's future financial prospects were virtually entirely dependent on success with paid

13   user expansion supports a finding of Defendants' scienter.

14   109.   *Defendants' violation of Item 303 of Regulation S-K supports scienter*.  In the 2021

15   amendments to Item 303 and the corresponding edits to Form 20-F, the SEC clarified that the

16   purpose of the rule is to enable investors to view the Company "through the eyes of management."[20]

17   Management, pursuant to SEC guidance, has the "responsibility…to identify and address those key

18   variables and other qualitative and quantitative factors which are peculiar to and necessary for an

19   understanding and evaluation of the individual company."[21]   Indeed, the amended Form 20-F

20   bluntly states that management "***must identify material recent trends***," and "***must discuss, for at***

21   ***least the current financial year, any known trends [or] uncertainties*** … that are reasonably likely

22   to have a material effect on the company's net sales or revenues, income from continuing operations

23   … or that would cause reported financial information not necessarily to be indicative of future

24   operating results."[22]   Importantly, as made clear by the SEC, management must analyze "***short***

25

26   [20] SEC 2020 Guidance at 93.

27   [21] *See* Managements Discussion & Analysis of Fin. Condition & Results of Operations, Release
    No. 6835, at *3 (May 18, 1989).

28   [22] SEC 2020 Guidance at 184-85.

*term results* as well as future prospects."[23]  As such, aside from touting how they closely monitored and disclosed Company trends, Defendants had a ***legal obligation*** to monitor, recognize, consider, and disclose negative trends affecting the Company's results of operations and revenues, including in the short term.  As noted above, Defendants not only failed to disclose the known negative trends, but ***affirmatively misrepresented*** to the market that any negative trends existed.

110.    The foregoing facts, particularly when considered collectively and in the light most favorable to Plaintiffs (as they must be), support a strong inference of Defendants' scienter.

**VIII.   <u>LOSS CAUSATION</u>**

111.    During the Class Period, Atlassian's publicly traded ordinary shares and common stock traded on the NASDAQ.  The market for Atlassian ordinary shares and common stock was open, well-developed and efficient at all relevant times.

112.    Throughout the Class Period, the price of Atlassian's ordinary shares and common stock was artificially inflated as a result of Defendants' materially false and misleading statements and omissions identified above.  Defendants engaged in a scheme to deceive the market, and a course of conduct that operated as a fraud or deceit on Class Period purchasers of Atlassian ordinary shares and common stock, by failing to disclose and misrepresenting the adverse facts detailed herein.  When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Atlassian stock fell precipitously as the prior artificial inflation dissipated.  As a result of their purchases of Atlassian ordinary shares and/or common stock during the Class Period, Lead Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

113.    By issuing materially false and misleading financial statements, among other adverse facts detailed herein, Defendants presented a misleading picture of Atlassian's business.  Defendants' false and misleading statements had the intended effect and caused Atlassian's ordinary shares and common stock to trade at artificially inflated levels throughout the Class Period.

---

[23] *Id.* at 31.

1    On November 3, 2022, the last trading day before Defendants' fraud was revealed, Atlassian
2    common stock closed at $174.17 per share.

3        114.    Defendants' after-market disclosures on November 3, 2022 revealed to the market
4    the false and misleading nature of Defendants' statements and omissions.  On that day, as described
5    above, Defendants finally disclosed the Company had suffered from negative trends in paid user
6    expansion and free to paid conversions due to macroeconomic conditions.  In response to these
7    revelations, the price of Atlassian stock declined almost 29% the following trading day, from a
8    closing price of $174.17 per share on November 3, 2022 to a closing price of $123.73 on November
9    4, 2022—representing an over $7 billion drop in market capitalization.  Atlassian's share price
10   continued to fall as the market continued to digest the news the next trading day, dropping an
11   additional 4% on November 7, 2022, to close at $119.23.

