**LATHAM & WATKINS LLP**
Michele D. Johnson (SBN 198298)
650 Town Center Drive, 20th Floor
Costa Mesa, California 92626
Telephone: 1.714.540.1235
Email: michele.johnson@lw.com

Colleen C. Smith (SBN 231216)
12670 High Bluff Drive
San Diego, California 92130
Telephone: 1.858.523.5400
Email: colleen.smith@lw.com

Susan E. Engel (*pro hac vice* pending)
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004
Telephone: 1.202.637.2200
Email: susan.engel@lw.com

Daniel R. Gherardi (SBN 317771)
140 Scott Drive
Menlo Park, California 94025
Telephone: 1.650.328.4600
Email: daniel.gherardi@lw.com

*Attorneys for Defendants Atlassian Corporation, Atlassian Corporation Plc, Michael Cannon-Brookes, Scott Farquhar, Anu Bharadwaj, and Cameron Deatsch*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| CITY OF HOLLYWOOD FIREFIGHTERS' PENSION FUND, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>ATLASSIAN CORPORATION, ATLASSIAN CORPORATION PLC, MICHAEL CANNON-BROOKES, SCOTT FARQUHAR, ANU BHARADWAJ, and CAMERON DEATSCH,<br><br>Defendants. | CASE NO. 3:23-cv-00519-WHO<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Date:      January 10, 2024<br>Time:      2:00 p.m.<br>Courtroom: 2, 17th Floor<br>Judge:     Hon. William H. Orrick III |

1  **TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

2       PLEASE TAKE NOTICE that on January 10, 2024, at 2:00 p.m., or as soon thereafter as

3  the Court's schedule allows, in Courtroom 2 of the United States District Court for the Northern

4  District of California, located at 450 Golden Gate Avenue, Seventeenth Floor, San Francisco,

5  California 94102, Defendants Atlassian Corporation and Atlassian Corporation Plc (together,

6  "Atlassian"), Michael Cannon-Brookes, Scott Farquhar, Anu Bharadwaj, and Cameron Deatsch

7  (collectively, with Atlassian, "Defendants") will and hereby do move to dismiss the Amended

8  Class Action Complaint for Violations of the Federal Securities Laws (Dkt. No. 40, the

9  "Amended Complaint") filed by Lead Plaintiffs City of Hollywood Firefighters' Pension Fund

10 and Oklahoma Firefighters Pension and Retirement System (together "Plaintiffs").

11      This Motion is made pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) and

12 the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. §§ 78u-4 *et seq*., on

13 the grounds that Plaintiffs fail to state a claim on which relief can be granted.

14      Defendants' Motion is based on this Notice of Motion and Motion to Dismiss, the

15 following Memorandum of Points and Authorities, the Request for Judicial Notice and

16 Incorporation by Reference and Declaration of Colleen C. Smith filed concurrently herewith, all

17 files and records in this action, and anything else as may be considered by the Court.  Through

18 this Motion, Defendants seek an order dismissing the Amended Complaint for failure to state a

19 claim.

20                          **ISSUES TO BE DECIDED**

21      Whether the Amended Complaint fails to state a claim under Section 10(b) and Section

22 20(a) of the Securities Exchange Act of 1934 ("Exchange Act").

23 Dated:  September 8, 2023              Respectfully submitted,

24                                        LATHAM & WATKINS LLP

25                                        By: */s/* Michele D. Johnson
26                                            Michele D. Johnson

27                                        *Attorneys for Defendants*

28

LATHAM&WATKINS^LLP
ATTORNEYS AT LAW

# TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................................... 1

II.   BACKGROUND ....................................................................................................... 3

      A.    Atlassian Achieves Growth by Providing Free Productivity-
            Enhancing Software and Then Expanding Its Customer
            Relationships ................................................................................................. 3

      B.    Atlassian Provides Q4 and FY 2022 Results and FY 2023 Revenue
            Guidance, While Warning That Its Growth Could Be Impacted by
            Market Conditions ......................................................................................... 5

      C.    Atlassian Redomiciles From the United Kingdom to the United
            States .............................................................................................................. 6

      D.    Atlassian Announces Q1 23 Financial Results That Met Its
            Guidance, but Revises Forward-Looking Guidance for the
            Remainder of FY 2023 Given the Emergence of Macroeconomic
            Headwinds...................................................................................................... 7

      E.    Plaintiffs File This Lawsuit............................................................................ 8

III.  LEGAL STANDARD................................................................................................ 8

IV.   ARGUMENT............................................................................................................. 9

      A.    Plaintiffs Do Not Plead Any False or Misleading Statement ................................. 9

            1.    Mr. Deatsch's August 4, 2022 Statements Regarding
                  Macroeconomic Impacts Were Not False................................................ 10

            2.    Atlassian's August 19, 2022 Statement About Material
                  Trends For Atlassian's *2022* Fiscal Year Was Not False ....................... 13

            3.    Ms. Bharadwaj's September 14, 2022 Statements
                  Cautioning That Atlassian Was Continuing to Monitor
                  Macroeconomic Impacts on Existing Paid User Expansion
                  Were Not False ...................................................................................... 16

            4.    Atlassian's Incorporation by Reference of Its Annual
                  Report in the October 4, 2022 S-8 Does Not Change the
                  Fact That Its Statement Addressed Material Trends for FY
                  2022........................................................................................................ 18

      B.    Plaintiffs Fail to Plead a Strong Inference of Scienter........................................ 19

            1.    Plaintiffs Do Not Allege Any Fact Establishing a Motive to
                  Defraud ................................................................................................... 20

            2.    Plaintiffs' Allegations Do Not Establish That Any
                  Defendant Acted With an Intent to Deceive or Deliberate
                  Recklessness ........................................................................................... 21

            3.    The Non-Fraudulent Inference Is More Compelling ............................... 25

1    C.    Plaintiffs Fail to State a Section 20(a) Claim...................................................... 25

2  V.   CONCLUSION........................................................................................................... 25

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LATHAM&WATKINSᴸᴸᴾ
ATTORNEYS AT LAW

DEFENDANTS' MOTION TO DISMISS
CASE NO. 3:23-cv-00519-WHO

# TABLE OF AUTHORITIES

## CASES

*Blackmoss Invs. Inc. v. ACA Cap. Holdings, Inc.*,
  2010 WL 148617 (S.D.N.Y. Jan. 14, 2010) .......................................................................... 18

*Bodri v. GoPro, Inc.*,
  252 F. Supp. 3d 912 (N.D. Cal. May 1, 2017) ..................................................................... 21

*Campo v. Sears Holding Corp.*,
  371 F. App'x 212 (2d Cir. 2010) ........................................................................................ 24

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
  2013 WL 6441843 (N.D. Cal. Dec. 9, 2013) ...................................................................... 13

*Eminence Cap., LLC v. Aspeon, Inc.*,
  316 F.3d 1048 (9th Cir. 2003) ............................................................................................ 20

*Golubowski v. Robinhood Markets, Inc.*,
  2023 WL 1927616 (N.D. Cal. Feb. 10, 2023) ..................................................................... 18

*In re Alteryx, Inc. Sec. Litig.*,
  2021 WL 4551201 (C.D. Cal. June 17, 2021) ..................................................................... 25

*In re AnaptysBio, Inc. Sec. Litig.*,
  2021 WL 4267413 (S.D. Cal. Sept. 20, 2021) ..................................................................... 24

*In re Arrowhead Pharms., Inc. Sec. Litig.*,
  2017 WL 8791111 (C.D. Cal. Dec. 21, 2017) ..................................................................... 21

*In re Cornerstone Propane Partners, L.P. Sec. Litig.*,
  355 F. Supp. 2d 1069 (N.D. Cal. 2005) .............................................................................. 25

*In re Downey Sec. Litig.*,
  2009 WL 2767670 (N.D. Cal. Aug. 21, 2009) .................................................................... 25

*In re Facebook, Inc. Sec. Litig.*,
  477 F. Supp. 3d 980 (N.D. Cal. 2020) ................................................................................ 17

*In re Finisar Corp. Deriv. Litig.*,
  2012 WL 2873844 (N.D. Cal. July 12, 2012) ..................................................................... 22

*In re Fusion-io, Inc. Sec. Litig.*,
  2015 WL 661869 (N.D. Cal. Feb. 12, 2015) ................................................................. 12, 13

*In re Intel Corp. Sec. Litig.*,
  2019 WL 1427660 (N.D. Cal. Mar. 29, 2019) .............................................................. 11, 15

*In re Intel Corp. Sec. Litig.*,
  2023 WL 2767779 (N.D. Cal. Mar. 31, 2023) .................................................................... 17

*In re NVIDIA Corp. Sec. Litig.*,
    768 F.3d 1046 (9th Cir. 2014) ........................................................................... 8, 14

*In re Pivotal Sec. Litig.*,
    2020 WL 4193384 (N.D. Cal. July 21, 2020) ........................................................... 25

*In re Pixar Sec. Litig.*,
    450 F. Supp. 2d 1096 (N.D. Cal. 2006) ................................................................... 20

*In re Rigel Pharms., Inc. Sec. Litig.*,
    697 F.3d 869 (9th Cir. 2012) .................................................................................. 8

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,
    160 F. Supp. 2d 1059 (N.D. Cal. 2001) ................................................................... 17

*In re Stemline Therapeutics, Inc. Sec. Litig.*,
    313 F. Supp. 3d 543 (S.D.N.Y. 2018) ...................................................................... 19

