**SAXENA WHITE P.A.**
David R. Kaplan (SBN 230144)
dkaplan@saxenawhite.com
505 Lomas Santa Fe Drive, Suite 180
Solana Beach, CA 92075
Tel.: (858) 997-0860
Fax: (858) 369-0096

*Counsel for Lead Plaintiffs*

*[Additional Counsel Listed on Signature Page]*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| CITY OF HOLLYWOOD FIREFIGHTERS' PENSION FUND, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>ATLASSIAN CORPORATION, ATLASSIAN CORPORATION PLC, MICHAEL CANNON-BROOKES, SCOTT FARQUHAR, ANU BHARADWAJ, and CAMERON DEATSCH,<br><br>Defendants. | Case No. 3:23-cv-00519-WHO<br><br>**OPPOSITION TO MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>Hearing Date: December 13, 2023<br>Time: 2:00 p.m.<br>Judge: Hon. William H. Orrick<br>Courtroom: 2, 17th floor |

1

## **TABLE OF CONTENTS**

2

I.    INTRODUCTION ....................................................................................................... 1

3

II.    STATEMENT OF FACTS ......................................................................................... 5

4

     A.    Atlassian's "Unique" Business Model Produced A "Linear Sales Cycle"
5          That Provided A Competitive Advantage Because Of Its "Predictability Of
          Sales" ................................................................................................................ 5
6

     B.    Defendants Assured Investors That They Personally Monitored Macro
7          Conditions "*Like A Hawk*" And Had "*Visibility Into Every Click*" ....................... 5

8

     C.    In Response To Analyst Inquiries, Defendants Assert That "We Have Yet
9          To See Any Specific Trend" "That Gives Us Pause Or Worry To Date" .............. 6

10

     D.    Analysts Relied On And Repeated Defendants' Claim That Atlassian Had
11          Experienced No Significant Macro Effects ........................................................... 7

12

     E.    Throughout The Class Period, Defendants Continued To Affirmatively
          Deny That Any Material Adverse Trends Were Impacting The Company ............ 8
13

     F.    Defendants Disclose That Atlassian's Business Had Been Materially
14          Impacted By Macroeconomic Trends *Throughout The Class Period* .................... 9

15

III.    LEGAL STANDARDS ............................................................................................. 10

16

IV.    ARGUMENT ........................................................................................................... 11

17

     A.    The Complaint Adequately Alleges Defendants' Misstatements And
18          Omissions ......................................................................................................... 11

19          1.    Defendants Falsely Stated That The Company Was Not
                Experiencing Any Adverse Trends On August 4, 2022 ........................... 11
20

          2.    The 2022 Annual Report Made Clear That There Were No Trends
21                For The *Current Fiscal Year* Affecting Operations ................................. 16

22          3.    A Mere Two Weeks Before The End Of Q1 2023, Defendants Claim
                That They "Haven't Really Seen Any Discernible Trend" ....................... 18
23

24          4.    Atlassian's October 4, 2022 Form S-8 Is Likewise False And
                Misleading ............................................................................................. 21
25

     B.    The Complaint Adequately Alleges A Strong Inference Of Scienter ................... 21
26

V.    CONCLUSION ........................................................................................................ 25
27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*Abramson v. Newlink Genetics Corp.*,
965 F.3d 165 (2d Cir. 2020) ................................................................................... 13

*Azar v. Yelp, Inc.*,
2018 WL 6182756 (N.D. Cal. Nov. 27, 2018) ............................................. 12, 16, 24

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ............................................................................ 11, 19

*Bodri v. GoPro, Inc.*,
252 F. Supp. 3d 912 (N.D. Cal. 2017) ..................................................................... 25

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
2013 WL 6441843 (N.D. Cal. Dec. 9, 2013) ............................................................ 16

*Commc'ns Workers of Am. Plan for Emp.' Pension & Death Benefits v. CSK Auto Corp.*,
525 F. Supp. 2d 1116 (D. Ariz. 2007) ..................................................................... 22

*Crews v. Rivian Auto., Inc.*,
2023 WL 4361098 (C.D. Cal. July 3, 2023) ............................................................. 24

*Eminence Capital, LLC v. Aspeon, Inc.*,
316 F.3d 1048 (9th Cir. 2003) ................................................................................ 25

*Evanston Police Pension Fund v. McKesson Corp.*,
411 F. Supp. 3d 580 (N.D. Cal. 2019) ..................................................................... 23

*Freudenberg v. E*Trade Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010) ...................................................................... 17

*Galestan v. OneMain Holdings, Inc.*,
348 F. Supp. 3d 282 (S.D.N.Y. 2018) ...................................................................... 15

*Glazer Capital Mgmt., L.P. v. Forescout Techs., Inc.*,
63 F.4th 747 (9th Cir. 2023) ............................................................................ 11, 15

*Golubowski v. Robinhood Markets, Inc.*,
2023 WL 1927616 (N.D. Cal. Feb. 10, 2023) ..................................................... 20, 21

*Hatamian v Advanced Micro Devices, Inc.*,
87 F. Supp. 3d 1149 (N.D. Cal. 2015) ..................................................................... 22

*In re Alphabet, Inc. Sec. Litig.*,
1 F.4th 687 (9th Cir. 2021) .................................................................................... 22

*In re Apple Inc. Sec. Litig.*,
   2020 WL 6482014 (N.D. Cal. Nov. 4, 2020)............................................................. 13, 14, 19, 25

*In re BioMarin Pharm. Inc. Sec. Litig.*,
   2022 WL 164299 (N.D. Cal. Jan. 6, 2022) ........................................................... 15, 22, 24, 25

*In re Countrywide Fin. Corp. Sec. Litig.*,
   588 F. Supp. 2d 1132 (C.D. Cal. 2008) ................................................................................ 17

*In re CPI Card Grp. Inc. Sec. Litig.*,
   2017 WL 4941597 (S.D.N.Y. Oct. 30, 2017) ...................................................................... 20

*In re Facebook, Inc. Sec. Litig.*,
   477 F. Supp. 3d 980 (N.D. Cal. 2020) ................................................................................. 20

*In re FibroGen, Inc.*,
   2022 WL 2793032 (N.D. Cal. July 15, 2022)....................................................................... 24

*In re Finisar Corp. Sec. Litig.*,
   2017 WL 1549485 (N.D. Cal. May 1, 2017) ....................................................................... 24

*In re Fusion-io, Inc. Sec. Litig.*,
   2015 WL 661869 (N.D. Cal. Feb. 12, 2015) ....................................................................... 16

*In re Gilead Scis. Sec. Litig.*,
   536 F.3d 1049 (9th Cir. 2008)............................................................................................. 10

*In re Immune Response Sec. Litig.*,
   375 F. Supp. 2d 983 (S.D. Cal. 2005).................................................................................. 22

*In re Intel Corp. Sec. Litig.*,
   2019 WL 1427660 (N.D. Cal. Mar. 29, 2019)..................................................................... 18

*In re NVIDIA Corp. Sec. Litig.*,
   768 F.3d 1046 (9th Cir. 2014)............................................................................................. 16

*In re Quality Sys., Inc. Sec. Litig.*,
   865 F.3d 1130 (9th Cir. 2017)...................................................................................... *passim*

*In re QuantumScape Sec. Class Action Litig.*,
   580 F. Supp. 3d 714 (N.D. Cal. 2022) .................................................................. 14, 20, 22, 24

*In re Scholastic Corp. Sec. Litig.*,
   252 F.3d 63 (2d Cir. 2001)................................................................................................... 24

*In re Stemline Therapeutics, Inc. Sec. Litig.*,
   313 F. Supp. 3d 543 (S.D.N.Y. 2018).................................................................................. 21

*In re Synchrony Fin. Sec. Litig.*,
   2022 WL 427499 (D. Conn. Feb. 11, 2022) ....................................................................... 13

*In re Syntex Corp. Sec. Litig.*,
   95 F.3d 922 (9th Cir. 1996)................................................................................. 18

*In re Toyota Motor Corp. Sec. Litig.*,
   2012 WL 3791716 (C.D. Cal. Mar. 12, 2012) ................................................. 23

*In re Wireless Facilities, Inc. Sec. Litig.*,
   2007 WL 9667131 (S.D. Cal. May 7, 2007)................................................... 23

*In re Zillow Grp., Inc. Sec. Litig.*,
   2019 WL 1755293 (W.D. Wash. Apr. 19, 2019)............................................ 23

*Indiana Pub. Ret. Sys. v. SAIC, Inc.*,
   818 F.3d 85 (2d Cir. 2016)............................................................................... 25

*Irving Firemen's Relief & Ret. Fund v. Uber Techs.*,
   2018 WL 4181954 (N.D. Cal. Aug. 31, 2018)............................................... 20

*Kong v. Fluidigm Corp.*,
   2021 WL 3409258 (N.D. Cal. Aug. 4, 2021).................................................. 13

*Lematta v. Casper Sleep, Inc.*,
   2022 WL 4637795 (E.D.N.Y. Sept. 30, 2022)............................................... 12

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011)........................................................................................... 10

*Miller v. Thane Intern., Inc.*,
   519 F.3d 879 (9th Cir. 2008)........................................................................... 19

*Mulligan v Impax*,
   36 F. Supp.3d 942 (N.D. Cal. 2014) ............................................................... 15

*New York City Employees' Ret. Sys. v. Berry*,
   667 F. Supp. 2d 1121 (N.D. Cal. 2009) .......................................................... 21

*Park v. GoPro, Inc.*,
   2019 WL 1231175 (N.D. Cal. Mar. 15, 2019)............................................... 18