12       115.    The decline in Atlassian's stock price was a direct result of the nature and extent of
13   Defendants' fraud finally being revealed to investors and the market.  The timing and magnitude
14   of the decline in the Company's share price negates any inference that the loss suffered by Plaintiffs
15   and the other Class members was caused by changed market conditions, macroeconomic or industry
16   factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

17   **IX.    PRESUMPTION OF RELIANCE**

18       116.    At all relevant times, the market for Atlassian's ordinary shares and common stock
19   was an open, efficient and well-developed market for the following reasons, among others:

20           a.  Atlassian's ordinary shares and common stock met the requirements for listing, and
21               was listed and actively traded on the NASDAQ, a highly efficient and automated
                 market;

22           b.  As a regulated issuer, Atlassian filed periodic reports with the SEC and the
23               NASDAQ;

24           c.  Atlassian regularly communicated with public investors via established market
                 communication mechanisms, including through regular disseminations of press
25               releases on the national circuits of major newswire services, and through other wide-
                 ranging public disclosures, such as communications with the financial press and
26               other similar reporting services; and

27           d.  Atlassian was followed by numerous securities analysts employed by major
                 brokerage firms who wrote reports which were distributed to those brokerage firms'

28

43                                                      AMENDED CLASS ACTION COMPLAINT
                                                        CASE NO. 3:23-CV-00519-WHO

sales force and certain customers. Each of these reports was publicly available and entered the public marketplace.

117.    As a result of the foregoing, the market for Atlassian's ordinary shares and common stock reasonably and promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of Atlassian's ordinary shares and common stock. All investors who purchased the Company's ordinary shares and/or common stock during the Class Period suffered similar injury through their purchase of Atlassian's ordinary shares and/or common stock at artificially inflated prices, and a presumption of reliance applies.

118.    A Class-wide presumption of reliance is also appropriate in this action under the U.S. Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding Atlassian's business and operations—information that Defendants were obligated to disclose— positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## X.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE

119.    The statutory safe harbor or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this Complaint. The statements alleged to be false or misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false or misleading may be characterized as forward-looking, they were not adequately identified as forward-looking statements when made, and there were no meaningful cautionary statements identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements.

120.    To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because

AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:23-CV-00519-WHO

1    at the time each of those forward-looking statements was made, each of these Defendants had actual

2    knowledge that the particular forward-looking statement was materially false or misleading.

3    Defendants are liable for the statements pleaded because, at the time each of those statements was

4    made, Defendants knew the statement was false, and the statement was authorized and/or approved

5    by an executive officer and/or director of Atlassian who knew that such statement was false when

6    made.

7    **XI.    CLASS ACTION ALLEGATIONS**

8           121.    Lead Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23(a)

9    and 23(b)(3) on behalf of a Class consisting of all persons and entities that purchased Atlassian

10   ordinary shares and/or common stock between August 5, 2022 and November 3, 2022, inclusive

11   (the "Class"), and who were damaged thereby.  Excluded from the Class are Defendants, the

12   officers and directors of Atlassian at all relevant times, members of their immediate families, and

13   their legal representatives, heirs, agents, affiliates, successors or assigns, Defendants' liability

14   insurance carriers, and any affiliates or subsidiaries thereof, and any entity in which Defendants or

15   their immediate families have or had a controlling interest.

16          122.    The members of the Class are so numerous that joinder of all members is

17   impracticable. Throughout the Class Period, Atlassian shares were actively traded on the

18   NASDAQ.  As of November 3, 2022, Atlassian had more than 148 million shares of common stock

19   outstanding.  While the exact number of Class members is unknown to Lead Plaintiffs at this time,

20   and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are at

21   least hundreds-of-thousands of members of the proposed Class. Record owners and other members

22   of the Class may be identified from records maintained by the Company, or its transfer agent(s),

23   and may be notified of this class action using a form of notice similar to that customarily used in

24   securities class actions.