*In re Syntex Corp. Sec. Litig.*,
    95 F.3d 922 (9th Cir. 1996) ................................................................................... 15

*In re Wet Seal, Inc. Sec. Litig.*,
    518 F. Supp. 2d 1148 (C.D. Cal. 2007) ..................................................... 22, 23, 24

*Irving Firemen's Relief & Ret. Fund v. Uber Techs.*,
    2018 WL 4181954 (N.D. Cal. Aug. 31, 2018) ......................................................... 17

*Kong v. Fluidigm Corp.*,
    2021 WL 3409258 (N.D. Cal. Aug. 4, 2021) ........................................................... 11

*Lipton v. Pathogenesis Corp.*,
    284 F.3d 1027 (9th Cir. 2002) .......................................................................... 22, 25

*Mulquin v. Nektar Therapeutics*,
    510 F. Supp. 3d 854 (N.D. Cal. 2020) ...................................................................... 8

*Nguyen v. Endologix, Inc.*,
    962 F.3d 405 (9th Cir. 2020) .......................................................................... 20, 21

*Norfolk Cnty. Ret. Sys. v. Solazyme, Inc.*,
    2016 WL 7475555 (N.D. Cal. Dec. 29, 2016) ........................................................... 9

*Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
    774 F.3d 598 (9th Cir. 2014) ...................................................................... 8, 19, 22

*Oxford Asset Mgmt., Ltd. v. Jaharis*,
    297 F.3d 1182 (11th Cir. 2002) .............................................................................. 18

*Panther Partners Inc. v. Jianpu Tech. Inc.*,
    2020 WL 5757628 (S.D.N.Y. Sept. 27, 2020) ......................................................... 13

*Pardi v. Tricida, Inc.*,
  2022 WL 3018144 (N.D. Cal. July 29, 2022)........................................................................ 24

*Park v. GoPro, Inc.*,
  2019 WL 1231175 (N.D. Cal. Mar. 15, 2019)................................................................ 16, 20

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
  759 F.3d 1051 (9th Cir. 2014) ............................................................................................ 23

*Prodanova v. H.C. Wainwright & Co., LLC*,
  993 F.3d 1097 (9th Cir. 2021) ............................................................................................ 21

*Sanders v. Realreal, Inc.*,
  2021 WL 1222625 (N.D. Cal. Mar. 31, 2021)..................................................................... 18

*Sneed v. AcelRx Pharms., Inc.*,
  2023 WL 4412164 (N.D. Cal. July 7, 2023)....................................................................... 13

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)........................................................................................................ 8, 20

*Tietsworth v. Sears, Roebuck & Co.*,
  720 F. Supp. 2d 1123 (N.D. Cal. 2010) ............................................................................... 8

*Veal v. Lendingclub Corp.*,
  2020 WL 3128909 (N.D. Cal. June 12, 2020) ..................................................................... 16

*Veal v. LendingClub Corp.*,
  423 F. Supp. 3d 785 (N.D. Cal. 2019) ................................................................................ 12

*Welgus v. TriNet Grp., Inc.*,
  2017 WL 6466264 (N.D. Cal. Dec. 18, 2017)................................................................ 15, 24

*Weston Family P'ship LLLP v. Twitter, Inc.*,
  29 F.4th 611 (9th Cir. 2022) ...................................................................................... 9, 15, 17

*Zucco Partners, LLC v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009) ...................................................................................... 12, 19, 23

**STATUTES**

15 U.S.C. § 78u-4(b)(1)(B)..................................................................................................... 8

15 U.S.C. § 78u-4(b)(2) ......................................................................................................... 19

**REGULATIONS**

17 C.F.R. § 229.303 ............................................................................................................... 13

DEFENDANTS' MOTION TO DISMISS
CASE NO. 3:23-cv-00519-WHO

**GLOSSARY**

| Term | Definition |
|---|---|
| Annual Report | Atlassian's annual report on Form 20-F for the fiscal year ended June 30, 2022, filed with the SEC on August 19, 2022 |
| Amended Complaint | Amended Class Action Complaint (Dkt. No. 40) |
| ¶ | Refers to the paragraphs of the Amended Complaint |
| Atlassian or the Company | Atlassian Corporation (and where applicable, Atlassian Corporation Plc) |
| CEO | Chief Executive Officer |
| COO | Chief Operating Officer |
| CRO | Chief Revenue Officer |
| CW | Confidential Witness |
| Defendants | Atlassian Corporation, Atlassian Corporation Plc, Michael Cannon-Brookes, Scott Farquhar, Anu Bharadwaj, and Cameron Deatsch |
| Ex. | Exhibits attached to the Declaration of Colleen C. Smith, filed concurrently herewith |
| FY 2022 | Fiscal year 2022 (July 1, 2021 – June 30, 2022) |
| FY 2023 | Fiscal year 2023 (July 1, 2022 – June 30, 2023) |
| GAAP | United States Generally Accepted Accounting Principles |
| Individual Defendants | Michael Cannon-Brookes, Scott Farquhar, Anu Bharadwaj, and Cameron Deatsch |
| Plaintiffs | Lead Plaintiffs City of Hollywood Firefighters' Pension Fund and Oklahoma Firefighters Pension and Retirement System |
| First quarter, Q1 or Q1 23 | First quarter of fiscal year 2023 (July 1, 2022 – September 30, 2022) |
| Fourth quarter, Q4 or Q4 22 | Fourth quarter of fiscal year 2022 (April 1, 2022 – June 30, 2022) |
| SEC | United States Securities and Exchange Commission |

# I.      INTRODUCTION

This case is a quintessential example of impermissible fraud by hindsight.  Plaintiffs point to Atlassian's revision of forward-looking guidance due to unexpected impacts of an unprecedentedly difficult macroeconomic environment and allege Defendants knew such impacts would arrive weeks before they did.  But Plaintiffs do not allege any particularized facts demonstrating that any challenged statement was false or misleading when made.  Instead, Plaintiffs take pieces of Atlassian's later descriptions of market headwinds and misrepresent them out of context to allege Defendants knew of but concealed macroeconomic impacts during the first quarter of fiscal year 2023.  But even a cursory review of Defendants' statements shows that Defendants disclosed impacts on *different* business metrics as they began to appear. Plaintiffs' case amounts to a demand for real time and *intra*-quarter updates on potential business impacts from economic headwinds that may or may not come true.  That is not the law; accordingly, the Amended Complaint should be dismissed.

Atlassian has experienced (and continues to experience) extraordinary growth by offering customers software that helps teams organize, discuss, and complete shared work at competitive and affordable prices.  Atlassian offers free subscriptions for new customers for up to ten users, and charges a relatively low cost per user if a customer converts to a paid subscription.  Atlassian measures these subscriptions through two different metrics: (1) free customers who convert to paid subscriptions ("Free-to-Paid Conversions"); and (2) existing paying customers who add additional users to their subscriptions ("Existing Paid User Expansion").  On August 4, 2022, Atlassian announced on its earnings call for the fourth quarter and full fiscal year 2022 (which ended June 30, 2022) that, despite the difficult global environment, it had met its guidance, and had not yet seen any impact on Existing Paid User Expansion, which accounts for over 90% of Atlassian's revenue.  Atlassian specifically warned, however, that it was "not immune" from macroeconomic headwinds that were beginning to be felt throughout the global economy (and particularly in the software industry) at that time, and it disclosed a slight slowdown in Free-to-Paid Conversions.  And it provided guidance for the coming fiscal year and the following quarter.

1    In announcing earnings for the next quarter (the first quarter of fiscal year 2023) on

2    November 3, 2022, Atlassian disclosed that just like virtually every other technology company,

3    the macroeconomic environment had begun to have a greater impact on the business.  It

4    announced that in the second half of the first quarter, Atlassian had begun to see an impact on

5    Existing Paid User Expansion.  It also announced that the slowdown in Free-to-Paid Conversions

6    (which it disclosed in the prior quarter) had become more pronounced.  Despite these impacts,

7    Atlassian still met its quarterly revenue, GAAP gross margin, and non-GAAP operating margin

8    guidance.  However, because it assumed the difficult macroeconomic conditions would continue

9    to impact the business, Atlassian lowered its forward-looking guidance for the full year fiscal

10   year 2023.

11   Atlassian's stock price temporarily declined following that first quarter earnings

12   announcement and revision of guidance.  Plaintiffs quickly filed suit, alleging that Atlassian had

13   concealed material adverse trends affecting Atlassian's business metrics.  Plaintiffs' allegations

14   fail to state a securities fraud claim.

15   **No Misstatement.**  Plaintiffs fail to allege a single particularized fact suggesting that any

16   macroeconomic impact occurred sooner than Atlassian disclosed.  Plaintiffs conflate two distinct

17   metrics (Free-to-Paid Conversions and Existing Paid User Expansion), and misleadingly contend

18   that Defendants "admitted" on November 3 that there had been a slowdown in *Existing Paid*

19   *User Expansion* dating back to the beginning of the first quarter of fiscal year 2023.  That is

20   wrong.  Atlassian disclosed in its November 3, 2022 shareholder letter that Atlassian had *started*

21   to see an impact on its Existing Paid User Expansion metric beginning in the *second half* of the

22   *just completed* first quarter of fiscal year 2023 (ended September 30, 2022).  Plaintiffs do not

23   point to any statement, and the Amended Complaint contains not a single fact suggesting any

24   slowdown in Existing Paid User Expansion occurred sooner than Atlassian disclosed—in the

25   second half of the first quarter.  Atlassian historically had a linear and non-seasonal sales cycle,

26   but it never promised that linearity would continue—on the contrary, it expressly warned that the

27   economic environment and shift to cloud-based services could affect historical sales cycles.