*Prodanova v. H.C. Wainwright & Co., LLC*,
   993 F.3d 1097 (9th Cir. 2021).......................................................................... 25

*Purple Mountain Tr. v. Wells Fargo & Co.*,
   432 F. Supp. 3d 1095 (N.D. Cal. 2020) .......................................................... 13

*Reese v. Malone*,
   747 F.3d 557 (9th Cir. 2014)........................................................................... 24

*Roberti v. OSI Sys. Inc.*,
   2015 WL 1985562 (C.D. Cal. Feb. 27, 2015)............................................... 24

*Sanders v. Realreal, Inc.*,
   2021 WL 1222625 (N.D. Cal. Mar. 31, 2021) ............................................................................ 21

*Scheller v. Nutanix, Inc.*,
   2020 WL 5500422 (N.D. Cal. Sept. 11, 2020) .......................................................................... 22

*Schueneman v. Arena Pharm., Inc.*,
   840 F.3d 698 (9th Cir. 2016) ..................................................................................................... 11

*Shenwick v. Twitter, Inc.*,
   282 F. Supp. 3d 1115 (N.D. Cal. 2017) ............................................................................. 14, 19

*Sneed v. AcelRx Pharm., Inc.*,
   2023 WL 4412164 (N.D. Cal. July 7, 2023) ............................................................................. 16

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ................................................................................................... 10, 22, 25

*Thomas v. Magnachip Semiconductor Corp.*,
   167 F. Supp. 3d 1029 (N.D. Cal. 2016) .................................................................................... 22

*Veal v. Lendingclub Corp.*,
   2020 WL 3128909 (N.D. Cal. June 12, 2020) .......................................................................... 18

*Warshaw v. Xoma Corp.*,
   74 F.3d 955 (9th Cir. 1996) ....................................................................................................... 15

*Welgus v. TriNet Group, Inc.*,
   2017 WL 6466264 (N.D. Cal. Dec. 18, 2017) .......................................................................... 18

*Weston Family P'ship LLP v. Twitter, Inc.*,
   29 F.4th 611 (9th Cir. 2022) ..................................................................................................... 18

*Weston v. DocuSign, Inc.*,
   2023 WL 3000583 (N.D. Cal. Apr. 18, 2023) ................................................................. *passim*

**RULES & REGULATIONS**

17 C.F.R. § 230.412 .............................................................................................................................. 21

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## STATEMENT OF ISSUES TO BE DECIDED

Whether the Complaint alleges facts that, considered holistically, state claims under §10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, and §20(a) of the Securities Exchange Act, 15 U.S.C. §78t(a).

1   **I.    INTRODUCTION**[1]

2        During the Class Period, by far the most critical issue facing Atlassian was whether

3   deteriorating global economic conditions were having a negative impact on the Company's

4   financial performance.  Accordingly, to assuage investor concerns, Defendants repeatedly and

5   consistently assured the market that there were no macro trends whatsoever negatively affecting

6   Atlassian.  For example, at the very beginning of the Class Period, on August 4, 2022, Defendants

7   represented that they had "***yet to see any specific trend . . . that gives us pause or worry to date***,"

8   and that "nothing we are seeing right now is changing our outlook."  A few weeks later, in

9   Atlassian's August 19, 2022 Annual Report, Defendants again assured the market that they were

10  "***not aware of any trends . . . for the current fiscal year*** that are reasonably likely to have a material

11  effect on our revenues, income, profitability, liquidity, or capital reserves."  Remarkably, ***even as***

12  ***late as September 14, 2022***—just ***two weeks*** before the end of Q1 2023—Defendants unequivocally

13  confirmed that there were no adverse trends affecting the Company's financial performance, stating

14  that "***[w]e're not seeing any trends there***" and "***[we] haven't really seen any discernible trend***

15  ***there in terms of the macroeconomic impact***."

16       Defendants' wholly positive statements were of such critical importance that Defendants

17  made sure the market knew that they personally monitored trend and subscriber metrics "***like a***

18  ***hawk***" and with "***surgical precision***," and that they had "***visibility into every click***" and were

19  "study[ing]" trend "information very carefully." Defendants also stated that they were remaining

20  "***exceedingly vigilant across watching all stages of our funnel***" and would "***continue to scan the***

21  ***horizon for warning signs and be candid with investors***."  Reflecting how significant the

22  statements were, a plethora of analysts specifically credited and quoted verbatim these

23  "***unabashedly positive***" statements.  For example, SMBC highlighted that "***[m]anagement ha[d]***

24  *'**yet to see any trend**'*"; Wolfe Research emphasized that the "cherry on top was reaffirmation of

---

[1]  All "¶_" references are to the Amended Class Action Complaint, ECF No. 40 ("AC" or "Complaint"). "Defendants" are Atlassian Corporation and Atlassian Corporation Plc (collectively, "Atlassian" or the "Company"); Michael Cannon-Brookes ("Cannon-Brookes"); Scott Farquhar ("Farquhar"); Anu Bharadwaj ("Bharadwaj"); and Cameron Deatsch ("Deatsch").  "DM_" refers to Defendants' Motion to Dismiss, ECF No. 43. "Ex" refers to the DM exhibits, ECF No. 43-1. Unless otherwise stated, all emphasis is added and internal quotations and citations are omitted.

OPPOSITION TO MOTION TO DISMISS
CASE NO. 3:23-CV-00519-WHO

basically ***zero*** impacts from macro"; and Oppenheimer was "bullish" on the Company because "***the company is seeing minimal macroeconomic weakness***."   Analysts even touted that these assurances differentiated Atlassian from its competitors, with Raymond James noting that the Company was "***feeling little impact from macro uncertainty that is causing budget tightening around the broader technology space***."   In turn, Atlassian's stock price soared, reaching a Class Period high of $289.36 per share on August 16, 2022.

However, Defendants' statements were indisputably false.  On November 3, 2022, Atlassian reported poor financial results for Q1 2023, including missing its earnings per share guidance for the first time in its history.  Significantly—and in direct contravention to Defendants' Class Period representations that they had not seen "***any discernible trend***" regarding "macroeconomic impact"—Defendants now admitted that the exact opposite was true: namely, that material adverse "trends" that had existed for months had negatively impacted ***all material segments*** of the Company's business.  Specifically, Defendants disclosed that Atlassian's poor results were directly attributable to material negative trends in (i) free-to-paid conversions (i.e., when a client first transitions from Atlassian's free service to a paying subscription), which represented 10% of Atlassian's business; and (ii) paid seat expansion (i.e., when an already-paying customer added additional users), which represented 90% of Atlassian's business.  Significantly, Defendants admitted that these two material adverse trends affected the Company ***throughout the Class Period***.  Indeed, in Defendants' own words, "the timing of things that we saw" with respect to these trends was "***July and August***"—i.e., by the start of the Class Period—thus admitting that these material trends existed at the ***exact same time*** that Defendants had represented the opposite to investors.

The market was stunned by these revelations.   Atlassian's stock price immediately plummeted over $50 per share, or nearly 30%, from $174.17 on November 3, 2022 to $123.73 on November 4, 2022—wiping out over $7 billion in shareholder value in a single trading day.  Analysts in turn excoriated Atlassian management for its failure to disclose these trends, noting management's "***abrupt change in tone and outlook***," and that "***the rate of change and surprise factor is high***" because of Defendants' "***significant and unexpected pivot in demand tone***."

OPPOSITION TO MOTION TO DISMISS
CASE NO. 3:23-CV-00519-WHO

1        In the face of these damning facts, Defendants principally argue that they made no false

2   statements.  Indeed, notwithstanding the massive decline in Atlassian's stock price and analysts'

3   visceral reaction to Defendants' admissions, Defendants contend that (i) they adequately and timely

4   disclosed the existence of these material trends; (ii) Atlassian's business was purportedly seasonal,

5   and while sales were down in July and August 2022, Defendants expected sales to recover in

6   September; and (iii) when Bhardwaj stated on September 14, 2022 that Defendants "haven't really

7   seen any discernible trend there in terms of the macroeconomic impact," she was supposedly not

8   talking about either free-to-paid conversions or paid seat expansion, even though those segments

9   comprised virtually all of Atlassian's revenue.  Defendants' arguments are meritless.

10      *First*, Defendants claim that they disclosed to the market a material adverse trend in free-

11   to-paid conversions because they noted that they saw a "modest decrease" in this metric.  But this

12   ignores the fact that Defendants repeatedly told the market that this "modest decrease" was entirely

13   inconsequential—in their own words, the decrease was a mere "***slight thing***" and a "***bit of softness***"

14   in "***really a very small part of our business***" that would have no impact whatsoever on the

15   Company's financial results.  Indeed, contrary to what Defendants now contend, Defendants made

16   clear to investors during the Class Period that this "modest" decrease in no way constituted a

17   material adverse trend, and in fact, told investors the exact opposite: namely, that they "***ha[d] yet***

18   ***to see any specific trend***" and "***haven't really seen any discernible trend there in terms of the***

19   ***macroeconomic impact***."

20      *Second*, Defendants ask the Court to believe that they supposedly did not see these material

21   negative trends until the very end of the quarter.  But Defendants' claim is completely contradicted

22   by both their repeated assurances that they personally monitored macro trends "like a hawk," and

23   their own admissions at the end of the Class Period.  Indeed, during the November 3, 2022 earnings

24   call, an analyst specifically noted that he "***[had] to believe that [Atlassian] had a very early***

25   ***warning***" regarding these trends, as Defendants had repeatedly trumpeted their "***tremendous***

26   ***visibility***" into sales and Atlassian's "***predictable sales model***."  In response, Defendants were

27   forced to clarify the true "timing of things that we saw," admitting that the "trend" in free-to-paid

28

OPPOSITION TO MOTION TO DISMISS
CASE NO. 3:23-CV-00519-WHO

conversions "*definitely came through throughout the quarter*" and "*going into August*"—i.e., *July 2022*; and Defendants were aware of the trend in paid user expansion in *July and August*, as "*people [were] not…adding more users*" and there was "*user growth slowdown across our customer base*."