25          123.    Lead Plaintiffs' claims are typical of Class members' claims, as all members of the

26   Class were similarly affected by Defendants' wrongful conduct in violation of federal laws, as

27   complained of herein.

28

124. Lead Plaintiffs will fairly and adequately protect Class members' interests, and have retained competent counsel experienced in class actions and securities litigation.

125. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of fact and law common to the Class are:

a. whether the federal securities laws were violated by Defendants' acts, as alleged herein;

b. whether the Defendants made statements to the investing public during the Class Period that were false, misleading or omitted material facts;

c. whether Defendants acted with scienter; and

d. the proper way to measure damages.

126. A class action is superior to all other available methods for the fair and efficient adjudication of this action because joinder of all Class members is impracticable. Additionally, the damage suffered by some individual Class members may be relatively small so that the burden and expense of individual litigation make it impossible for such members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XII.   CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT I

**For Violations of Section 10(b) of the Exchange Act,
and SEC Rule 10b-5 Promulgated Thereunder**

**(Against All Defendants)**

127. Lead Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

128. This Count is asserted on behalf of all members of the Class against Atlassian and the Individual Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

129. During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew were, or they deliberately disregarded as, misleading in that they

contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

130.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b5 promulgated thereunder in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiffs and other investors similarly situated in connection with their purchases of Atlassian ordinary shares and/or common stock during the Class Period.

131.    Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiffs and the other members of the Class; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with a severely reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of Atlassian ordinary shares and common stock, which were intended to, and did: (a) deceive the investing public, including Lead Plaintiffs and the other members of the Class, regarding, among other things, Atlassian's business and operations; (b) artificially inflate and maintain the market price of Atlassian ordinary shares and common stock; and (c) cause Lead Plaintiffs and the other members of the Class to purchase the Company's ordinary shares and/or common stock at artificially inflated prices, and to suffer losses when the true facts became known.

132.    Defendants are liable for all materially false and misleading statements made during the Class Period, as alleged above.

133.    As described above, Defendants acted with scienter throughout the Class Period, in that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness.

The misrepresentations and omissions of material facts set forth herein, which presented a danger of misleading buyers or sellers of Atlassian ordinary shares and/or common stock, were either known to the Defendants, or were so obvious that the Defendants should have been aware of them.

134.    Lead Plaintiffs and the other members of the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for Atlassian ordinary shares and common stock, which inflation was removed from its price when the true facts became known. Lead Plaintiffs and the other members of the Class would not have purchased Atlassian ordinary shares and common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by these Defendants' misleading statements.

135.    As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages attributable to the material misstatements and omissions alleged herein in connection with their purchases of the Company's ordinary shares and/or common stock during the Class Period.

## COUNT II

**For Violations of Section 20(a) of the Exchange Act**
**(Against the Individual Defendants)**

136.    Lead Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

137.    This Count is asserted on behalf of all members of the Class against the Individual Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

138.    During their tenures as officers and/or directors of Atlassian, each of these Individual Defendants was a controlling person of the Company, within the meaning of Section 20(a) of the Exchange Act. *See e.g.* ¶¶21-32. By reason of their positions of control and authority as officers and/or directors of Atlassian, these Individual Defendants had the power and authority to direct the management and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein. These Individual Defendants were able to and did control, directly and indirectly, the content of the public statements made by

Atlassian during the Class Period, including its materially misleading statements, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

139.    In their capacities as senior corporate officers of the Company, and as more fully described above, the Individual Defendants had direct involvement in the day-to-day operations of the Company, in reviewing and managing its regulatory compliance, accounting and reporting functions, including overseeing, reviewing and managing the Company's customer expansion. The Individual Defendants signed the Company's SEC filings during the Class Period, and were directly involved in providing false information, and in certifying and approving the false statements disseminated by Atlassian during the Class Period. The Individual Defendants were also directly involved in providing false information, and they certified and approved the false statements disseminated by Atlassian during the Class Period. As a result of the foregoing, the Individual Defendants, together and individually, were controlling persons of Atlassian within the meaning of Section 20(a) of the Exchange Act.