28   Atlassian had no duty to provide Plaintiffs and investors with intra-quarter updates, and Plaintiffs

1   fail to allege any facts suggesting Atlassian misled investors when it provided updates each

2   quarter about the impacts it was seeing on its business metrics.

3       **No Scienter.**  Even if Plaintiffs had identified an actionable misstatement or omission

4   (they have not), they have fallen far short of their heavy burden of pleading with particularity

5   that any Defendant acted with an intent or deliberate recklessness to defraud investors.  Plaintiffs

6   do not allege any motive to commit fraud:  there are no allegations of any suspicious or unusual

7   insider stock sales, or any other effort by any Defendant to capitalize on this supposed scheme.

8   Accordingly, the notion that any Defendant intentionally or recklessly misled investors with no

9   apparent motive, while knowing that the impact of macroeconomic conditions on Atlassian's

10  growth would be disclosed in Atlassian's next quarterly filings makes no sense.

11      Plaintiffs also plead no facts supporting the necessary strong inference that any

12  Defendant deliberately made a misstatement intending to mislead investors.  Instead, Plaintiffs

13  allege generally that certain Individual Defendants had "access" to databases and monitored the

14  business, but they cite no specific information given to Individual Defendants that contradicted a

15  challenged statement.  And while Plaintiffs allege Defendants "admitted" after the class period

16  they had seen a slowdown in Existing Paid User Expansion during the last quarter of fiscal year

17  2022, Defendants said no such thing.  Instead, just as it had previously disclosed in August 2022,

18  Atlassian noted it had started to see a slowdown in *Free-to-Paid Conversions* during the last

19  quarter of fiscal year 2022, and that it began to see a slowdown in *Existing Paid User Expansion*

20  in the *second half* of the first quarter of fiscal year 2023.  The more compelling inference from

21  these facts is that Defendants updated investors as soon as macroeconomic headwinds began to

22  have a meaningful impact on Atlassian's business.  That is the opposite of fraud.

23      The Amended Complaint should be dismissed.

24  **II.     BACKGROUND**

25      **A.     Atlassian Achieves Growth by Providing Free Productivity-Enhancing
26  Software and Then Expanding Its Customer Relationships**

27      Atlassian is a technology company that develops, sells, and licenses team collaboration

28  software designed to enhance productivity and help teams work together.  ¶¶ 4, 33.  Among its

many tools are:  Jira Software and Jira Work Management, for team planning and project management; Confluence, for team content creation and sharing; Jira Service Management, for team service and support applications; Trello for capturing and adding structure to fluid, fast forming work for teams; Opsgenie, for incident management; Jira Align, for enterprise agile planning; and Bitbucket, for team code sharing and management.  Ex. A at 39-40.  Atlassian was founded in 2002 by Michael Cannon-Brookes and Scott Farquhar, who serve as co-CEOs, joined during the class period by then-COO Ms. Bharadwaj (who was promoted to President in February 2023) and CRO Mr. Deatsch.  ¶ 3.  Atlassian takes pride in its culture—The Atlassian Values— which includes transparency and openness throughout the organization and including with its customers and investors.  ¶ 34.

Atlassian is unique in that it does not rely primarily on a traditional sales force to distribute and sell its products.  ¶ 36.  Instead, Atlassian offers its products free to new customers, up to ten users per account.  ¶ 37.  It then generates most of its revenue when a customer converts to a paid subscription (e.g., with more than ten users), Free-to-Paid Conversions, which accounts for approximately 10% of Atlassian's revenue, or when an existing paying customer adds additional users for a fee, Existing Paid User Expansion, which accounts for approximately 90% of Atlassian's revenue.  ¶¶ 37-39.  Atlassian also generates revenue through upgrades to premium or enterprise plans that include additional services and features more personalized to the customer ("Subscription Upgrades").  Ex. A at 38, 39; *see also* ¶ 63.

In part because Atlassian does not primarily rely on a traditional sales force, it has historically had a relatively linear sales cycle, meaning that it does not experience a significant "hockey stick" style uptick in sales at the end of each quarter or fiscal year, as is otherwise common in the software industry.  ¶¶ 41-45 (largely citing statements well before the class period).  But at the beginning of the class period in August 2022, Atlassian noted that certain events including a transition from selling products hosted on customers' servers to cloud-based operations could "drive short-term variability" (Ex. A at 39), and it specifically warned that despite its historical linear sales cycle, "quarterly financial results may fluctuate as a result of a variety of factors, many of which are outside of our control" (*id.* at 10).  Atlassian also warned

that "***the impact of the current economic uncertainty*** may cause customers to request concessions, including better pricing, or to slow their rate of expansion or reduce their number of licenses, ***which may not be reflected immediately in our results of operations***." *Id.* at 12 (emphasis added).

**B.    Atlassian Provides Q4 and FY 2022 Results and FY 2023 Revenue Guidance, While Warning That Its Growth Could Be Impacted by Market Conditions**

The class period begins on August 4, 2022, when Atlassian issued a press release and—consistent with its longstanding culture of transparency—a detailed shareholder letter announcing financial results for the fourth quarter and full fiscal year 2022, which ended June 30, 2022. *See* Ex. C; ¶¶ 51-52. Atlassian hosted an investor call the same day. Ex. B; ¶¶ 53-54.

In the shareholder letter, Atlassian did not say it would not be impacted by the broader macroeconomic environment (¶ 51); rather, Atlassian's first observation in that letter was a warning that "we find ourselves in a climate of widespread uncertainty." Ex. C at 2. Atlassian expressed optimism about its ability to weather the storm of "unsettling world events and headlines reporting macroeconomic volatility," but noted that it was "not insulated from broader macroeconomic pressures." *Id.*; *see also id.* at 14. Atlassian specifically disclosed that it had already begun to see some softening in the fourth quarter of fiscal year 2022 in the Free-to-Paid Conversion portion of its business (which accounts for just 10% of its revenues). *Id.* at 14; ¶ 54. And while Atlassian stated that "nothing we are seeing *right now* is changing our outlook" including based on projected revenue from existing paying customers, Atlassian was clear with investors that it would need to "*remain vigilant* in this environment." Ex. C. at 2, 14 (emphasis added); ¶¶ 52-53. In its accompanying Annual Report, Atlassian expressly disclosed several macroeconomic pressures as "trends" that could have a material effect on its revenues, including "[w]eakening economic conditions as a result of the COVID-19 pandemic, rising inflation, increases in interest rates, and Russia's invasion of Ukraine," and warned investors that "the extent to which any of these risks ultimately impacts our business . . . will depend on future developments, which are uncertain and cannot be predicted at this time." Ex. A at 66. In the same trends section, Atlassian cautioned "we have revenue exposure to customers who are small-

1 and medium-sized businesses and to industries that may be disproportionately impacted by

2 weakening economic conditions," "[a]lso, a majority of our Cloud customers choose to be billed

3 on a monthly basis and many of these customers are small and medium-sized business that may

4 be adversely impacted by weakening economic conditions," and "we may experience elongated

5 sales cycles and extended payment terms and concessions due to weakening economic

6 conditions." *Id.*

7         During a later investor conference held on September 14, 2022, Atlassian's then-COO

8 Ms. Bharadwaj reiterated in response to an analyst's question that Atlassian was not immune to

9 "overall macroeconomic conditions." Ex. D at 9; ¶¶ 61-62.  She confirmed (as Atlassian had

10 previously disclosed) that with respect to Free-to-Paid Conversions "we are seeing a bit of

11 softness over the past couple of months." Ex. D at 9.  But contrary to what Plaintiffs allege (¶

12 63), Ms. Bharadwaj did not provide any assurances with respect to trends that may be impacting

13 Existing Paid User Expansion. *See* Ex. D at 9.  In fact, in response to a follow-up question from

14 another analyst, Ms. Bharadwaj explained that Existing Paid User Expansion was "an area that

15 we continue to monitor" and "that's going to be an important one to look at in the current

16 climate":

> 17 And user expansion, which is unique to the Atlassian model of
> organic growth, user expansion is a place where we don't go off
> 18 and try to do – try to influence that using a bunch of levers.  We let
> that happen organically because that's how we believe we
> 19 construct our long-term sustainable business model with low
> [customer acquisition costs].  *That's an area that we continue to*
> 20 *monitor.*  That's not an area where we try to do a lot of product
> interventions, *but that's going to be an important one to look at in*
> 21 *the current climate.  Id.* at 10 (emphasis added); ¶ 63.

22 For the only other "trend" Ms. Bharadwaj mentioned—Subscription Upgrades from free to

23 standard, standard to premium, and premium to enterprise—she explained she personally had not

24 seen "any discernable trend . . . in terms of the macroeconomic impact." Ex. D at 10.