Recognizing that these cold, hard facts establish the falsity of their statements, Defendants attempted to proffer another excuse, claiming that while the Company's sales were admittedly suffering in July and August 2022, they expected business to recover in September 2022 because Atlassian's business was supposedly "seasonal" in nature.  However, that purported justification is completely contradicted by Atlassian's myriad representations that its business was not seasonal, but entirely *linear* and "predictable."  Indeed, Atlassian's own SEC filings made clear to investors that its "linear quarterly sales cycle" provided the Company with predictable sales— "*approximately a third of our quarterly sales occur[] within each month of the respective quarter*"—and in every Annual Report, including during the Class Period, Defendants touted that Atlassian's "linear quarterly sales cycle" provided great "[p]redictability of [s]ales."

*Finally*, Defendants ask the Court to believe that Defendant Bhardwaj's statement on September 14, 2022 that Defendants "*haven't really seen any discernible trend there in terms of macroeconomic impact*," supposedly was not addressing either free-to-paid conversions or paid user expansion, but was actually purportedly addressing only "Subscription Upgrades."  Nonsense. Defendants' argument is belied by (i) Bhardwaj's own words, as Bhardwaj expressly denied that there were any negative trends affecting Atlassian's critical ability to add users, verifying to the market that she disclosed "*overall what we are seeing in different parts of the business*" and all known macro impacts "*across the board, across existing and new [customers]*"; and (ii) the reaction of the market, which explicitly noted that Defendants' end-of-Class Period disclosures represented an "abrupt change in tone and outlook" from their Class Period statements.  At best, Defendants' argument raises fact issues that cannot be decided at the pleading stage.

Defendants' motion should be denied in its entirety.

OPPOSITION TO MOTION TO DISMISS
CASE NO. 3:23-CV-00519-WHO

## II.    STATEMENT OF FACTS

### A.    Atlassian's "Unique" Business Model Produced A "Linear Sales Cycle" That Provided A Competitive Advantage Because Of Its "Predictability Of Sales"

Atlassian develops collaboration software. ¶4. Over 90% of Atlassian's revenue comes from "paid seat expansion"—existing customers who expand their current subscriptions to add more users; the bulk of the remaining 10% of revenue is derived from "free-to-paid conversions"—when non-paying customers hit the ten-user mark. ¶¶37-40, 52, 54, 62-63, 108; DM at 4.

Since Atlassian's first day as a public company, Defendants touted that its business strategy produced a "linear sales cycle," which was "unique" in the industry and afforded Atlassian a competitive advantage over its rivals precisely because it allowed senior management to accurately "predict" sales and easily manage the business. ¶¶12, 41-46, 60, 68, 71-72, 104.  For example, in its IPO Prospectus, Atlassian boasted that "[u]nlike traditional enterprise software businesses, we have historically experienced a linear quarterly sales cycle with approximately a third of our quarterly sales occurring within each month of the respective quarter." *See* ¶¶12, 41-44 (charts depicting **no** seasonality). In every Annual Report thereafter, Defendants touted that Atlassian's "linear quarterly sales cycle" provided great "[p]redictability of [s]ales." ¶¶12, 41-42, 60, 71, 104.

Indeed, Atlassian repeatedly highlighted that the "***remarkably linear***" cycle provided Defendants with real-time, intra-quarter insights. ¶44. For example, Atlassian's former CFO claimed that the linearity "***really helps us in-quarter to understand where we're at financially***" and "puts us in a position where we're really in a ***no-surprise environment***." ¶42. Similarly, Atlassian's former President stressed that management was never "***sweating the last 2 or 3 weeks of a quarter trying to figure out whether or not people had forecasted things correctly***." ¶43. To quash concerns about the macro environment, Atlassian's Head of Investor Relations noted that "we have this ***beautiful linearity throughout our quarter***," which allowed Atlassian to "***look at bookings on an ongoing basis***" and remain current with its trends throughout its quarters.  ¶45.

### B.    Defendants Assured Investors That They Personally Monitored Macro Conditions "*Like A Hawk*" And Had "*Visibility Into Every Click*"

Defendants also conveyed, and investors understood, that Atlassian had complete and

5

"*tremendous*" real-time visibility into Atlassian's business and operations. ¶68.  For example, Atlassian management repeatedly boasted that they had "*visibility into every click*," and would "study" trend "information very carefully," including personally monitoring "bookings," "customer numbers," and "usage and adoption metrics."  ¶103.  In the Company's August 4, 2022 Shareholder Letter, Defendants even touted that they could identify sales issues "*with surgical precision*." ¶47.

Significantly, Defendants repeatedly made sure that investors knew that Atlassian's most senior officers were closely and carefully monitoring the impact of macroeconomic conditions on the Company's business and operations, which they would "*continue to watch like a hawk*." ¶53. Indeed, throughout the Class Period, Defendants assured investors that they would "*remain vigilant in this environment*," were "*being exceedingly vigilant across watching all stages of our funnel*," and would "*continue to scan the horizon for warning signs* and be candid with investors" regarding macroeconomic impacts.  ¶¶47-48, 53, 88.

### C.    In Response To Analyst Inquiries, Defendants Assert That "We Have Yet To See Any Specific Trend" "That Gives Us Pause Or Worry To Date"

In the spring of 2022, investors were greatly concerned that poor global macroeconomic conditions would negatively affect Atlassian's business.  ¶¶4, 50.  In response, Defendants repeatedly assured investors that those issues were not impacting Atlassian.  ¶¶5, 51-54. Specifically, the August 4, 2022 Q4'22 Shareholder Letter—issued five weeks into the Q1'23 quarter—represented that there were no negative trends currently affecting Atlassian, confirming that "*nothing we are seeing right now* is changing our outlook," and that Defendants "never felt more confident about our strategies . . . *and the secular trends that reinforce them*."  ¶52.  As a result, Defendants were "reiterating…approximately 50% year-over-year [growth] for both FY23 and FY24." *Id*.  Defendants even went so far as to state that the declining macroeconomic environment gave Atlassian a competitive advantage: the "*turbulent economic environment[] offer[ed] a chance . . . to gain market share*."  ¶¶5, 51.  Similarly, on the earnings call held that day, Defendant Deatsch represented that Defendants had "*yet to see any specific trend geographically or even in industry segments or in customer size that gives us pause or worry to*

date"; that they had "*not seen any significant shift in customer demand across our product lines*"; and that there was "*no new news to share today*." ¶¶53, 89.

Additionally, while Atlassian reported a "modest decrease" in free-to-paid conversions—which represented just 10% of the Company's business—Defendants made clear that this decrease was completely immaterial and in no way constituted an adverse trend. ¶54. Indeed, in response to an analyst inquiry about why Atlassian was not experiencing "impacts [] other companies are seeing," Defendants minimized the decrease, calling it a "*slight thing*" that "*does not take away from the continued growth we see in our existing customer base that also drives more than 90% of our revenue in the existing year*." ¶¶54, 91-92. Defendant Deatsch also stated that "existing customers continue to have demand," confirming that the Company's "overall retention continues to be exceedingly strong," which had "been supporting our net expansion rate." *Id.*

**D.    Analysts Relied On And Repeated Defendants' Claim That Atlassian Had Experienced No Significant Macro Effects**

Tellingly, the market responded positively to Defendants' representations, with Atlassian's share price soaring to $289.36 per share on August 16, 2022—a 25% increase from just prior to the Class Period.  ¶59.  Significantly, a plethora of analysts specifically repeated and quoted *verbatim* Defendants' assurances that Atlassian had experienced no significant macro effects or trends:

- SMBC: Atlassian's "*narrative was unabashedly positive*" as "*[m]anagement has 'yet to see any trend' in geographies or customer segments that indicate macro-driven weakness,*" highlighting that Atlassian "*has not seen any broader slowdowns*." ¶56.

- Macquarie: Atlassian is "*resilient in a downturn*" because the Company showed "*little to no impacts from the macro environment.*"  ¶57.

- William Blair: Atlassian "has been vigilant in monitoring the macroeconomic environment and *has not seen any material signs of a slowdown in its data yet*," and a "key highlight[]" is that the Company reported "**No material macro impact coming through the business**." (emphasis in original). ¶58.

- Wolfe Research: the "*cherry on top was [Atlassian's] reaffirmation of basically zero impacts from macro* (outside of slight decrease in free to pay conversion rates)."  ¶55.

- Cowen: Atlassian saw "*consistent demand trends*" and "*is not seeing any notable macro pressures* in pipelines/close rates."  ¶56.

Analysts also made clear that Defendants' wholly positive statements gave the Company a competitive advantage.  For example, Raymond James concluded that Atlassian was "*feeling little*

*impact from macro uncertainty that is causing budget tightening around the broader technology space*." ¶55. Truist noted Atlassian was "*one of the key companies*" regarding "*macro commentary*" and that, "[w]hile other companies in our coverage have discussed headwinds … *[Atlassian] did not indicate any difference in buyer behaviors*." ¶56.