140.    As set forth above, Atlassian violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint.

141.    By virtue of their positions as controlling persons of Atlassian, and as a result of their own aforementioned conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiffs and the other members of the Class, who purchased the Company's ordinary shares and/or common stock. As detailed above in ¶¶21-32, during the respective times these Individual Defendants served as officers and/or directors of Atlassian, each of these Individual Defendants was culpable for the material misstatements and omissions made by the Company.

142.    As a direct and proximate result of these Individual Defendants' conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchase of Atlassian ordinary shares and/or common stock during the Class Period.

**XIII.   PRAYER FOR RELIEF**

143.   WHEREFORE, Lead Plaintiffs pray for relief and judgment as follows:

a.   Declaring the action to be a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b.   Awarding all damages and other remedies available under the Securities Exchange Act in favor of Lead Plaintiffs and all other members of the Class against Defendants in an amount to be proven at trial, including interest thereon;

c.   Awarding Lead Plaintiffs and the other members of the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

d.   Such other and further relief as the Court may deem just and proper.

**XIV.   JURY DEMAND**

144.   Lead Plaintiffs hereby demand a trial by jury.

Dated:  July 14, 2023                                    **SAXENA WHITE P.A.**

                                                        */s/ Lester R. Hooker*

                                                        Maya Saxena (*pro hac vice forthcoming*)
                                                        msaxena@saxenawhite.com
                                                        Lester R. Hooker (SBN 241590)
                                                        lhooker@saxenawhite.com
                                                        Dianne M. Pitre (SBN 286199)
                                                        dpitre@saxenawhite.com
                                                        Jonathan D. Lamet (*pro hac vice forthcoming*)
                                                        jlamet@saxenawhite.com
                                                        7777 Glades Road, Suite 300
                                                        Boca Raton, FL 33434
                                                        Tel.: 561.394.3399
                                                        Fax: 561.394.3382

                                                        David R. Kaplan (SBN 230144)
                                                        dkaplan@saxenawhite.com
                                                        505 Lomas Santa Fe Drive, Suite 180
                                                        Solana Beach, CA 92075
                                                        Telephone: (858) 997-0860
                                                        Facsimile: (858) 369-0096

                                                        Steven B. Singer (*pro hac vice forthcoming*)
                                                        ssinger@saxenawhite.com
                                                        Marisa N. DeMato (*pro hac vice forthcoming*)
                                                        mdemato@saxenawhite.com
                                                        10 Bank Street, Suite 882
                                                        White Plains, NY 10606
                                                        Telephone: (914) 437-8551
                                                        Facsimile: (888) 631-3611

                                                        *Counsel for Lead Plaintiffs*

*and Lead Counsel for the Class*

**KLAUSNER KAUFMAN JENSEN
& LEVINSON**
Robert D. Klausner
Stuart A. Kaufman
7080 NW 4th Street
Plantation, Florida 33317
Tel.: (954) 916-1202
Fax: (954) 916-1232
bob@robertdklausner.com
stu@robertdklausner.com

*Additional Counsel for City of Hollywood
Firefighters' Pension Fund*

AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:23-CV-00519-WHO

1

## CERTIFICATE OF SERVICE

2      I hereby certify under penalty of perjury that on July 14, 2023, I authorized the electronic

3   filing of the foregoing with the Clerk of the Court using the CM/ECF system, which will send

4   notification of such filing to all counsel or parties of record.

5   Dated:  July 14, 2023                          **SAXENA WHITE P.A.**

6                                                  */s/ Lester R. Hooker*
                                                   Lester R. Hooker (SBN 241590)
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

AMENDED CLASS ACTION COMPLAINT
                                                  CASE NO. 3:23-CV-00519-WHO