25     **C.**    **Atlassian Redomiciles From the United Kingdom to the United States**

26         Earlier in 2022, Atlassian disclosed to its shareholders that it would redomicile its parent

27 company to the United States, incorporating in Delaware, effective September 30, 2022,

28 following board and shareholder approval. *E.g.,* Ex. C at 17; *see also* ¶ 19.  In connection with

the redomiciliation, Atlassian Corporation Plc shares were cancelled, and its shareholders received an equal number of Atlassian Corporation shares.  ¶ 20.  The redomiciliation required Atlassian to file certain documents with the SEC to effectuate the move, including a post-effective amendment to its existing registration statements on Form S-8 for its employee stock award plans, which in turn required Atlassian to incorporate by reference its most recently filed Annual Report.  ¶¶ 94 n.18, 100.  Atlassian filed the post-effective Form S-8 amendment on October 4, 2022 (¶ 100).

> **D.    Atlassian Announces Q1 23 Financial Results That Met Its Guidance, but Revises Forward-Looking Guidance for the Remainder of FY 2023 Given the Emergence of Macroeconomic Headwinds**

On November 3, 2022, Atlassian announced its financial results for the next quarter—its first quarter of fiscal year 2023, covering the period July 1, 2022 to September 30, 2022.  Ex. E; Ex. F; ¶¶ 66-73.  Atlassian did not announce "poor financial results" (¶ 66), but rather reported revenue of $807 million, GAAP gross margin of 82.7%, and non-GAAP operating margins of 18% (Ex. F at 12, 14; Ex. E at 1), *at the high end* of its $795 million to $810 million guidance, *above* GAAP gross margin guidance of 80%-81%, and exactly the same as non-GAAP operating margin guidance of 18% (Ex. C at 3).

While Atlassian had turned in a strong quarter, it also informed investors that it was "beginning to see the impact" of economic headwinds on its business.  Ex. F at 2, 11. Specifically—and in "the spirit of our 'Open company, no bullshit' value'"—Atlassian reported: "1) We saw a more pronounced continuation of the trend discussed last quarter, where fewer Free instances converted to paid plans; and 2) we also saw the growth of paid users from existing customers slow in the second half of Q1."  *Id.* at 11.  Both of these trends were "the result of companies tightening their belts and slowing their pace of hiring."  *Id.*; ¶ 67; *see also* Ex. G at 8 (Farquhar:  reduction in growth rates was the product of "customers who are dealing with their own turbulence" and addressing their own internal spending and headcount needs); *id.* at 10 (Deatsch:  Atlassian's customers had slowed down hiring which "slows down our user growth"); *id.* at 11 (Farquhar:  "customers are not adding seats and heads . . . because the hiring

1 environment has changed").  To account for this slowdown and in keeping with its commitment

2 to transparency with investors, Atlassian lowered its cloud-based revenue guidance for the

3 remainder of its fiscal year, from 50% year-over-year projected growth to a range of

4 approximately 40% to 45% year-over-year projected growth for fiscal year 2023.  Ex. F at 15.

5          **E.      Plaintiffs File This Lawsuit**

6          After Atlassian revised its go-forward guidance in November 2022, Atlassian's stock

7 price dropped.  ¶ 74.  Plaintiffs reflexively filed suit soon after.  Dkt. No. 1.  Plaintiffs filed the

8 operative Amended Complaint on July 14, 2023.  Dkt. No. 40.

9 **III.    LEGAL STANDARD**

10          To state a Section 10(b) securities fraud claim, Plaintiff must plead with particularity that

11 a defendant made a (1) material misrepresentation or omission of fact, (2) with scienter, and (3)

12 that caused the plaintiff's economic losses.  *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869,

13 876 (9th Cir. 2012).  Plaintiff must also satisfy the "heightened pleading requirements" of Rule

14 9(b) and the PSLRA which apply to "all elements of a securities fraud action," and "present no

15 small hurdle."  *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 605 (9th Cir. 2014).

16          Plaintiff must "specify each statement alleged to have been misleading, the reason or

17 reasons why the statement is misleading," and to "state with particularity all facts on which that

18 belief [that a statement is misleading] is formed."  15 U.S.C. § 78u-4(b)(1)(B).  And Plaintiff

19 must plead particularized facts giving rise to a strong inference of scienter, either that Defendants

20 acted with an "intent to deceive, manipulate, or defraud" or with deliberate recklessness, which

21 is "actually much closer to one of intent."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S.

22 308, 319 (2007); *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1053 (9th Cir. 2014).  In

23 addition, to plead loss causation, Plaintiff must allege with particularity sufficient facts indicating

24 that "the revelation of [the alleged] misrepresentation or omission was a substantial factor in

25 causing a decline in the security's price."  *Mulquin v. Nektar Therapeutics*, 510 F. Supp. 3d 854,

26 870 (N.D. Cal. 2020).  In ruling on a motion to dismiss, courts "need not accept as true

27 allegations that are conclusory, unwarranted deductions of fact, or unreasonable inferences."

28 *Tietsworth v. Sears, Roebuck & Co.*, 720 F. Supp. 2d 1123, 1132 (N.D. Cal. 2010).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

DEFENDANTS' MOTION TO DISMISS
CASE NO. 3:23-cv-00519-WHO

IV.     ARGUMENT

  A.     **Plaintiffs Do Not Plead Any False or Misleading Statement**

Plaintiffs challenge nine statements from August 4 to October 4, 2022, alleging that Defendants misled investors by not disclosing purported "material adverse trends" caused by macroeconomic headwinds on two of Atlassian's business metrics (Free-to-Paid Conversions and Existing Paid User Expansion) during the first quarter of fiscal year 2023.  But Plaintiffs allege no facts establishing any contemporaneous facts that contradicted what Defendants told the market.  *See Norfolk Cnty. Ret. Sys. v. Solazyme, Inc.*, 2016 WL 7475555, at *3 (N.D. Cal. Dec. 29, 2016) (dismissing securities fraud claims where "allegations omit contemporaneous facts that would establish a contradiction between the alleged materially misleading statements and reality"); *see also Weston Family P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611, 619 (9th Cir. 2022) ("[f]or a statement to be misleading, it must directly contradict what the defendant knew at the time or omit material information") (internal quotation marks omitted).

Instead, Plaintiffs seek to manufacture a claim by misrepresenting what Defendants said about what Atlassian was seeing and when.  Atlassian disclosed at the start of the class period that macroeconomic conditions were having a negative impact on one of its business metrics, Free-to-Paid Conversions.  And while it had yet to see those same conditions impacting the Existing Paid User Expansion metric, Atlassian cautioned that it was not immune to broader market conditions, that the economic slowdown could have an impact in the future, and that it would continue to be vigilant.  When macroeconomic conditions began to impact Existing Paid User Expansion in the second half of the first quarter of fiscal year 2023, Atlassian promptly disclosed that fact in its next earnings call on November 3, 2022.  Atlassian announced that while it met its revenue, GAAP gross margin, and non-GAAP operating margin guidance for the first quarter of fiscal year 2023, it had seen a slowdown in Existing Paid User Expansion beginning in the *second half of that just-completed first quarter*, and that slowdown justified revising its forward-looking guidance for the rest of the fiscal year.  That is transparency, not fraud.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

1

    **1.**  **Mr. Deatsch's August 4, 2022 Statements Regarding Macroeconomic Impacts Were Not False**

2

3    Plaintiffs challenge four statements made by Mr. Deatsch during Atlassian's August 4,

4 2022 earnings call discussing results for the fourth quarter and fiscal year ended June 30, 2022:

5   &bull; "The good news **as of to date** is we have **yet to see** any specific trend geographically
6     or even in industry segments or in customer size that gives us pause or worry to date.
     So, something we continue to watch like a hawk, but there is no news to share today."
7     ¶ 89.

8   &bull; "[W]e have not seen any significant shift in customer demand across our product
     lines," and "we continue to see demand for collaboration products that continue to be
9     strong." *Id.*

10   &bull; The slowdown in free-to-paid customer conversions was a "slight thing" that "does
     not take away from the continued growth we see in our existing customer base that
11     also drives more than 90% of our revenue in the existing year." ¶ 92.

12   &bull; Atlassian's "existing customers continue to have demand for what our products do to
     help their teams work more productively in the future," and Atlassian would
13     "continue to be vigilant." *Id.*

14 Plaintiffs allege these statements were false because Mr. Deatsch purportedly "admitted" on the

15 next earnings call for the first quarter of fiscal year 2023 on November 3, 2022, that there had

16 been impacts on both Free-to-Paid Conversions and Existing Paid User Expansion before August

17 4, 2022.  ¶¶ 90, 93.  That argument fails.

18    *First*, Mr. Deatsch did not "admit" that there had been impacts on *both* Free-to-Paid

19 Conversions and Existing Paid User Expansion dating back to the start of the first quarter (¶

20 102).  Rather, on November 3, Atlassian disclosed that there was a new impact on Existing Paid

21 User Expansion that began *during the second half of the first quarter*—and that the impact on

22 Free-to-Paid Conversions had become more pronounced during the first quarter.  Ex. G at 12;

23 Ex. F at 2, 11.  Plaintiffs muddle the two separate metrics.

24    As to the Free-to-Paid Conversions, Mr. Deatsch stated on November 3, "***As we***

25 ***mentioned in August***, *what we were seeing in the August time frame was the net new*

26 *customers, the free customers converted to paid was slowing down going into August*."  Ex. G

27 at 12 (emphasis added); ¶ 69.  That is, as disclosed on August 4, 2022, Atlassian had begun

28

1    seeing a slowdown in Free-to-Paid Conversions during the fourth quarter of fiscal year 2022.