### E. Throughout The Class Period, Defendants Continued To Affirmatively Deny That Any Material Adverse Trends Were Impacting The Company

On August 19, 2022, Atlassian filed its 2022 Annual Report, making clear that there were no current trends affecting operations. Specifically, the 2022 Annual Report stated unequivocally that Atlassian was "*not aware of any trends, uncertainties, demands, commitments or events <u>for the current fiscal year</u> that are reasonably likely to have a material effect* on our revenues, income, profitability, liquidity or capital reserves, or that caused the disclosed financial information to be not necessarily indicative of future results of operations or financial conditions." ¶94.

A mere two weeks before the end of Atlassian's Q1 2023, at a September 14, 2022 industry conference, Atlassian continued to represent that there were no trends having a material impact on its business. At that conference, an analyst was "dying to ask" Defendants about "the macroeconomic conditions," and specifically asked "[w]hat are you seeing out there with the demand environment?" ¶¶61, 96. In response, Defendant Bharadwaj discussed "what different parts of our business are seeing what impact." ¶¶62, 97. With respect to Atlassian's "conversion of users from free to paid," Bharadwaj again assured investors that the slowdown was completely inconsequential and represented only a "*bit of softness over the past couple of months*"; that the decrease in no way constituted a material trend; and that "*it's important to illustrate that point in the overall picture as over 90% of our revenue comes from existing customers. So the conversion from free to paid is really a very small part of our business*." *Id.* Significantly, Bharadwaj also specifically represented that Atlassian was not experiencing any material adverse trends and that she had dutifully disclosed all relevant macro information affecting both metrics: "*We're not seeing any trends there. So across the board, across existing and new, that's overall what we are seeing in different parts of the business*." *Id.*

Analysts further questioned Bharadwaj about the significance of the "modest" conversion

decrease.  ¶¶63, 98.  In response, Bharadwaj reminded investors of the business model where "the first 10 users are free, and then the 11th user onwards, it's paid" and reported that "*we've seen some very encouraging progress there over the last four quarters*," and that Defendants "*haven't really seen any discernible trend there in terms of the macroeconomic impact*."  *Id*.  These representations had their intended effect, with Morgan Stanley reporting on September 15, 2022 that "*Atlassian has seen little impact from the weakened macro environment*."  ¶64.

### F. Defendants Disclose That Atlassian's Business Had Been Materially Impacted By Macroeconomic Trends *Throughout The Class Period*

On November 3, 2022, Defendants shocked the market by announcing poor financial results for Q1 2023.  ¶66.  Specifically, Atlassian missed its EPS guidance for the very first time, its cloud growth came in well below analysts' consensus, and it walked back full year cloud growth guidance issued just one quarter prior.  ¶¶66, 75.  In addition, Defendants acknowledged that they needed to address "*the topic that's top of mind for shareholders: macro impacts*." ¶67. To that end, in direct contrast with Defendants' prior representations, Defendants finally disclosed that during the quarter, Atlassian suffered from "*two trends*" from "*macro headwinds*" in both paid seat expansion and free-to-paid conversions that adversely impacted the Company's financial results.  ¶¶9, 67.

Significantly, while Defendants initially stated that they supposedly did not see these macro trends until "towards the end of the quarter," the market rejected this excuse, as it was completely contradicted by Defendants' assurances that they personally monitored these metrics "like a hawk," and Atlassian's repeated statements concerning the "predictability" of its "linear" sales cycle.  ¶¶42, 68, 89. Indeed, during the earnings call, an analyst noted that he "*[had] to believe that [Atlassian] had a very early warning*" regarding the trends because of Atlassian's "very linear" quarters and Defendants' "tremendous visibility into customer buying and usage patterns."  ¶68.  In response, Defendant Deatsch was forced to clarify "*the timing of things we saw*," expressly admitting with respect to free-to-paid conversions that "*the free customers converting to paid was slowing down going into August*"—i.e., July 2022; and with respect to the paid seat expansion, Defendants saw this trend in "*July and August*," as "*[Atlassian] tend[s] to see user growth slowdown across our customer base*" "*people are not upgrading instances, adding more users*."  ¶¶69-70.

Recognizing that this admission meant that Defendants were fully aware that Atlassian's business was suffering from these material adverse trends in July and August, Deatsch then tried to blame "seasonality" for this downturn, stating that Defendants expected the Company's business to recover in September 2022. ¶70. However, this claim was completely contradicted by Atlassian's numerous, consistent and repeated representations that the Company's business was not seasonal, but entirely linear, which afforded Defendants with great "predictability of sales" and a competitive advantage in the industry. ¶¶41-46, 71-72.  In fact, even on the very same November 3 earnings call, Defendant Farquhar confirmed that Atlassian's quarters had always seen "linearity." ¶72.

In response to the shocking news, the Company's share price fell almost 30%, from $174.17 per share on November 3, 2022 to $123.73 on November 4, 2022—a $7 billion decline in market capitalization in a single day. ¶114.  Prominent market analysts noted that Defendants' disclosures directly contradicted their prior assertions. ¶¶75-76.  For example, Wolfe Research concluded that the "***abrupt change in tone and outlook likely puts shares in the penalty box***," emphasizing that management's disclosure "***took us and investors by surprise***." ¶75. Citi similarly highlighted Defendants' reversal from their prior statements, calling it a "***significant and unexpected pivot in demand tone***."  *Id*.  BMO Capital likewise noted it was "***surprised by the magnitude of the slowdown in consolidated growth and cloud growth more particularly***."  *Id*.

## III.    LEGAL STANDARDS

On a motion to dismiss, courts "accept all factual allegations … as true," and construe them in the light most favorable to the plaintiff. *Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 322-23 (2007). The Court is "not sitting as a trier of fact"; and "so long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings." *In re Gilead Scis. Sec. Litig*., 536 F.3d 1049, 1057 (9th Cir. 2008). Thus, a plaintiff "need only allege enough facts to state a claim to relief that is plausible on its face." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 n.12 (2011).

## IV.    ARGUMENT

### A.    The Complaint Adequately Alleges Defendants' Misstatements And Omissions

A statement is false or misleading "if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008). Once securities issuers "tout positive information to the market, they [are] bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information." *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 706 (9th Cir. 2016). Moreover, courts must not "impute the strong inference standard of scienter to the element of falsity; we do not require a strong inference of fraud." *Glazer Capital Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 766 (9th Cir. 2023). Instead, "[f]alsity is subject to a particularly requirement and the *reasonable inference* of plausibility set out in *Twombly* and *Iqbal*." *Weston v. DocuSign, Inc.*, 2023 WL 3000583, at *17 (N.D. Cal. Apr. 18, 2023) (Orrick, J.) (emphasis in original).

### 1.    Defendants Falsely Stated That The Company Was Not Experiencing Any Adverse Trends On August 4, 2022

On August 4, 2022, Defendants falsely represented to investors that there were no adverse trends materially affecting Atlassian's business.  Specifically, Defendants assured the market that they "have yet to see any specific trend…that gives us pause or worry to date," and then specifically and repeatedly asserted that they "have not seen any significant shift in customer demand," there was only "continued growth" from "our existing customers base," and "existing customers continue to have demand."  ¶¶89, 92.  While Defendants noted a "modest decrease" in free-to-paid conversions, they made sure the market understood that this was merely a "slight thing" that in no way constituted a material adverse trend.  ¶54.  Indeed, Defendants specifically noted that "secular trends" reinforced Atlassian's growth.  ¶52.

These statements were demonstrably false.  Indeed, on November 3, 2022, ***Defendants admitted*** that they had seen "***two trends***" from "***macro headwinds***" in Atlassian's business dating back to ***July of 2022*** in both free-to-paid conversions and paid user expansion.  ¶¶9, 67, 69-73. Defendants' own admissions thus demonstrate the falsity of their August 4 statements. *See In re*

1    *Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1144 (9th Cir. 2017) (misleading to claim "prospective

2    sales in the pipeline was unchanged, or even growing" when it was actually contracting).

3          In response, Defendants make several arguments, each of which is without merit.

4          *First*, Defendants contend that they disclosed the material negative trends impacting the

5    Company because they told investors that they had seen a "modest decrease" in free-to-paid

6    conversions.  DM at 9.  That is nonsense, as Defendants' arguments are directly contradicted by

7    the statements they made during the Class Period.  Indeed, Defendants intentionally downplayed

8    this "modest decrease" as entirely inconsequential—in Defendants' own words, it was a "***slight***

9    ***thing***" and a "***bit of softness***" in "***really a very small part of our business***"—and Defendants made

10   clear that it in no way constituted a material trend that should worry investors.  ¶¶54, 62; *see Azar*

11   *v. Yelp, Inc.*, 2018 WL 6182756, at *11 (N.D. Cal. Nov. 27, 2018) (disclosing a "modest slowdown"

12   was misleading where "advertisers were dropping out of the program in high numbers").

13         In fact, rather than disclosing a material trend, Defendants told investors the opposite: that

14   there were no "***specific trend[s]***"; meaning, none were "reasonably likely to have a material

15   …unfavorable impact on" Atlassian.  ¶¶81-82 (citing SEC guidance); *see also Lematta v. Casper*

16   *Sleep, Inc.*, 2022 WL 4637795, at *13 (E.D.N.Y. Sept. 30, 2022) (trends connote that the "presently

17   known" condition is "reasonably likely to have material effects on the registrant's financial

18   conditions or results").  To buttress this narrative, Defendants reiterated the exact same growth

19   guidance—indicating ***no*** material effects—and confirmed that all "***secular trends***" "reinforce[d]"

20   growth. ¶¶52-54.  Defendants thus gave investors the false impression that there were ***no*** material

21   macro impacts on Atlassian—a conclusion analysts completely credited. ¶¶8, 55-58; *see Quality*

22   *Sys.*, 865 F.3d at 1144 (false statement "affirmatively created an impression of a state of affairs that

23   differed in a material way from the one that actually existed").  Indeed, the fact that analysts

24   uniformly relied on and ***quoted verbatim*** Defendants' statements in concluding that "management

25   has '***yet to see any trend***' in geographies or customer segments that indicate macro-driven

26   weakness" provides further compelling evidence that Defendants in no way disclosed the existence

27   of negative trends.  ¶¶8, 55-58.