2    Ex. C at 14.  That slowdown became more pronounced in the first quarter of 2023.  Ex. F at 11.

3          As to the separate Existing Paid User Expansion metric, Atlassian explained on

4    November 3, 2022 that it had begun to see a slowdown in this metric for the first time *during the*

5    *second half of the first quarter.  Id.* at 2, 11.  Atlassian did not say on November 3, 2022 that

6    there had been a slowdown in Existing Paid User Expansion during the *fourth* quarter of fiscal

7    year 2022, or even the first half of its first quarter of fiscal year 2023.  Plaintiffs cannot state a

8    claim for securities fraud by misrepresenting Defendants' disclosures.  *See In re Intel Corp. Sec.*

9    *Litig.*, 2019 WL 1427660, at *11 (N.D. Cal. Mar. 29, 2019) (dismissing on falsity grounds where

10   "relevant context" including "the words and sentences surrounding the challenged phrases"

11   undermined allegations).

12         *Second,* Plaintiffs do not allege any facts that contradict Mr. Deatsch's statements as of

13   the August 4, 2022 earnings call.  Plaintiffs allege no facts suggesting a more pronounced impact

14   on Free-to-Paid Conversions existed in the fourth quarter of fiscal year 2022, or that Mr. Deatsch

15   was aware of any slowdown in Existing Paid User Expansion as of August 4, 2022.  *See Kong v.*

16   *Fluidigm Corp.*, 2021 WL 3409258, at *7-8 (N.D. Cal. Aug. 4, 2021) (plaintiff must plead with

17   particularity that challenged statements were "false when made," including by pointing to

18   "defendant's statements that directly contradict what the defendant knew at that time").

19         Plaintiffs attempt to contradict Mr. Deatsch's truthful statements by suggesting that given

20   Atlassian's linear sales cycle, there must have been a slowdown earlier.  *See generally* ¶¶ 41-49.

21   But this allegation makes no sense.  Plaintiffs do not challenge Atlassian's disclosure on

22   November 3, 2022 that the slowdown in Existing Paid User Expansion was *not* linear—it only

23   began in the *second half* of the first quarter of 2023, due to customers slowing their own hiring.

24   ¶ 93.  While Atlassian's sales cycle may have been historically more linear (as opposed to a

25   hockey-stick style demand pattern, more common among other software companies), that fact

26   says nothing about the demand patterns Atlassian actually experienced (and disclosed) in its first

27   quarter in 2023.  Certainly Atlassian never guaranteed that its sales cycle would always be linear;

28

instead, it warned of the exact opposite, including that quarterly financial results could fluctuate. *See, e.g.*, Ex. A at 10-11 (warning that "quarterly results may fluctuate significantly").

Plaintiffs attempt to bolster their deficient claims by pointing to allegations they attribute to one CW that Atlassian's sales cycle was historically "linear" (despite the CW only working at Atlassian for one year) and its software development work (which says nothing about sales) was not seasonal, and another CW that said that Atlassian had "one of the best data monitoring systems." ¶¶ 46, 49. But none of these allegations contradict any challenged statement as none of the challenged statements purports to speak to linearity in the sales cycle or a lack of seasonality in software development in the first quarter of fiscal year 2023. Moreover, Atlassian warned investors that quarterly results could fluctuate, including due to seasonality in operations. Ex. A at 10-11. Regardless, Plaintiffs cannot rely on their CW allegations, which fall far short of this Circuit's standards for CW allegations, which require that each CW "must be described with sufficient particularity to establish their reliability and personal knowledge." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009). Neither CW is alleged to have been a part of, nor played any role in, Atlassian's sales process, financial projections or accounting, or strategic analysis. CW1 was a low-level "Senior Support Engineer" who worked at Atlassian for just one year and was "responsible for onboarding expansion and net new customers." ¶ 46 & n.5. CW2 is alleged to have been a "contractor" working as a "Data Analyst" in Atlassian's marketing department. ¶ 49 & n.6. In fact, CW2 is alleged to have left Atlassian well before the class period, further undermining CW2's contribution to Plaintiffs' claims. *See In re Fusion-io, Inc. Sec. Litig.*, 2015 WL 661869, at *18 (N.D. Cal. Feb. 12, 2015) (requiring CW accounts to be "contemporaneous" with the alleged misstatements). Neither CW is alleged to have ever spoken to any Defendant. That failure alone renders their allegations irrelevant. *See Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 814 (N.D. Cal. 2019) (rejecting CW statements where there were no allegations the CW had direct or indirect contact with the individual defendants).

*Third*, each of the four challenged statements by Mr. Deatsch are non-actionable corporate optimism. The statements include nonquantifiable vague terms like "watch like a hawk," "significant shift," demand that is "strong," a "slight" slowdown, and continuing to be

"vigilant." ¶¶ 89, 92.  Courts consistently find such "vague, generalized assertions of corporate optimism" to be inactionable because "no reasonable investor would rely on such statements." *See Sneed v. AcelRx Pharms., Inc.*, 2023 WL 4412164, at *8 (N.D. Cal. July 7, 2023); *see also In re Fusion-io*, 2015 WL 661869 at *14 (rejecting challenge to statements about "excellent results" and "significant sales gains" as corporate optimism); *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 2013 WL 6441843, at *11-12 (N.D. Cal. Dec. 9, 2013) (dismissing as corporate optimism statements reporting a "strong" quarter and "strong growth").

### 2.  Atlassian's August 19, 2022 Statement About Material Trends For Atlassian's *2022* Fiscal Year Was Not False

Plaintiffs challenge a single statement in Atlassian's Annual Report:

> Other than as disclosed elsewhere in this Annual Report, we are not aware of any trends, uncertainties, demands, commitments, or events for the current fiscal year that are reasonably likely to have a material effect on our revenues, income, profitability, liquidity or capital reserves, or that caused the disclosed financial information to be not necessarily indicative of future results of operations or financial conditions.

¶ 94; Ex. A at 66.  Plaintiffs allege this statement was false because Defendants allegedly knew there were "significant material adverse 'trends' as a result of 'macro headwinds' in both key areas of [Atlassian's] business." ¶ 95.  This claim, too, fails.

*First*, this statement appears in the "Trend Information" section of the Annual Report pursuant to Item 5 of SEC Form 20-F (akin to Item 303 of Regulation S-K), which requires companies to disclose known trends or uncertainties "that are reasonably likely to have a material effect on the company's net sales or revenues, income from continuing operations, profitability, liquidity or capital resources, or that would cause reported financial information not necessarily to be indicative of future operating results or financial condition."  *See* SEC Form 20-F; *see also* 17 C.F.R. § 229.303 (Item 303).[1]  Plaintiffs suggest that this statement violated Item 303 , but they don't actually allege a claim premised on an alleged violation of Item 303— because they can't.  The Ninth Circuit has expressly held that "Item 303 does not create a duty to

---

[1] Courts hold Item 5 of Form 20-F (which applies to foreign corporations) calls "for the same disclosure as Item 303 of Regulation S-K" (which applies to domestic corporations).  *Panther Partners Inc. v. Jianpu Tech. Inc.*, 2020 WL 5757628, at *7 n.5 (S.D.N.Y. Sept. 27, 2020).

1  disclose for purposes of Section 10(b)." *NVIDIA*, 768 F.3d at 1056.  So Plaintiffs' backdoor

2  challenge to Atlassian's disclosure fails on this basis alone.

3    *Second*, as with the August 4, 2022 challenged statement, Plaintiffs ignore what Atlassian

4  actually said.  The Annual Report discloses that management was not aware of any material

5  adverse trends or uncertainties that had "a material adverse impact on [Atlassian's] financial

6  condition or results of operations ***during the fiscal year ended June 30, 2022***."  Ex. A at 66

7  (discussing lack of known material adverse trends "for the current fiscal year").  Annual reports

8  necessarily are filed after the conclusion of a fiscal year.  In describing what Atlassian had seen

9  in fiscal year 2022, Atlassian did not purport to speak about the time period between the end of

10  the fiscal year and the filing date of the Annual Report.  Plaintiffs do not allege Atlassian had

11  experienced any undisclosed impact from macroeconomic headwinds during fiscal year 2022.

12  And Plaintiffs do not explain how a report for the period of July 1, 2021 to June 30, 2022, could

13  be false or misleading based on allegations about a more pronounced slowdown in Free-to-Paid

14  User Conversions and a *new* slowdown in Existing Paid User Expansion that happened after the

15  reported fiscal year and after the Annual Report was filed.

16    *Third*, Plaintiffs also omit key language in the two paragraphs preceding the challenged

17  statement.  The risks Plaintiffs say Defendants concealed *are disclosed* on the *same page* and in

18  the very same section as the challenged statement.  Atlassian's complete disclosure does not say

19  what Plaintiffs ask the Court to assume:

20     **Our results of operations may vary based on the impact of**
      **changes in our industry or the global economy on us or our**
21     **customers.**  Our business depends on demand for business
      software applications generally and for collaboration software
22     solutions in particular.  **Weakening economic conditions** as a
      result of the COVID-19 pandemic, rising inflation, increases in
23     interest rates, and Russia's invasion of Ukraine **did not**
      individually **have a material adverse impact** on our financial
24     condition or results of operations **during the fiscal year ended**
      **June 30, 2022; however, the extent to which any of these risks**
25     **ultimately impacts our business, results of operations, and**
      **financial position will depend on future developments, which**
26     **are uncertain and cannot be predicted at this time**.  For
      example, while our diverse customer base is a competitive
27     advantage for us and helps fuel our low-friction flywheel sales
      model, **we have revenue exposure to customers who are small-**
28     **and medium-sized businesses and to industries that may be**
      **disproportionately impacted by weakening economic**

**conditions**.  Also, a majority of our Cloud customers choose to be billed on a monthly basis and many of these customers are small and medium-sized businesses that may be adversely impacted by weakening economic conditions.  In addition, we may experience elongated sales cycles and extended payment terms and concessions due to weakening economic conditions.