28

Defendants also argue there was no conversion "trend" in August 2022 because the slowdown only "became more pronounced in the first quarter of 2023," and the Complaint "alleges no facts suggesting a more pronounced impact on Free-to-Paid Conversions" at the time of the August call. DM at 11. But Defendants ignore that their own admissions characterized this as a "trend" that existed in August: the deterioration in conversions was a "***continuation of the trend***" that was felt "***last quarter***"—*i.e.*, Q4 2022. ¶¶67, 73. Defendant Deatsch himself confirmed that the conversion "***trend*** definitely came through ***throughout the quarter***" and that it was felt "***going into August***," thereby confirming that Defendants were aware of the trend ***prior to August 4***. ¶69; *see In re Apple Inc. Sec. Litig.*, 2020 WL 6482014, at *6 (N.D. Cal. Nov. 4, 2020) (admission of impacts seen "as the quarter went on" meant the trend occurred in the first month of the quarter); *Purple Mountain Tr. v. Wells Fargo & Co.*, 432 F. Supp. 3d 1095, 1105 (N.D. Cal. 2020) (admissions by defendants are sufficient to allege falsity).[2]

*Second*, Defendants argue that there was no negative trend regarding paid user growth at the time of the August 4, 2022 earnings call because "Plaintiffs muddle the two separate metrics" and supposedly "Deatsch did not admit" that the expansion trend began in July. DM at 10-11. But this is not true, and again, Defendants' argument cannot be reconciled with their own words. As an initial matter, Deatsch's clarification regarding the "timing of things that we saw" with respect to these trends came in direct response to an analyst's question noting that Defendants had "tremendous visibility into customer buying and usage patterns," and that the analyst "***had to believe that you had a very early warning of the paid user growth slowdown***." ¶¶68, 69; *see Apple*, 2020 WL 6482014, at *5 (interpreting statement in light of the "analyst question that spurred [defendant's] answer"); *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 178 (2d Cir. 2020) (deciphering statement based on "its posture as a response to a specific question and its categorical nature"); *In re Synchrony Fin. Sec. Litig.*, 2022 WL 427499, at *10 (D. Conn. Feb. 11, 2022) (interpreting a statement where "the question from the analyst was not 'imprecise' or 'potentially ambiguous', as the Defendants claim, but rather direct and targeted"). In response, Deatsch first

---

[2] *Kong v. Fluidigm Corp.*, 2021 WL 3409258, at *7 (N.D. Cal. Aug. 4, 2021) (DM at 11) is inapposite as in that case, "there [was] no specific admission" relevant to the allegations.

OPPOSITION TO MOTION TO DISMISS
CASE NO. 3:23-CV-00519-WHO

disclosed that "the free customers converted to paid was slowing down going into August," but he did not end there. ¶69. Deatsch continued with respect to paid user growth that in "July and August," Atlassian identified a "user growth slowdown *across our customer base*" and confirmed that "July and August are slower as people are not upgrading instances, *adding more users*." ¶¶69-70. Therefore, in Deatsch's own words, the slowdown affected *all* customers, including existing ones—*i.e.*, the exact negative trend in paid user expansion. ¶67.

Thus, according to Defendants, even though the analyst's question was pointed directly at Defendants' "very early warning of the *paid user growth slowdown*," and even though Deatsch's answer concerned "*user growth slowdown across our customer base*," Deatsch only spoke about free-to-paid conversions. ¶¶68-69. This argument is contradicted by the actual exchange with the analyst, and to the extent that Defendants wish to argue that Deatsch meant something other than what he said, that raises a fact issue that is inappropriate to resolve at this stage. *Quality Sys.*, 865 F.3d at 1140 (allegations "construe[d] ... in the light most favorable to" plaintiffs)*; Apple*, 2020 WL 6482014, at \*3, \*6 n. 5 (same); *see also In re QuantumScape Sec. Class Action Litig.*, 580 F. Supp. 3d 714, 734 (N.D. Cal. 2022) (Orrick, J.) (falsity where "representations directly contradicted what [Defendant] knew at the time about the fundamental risks"); *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1139-40 (N.D. Cal. 2017) (statements "suggesting positive…user engagement trends were misleading" where defendants implied "Twitter's user engagement was strong and increasing").

*Third*, Defendants argue that Defendants' August 4 statements were truthful because Atlassian "never guaranteed that its sales cycle would always be linear" and warned that "results may fluctuate." DM at 11-12. This is a red herring. The Complaint never alleged that Defendants' statements were false because Atlassian failed to maintain a linear sales cycle or had inadequate warnings concerning linearity. Rather, it was *Defendants* that repeatedly told the market that Atlassian's "linear" sales cycle was significant precisely because it provided "*predictability of sales*" that produced a "*no surprise environment*" in the "last 2 or 3 weeks of a quarter"—and that this "predictability" gave the Company a competitive advantage because it allowed management "*in-quarter to understand where we're at*." ¶¶41-45, 71-72. In sum, the Complaint contains

detailed allegations regarding the linearity of Atlassian's business because such representations establish that Defendants' proffered excuse for **not** disclosing these material adverse trends in July and August—that they expected sales to recover in September 2022 because Atlassian's business was supposedly "seasonal"—is completely meritless.  ¶¶70-72.

    *Fourth,* while Defendants contend that their statements were mere "corporate optimism" that "no reasonable investor would rely on" (DM at 12-13), the exact opposite is true: Defendants' statements were highly specific and material, as demonstrated by the fact that **analysts uniformly relied on and repeated verbatim** Defendants' exact statements. ¶¶55-58; *see Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 303 (S.D.N.Y. 2018) ("the analyst's report reflected the state of market knowledge, which relied on Defendants' public statements").  For example, numerous analysts directly quoted Defendants' claim that Atlassian has "**yet to see any trend**" and its "**unabashedly positive**" report, as well as Defendants' statement minimizing the "slight" and "modest" decrease in conversions. ¶¶55-56.  Moreover, Defendants' August 4 statements were in direct response to analyst questions about the macro effects on Atlassian and were therefore unquestionably material to investors.  ¶¶88-89; 91-92; *see Glazer*, 63 F.4th at 771 (statements "made in response to specific questions asked by financial analysts" were material and not "mere puffery").  In addition, the statements were "not presented only as beliefs, they were presented as the truth of the situation," and are therefore actionable. *See In re BioMarin Pharm. Inc. Sec. Litig.*, 2022 WL 164299, at *12 (N.D. Cal. Jan. 6, 2022) (Orrick, J.).[3]

    Moreover, courts in the Ninth Circuit routinely find similar statements about "customer demand" actionable "when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly."  *DocuSign*, 2023 WL 3000583, at *18; *Warshaw v.*

---

[3] Defendants claim that the CWs do not support falsity. DM at 12. However, the Complaint provides the basis for CW1's report about sales linearity, as he onboarded both expanding and new customers and was therefore aware of the stream of seat additions.  ¶46 n.5; *Glazer*, 63 F.4th at 771 ("plaintiffs need only provide a basis for each CW's knowledge about the specific statements he made"); *Mulligan v Impax*, 36 F. Supp.3d 942, 962-63 (N.D. Cal. 2014) (plaintiffs who "number each witness and describe his or her job description and responsibilities" describe CWs with "sufficient particularity"). That CW2 left pre-Class Period is of no consequence, as he provided information about the data monitoring systems and Defendants' access thereto. *Quality Sys.*, 865 F.3d at 1145 ("Although CW6 was not at QSI during the Class Period, [she] had personal knowledge of executive-level management's real-time access to Salesforce reports forecasting quarterly sales").

1   *Xoma Corp.*, 74 F.3d 955, 957, 959-60 (9th Cir. 1996) (statement that "everything is going fine"

2   actionable when made to quell fears about the "unlikelihood of FDA approval" for new drug).[4]

3       ### 2.    The 2022 Annual Report Made Clear That There Were No Trends For
                    The *Current Fiscal Year* Affecting Operations

4

5       More than midway through Q1 2023, on August 19, 2022, Atlassian filed its Annual Report,

6   which stated that Defendants were "not aware of any trends…for the ***current fiscal year*** that are

7   reasonably likely to have a material effect on our revenues." ¶94.  This was false because, as

8   Defendants themselves expressly admitted, at that time there were in fact "two trends" from "macro

9   headwinds" materially negatively impacting the Company's business. ¶¶9, 67, 69-71.

10      Defendants do not dispute that they knew of the trends at the time of this filing, as they

11  stress that the trends were noticeable "in the *second half of that just-completed first quarter*." DM

12  at 9-11; *see Yelp*, 2018 WL 6182756, at *17 (admission that issue was known "about halfway

13  through the quarter" meant statements made at "almost the exact halfway point of the first quarter"

14  were misleading).  Instead, Defendants claim that when the Annual Report referenced the "current

15  fiscal year," Atlassian was really ***not*** talking about the current fiscal year, but was actually talking

16  about the ***prior*** fiscal year "ended June 30, 2022."  DM at 14.[5]  Defendants are wrong.