**We will continue investing to pursue the large market opportunities ahead of us, despite macroeconomic headwinds and slower revenue growth.**  . . .

**Other than as disclosed elsewhere in this Annual Report**, we are not aware of any trends, uncertainties, demands, commitments, or events **for the current fiscal year** that are reasonably likely to have a material effect on our revenues, income, profitability, liquidity or capital reserves, or that caused the disclosed financial information to not necessarily be indicative of future results of operations or financial conditions.

Ex. A at 66 (emphasis added); *see Twitter*, 29 F.4th at 621-22 (no falsity where "context makes clear" challenged statements were not misleading).  Plaintiffs cannot state a securities fraud claim by omitting language just sentences above the challenged statement that directly refutes their claim.  *See Intel*, 2019 WL 1427660, at *11 (dismissing claims where "the relevant context" including "the words and sentences surrounding the challenged phrases" undermined plaintiff's allegations); *see also Welgus v. TriNet Grp., Inc.*, 2017 WL 6466264, at *10 (N.D. Cal. Dec. 18, 2017) (dismissing claims where "[r]ather than plead specific facts that render Defendants' representations false or misleading, Plaintiff takes pieces of Defendants' 'admissions' out of context, and urges the Court to adopt an implausible inference of falsity"); *In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 929 (9th Cir. 1996) (viewing challenged statement "in context," which included warning of potential risks whose later materialization did "not reflect on the accuracy of Defendants' predictions as stated in the" annual report).

Moreover, Defendants warned investors that "the extent to which any of [the enumerated risks including weakening economic conditions] ultimately impacts our business . . . will depend on future developments, which are uncertain and cannot be predicted at this time."  Ex. A at 66. Indeed, Atlassian specifically warned that many of its customers "may be disproportionately impacted by weakening economic conditions," which would in turn affect Atlassian's revenue. *Id.*  Plaintiffs do not allege any fact, much less particularized ones, indicating that any such risk

had already materialized at the time of the Annual Report.  *See, e.g.*, *Park v. GoPro, Inc.*, 2019 WL 1231175, at *16-17 (N.D. Cal. Mar. 15, 2019) (dismissing challenge to disclosure of risk of impact from macroeconomic environment where plaintiff failed to allege risk had already materialized); *Veal v. Lendingclub Corp.*, 2020 WL 3128909, at *8 (N.D. Cal. June 12, 2020) (similar).

      **3.**    **Ms. Bharadwaj's September 14, 2022 Statements Cautioning That Atlassian Was Continuing to Monitor Macroeconomic Impacts on Existing Paid User Expansion Were Not False**

Plaintiffs next challenge three of Ms. Bharadwaj's statements at a September 14, 2022, Goldman Sachs investor conference where she reiterated the impact macroeconomic headwinds were having and could have on Atlassian:

- Atlassian had various "attributes" that gave it "a few advantages in the overall macroeconomic climate," including providing "mission-critical software" at a "highly, highly competitive" price. ¶ 96.

- "Just in the last shareholder letter, we talked about conversion of users from free to paid.  We are seeing a bit of softness over the past couple of months.  But it's important to illustrate the point in the overall picture as over 90% of our revenue comes from existing customers.  So the conversion from free to paid is really a very small part of our business.  And also, the number of free users that are coming in that create new free instances continues to grow steadily.  We're not seeing any trends there.  So across the board, across existing and new, that's overall what we're seeing in different parts of the business." ¶ 97.

- "So to address your question, the way our pricing model works is the first 10 users are free, and then the 11th user onwards, it's paid . . . So we think of **upsell** as really across free to standard, standard to premium, premium to enterprise.  And we've seen some very encouraging progress there over the last four quarters.  And I haven't really seen any discernible trend **there** in terms of the macroeconomic impact.  **And user expansion . . . That's an area that we continue to monitor.  That's not an area where we try to do a lot of product interventions.  But that's going to be an important one to look at in the current climate.**" ¶ 98 (emphasis added).

Plaintiffs allege these statements were false because Atlassian supposedly was already seeing adverse trends. ¶ 99.  But to reach this conclusion, first, Plaintiffs once again misrepresent what Ms. Bharadwaj actually said and conflate distinct business metrics.  And, second, no alleged facts contradict anything she said.

1       *First*, Ms. Bharadwaj spoke about three separate Atlassian business metrics:  (1) Existing

2 Paid User Expansion, (2) Subscription Upgrades, and (3) Free-to-Paid Conversions.  Plaintiffs

3 muddle these distinct metrics to fit their erroneous narrative, but a review of Ms. Bharadwaj's

4 statements undermines Plaintiffs' claims.  As to Existing Paid User Expansion, Ms. Bharadwaj

5 made no representations ***at all*** about what she or Atlassian were or were not seeing.  Instead, she

6 noted that Atlassian does not "try to influence that using a bunch of levers," and she expressly

7 *warned* investors that this was an "important" area to "look at in the current climate, and that

8 ***Atlassian would "continue to monitor" it***.  *See id.*  She made no representation about any

9 macroeconomic impact on Existing Paid User Expansion.  *See In re Facebook, Inc. Sec. Litig.*,

10 477 F. Supp. 3d 980, 1027 (N.D. Cal. 2020) (rejecting omissions theory where defendants did

11 not make guarantees about the future and "simply stat[ed] the relevant data and promis[ed] to

12 'continue to monitor'" because that "makes no promise about future results"); *Irving Firemen's*

13 *Relief & Ret. Fund v. Uber Techs.*, 2018 WL 4181954, at *5 (N.D. Cal. Aug. 31, 2018) (finding

14 no falsity where statement did not "affirmatively le[a]d [investors] in a wrong direction").  Nor

15 did Ms. Bharadwaj have any duty to provide (or speculate about) an intra-quarter update on

16 whether there was or was not a trend impacting Existing Paid User Expansion.  *See Twitter*, 29

17 F.4th at 620 ("companies do not have an obligation to offer an instantaneous update of every

18 internal development"); *see also In re Intel Corp. Sec. Litig.*, 2023 WL 2767779, at *18 (N.D.

19 Cal. Mar. 31, 2023) (plaintiffs' omission theory failed because company did not have duty to

20 disclose interim internal update); *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d

21 1059, 1077-78 (N.D. Cal. 2001) (no duty to update because "[s]tatements regarding past events

22 contain no implicit prediction that those events or conditions will continue in the future").

23       As to Subscription Upgrades—which are upgrades in an existing user's subscription to

24 add services and features—Ms. Bharadwaj said Atlassian was not seeing "any trends" related to

25 "macroeconomic impact.".  ¶ 98 ("I haven't really seen any discernible trend **there** in terms of

26 the macroeconomic impact.").  Plaintiffs do not (and cannot) allege any connection between

27 Subscription Upgrades and Existing Paid User Expansion.

28

1    With respect to Free-to-Paid Conversions, Ms. Bharadwaj discussed the impacts that had

2    been disclosed "[j]ust in the last shareholder letter." Ex. D at 9.  She reiterated that Atlassian had

3    seen some slowdowns in Free-to-Paid conversions in the period ended June 30, 2022, and

4    referred to Atlassian's August 4, 2022 disclosure of those slowdowns.  *Id.*

5    *Second*, Plaintiffs have not alleged any facts suggesting there *was* a discernible trend in

6    Existing Paid User Expansion as of September 14, 2022.  All that Plaintiffs point to is

7    Defendants' purported "admission" in November 2022 about the "timing" of a slowdown in

8    Existing Paid User Expansion.  ¶ 99.  But that statement in November 2022 explained that while

9    Atlassian *met its quarterly revenue guidance*, Atlassian *started* seeing a slowdown in Existing

10   Paid User Expansion in the *second half* of the first quarter of fiscal year 2023, *i.e.* beginning at

11   the earliest in mid-August, and that slowdown persisted into the fall.  Ex. G at 12.  Four weeks of

12   a slowdown is not a *trend* that contradicted any of Ms. Bharadwaj's prior  statements.  *See*

13   *Golubowski v. Robinhood Markets, Inc.*, 2023 WL 1927616, at *8 (N.D. Cal. Feb. 10, 2023)

14   (dismissing claim based on purportedly undisclosed trend for failure to adequately allege that

15   "declines" over three-month period "accurately reflect[ed] persistent conditions"); *Blackmoss*

16   *Invs. Inc. v. ACA Cap. Holdings, Inc.*, 2010 WL 148617, at *10 (S.D.N.Y. Jan. 14, 2010) (two-

17   month period does not establish a trend).  A "trend" involves an "observed *pattern* [that]

18   accurately reflects *persistent conditions* of the [company's] business environment."  *Oxford*

19   *Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1191 (11th Cir. 2002) (emphasis added).  Plaintiffs

20   offer no allegations establishing such a persistent pattern.  *See Sanders v. Realreal, Inc.*, 2021

21   WL 1222625, at *22 (N.D. Cal. Mar. 31, 2021) (plaintiffs failed to allege trend where business

22   metric declined for one year but increased in prior and subsequent periods and was therefore

23   more of a "singular occurrence").