17      Defendants' statement did not limit itself to the prior fiscal year—indeed, had it done so, it

18  would have said as much.  To the contrary, the Annual Report stressed the *current* fiscal year—

19  meaning exactly what it said.  This is made clear by the rest of the Annual Report itself.  Indeed,

20  throughout the entirety of the Annual Report, Defendants never referred to the 2022 fiscal year as

21  [4] Defendants' authorities are distinguishable. DM at 13. In *Sneed v. AcelRx Pharm., Inc.*, 2023 WL
    4412164, at *8 (N.D. Cal. July 7, 2023), the statement that the product launch was "progressing

22  well" was not made in response to analyst questions and was far more vague than the statements
    here denying any "discernible trend."  The allegations in *City of Dearborn Heights Act 345 Police*

23  *& Fire Ret. Sys. v. Align Tech., Inc.*, 2013 WL 6441843, at *11 (N.D. Cal. Dec. 9, 2013) dealt with
    an allegedly late goodwill impairment not alleged here.   Defendants falsely claim the court in *In*

24  *re Fusion-io, Inc. Sec. Litig.*, 2015 WL 661869, at *14 (N.D. Cal. Feb. 12, 2015), held that
    statements reporting "excellent results" and "significant sales gains" are puffery. Not so. The court

25  there actually noted that statements "***projecting***" such items were not actionable.

26  [5] Defendants' claim that Plaintiffs "backdoor" an Item 303 challenge is absurd. DM at 13-14. The
    Complaint alleges ***affirmative denials of trends***, and while the Ninth Circuit held in *In re NVIDIA*

27  *Corp. Sec. Litig.*, 768 F.3d 1046, 1056 (9th Cir. 2014) that Item 303 does not "create a duty to
    disclose" trends, that holding does not permit Defendants to affirmatively state that no trends

28  existed when they knew the exact opposite was true. *See Quality Sys.*, 865 F.3d at 1137 (statement
    claiming occurrence was "absolutely not a macro trend" found false and actionable).

the "current fiscal year," but rather as either "***fiscal year ended June 30, 2022***" or "***fiscal year 2022***." *See generally* Ex. A. In fact, when the Annual Report wanted to address the 2022 fiscal year, it had no trouble doing so, as the report specifically represented that no trends "ha[d] a material adverse impact on [Atlassian's] financial condition or results of operations *during the fiscal year ended June 30, 2022*." DM at 14 (Ex. A at 66). Accordingly, the change in diction to the "***current***" year in the challenged statement was clearly intentional and related to July and August 2022 (the time between the end of fiscal year 2022 and the filing of the Annual Report).

Moreover, other sections of the Annual Report negate Defendants' claim that the term "current" applies to the prior year and "nothing in the Annual Report purports to speak of any event or occurrence outside of the period July 1, 2021 – June 30, 2022." DM at 14, 19. For example, in discussing Defendant Farquhar's employment, the Annual Report noted "Farquhar ***currently*** serves as our Interim [CFO], a position he has held since ***July 1, 2022***." Ex. A at 67. Clearly, the Annual Report addressed post-reporting period events and did so by using the term "current."

Further, Defendants' assertion that the Annual Report warned investors of the risk that macroeconomic pressure "may" impact results misses the point entirely. DM at 14-15. The risk warnings do not insulate Defendants from disclosing trends that ***had already materialized***. *See DocuSign*, 2023 WL 3000583, at *17 ("[r]isk disclosures that speak entirely of as-yet-unrealized risks and contingencies and do not alert the reader that some of these risks may already have come to fruition can mislead reasonable investors"); *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1178 n. 62 (C.D. Cal. 2008) ("cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired").[6] Furthermore, prior to the Annual Report, Defendants specifically disclaimed any negative trends (¶89), and the Annual Report disclaimed trends in the "current fiscal year." *See Freudenberg v. E*Trade Fin. Corp.,* 712 F. Supp. 2d 171, 193–94 (S.D.N.Y. 2010) ("Defendants' misleading Class Period statements are

---

[6] Defendants ignore Plaintiffs' allegations, and their brief's admissions, in arguing that Plaintiffs do not allege that the "risk had already materialized at the time of the Annual Report." DM at 15-16. The Complaint plainly alleges that Defendants knew of the trends in July, and, as noted, Defendants concede that the trends were perceived no later than August. DM at 9-11; ¶¶69-73.

OPPOSITION TO MOTION TO DISMISS
CASE NO. 3:23-CV-00519-WHO

alleged to have contradicted, and thus, nullified any risk disclosures").[7]

### 3. A Mere Two Weeks Before The End Of Q1 2023, Defendants Claim That They "Haven't Really Seen Any Discernible Trend"

On September 14, 2022—just two weeks before Q1 2023 ended—Defendant Bharadwaj again provided the exact assurance concerning macro impacts for which the market was clamoring. Specifically, in direct response to an analyst "dying to ask" about any macro impacts on Atlassian, Bharadwaj stated that there was only a "***bit of softness over the past couple of months***" in conversions—which was inconsequential given that conversions were "***really a very small part of the business***"; and that there were no material adverse trends to report "***across the board, across existing and new [customers]***," as Defendants "***haven't really seen any discernable trends there in terms of macroeconomic impact***," and she fully conveyed "overall what we are seeing in different parts of the business." *See, e.g.*, ¶¶61-63, 96-98.

These statements were patently false and "inconsistent with" internal known information. *Quality Sys.*, 865 F.3d at 1144. Defendants cannot deny that both the paid user expansion and free-to-paid conversion trends were abundantly apparent by mid-September, as their entire position in their motion is that the trends were discovered in August. DM at 9-11. Defendants instead argue that when Bharadwaj stated that there were no trends "***across the board, across existing and new [customers]***," she was not addressing the critical parts of Atlassian's business that actually mattered to investors—*i.e.*, either paid user expansion or free-to-paid conversions. DM at 17. Defendants' argument is wholly implausible.

As Defendants' brief concedes, those two metrics constituted virtually 100% of Atlassian's business (DM at 4), and both the plain meaning of Bharadwaj's statements and the context in which

---

[7] Defendants' authorities are inapposite. DM at 15-16. *Weston Family P'ship LLP v. Twitter, Inc.*, 29 F.4th 611, 621 (9th Cir. 2022), *In re Intel Corp. Sec. Litig.*, 2019 WL 1427660, at *10 (N.D. Cal. Mar. 29, 2019), and *In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 929 (9th Cir. 1996) stand for the common sense proposition that context matters, but none support an argument that a direct denial of any known trends is saved by a warning that trends "may" exist in the future. *Park v. GoPro, Inc.*, 2019 WL 1231175, at *17 (N.D. Cal. Mar. 15, 2019) and *Veal v. Lendingclub Corp.*, 2020 WL 3128909, at *8 (N.D. Cal. June 12, 2020) are inapposite because the plaintiffs failed to allege facts showing the risk had materialized at the time the warning was made, and there were no direct admissions to the contrary. The "admissions" made in *Welgus v. TriNet Group, Inc.*, 2017 WL 6466264, at *10 (N.D. Cal. Dec. 18, 2017) are distinguishable because they did not directly counteract the defendant's prior public statements—which is not the case here.

they were made underscore that she was talking about these very issues, as they came on the heels of a direct analyst question about "macroeconomic conditions." *Apple*, 2020 WL 6482014, at *5. In response, Bharadwaj assured the market that there were no trends "***across the board, across existing and new [customers]***"—after she explicitly referenced that "over 90% of our revenue comes from existing customers"—thus directly denying ***any*** adverse impacts in the all-important paid user expansion metric. ¶97; *see Miller v. Thane Intern., Inc.*, 519 F.3d 879, 888 (9th Cir. 2008) ("emphasiz[ing]" that the "context and manner of presentation" can show falsity).

Along the same lines, Defendants' argument that Bharadwaj's statement was exclusively limited to "Subscription Upgrades" is entirely unfounded. DM at 17. In denying the existence of any "discernible trends," Bharadwaj referenced Atlassian's business model of adding more users ("11th user onward, it's paid"), which affects ***both*** conversion and expansion, but is fundamentally ***irrelevant*** to upgrades. ¶98. Indeed, Defendants' own brief explains that upgrades only consider added "services and features," ***not*** additional users. DM at 17. Thus, Bharadwaj's statements gave investors an "impression of a state of affairs" regarding user expansion "that differ[ed] in a material way from the one that actually exist[ed]." *Berson*, 527 F.3d at 985. To the extent that Defendants now argue that Bharadwaj meant something different than what she actually said, this is yet another argument that cannot be resolved on a motion to dismiss and must await discovery.

Furthermore, the law is clear that when Bharadwaj chose to discuss "discernible trends" that may or may not be impacting Atlassian's business, she was required to disclose all trends that the Company was seeing at that time—including those material negative trends that were impacting Atlassian's most important segments. *Berson*, 527 F.3d at 987 ("once defendants chose to tout the company's backlog, they were bound to do so in a manner that wouldn't mislead investors as to what that backlog consisted of"). This is even more true here, where Bharadwaj directly referenced "user expansion" as an "important [metric] to look at in the current climate" and one she would "continue to monitor"—and claiming she had not seen any "discernible trend[s]"—while failing to provide investors with known material and contrary information concerning that topic. ¶98; *Shenwick*, 282 F. Supp. 3d at 1135-40 (defendants "misled investors by failing to disclose [key

internal] metrics" showing "flat or declining [] trends," which "cut[] against" their "reassurances [of] positive growth and [] trends"); *see also QuantumScape*, 580 F. Supp. 3d at 730 ("[e]ven if a statement is not false, it may be misleading if it omits material information").[8]

Defendants next contend that when Bhardwaj assured investors that the "modest decrease" in conversions was only a "bit of softness," she intended to limit her response to the "period ended June 30, 2022," and in no way commented on the current impact of the trend. DM at 18. This argument ignores that Bharadwaj stated that this "bit of softness" existed for the "past couple of months," meaning from July through September—the same timeframe that Defendants admitted they saw these trends. ¶97. Moreover, the notion that Defendants adequately disclosed any material adverse trend is belied by the market reaction at the end of the Class Period, with Atlassian's stock price plunging by nearly 30% and analysts uniformly castigating Atlassian management for their "abrupt change in tone and outlook," which "puts shares in the penalty box." ¶¶74-76.