24   **4.    Atlassian's Incorporation by Reference of Its Annual Report in the October 4, 2022 S-8 Does Not Change the Fact That Its Statement Addressed Material Trends for FY 2022**

25

26   Plaintiffs make passing reference to the fact that on October 4, 2022, Atlassian filed a

27   post-effective amendment to a prior SEC filing on Form S-8—related to Atlassian's employee

28   stock plans—as required in connection with its redomiciliation.  ¶¶ 65, 100.  According to

1    Plaintiffs, the Form S-8 was false or misleading because it incorporated Atlassian's Annual

2    Report by reference, which (Plaintiffs say) "reconfirmed" Atlassian's August 19, 2022

3    statements regarding material trends after its first quarter was over.   ¶ 65.

4          This argument rests on a faulty legal premise.   In filing a post-effective amendment that

5    incorporates an earlier filing by reference, the filer (in this case, Atlassian) is not reaffirming the

6    accuracy of the facts and statements in the earlier filing as of a new, current date.   Rather,

7    incorporation of a prior filing speaks only to matters *as of the date of that earlier filing*, here,

8    August 19, 2022.   *See In re Stemline Therapeutics, Inc. Sec. Litig.*, 313 F. Supp. 3d 543, 548-49

9    (S.D.N.Y. 2018) (holding that company's incorporation of annual report by reference into

10   subsequent SEC filing did not render annual report's discussion of data from prior period false or

11   misleading when made).   Indeed, Atlassian's Form S-8 filing makes it clear that the Annual

12   Report incorporated by reference is for the period ended June 30, 2022, and nothing in the

13   Annual Report purports to speak of any event or occurrence outside of the period July 1, 2021 –

14   June 30, 2022.   Ex. H.   There were no statements in the Form S-8 about Atlassian's financial

15   results or guidance, much less any trends in Free-to-Paid Conversions or Existing Paid User

16   Expansion.   Plaintiffs' challenge to this statement fails.

17       **B.**    **Plaintiffs Fail to Plead a Strong Inference of Scienter**

18          Plaintiffs' claims should be dismissed for the independent reason that they do not plead

19   particularized facts as to each Defendant supporting a strong inference of scienter.   *See* 15 U.S.C.

20   § 78u-4(b)(2); *Apollo*, 774 F.3d at 607.   "[M]ere recklessness or a motive to commit fraud and

21   opportunity to do so . . . are not sufficient" to plead scienter.   *Zucco*, 552 F.3d at 991.   Instead,

22   Plaintiffs must allege specific facts establishing that "the defendants made false or misleading

23   statements either intentionally or with deliberate recklessness."   *Id*.   Deliberate recklessness is a

24   high bar requiring "intentional or knowing conduct" and an "extreme departure from the

25   standards of ordinary care, and which presents a danger of misleading buyers or sellers that is

26   either known to the defendant or is so obvious that the actor must have been aware of it."   *Id.*

27   And Plaintiffs must plead facts from which an inference of fraudulent intent is "more than

28   merely plausible or reasonable—it must be cogent and at least as compelling as any opposing

DEFENDANTS' MOTION TO DISMISS
CASE NO. 3:23-cv-00519-WHO

1   inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.  As the Ninth Circuit has

2   consistently recognized, this "is not an easy standard to comply with—it is not intended to be—

3   and plaintiffs must be held to it." *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th

4   Cir. 2003); *see also Nguyen v. Endologix, Inc.*, 962 F.3d 405 (9th Cir. 2020).  Plaintiffs do not

5   come close to meeting this standard.  Indeed, Plaintiffs do not allege any of the typical hallmarks

6   of scienter—no reports given to the Individual Defendants contradicting their public statements,

7   no meetings attended by the Individual Defendants where contradictory information was

8   discussed, no unusual or suspicious stock sales by any Individual Defendant.  Plaintiffs' lack of

9   any cognizable scienter theory is fatal to their claims.

10          **1.      Plaintiffs Do Not Allege Any Fact Establishing a Motive to Defraud**

11          Plaintiffs do not even attempt to plead that any Defendant had a motive or opportunity to

12   commit fraud.  They acknowledge (in a footnote) that Individual Defendants Farquhar and

13   Cannon-Brookes sold stock during the class period pursuant to longstanding Rule 10b5-1 trading

14   plans that result in the sale of exactly the same number of shares across every single trading day

15   during the year.  *See* ¶ 103 n.19; Ex. I.  These Rule 10b5-1 trading plans were adopted in

16   February 2022, long before the start of the class period, and mirror what Individual Defendants

17   Farquhar and Cannon-Brookes have done since Atlassian's 2015 initial public offering.  *See id.*

18   Because these stock sales were made pursuant to pre-established 10b5-1 plans, they are not

19   suspicious and do not support scienter.  *See Park*, 2019 WL 1231175, at *23.  And there can be

20   no legitimate dispute that daily sales of the exact same number of shares every trading day both

21   before and after the class period are neither unusual nor remotely suspicious.  *See, e.g.*, *In re*

22   *Pixar Sec. Litig.*, 450 F. Supp. 2d 1096, 1104 (N.D. Cal. 2006) (requiring plaintiff to allege

23   insider sales were "unusual" or "suspicious" or "dramatically out of line with prior trading

24   practices at times calculated to maximize the personal benefit from undisclosed inside

25   information").

26          The notion that Defendants deliberately misled investors about Atlassian's business

27   prospects between August and October 2022 while purportedly knowing that Atlassian would

28   have to reduce its financial guidance in the next quarter due to macroeconomic headwinds—all

1   with no apparent motive—makes no sense.  *See Endologix*, 962 F.3d at 415-16 (fraud theory

2   implausible where complaint lacked any allegations that defendants had attempted to profit from

3   false statements; it "does not resonate in common experience" for a company to artificially

4   inflate stock prices before "fac[ing] the inevitable fallout").  In the absence of alleged facts

5   establishing that Defendants somehow profited from their purportedly false statements, it is

6   "much less likely" that Plaintiffs can meet the high bar required to plead scienter.  *Prodanova v.*

7   *H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1108 (9th Cir. 2021) (the "lack of a plausible

8   motive certainly makes it much less likely that a plaintiff can show a strong inference of

9   scienter."); *see also Bodri v. GoPro, Inc.*, 252 F. Supp. 3d 912, 933 (N.D. Cal. May 1, 2017) (the

10  "absence of a motive allegation . . . significantly undermine[s] a plaintiff's theory of fraud").

11           **2.      Plaintiffs' Allegations Do Not Establish That Any Defendant Acted
                        With an Intent to Deceive or Deliberate Recklessness**

12

13          Plaintiffs' scienter theory assumes Atlassian and its executives assured investors

14  Atlassian was not experiencing slowing growth from macroeconomic headwinds and issued

15  misleading forward-looking guidance—all the while, knowing it would need to withdraw that

16  guidance a few months later.  Not only is this theory entirely illogical, it is also unsupported by

17  specific alleged facts.  Plaintiffs do not identify any facts—documents, meetings, statements, or

18  even any relevant and credible CW accounts—establishing that any Defendant made any

19  particular statement knowing it was false.  *See In re Arrowhead Pharms., Inc. Sec. Litig.*, 2017

20  WL 8791111, at *6 (C.D. Cal. Dec. 21, 2017) (no scienter absent particularized facts showing

21  defendants had actual knowledge of information contradicting challenged statements). Instead,

22  Plaintiffs rely on (1) alleged contemporaneous knowledge of material adverse trends based on

23  Defendants' close monitoring and a historically linear sales cycle, (2) a core operations

24  inference, (3) analyst comments, and (4) an unalleged Item 303 (or Item 5) violation.  Each fails.

25          <u>Atlassian's Monitoring of Metrics Supports Good Faith, Not Scienter</u>.  Plaintiffs' scienter

26  theory depends largely on its allegations the Individual Defendants "monitored trends and

27  subscriber metrics closely," and that given Atlassian's "linear" sales cycle, they must have

28  known when they made the challenged statements in August and September that macroeconomic

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

DEFENDANTS' MOTION TO DISMISS
CASE NO. 3:23-cv-00519-WHO

headwinds would significantly impact Atlassian's projected financial performance later in its

fiscal year.  ¶¶ 102-04, 109.  But Plaintiffs do not allege specific facts (as they must) establishing

that any Individual Defendant was aware of any specific information, as of any challenged

statement, contradicting what any of the Individual Defendants said.  Indeed, Plaintiffs rely on

Mr. Deatsch's purported explanation "that he and Defendants Farquhar and Cannon-Brookes

personally monitored" certain metrics, without alleging anything about what those metrics

showed, let alone that they reflected slowing growth rates at the time of the challenged

statements.  Plaintiffs do not allege a single fact showing the amount or rate by which growth

was purportedly slowing, when it was purportedly slowing, or whether any slowing was

temporary or persistent (or how any Individual Defendant could have discerned any trend at the

time of the challenged statements).