Further, Defendants argue that "[f]our weeks of a slowdown" was not a "trend." DM at 18. However, it was ***Defendants*** who, just weeks later, specifically acknowledged that the impacts indeed constituted "***two trends***." ¶67. Moreover, the Complaint's allegations show that Defendants knew of the trends in July, and therefore the impacts were prevalent for ***months***, not weeks, by September. ¶¶67, 69-71. Regardless, "whether a pattern or occurrence is sufficiently lengthy to constitute a trend…should not be resolved at the motion to dismiss stage." *In re CPI Card Grp. Inc. Sec. Litig.*, 2017 WL 4941597, at *3 (S.D.N.Y. Oct. 30, 2017). Finally, while Defendants claim investors were not entitled to an "intra-quarter" update on trends (DM at 17), the law is clear that Defendants cannot make affirmative misstatements contrary to known facts. *Quality Sys.* 865 F.3d at 1137 (intra-quarter statement claiming "absolutely not a macro trend" actionable).[9]

---

[8] Defendants' reliance on *In re Facebook, Inc. Sec. Litig.*, 477 F. Supp. 3d 980, 1027 (N.D. Cal. 2020) is misplaced. DM at 17. There, the defendant's promise to "continue to monitor user engagement" was not accompanied by "any qualitative comment about user growth." *Id.* Here, by contrast, Bharadwaj's assurance was made in the same breadth she claimed, "I haven't [] seen any discernable trend." ¶98. The decision in *Irving Firemen's Relief & Ret. Fund v. Uber Techs.*, 2018 WL 4181954, at *5 (N.D. Cal. Aug. 31, 2018) is distinguishable for the same reason, as there the concealed information was "unconnected to the actual challenged statements."

[9] The decisions in *Golubowski v. Robinhood Markets, Inc.,* 2023 WL 1927616, at *2 (N.D. Cal.

OPPOSITION TO MOTION TO DISMISS
CASE NO. 3:23-CV-00519-WHO

### 4. Atlassian's October 4, 2022 Form S-8 Is Likewise False And Misleading

On October 4, 2022, after Q1 2023 had concluded, Defendants filed a public amendment to their registration statement, expressly incorporating Atlassian's Annual Report from August 19, 2023. ¶100. As noted above, the Annual Report disclaimed the existence of trends for the "***current*** fiscal year"—a false statement given that Defendants admitted the opposite just weeks later.

Defendants argue the incorporation of the Annual Report is benign because it "speaks only to matters as of the date" of the original filing. DM at 19. But the Complaint alleges that the Annual Report was false when it was filed. *See* § IV.A.2 *supra*; *New York City Employees' Ret. Sys. v. Berry*, 667 F. Supp. 2d 1121, 1125 (N.D. Cal. 2009) (finding 10(b) liability where registration statement incorporated documents that were false and misleading). Further, Defendants are wrong. Documents incorporated into a registration statement need to be updated if no longer accurate. *See* 17 C.F.R. § 230.412 (statement in incorporated document deemed to be in force unless "modified or superseded" by "any other subsequently filed document which also is or is deemed to be incorporated by reference" and "modifies or replaces [the original] statement"). Here, the Form S-8 noted that statements made in any "document incorporated by reference herein shall be deemed to be modified or superseded" ***only*** to the "extent that a statement contained herein or in any other subsequently filed document which also is or is deemed to be incorporated by reference herein modifies or supersedes such earlier statement." Ex. H at 4. Nothing modified the Annual Report, and therefore Defendants reasserted the denial of trends through their incorporation. Indeed, if Defendants were correct, there would be no point at all to incorporating by reference.[10]

### B. The Complaint Adequately Alleges A Strong Inference Of Scienter

Scienter is "a mental state that not only covers intent to deceive, manipulate, or defraud, but

---

Feb. 10, 2023) and *Sanders v. Realreal, Inc.*, 2021 WL 1222625, at *21 (N.D. Cal. Mar. 31, 2021) are distinguishable as neither involved affirmative denials of trends nor post-class period admissions. DM at 18. Furthermore, the *Robinhood* plaintiff failed to allege the recent declines were "historically extraordinary," *see* 2023 WL 1927616, at *8, but the Complaint here alleges the impacts were a significant departure from Atlassian's historical linear financial reporting. ¶¶71-72.

[10] Defendants' citation to *In re Stemline Therapeutics, Inc. Sec. Litig.*, 313 F. Supp. 3d 543, 548 (S.D.N.Y. 2018) (DM at 19) is misleading. There, the prospectus contained "explicit disclaimers providing ample warnings that the incorporated statements represented facts that had existed *at the time the incorporated documents were filed* with the SEC." *Id.* Not so here.

OPPOSITION TO MOTION TO DISMISS
CASE NO. 3:23-CV-00519-WHO

1   also deliberate recklessness."[11]  *DocuSign*, 2023 WL 3000583, at *19.  A "strong inference" "need

2   not be irrefutable . . . or even the most plausible," and no "smoking gun" is required—rather, the

3   standard is "[w]hen the allegations are accepted as true and taken collectively, would a reasonable

4   person deem the inference of scienter at least as strong as any opposing inference." *Tellabs*, 551

5   U.S. at 324-26. The "Supreme Court [] made clear [in *Tellabs*]" that for scienter, "a tie goes to the

6   plaintiff." *Commc'ns Workers of Am. Plan for Emp.' Pension & Death Benefits v. CSK Auto Corp.*,

7   525 F. Supp. 2d 1116, 1120 (D. Ariz. 2007); *Scheller v. Nutanix, Inc.*, 2020 WL 5500422, at *9

8   (N.D. Cal. Sept. 11, 2020) (Orrick, J.) (a "close question" on scienter resolves in plaintiffs' favor).

9          Here, Defendants' scienter is readily established, as numerous facts demonstrate that

10   Defendants made their statements with knowledge or deliberate recklessness of their falsity.

11          *First*, "it is a problem when a company represents the opposite to the market" of what it

12   knew.  *BioMarin*, 2022 WL 164299, at *13 ("defendants allegedly told the market things that were

13   allegedly not true and that it must have known were not true").  Here, Defendants **admitted** that

14   they knew of negative trends **since July 2022**. *See supra* § IV.A.1; *QuantumScape,* 580 F. Supp.

15   3d at 741 (disclosures showed defendants "must have known they were not reporting the truth—

16   there is no middle ground between the two positions"); *Hatamian v Advanced Micro Devices, Inc.*,

17   87 F. Supp. 3d 1149, 1160 (N.D. Cal. 2015) ("Defendants' later admissions also make plausible

18   plaintiffs' allegations that [the] statements . . . were false when made").  Defendants made multiple

19   contrary statements thereafter in August, September and October 2022. *See In re Alphabet, Inc.*

20   *Sec. Litig.*, 1 F.4th 687, 701 (9th Cir. 2021) ("a reckless omission of material facts satisfies the

21   element of scienter"); *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1022 (S.D. Cal.

22   2005) ("[T]hat the defendants published statements when they knew facts suggesting the statements

23   were inaccurate or misleadingly incomplete is classic evidence of scienter").

24          *Second*, Defendants themselves made clear to investors they had complete and tremendous

25

26   ―――――――――――
     [11] Defendants argue that Plaintiffs fail to allege specific knowledge. DM at 20-21.  While Plaintiffs
27   show Defendants' knowledge through Defendants' very own admissions, knowledge is not
     required at the pleading stage to allege scienter. *See Thomas v. Magnachip Semiconductor Corp.*,
28   167 F. Supp. 3d 1029, 1044 (N.D. Cal. 2016) ("Given that many of Plaintiffs' allegations lend
     themselves more to recklessness than knowledge. . . Defendants' argument is unpersuasive.").

OPPOSITION TO MOTION TO DISMISS
                                                CASE NO. 3:23-CV-00519-WHO

real-time visibility into Atlassian's business and operations, stating that they could identify sales issues "***with surgical precision***" and that they personally monitored the effects of macro conditions and operational metrics "***like a hawk***." *See* ¶¶47-48, 103; *DocuSign*, 2023 WL 3000583, at *20 ("executives told investors they had real-time access to, and knowledge of, sales information"). Management also represented that they had "***visibility into every click***," "study" trend "information very carefully," "look at bookings on an ongoing basis," and Deatsch touted that management ***personally*** monitored "bookings," "customer numbers," and "usage and adoption metrics." ¶¶45, 103; *see In re Zillow Grp., Inc. Sec. Litig.*, 2019 WL 1755293, at *19 (W.D. Wash. Apr. 19, 2019) ("scienter can be inferred where a corporate officer states that he or she knew about or was monitoring the subject of the misleading statements"). Moreover, CW 2 reported that "Atlassian had one of the best data monitoring systems" he had seen and confirmed that Company metrics were instantaneously updated in the internal system ***accessible to management***.[12] ¶49.