Further, Plaintiffs do not allege that Ms. Bharadwaj was monitoring financial metrics and

had any information on September 14, 2022 contradicting the statements she made—they do not

even allege that she monitored the same information and they cannot rely on group pleading

allegations.  *See In re Finisar Corp. Deriv. Litig.*, 2012 WL 2873844, at *9 (N.D. Cal. July 12,

2012) (requiring scienter be alleged on an "individualized, defendant-by-defendant basis" and

holding group pleading is "not permissible under the PSLRA"); *see also Apollo*, 774 F.3d at 607

(scienter must be alleged "with respect to each of the individual defendants").  Absent

allegations establishing that a particular Individual Defendant had information directly

contradicting his or her statements at the time they were made, Plaintiffs cannot establish

scienter.  *See, e.g.*, *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1035-36 (9th Cir. 2002)

(rejecting scienter allegations based on conclusory statements about management's access to

supposed "negative internal reports" about customer demand without particularized allegations

of specific information contradicting defendants' public statements); *In re Wet Seal, Inc. Sec.*

*Litig.*, 518 F. Supp. 2d 1148, 1175 (C.D. Cal. 2007) (rejecting scienter allegations based on

management access to real-time reports because, as here, "Plaintiffs have not alleged any

specific data that the individual Defendants learned from these reports that were inconsistent

with [the company's] public statements").

1    Plaintiffs seek to fill this gap by offering speculative allegations that Defendants (1) had

2    access to and monitored financial "metrics" (¶¶ 29, 49, 103), (2) "admitted" in November that

3    material trends were known in July 2022 (¶ 102), and (3) must have known of an emerging trend

4    based on Atlassian's historically linear sales cycle (¶ 104).  None establishes scienter.

5    *First*, Plaintiffs' vague and conclusory allegations that Defendants had access to

6    unspecified "metrics" and monitored Atlassian's financial performance are the type of

7    generalized allegations courts have long held do not suffice for scienter.  "[M]ere access" to

8    unspecified information "even combined with allegations of a hands-on management style, is not

9    enough to show deliberate recklessness." *Wet Seal*, 518 F. Supp. 2d at 1175; *Police Ret. Sys. of*

10   *St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1063 (9th Cir. 2014) (finding insufficient

11   allegations about "[m]ere access to reports containing undisclosed sales data"); *Zucco*, 552 F.3d

12   at 1000 (finding insufficient "allegations that senior management . . . closely reviewed the

13   accounting numbers generated . . . each quarter [], and that top executives had several meetings

14   in which they discussed quarterly inventory numbers").

15   *Second*, while Plaintiffs allege Defendants "admitted" that material adverse trends began

16   in July 2022, Defendants admitted no such thing.  *Supra* § IV.A.3.  Defendants disclosed on

17   November 3, 2022 that Free-to-Paid Conversion slowdowns had grown "more pronounced"

18   through the first quarter of fiscal year 2023, and Atlassian *started* to see a slowdown in Existing

19   Paid User Expansion in ***the second half*** of the first quarter.  Ex. F at 2, 11.  All of the challenged

20   statements about what Atlassian was seeing in Existing Paid User Expansion were made in or

21   before the first half of the first quarter, before Atlassian began seeing a slowdown in this metric.

22   And Ms. Bharadwaj's statement in the second half of the first quarter did not make any

23   representation about trends in Existing Paid User Expansion, but rather warned investors that it

24   would be an important metric to watch given the macroeconomic environment.

25   *Third*, Plaintiffs conclude that because Atlassian's sales cycle had historically been

26   "linear," Defendants must have been "immediately aware of negative trends in the business."

27   ¶ 104.  Such a conclusion is sheer speculation, supported by no alleged facts establishing that any

28

1  Defendant actually saw any departure from the line at the time of the challenged statements in

2  early August.  *Supra* § IV.A.

3           Plaintiffs' Invocation of the "Core Operations" Theory Carries No Weight.  Plaintiffs

4  invoke a "core operations" theory of scienter based on the general allegation that because "90%

5  of the Company's revenue in any given year comes from existing customers," Defendants must

6  have been aware of "Atlassian's core business."  ¶ 108.  Pleading scienter based on core

7  operations is "not easy" and is only appropriate in "rare circumstances," such as where a plaintiff

8  alleges "witness accounts demonstrating that executives had actual involvement in creating false

9  reports."  *Welgus*, 2017 WL 6466264, at *19 (rejecting core-operations theory where defendant

10 derived 83% of revenue from one product).  Such rare circumstances are not alleged and do not

11 exist here.  Plaintiffs do not offer the necessary detailed allegations showing that any Defendant

12 had exposure to any specific facts establishing that the macroeconomic environment would have

13 a negative impact on Atlassian's future guidance at the time of any challenged statement.

14 Allegations "merely emphasizing the importance" of a business metric or product line to the

15 company do "not show that the core operations theory applies."  *See, e.g.*, *Pardi v. Tricida, Inc.*,

16 2022 WL 3018144, at *15 (N.D. Cal. July 29, 2022) (citing cases); *In re AnaptysBio, Inc. Sec.*

17 *Litig.*, 2021 WL 4267413, at *14 (S.D. Cal. Sept. 20, 2021) (rejecting core operations theory

18 based on importance of company's product).

19          Analyst Opinions Do Not Support Scienter.  Plaintiffs point to analyst reports and

20 questions expressing interest in macroeconomic impacts and later reports of disappointment in

21 Atlassian's reduced fiscal year 2023 guidance as support for scienter.  ¶¶ 105-107.  But the

22 opinions of third-party analysts about Atlassian's financial guidance has nothing to do with any

23 defendant's state of mind and cannot support scienter.  *See Wet Seal*, 518 F. Supp. 2d at 1172-73

24 (rejecting scienter based on reported statements made by analysts); *Campo v. Sears Holding*

25 *Corp.*, 371 F. App'x 212, 215 (2d Cir. 2010) (no scienter based on journalist opinion).

26          A Purported Item 303 (or Item 5) Violation Does Not Support Scienter.  Plaintiffs point

27 to Atlassian's alleged violation of Item 303 to support an inference of scienter.  ¶ 109.  Not only

28 is the Complaint devoid of any alleged Item 303 violation as explained above (§ IV.A.2), "[t]he

1   majority of circuits have clearly held that standing alone, allegations of violations of GAAP or

2   SEC regulations do not establish scienter." *In re Cornerstone Propane Partners, L.P. Sec. Litig.*,

3   355 F. Supp. 2d 1069, 1091 (N.D. Cal. 2005); *see also In re Downey Sec. Litig.*, 2009 WL

4   2767670, at *11-12 (N.D. Cal. Aug. 21, 2009) (violations of SEC reporting rules, "even

5   significant ones requiring large or multiple restatements" are insufficient to plead scienter).

6   **3.      The Non-Fraudulent Inference Is More Compelling**

7   Plaintiffs urge the Court to conclude Defendants engaged in a scheme to conceal slowing

8   growth to artificially inflate revenues for no reason, but the alleged facts do not support that

9   conclusion.  The far more plausible and compelling inference is that Defendants believed in the

10  continued growth of their products, and despite not seeing any discernible material adverse

11  trends from macroeconomic headwinds at the time of the challenged statements, specifically

12  warned investors that Atlassian was not immune to the potential impact of an uncertain economic

13  environment.  And, as soon as those macroeconomic forces began to have an impact, Atlassian

14  disclosed them and responsibly reset investor expectations for the future in its next scheduled

15  quarterly filing.  These facts support an inference of responsible communications with investors

16  in uncertain economic times, not fraud.  *See In re Alteryx, Inc. Sec. Litig.*, 2021 WL 4551201, at

17  *10 (C.D. Cal. June 17, 2021) (holding plaintiff failed to plead scienter where "more plausible

18  alternative explanation for the events detailed in the [complaint]" is that defendants' decision to

19  "pull [forward-looking] fiscal year guidance" in the midst of uncertain economic circumstances

20  "is more indicative of a business responding to uncertainty"); *see also In re Pivotal Sec. Litig.*,

21  2020 WL 4193384, at *17 (N.D. Cal. July 21, 2020) ("honest optimism followed by

22  disappointment is not the same as lying or misleading").

23  **C.      Plaintiffs Fail to State a Section 20(a) Claim**

24  Plaintiffs do not plead a Section 10(b) claim, so their Section 20(a) claim fails.  *See*

25  *Lipton*, 284 F.3d at 1035 n.15.

26  **V.      CONCLUSION**

27  Defendants respectfully request that the Court grant Defendants' Motion to Dismiss.

28

1 Dated:  September 8, 2023     Respectfully submitted,

2               LATHAM & WATKINS LLP

3               By /s/ Michele D. Johnson

4                 Michele D. Johnson (SBN 198298)

                 650 Town Center Drive, 20th Floor

5                 Costa Mesa, California 92626

                 Telephone:  1.714.540.1235

6                 Email:  michele.johnson@lw.com

7                 Colleen C. Smith (SBN 231216)

                 12670 High Bluff Drive

8                 San Diego, California 92130

                 Telephone:  1.858.523.5400

9                 Email:  colleen.smith@lw.com

10                Susan E. Engel (*pro hac vice* pending)

                 555 Eleventh Street, NW, Suite 1000

11                Washington, D.C. 20004

                 Telephone:  1.202.637.2200

12                Email:  susan.engel@lw.com

13               Daniel R. Gherardi (SBN 317771)

14                140 Scott Drive

                 Menlo Park, California 94025

15                Telephone:  1.650.328.4600

16                Email:  daniel.gherardi@lw.com

17               *Attorneys for Defendants*

18

19

20

21

22

23

24

25

26

27

28