   *Third*, Defendants repeatedly touted the "predictability" of Atlassian's "linear sales cycle," and any variance from this linearity should have been a glaring red flag. ¶72. While Defendants assert that this is "sheer speculation" (DM at 23), the fact remains that Defendants made countless statements touting the significance of this linearity and how "a third of [its] quarterly sales" came in each month, which allowed them "***in-quarter to understand where we're at financially.***" ¶¶60, 71-72.[13] In fact, just prior to the Class Period, in remarks about the upcoming summer season, Atlassian management touted the "beautiful linearity" as a protection against the macro "elephant in the room," and Deatsch represented that the "next coming months" would see "business as usual,

---

[12] Defendants' argument that Bharadwaj was not monitoring "the same information" as other management (DM at 22) is absurd given her roles at Atlassian and her own statements that she would "continue to monitor" trends in "user expansion," which was "an important one to look at in the current climate."  ¶¶26, 48; *Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 602 (N.D. Cal. 2019) (whether statements "suggest personal knowledge" or knowledge of other employees "is a question of fact not appropriate for resolution on a motion to dismiss").

[13] Defendants claim their representations regarding linearity are "largely" "well before the class period," (DM at 4) but the Annual Report confirmed the linearity was alive and well. ¶60. Regardless, pre-Class Period information can confirm what a defendant should have known during the class period. *In re Toyota Motor Corp. Sec. Litig.*, 2012 WL 3791716, at *4 (C.D. Cal. Mar. 12, 2012) ("common sense dictates that facts relevant to scienter will ordinarily date from before any alleged misrepresentations"); *In re Wireless Facilities, Inc. Sec. Litig.*, 2007 WL 9667131, at *8 (S.D. Cal. May 7, 2007) (pre-class period knowledge is "not lost when the class period began").

1    if not stronger." ¶72. Even at the end of the Class Period, Farquhar confirmed "***the linearity that***

2    ***you've seen over the years***." *Id*. Further, CW1 confirmed the linear nature of Atlassian's sales. ¶46.

3          *Fourth*, Defendants repeatedly made specific, strong responses to analysts' direct questions

4    about macro conditions confirming that Atlassian's business was not affected—when Defendants

5    knew (and would later admit) that the exact opposite was true.  ¶¶88-89, 91-92, 96-98; *see In re*

6    *FibroGen, Inc.,* 2022 WL 2793032, at \*23 (N.D. Cal. July 15, 2022) ("specific [statements] … in

7    response to questions from analysts and investors" contributed to strong scienter inference);

8    *QuantumScape*, 580 F. Supp. 3d at 741 (N.D. Cal. 2022) ("the individual defendants personally

9    reported facts about the company that are alleged to be completely at odds with reality").

10          *Fifth*, analysts' reliance on the misstatements and their visceral reaction to Defendants'

11   disclosures, pointedly noting that they directly contradicted Defendants' prior representations,

12   support scienter.  ¶¶55-58, 75-76; *see In re Finisar Corp. Sec. Litig*., 2017 WL 1549485, at \*7

13   (N.D. Cal. May 1, 2017) (analysts' "substantial interest" in inventory issue caused "any statement

14   made by [defendants] on the topic [to be] of significant interest and importance to the market");

15   *FibroGen,* 2022 WL 2793032, at \*22 (scienter "supported by the reaction of the … financial

16   community"); *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001) (same).

17          *Sixth*, existing customers represented 90% of Atlassian's revenues, with the remainder

18   coming from free-to-paid conversions; thus, these metrics were indisputably Atlassian's core

19   operation. ¶39; *Reese v. Malone,* 747 F.3d 557, 575 (9th Cir. 2014) ("we can impute scienter based

20   on the inference that key officers have knowledge of the core operations of the company").  Thus,

21   it would be "absurd" to suggest that Defendants "were not aware of issues relating to" Atlassian's

22   "largest and most profitable" revenue source. *Roberti v. OSI Sys. Inc.*, 2015 WL 1985562, at \*13

23   (C.D. Cal. Feb. 27, 2015); *BioMarin*, 2022 WL 164299, at \*14 ("that a product was critical to the

24   defendant's financial success contributed to an inference of scienter"); *see also Crews v. Rivian*

25   *Auto*., *Inc.*, 2023 WL 4361098, at \*14 (C.D. Cal. July 3, 2023) (same); *Yelp*, 2018 WL 6182756, at

26   \*\*20-21 (operations represented "more than half" of company's revenue, and collecting cases).

27          *Seventh*, the "close timing between misleading statements and disclosure of inconsistent

28

24

facts suggests that (1) the facts existed at the time the challenged statements were made, and (2) the facts were not caused by intervening factors, such as a shift in consumer demand, that only became evident after the challenged statements were made." *Apple*, 2020 WL 6482014, at *10 ("[T]emporal proximity makes more plausible that intervening events did not cause the inconsistent statements"). Here, temporal proximity supports a strong inference of scienter.

*Eighth*, while a violation of Item 303 does not, on its own, constitute a 10(b) violation, the failure to disclose what Defendants themselves admitted were "trends" affecting Atlassian's business in July and August 2022, as required by Item 303, contributes to the inference of scienter. ¶¶77-85, 109; *see Indiana Pub. Ret. Sys. v. SAIC, Inc.,* 818 F.3d 85, 96 (2d Cir. 2016) ("We conclude that the allegations support the inference that SAIC acted with at least a reckless disregard of a known or obvious duty to disclose when, as alleged, it omitted this material information from its March 2011 10–K in violation of FAS 5 and Item 303").

*Finally*, while the Supreme Court has held that motive is not required (*Tellabs,* 551 U.S. at 325), Defendants' large Atlassian holdings, their ***daily*** stock sales totaling ***$222 million***, and the impending domiciliation as a U.S. corporation, provided substantial motive to delay disclosure here, even if just for a few months—thereby distinguishing Defendants' sales from their cited authorities (DM at 20).[14] ¶¶20, 25, 103 n.19; *see BioMarin*, 2022 WL 164299, at *14 (stock sales of $23 million "help[] contribute to an inference of scienter"); *Apple*, 2020 WL 6482014, at *13 (a lack of motive "do[es] not defeat an inference of scienter under a holistic analysis").

## V.    CONCLUSION

For all of these reasons, Defendants' motion to dismiss should be denied.[15]

---

[14]  *Bodri v. GoPro, Inc.*, 252 F. Supp. 3d 912, 933 (N.D. Cal. 2017) (DM at 21) is distinguishable because, unlike here, the company instituted a share repurchase program making it "illogical that GoPro would have been repurchasing its shares had it been aware of facts that would indicate the price would fall." *Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1107 (9th Cir. 2021) is inapposite as it recognizes potential motive where "someone inside a company… sell[s] shares before the company discloses negative information."

[15]  As Plaintiffs have stated a Section 10(b) claim against Defendants, Plaintiffs' Section 20(a) claim should be upheld as well.  *See DocuSign*, 2023 WL 3000583, at *24.  Moreover, if the Court grants the motion as to any defendant, Plaintiffs respectfully request leave to amend. *See Eminence Capital, LLC v. Aspeon, Inc*., 316 F.3d 1048, 1052 (9th Cir. 2003).

1    Dated:  October 23, 2023                    Respectfully submitted,

2                                                **SAXENA WHITE P.A.**

3                                                */s/ Lester R. Hooker*
4                                                Maya Saxena (*pro hac vice*)
                                                 msaxena@saxenawhite.com
5                                                Lester R. Hooker (SBN 241590)
                                                 lhooker@saxenawhite.com
6                                                Dianne M. Pitre (SBN 286199)
                                                 dpitre@saxenawhite.com
7                                                Jonathan D. Lamet (*pro hac vice)*
                                                 jlamet@saxenawhite.com
8                                                7777 Glades Road, Suite 300
                                                 Boca Raton, FL 33434
9                                                Tel.: 561.394.3399
                                                 Fax: 561.394.3382

10                                               Steven B. Singer (*pro hac vice forthcoming*)
11                                               ssinger@saxenawhite.com
                                                 Marisa N. DeMato (*pro hac vice forthcoming)*
12                                               mdemato@saxenawhite.com
                                                 10 Bank Street, Ste. 882
13                                               White Plains, NY 10606
                                                 Tel: 914-437-8551

14                                               David R. Kaplan (SBN 230144)
15                                               dkaplan@saxenawhite.com
                                                 505 Lomas Santa Fe Drive, Suite 180
16                                               Solana Beach, CA 92075
                                                 Telephone: (858) 997-0860
17                                               Facsimile: (858) 369-0096

18                                               *Counsel for Lead Plaintiffs and*
                                                 *Lead Counsel for the Class*

19                                               **KLAUSNER KAUFMAN JENSEN**
20                                               **& LEVINSON**
                                                 Robert D. Klausner (*pro hac vice forthcoming)*
21                                               Stuart A. Kaufman (*pro hac vice forthcoming)*
                                                 7080 NW 4th Street
22                                               Plantation, Florida 33317
                                                 Tel.: (954) 916-1202
23                                               Fax: (954) 916-1232
                                                 bob@robertdklausner.com
24                                               stu@robertdklausner.com

25                                               *Additional Counsel for City of Hollywood*
                                                 *Firefighters' Pension Fund*

26

27

28

                                                 26                    OPPOSITION TO MOTION TO DISMISS
                                                                       CASE NO. 3:23-CV-00519-WHO

## **CERTIFICATE OF SERVICE**

I hereby certify under penalty of perjury that on October 23, 2023, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel or parties of record.

_/s/ Lester R. Hooker_
Lester R. Hooker (SBN 241590)