1
2
3
4               UNITED STATES DISTRICT COURT

5              NORTHERN DISTRICT OF CALIFORNIA

6

7   CITY OF HOLLYWOOD FIREFIGHTERS          Case No.  3:23-cv-00519-WHO
    PENSION FUND, et al.,
8                                           **ORDER GRANTING MOTION TO**
                 Plaintiffs,                **DISMISS**
9
         v.                                 Re: Dkt. No. 43
10
    ATLASSIAN CORPORATION, et al.,
11
                 Defendants.
12

13          In this putative securities class action, the investor-plaintiffs sued the defendants—

14  corporate entities as well and individual officers—for making at least nine false and misleading

15  statements about the strength of the financial outlook.  The plaintiffs say that this overinflated the

16  stock, and when the truth was revealed and the stock dropped, investors collectively lost billions

17  of dollars.  The defendants moved to dismiss.  Because the plaintiffs fail to plausibly allege that

18  most of the statements were false or misleading and fail to allege any plausible theory of scienter,

19  among the other reasons discussed below, the defendants' motion is granted with leave to amend.

20                              **BACKGROUND**

21  **I.      FACTUAL BACKGROUND**

22          This is a putative securities class action filed by lead plaintiffs, City of Hollywood

23  Firefighters Pension Fund and Oklahoma Firefighters Pension and Retirement Systems ("the

24  plaintiffs").  Amended Complaint ("AC") [Dkt. No. 40].  The lead plaintiffs assert that they

25  collectively hold $3.64 billion in assets for the benefit of their participants and beneficiaries.  *Id.*

26  ¶¶ 16-17.  They filed this lawsuit against defendants Atlassian Corporation, Atlassian Corporation

27  PLC, Atlassian's co-founder and co-CEO Michael Cannon-Brookes, Atlassian's other co-founder

28  and co-CEO Scott Farquhar, Atlassian's current President and former Chief Operating Officer

United States District Court
Northern District of California

Anu Bharadwaj, and Atlassian's Chief Revenue Officer Cameron Deatsch. *Id.* ¶¶ 18-19, 21, 23, 26-27.

Atlassian is a software company that sells various software products. *Id.* ¶¶ 4, 18-19, 33. It does not have a traditional sales team. *Id.* ¶ 36. Rather, its sales and growth strategy is grounded in providing free versions of its software products for up to ten users, and then charging customers for the eleventh and subsequent users. *Id.* ¶¶ 36-37. Given this strategy, Atlassian has two main growth metrics: "Free to Paid Conversions," which consist of customers that used the free version of its software and then upgraded to a paid version; and "Paid User Expansion," which consists of customers using a paid version of the products that add "seats" or "heads"—for example, a customer had 50 paid users at its company and then added 10 more paid users. *Id.* ¶¶ 37-39. About ninety percent of Atlassian's revenue comes from "Paid User Expansion." *Id.* ¶ 39.

Atlassian has regularly touted that it has a nontraditional "linear sales cycle" that differentiates it from other software companies. *Id.* ¶¶ 41-45. This is because it relies heavily on growth from current customers instead of growth through a sales or marketing team. *See id.* It also regularly advertises that as a company, it values and practices open communication and "no bullshit" with respect to communicating with shareholders, investors, and the public. *See id.* ¶¶ 34-35. One of the ways it does this is through intra-quarter updates to shareholders. *See id.*

Atlassian's fiscal year ("FY") 2022 ended on June 30, 2022. *Id.* 2 n.1. The first quarter ("Q1") of FY23 began on July 1. *See id.* According to the plaintiffs, by mid-July Atlassian was seeing a slowdown in growth for its Free to Paid Conversions and its Paid User Expansion. *Id.* ¶¶ 9, 66-73.

On August 4, Atlassian held an earnings call with investors and analysts. *Id.* ¶ 47-48. Atlassian addressed several questions about the impact of the turbulent 2022 macroeconomic environment on the company. *See id.* ¶¶ 47-48, 51., 55, 88-89. Atlassian said that it saw a decrease in Free to Paid Conversions but that was a "slight thing" because it was a very small portion of the business. *Id.* ¶ 92. It did not mention a slowdown or any change to Paid User Expansions.

On August 19, Atlassian published its FY22 Annual Report with the Securities Exchange Commission ("SEC").  *Id.* ¶ 94.  According to the plaintiffs, the report said that Atlassian was not aware of any trends, including in the macroeconomic environment, that affected its business.  *see id.* ¶¶ 94-95.

On September 14, Bharadwaj attended a conference hosted by Goldman Sachs.  *Id.* ¶ 96.  At that conference she said that Atlassian was experiencing a "bit of softness" in Free to Paid Conversions but emphasized that metric was "really a very small part of our business."  *Id.* ¶ 97.  The plaintiffs say that Bharadwaj also said that there were no trends affecting upgrades or other parts of the business.  *Id.* ¶¶ 97-98.  She did not specifically address Paid User Expansions.  *See id.*

On October 4, the defendants filed a Post-Effective Amendment to its Form S-8 Registration Statements with the SEC.  *See id.* ¶ 100.  That form incorporated the statements made in the August 19 Annual Report.  *Id.*

The first quarter of FY23 ended on September 30, 2022.  On November 3, the defendants announced their results from Q1.  *Id.* ¶¶ 9, 66.  They affirmed that Free to Paid Conversions slowed down.  *Id.* ¶ 67.  They also announced that Paid User Expansion had experienced a slowdown.  *Id.*  Analysts announced that they were "surprise[d]" by these "unexpected" results, which "took us and investors by surprise."  *See id.* ¶¶ 11, 75-76.  The price of Atlassian's stock fell from $174.17 per share on November 3 to $121.73 per share on November 4, 2022.  *Id.* ¶ 10.

The plaintiffs say that Atlassian knew of the slowdown to Paid User Expansion by mid-July 2022 but that during its public statements in August and September 20202, the company falsely denied any trend to its business and materially omitted that the slowdown existed.  *See id.* ¶¶ 66-71.  The lead plaintiffs assert that shareholders collectively lost $7 billion due to this fraud.  *Id.* ¶ 10.

The plaintiffs filed this putative class action for all buyers or sellers of Atlassian's stock from August 5 to November 3, 2022.  *Id.* ¶ 121.  They bring two causes of action: first under Section 10(b) of the Securities Exchange Act, and second under 20(a) of the Act.  *Id.* ¶¶ 127-42.

## II.     PROCEDURAL BACKGROUND

I appointed City of Hollywood Firefighters Pension Fund and the Oklahoma Firefighters

1    Pension and Retirement Systems as lead plaintiff under the guidelines of the Private Securities

2    Litigation Reform Act ("PSLRA").  [Dkt. No. 37].

3          The defendants filed this motion to dismiss the Amended Complaint.  ("Mot.") [Dkt. No.

4    43].  Attached to the motion were nine documents they say were incorporated into the AC, [Dkt.

5    Nos. 43-3-11], as well as a Request for Judicial Notice of those documents, [Dkt. No. 43-12].

6    Plaintiffs filed an opposition to the motion to dismiss.  ("Oppo.") [Dkt. No. 49].  The defendants

7    replied.  [Dkt. No. 50].  I held a hearing at which counsel for both parties appeared.

8                                       **LEGAL STANDARD**

9          Under Federal Rule of Civil Procedure ("FRCP") 12(b)(6), a district court must dismiss a

10   complaint if it fails to state a claim upon which relief can be granted.  To survive a Rule 12(b)(6)

11   motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible

12   on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible

13   when the plaintiff pleads facts that "allow the court to draw the reasonable inference that the

14   defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

15   (citation omitted).  There must be "more than a sheer possibility that a defendant has acted

16   unlawfully." *Id.*  While courts do not require "heightened fact pleading of specifics," a plaintiff

17   must allege facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550

18   U.S. at 555, 570.

19         In deciding whether the plaintiff has stated a claim upon which relief can be granted, the

20   court accepts the plaintiff's allegations as true and draws all reasonable inferences in favor of the

21   plaintiff. *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987).  However, the court is

22   not required to accept as true "allegations that are merely conclusory, unwarranted deductions of

23   fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir.

24   2008).

25         A complaint alleging a violation of section 10(b) of the Securities Exchange Act "must

26   meet both the heightened pleading requirements for fraud" under FRCP 9(b) and the "exacting

27   pleading requirements" of the PSLRA. *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1140

28   (9th Cir. 2017) (citations omitted).  This requires that the complaint "state with particularity the

United States District Court
Northern District of California

1   circumstances constituting fraud," to satisfy Rule 9(b), and "state with particularity facts giving

2   rise to a strong inference that the defendant acted with the required state of mind," to meet the

3   PSLRA's standard.  *Id.* (citations omitted).

4          With respect to falsity, "the complaint [must] specify each statement alleged to have been

5   misleading, [and] the reason or reasons why the statement is misleading."  15 U.S.C. § 78u-

6   4(b)(1)(B).  With respect to scienter, "the complaint shall, with respect to each act or omission

7   alleged . . . state with particularity facts giving rise to a strong inference that the defendant acted

8   with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A).  "[F]alsity and scienter in private

9   securities fraud cases are generally strongly inferred from the same set of facts, and the two

10  requirements may be combined into a unitary inquiry under the PSLRA."  *In re Daou Sys., Inc.*,

11  411 F.3d 1006, 1015 (9th Cir. 2005) (citation and internal quotation marks omitted).

12         "To adequately demonstrate that the defendant acted with the required state of mind, a

13  complaint must allege that the defendants made false or misleading statements either intentionally

14  or with deliberate recklessness."  *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th

15  Cir. 2009) (quotation marks and citation omitted).  "Facts showing mere recklessness or a motive

16  to commit fraud and opportunity to do so provide some reasonable inference of intent, but are not

17  sufficient to establish a strong inference of deliberate recklessness."  *In re VeriFone Holdings, Inc.*

18  *Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012) (citation omitted).  Accordingly, "a court must

19  consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences

20  favoring the plaintiff."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).

21  "[A]n inference of scienter must be more than merely plausible or reasonable—it must be cogent

22  and at least as compelling as any opposing inference of nonfraudulent intent."  *Id.* at 314.  "The

23  inference that the defendant acted with scienter need not be irrefutable, i.e., of the 'smoking-gun'

24  genre, or even the 'most plausible of competing inferences.'"  *Id.* at 324 (citation omitted).  "The

25  inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of

26  scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  *Id.*

27  at 322-23 (citations omitted).

28         If the court dismisses the complaint, it "should grant leave to amend even if no request to

1   amend the pleading was made, unless it determines that the pleading could not possibly be cured

2   by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000).  In making

3   this determination, the court should consider factors such as "the presence or absence of undue

4   delay, bad faith, dilatory motive, repeated failure to cure deficiencies by previous amendments,

5   undue prejudice to the opposing party and futility of the proposed amendment." *Moore v. Kayport*

6   *Package Express*, 885 F.2d 531, 538 (9th Cir. 1989).

**DISCUSSION**

8   **I.      JUDICIAL NOTICE AND INCORPORATION BY REFERENCE**

9       The defendants filed nine documents with their motion, asserting that each was

10  incorporated by reference into the complaint or is subject to judicial notice.  [Dkt. Nos. 43-3-11].

11  The plaintiffs neither responded nor opposed.

12      I have previously discussed the Ninth Circuit's recognition of the "concerning pattern in

13  securities cases" regarding incorporation by reference and judicial notice: parties "exploit[] these

14  procedures improperly to defeat what would otherwise constitute adequately stated claims at the

15  pleading stage." *Weston v. DocuSign, Inc.*, No. 22-CV-00824-WHO, 2023 WL 3000583, at *9

16  (N.D. Cal. Apr. 18, 2023) (quoting *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th

17  Cir. 2018)).  Therefore, "courts must examine such requests carefully, and determine 'when it is

18  proper to take judicial notice of facts in documents, or to incorporate by reference documents into

19  a complaint, and when it is not.'" *Id.* (quoting *Khoja*, 899 F.3d at 999).

20      A court may take judicial notice of a fact "that is not subject to reasonable dispute because

21  it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately

22  and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R.

23  Evid. 201(b).

24      "Although mere mention of the existence of a document is insufficient to incorporate the

25  contents of a document, the document is incorporated when its contents are described and the

26  document is integral to the complaint." *Tunac v. United States*, 897 F.3d 1197, 1207 n.8 (9th Cir.

27  2018) (internal quotation marks and citation omitted).  This doctrine "prevents plaintiffs from

28  selecting only portions of documents that support their claims, while omitting portions of those

United States District Court
Northern District of California

1    very documents that weaken—or doom—their claims." *Khoja*, 899 F.3d at 1002 (citation

2    omitted).  But this "is not a tool for defendants to short-circuit the resolution of a well-pleaded

3    claim," for example, by attempting to use a document that is not mentioned in the complaint "to

4    insert their own version of events into the complaint to defeat otherwise cognizable claims." *Id.* at

5    1002-03 (citations omitted).  Although a court may assume the contents of an incorporated

6    document are true for the purposes of a motion to dismiss (unlike judicial notice), "it is improper

7    to assume the truth of an incorporated document if such assumptions only serve to dispute facts

8    stated in a well-pleaded complaint." *Id.* at 1003 (citations omitted).

9        With this guidance in mind, I turn to the defendants' requests.  As I did in *Weston*, here too

10   I will take judicial notice of the earnings call transcripts, (Exs. B, G); Form 20-F, (Ex. A); and

11   Form S-8/A, (Ex. H), because they are "sources whose accuracy cannot reasonably be questioned"

12   as the defendants filed these documents with the SEC and are otherwise publicly available.

13   *Weston*, 2023 WL 3000583, at *10 (first quoting *Khoja*, 899 F.3d at 999-1000; and then citing

14   *Wochos v. Tesla, Inc.*, No. 17-CV-05828-CRB, 2019 WL 1332395, at *2 (N.D. Cal. Mar. 25,

15   2019) (taking notice of documents filed with the SEC and earnings call transcripts because they

16   were publicly filed).  For the same reasons I will take notice of the shareholder letters from August

17   4 and November 3, (Exs. C, F), both of which were filed with the SEC, are publicly available, and

18   form the basis for integral allegations in the complaint.  And, as in *Weston*, here "I will only take

19   notice of facts within these documents that show what representations [the defendants] made to the

20   market.  I will not consider them for the truth of any of the facts asserted." 2023 WL 3000583, at

21   *10 (citing *Wochos*, 2019 WL 1332395, at *2 (drawing the same distinction)).

22       Also as in *Weston*, here I will take notice of the transcripts from the September 14

23   conference, (Ex. D), because it is mentioned in the AC as the source of some of the alleged

24   misstatements.  *See Weston*, 2023 WL 3000583, at *10.  For the same reason I will take notice of

25   the November 3 press release, (Ex. E), as it is mentioned in and integral to the allegations in the

26   AC, as one source in which the alleged fraud was revealed.  *See, e.g.*, AC ¶¶ 9, 66, 114.

27       Finally, Exhibit I is Atlassian's May 27, 2022 press release "discussing Rule 10b5-1

28   trading plans entered into by Michael CannonBrookes and Scott Farquhar."  [Dkt. No. 43-12].

Though it is apparently publicly available and filed with the SEC, it is not mentioned directly in the AC.  Addressing those documents now is akin to allowing the defendants "to insert their own version of events in the complaint," which is not an appropriate reason to take judicial notice. *Khoja*, 899 F.3d at 1002-03.  Additionally, the defendants seek judicial notice of this document so that they can argue against allegations of scienter for Cannon-Brookes and Farquhar, but as discussed below, those allegations are not relevant at this point and insufficient to state a claim.  I decline to take notice at this point.

Accordingly, the request for judicial notice and for incorporation by reference is GRANTED in part and DENIED in part.

## II.  STATING A CLAIM

To plead a violation of the securities laws,[1] a plaintiff must adequately allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1206 (9th Cir. 2016) (quoting *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804 (2011)).

The plaintiffs point to multiple statements that they say were false or misleading and so are actionable as material misrepresentations or omissions under the securities laws.  In turn, the defendants contend that the plaintiffs fail to allege falsity for any statement, and they insist that the plaintiffs selectively and misleadingly highlighted portions of statements out of context in the AC. They also assert that the plaintiffs have failed to plead scienter.  I address these arguments in turn.

### A.  Material Misrepresentations or Omissions

The plaintiffs group the alleged misrepresentations and omissions into four categories based on when and how they were made: (1) statements made during a shareholders call with analysts and investors on August 4, 2022, AC ¶¶ 88-93; (2) statements made in Atlassian's 2022

---

[1] The plaintiffs bring claims under Sections 10(b) and 20(a) of the Securities Exchange Act and Rule 10b-5, which implements the former.  The defendants assert and the plaintiffs do not disagree that both claims rise or fall together according to the standards laid out in this Order.  *See Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000).

United States District Court
Northern District of California

Annual Report Form 20-F filed with the SEC on August 19, 2022, *id.* ¶¶ 94-95; (3) statements made by Bharadwaj during the "Goldman Sachs Communacopia + Technology Conference" on September 14, 2022, *id.* ¶¶ 96-99; and (4) statements made in Atlassian's Post-Effective Amendment to its Form S-8 Registration Statements, filed with the SEC on October 4, 2022, *id.* ¶ 100.

"Falsity is alleged when a plaintiff points to defendant's statements that directly contradict what the defendant knew at that time." *Khoja*, 899 F.3d at 1008 (citing *In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 794-96 (9th Cir. 2017)). "To be misleading, a statement must be capable of objective verification." *Id.* (quoting *Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1275 (9th Cir. 2017)).

"[T]o properly allege falsity" of affirmative representations, "a securities fraud complaint must now specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, state with particularity all facts on which that belief is formed." *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 877 (9th Cir. 2012) (internal quotation marks, citation, and alteration omitted). But "[e]ven if a statement is not false, it may be misleading if it omits material information." *Khoja*, 899 F.3d at 1008-09 (citing *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1054 (9th Cir. 2014)). An omission is misleading if it "affirmatively create[s] an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (citation omitted).

The securities laws "do not create an affirmative duty to disclose any and all material information. Disclosure is required . . . only when necessary 'to make . . . statements made, in the light of the circumstances under which they were made, not misleading.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44-45 (2011) (first quoting 17 C.F.R. § 240.10b-5(b); and then citing *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988)). "As such, 'companies can control what they have to disclose under these provisions by controlling what they say to the market.'" *Khoja*, 899 F.3d at 1009 (quoting *Matrixx Initiatives*, 563 U.S. at 45). "But once defendants [choose] to tout positive information to the market, they [are] bound to do so in a manner that wouldn't

1    mislead investors, including disclosing adverse information that cuts against the positive

2    information." *Id.* (quoting *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705-06 (9th Cir.

3    2016)).

4         "[O]nly if the adequacy of the disclosure or the materiality of the statement is so obvious

5    that reasonable minds could not differ are these issues appropriately resolved as a matter of law."

6    *Fecht v. Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995) (internal quotation marks, citations, and

7    alteration omitted).

8              **1.    August 4 Shareholders Call—Statements 1-4**

9         The first four statements that the plaintiffs cite were made during a call with shareholders

10   and analysts on August 4, 2022.  I address each statement in turn, though the plaintiffs make most

11   of the same arguments about each statement.

12                  **a.    Statement 1**

13        The first challenged statement was made by Deatsch:

14        The good news as of to date is we have yet to see any specific trend geographically
          or even in industry segments or in customer size that gives us pause or worry to
15        date.  So, something we continue to watch like a hawk, but there is no new news to
          share today.
16
     AC ¶ 89; Ex. B at 6.
17
18        Reading this statement in context, Deatsch was responding to a question about "demand

19   . . . from a geographic perspective in terms of weaknesses or relative strength."  Ex. B at 6.  He

20   replied that the company had "yet to see any specific trend geographically or even in industry

21   segments or in customer size that gives us pause or worry."  *Id.*  A few minutes later, he said:

22        And the one thing that's worth calling out that we've seen literally just in the last
          month is that the cohort of customers that came in, in the April, May, and June
23        timeframe are converting to those paid plans at a slightly slower rate than what
          we've seen in previous quarters.  Now, I'd love to say that's specific to a product or
24        a geography or an industry.  There's no specific customer segment there.  It just
          seems that, in general, those cohort of customers that are signing up in the last
25        quarter . . . simply just haven't put those credit cards and hit those paid walls yet.

26   *Id.* at 9.

27        Turning to the statement itself, the plaintiffs' theory seems to focus on the middle of the

28   statement, about customer size.  *See* Oppo. 12:13-13:12.  As best I can tell, the plaintiffs believe

United States District Court
Northern District of California

that it was false or misleading to say that the defendants had yet to see a specific trend with respect to customer size, while in November they said they had seen a trend starting in the second half of that quarter. It is true that the defendants' November statement provided that they "saw a more pronounced continuation of the trend discussed last quarter, where fewer Free instances converted to paid plans continuation of the trend." Ex. F at 11. But the plaintiffs do not sufficiently plead that this rendered Statement 1 false. Statement 1 did not "directly contradict" what Atlassian knew in August, *Khoja*, 899 F.3d at 1008, because it confirms what Atlassian knew and told shareholders *in August*: there was a slowdown in Free to Paid Conversions, *see* Ex. B at 9. The plaintiffs do not contest that the defendants informed shareholders of this slowdown. And though the plaintiffs seem to allege that it was false or misleading to not label this slowdown as a "trend" in August, *see* Oppo. 13:1-12, that theory ignores the context of the statement, which was given in response to a question about geography, and further contextualized a few minutes later with more information about the slowdown.

The plaintiffs also seem to argue that Statement 1 was false or misleading because the defendants knew about a "trend" in the Paid User Expansion as of July or August 2022. *See* Oppo. 13:13-14:6. But to demonstrate this, they point to the following statement made by Deatsch in the November earnings call, which does not show that there was any trend in Paid User Expansion at that time:

> [W]hat we were seeing in the August timeframe was the net new customers, the free customers converting to paid was slowing down going into August. We normally, through our summer season, the July and August, tend to see user growth slowdown across our customer base, largely due to seasonality, vacations and holidays. It just tends to be a normal seasonal trend where July and August are slower, as people are not upgrading instances, adding more users.

Ex. G at 12.

The first sentence of the statement concerns the slowdown of Free to Paid Conversions, not Paid User Expansion. This was communicated to shareholders in August and does not render Statement 1 false or misleading. The second part discussing the "gradual slowdown across our customer base" and the "normal seasonal trend" of "people not upgrading instances, adding more users" also does not show that there was a trend in Paid User Expansion starting in July. Rather, it

11

1  states that the company "tend[s] to see" a slowdown in those months.  Indeed a few minutes

2  before making this November statement, Deatsch specifically said that the company "saw the

3  growth of paid users from existing customers [Paid User Expansion] slow *in the second half of*

4  *Q1*," Ex. G at 10 (emphasis added), meaning the slowdown to Paid User Expansion began mid-

5  August, *see* AC at 2 n.1 (noting that Atlassian fiscal year begins July 1).  As pleaded, then, the

6  slowdown to Paid User Expansion began after Statement 1 was made on August 4.  Saying there

7  was "no specific trend . . . in customer size" on August 4 did not contradict "what the defendant[s]

8  knew at that time."  *See Khoja*, 899 F.3d at 1008.  Nor did it create any impression that the state of

9  affairs differed "in a material from the one that actually exists."  *Brody*, 280 F.3d at 1006.  The

10  plaintiffs therefore do not plead falsity.

11      The plaintiffs' final argument is that Statement 1 was misleading when combined with the

12  defendants' pronouncements that their sales cycle was linear because the statement omitted that

13  seasonality might affect the defendants' performance.  *See* Oppo. 14:19-15:4.  But in the same call

14  where Statement 1 was made, the defendants specifically warned investors and shareholders that

15  they would likely see "seasonality . . . over the next four quarters" and that growth would

16  "moderat[e]" throughout the next fiscal year.  Ex. B at 8.  On November 3, the defendants

17  confirmed exactly that: they had seen "the growth of paid users from existing customers slow in

18  the second half of Q1."  Ex. G at 10.  I take the plaintiffs' point that the defendants regularly

19  emphasized the competitive advantage of their linear sales cycle and so it would make sense that,

20  should the linear cycle shift at all, the defendants might know of any changes right away.  But the

21  pleadings and exhibits show, at most, that the linear sales cycle shifted in mid-August, so there

22  was nothing for the defendants to warn about on August 4.

23      Accordingly, the plaintiffs do not plead that Statement 1 was false or misleading.

24                    **b.      Statement 2**

25      The second challenged statement from the August 4 call was: "[W]e have not seen any

26  significant shift in customer demand across our product lines."  AC ¶ 89; Ex. B at 7.

27      Again, this statement must be read in context.  It was made in response to the question,

28  "Has there been any change to the mix of products sold over the last few months?  Anything

United States District Court
Northern District of California

different with regard to customer prioritization?"  Ex. B at 7.  Deatsch responded, "As far as the overall mix, no, we have not seen any significant shifts in customer demand across our product lines."  *Id.*  Notably, the plaintiffs do not assert that there *was* a significant shift in demand for any particular product line, so they do not plead Statement 2 was false or misleading on its face.

Instead, they say that the statement was false or misleading because the defendants later admitted to a slowdown "across our customer base" beginning in July, including customers "*not upgrading instances, adding more users*."  Oppo. 14:2-6 (emphasis added).  This is the same language that I addressed above and for the same reasons, it fails to show falsity or misrepresentation.  At most, it shows that there was a slowdown in *Free to Paid Conversions* in early Q1, and the defendants told investors of this on August 4.  The rest of the November 3 transcript shows that the Paid User Expansion slowdown began in the second half of Q1, after the August 4 call.  Ex. G at 10.  Because that would mean that shift in customer demand occurred after Statement 2 was made, the plaintiffs fail to plead that Statement 2 contradicted anything that the defendants knew at the time.

I note too that the exhibits show that the defendants told investors on November 3 that they were "*not* seeing any changes in our competitive position or in the inherent demand for our products."  Ex. F at 2.  This apparently aligns exactly with what they told investors on August 4. Accordingly, the plaintiffs fail to plead that Statement 2 was false or misleading.

### c.    Statement 3

The third challenged statement from August 4 was: "We continue to see demand for collaboration products continue [sic] to be strong."  AC ¶ 89; Ex. B at 7.

The plaintiffs again repeat the same arguments as those made for Statements 1 and 2.  For the same reasons as above—including that the plaintiffs fail to allege that there was any change in Paid User Expansion before Statement 3 was made—the plaintiffs do not allege that this was false or misleading.  And importantly for this statement, the plaintiffs fail to ever allege that demand was not "strong"; rather, the falsity argument about Statement 3 is hindered by the defendants' November confirmation that they were "not seeing any changes . . . in the inherent demand for our products.  Looking across our customer base of 249,000+, there has been no overall decrease in

usage or change in churn."  Ex. F at 2; *see also id.* at 7-8 (showing charts of new users).  It is not clear, at least as pleaded, what else the defendants could have told investors in August with respect to this statement.

d.      Statement 4

The final challenged statement from August 4 was that the decrease in Free to Paid Conversions was a "slight thing" that "does not take away from the continued growth we see in our existing customer base.  That also drives more than 90% of our revenue in the existing year."  AC ¶ 92; Ex. B at 9.

The context and full statements were:

> As far as that **slight thing** that we've mentioned in the shareholder letter, just so you all realize that we land all of our net new customers in Free plans. . . . And the one thing that's worth calling out that we've seen literally just in the last month is that the cohort of customers that came in, in the April, May, and June timeframe are converting to those paid plans at a slightly slower rate than what we've seen in previous quarters. . . .  There's no specific customer segment there. . . .  [T]hose cohort of customers that are signing up in the last quarter are using the products, . . . but they simply just haven't put those credit cards and hit those paid walls yet.  So that's one of those areas that we continue to be vigilant. We have multiple analytics teams, multiple growth teams, as well as our onboarding and R&D teams that are focused on ensuring that those customers remain active, and that gives us more chances to convert them to paid plans in the future.  **That does not take away from the continued growth we see in our existing customer base.  That also drives more than 90% of our revenue in existing year**.

Ex. B at 9 (emphases added).  Later in the same call, the defendants stated:

> As mentioned earlier, we are not insulated from broader macroeconomic impacts.  **We are seeing a modest decrease in the conversion rates of Free instances upgrading to paid plans, but nothing we are seeing right now is changing our outlook.**  As a reminder, over 90% of our revenue in FY22 was derived from existing customers, and this dynamic has been consistent in our business over the years.  We will remain vigilant and continue to inspect all aspects of our business relying on our well refined analytics and understanding of our funnels.

Ex. C at 14 (emphasis added).

The plaintiffs do not seem to allege that anything in Statement 4 was false—nor can they when they concede that Free to Paid Conversions constituted only 10 percent of Atlassian's revenue.  And because the earnings call transcript shows that the defendants made clear that they were experiencing a slowdown in Free to Paid Conversions, the plaintiffs fail to allege that the

14

defendants were aware of the slowdown but did not inform investors—the transcript itself directly contradicts this assertion.  *See* Oppo. 13:6-8.

Instead, the plaintiffs seem to say Statement 4 was misleading because the defendants downplayed the severity of the slowdown in this metric.  *See* Oppo. 12:4-12.  But the plaintiffs do not plead that the severity was worse than the defendants provided; indeed the plaintiffs do not allege facts that slowdown in Free to Paid Conversions was anything more than "slight" in August.  Rather, they fall back on the argument that the defendants later referred to this slowdown as a "trend" and so should have called it out as a trend in August, too.  *See* Oppo. 11-12.  But the plaintiffs do not sufficiently allege why omitting the "trend" label "affirmatively create[d] an impression of a state of affairs that differs in a material way from the one that actually exists," *Brody*, 280 F.3d at 1006, especially when the information the defendants provided was apparently accurate.

Accordingly, they fail to plead that Statement 4 was false or misleading.

*     *     *

Because the plaintiffs fail to plead that any of the August 4 statements were false or misleading, I need not address the defendants' argument that the statements were "non-actionable corporate optimism."  Mot. 12:26-13:7.  They may reraise that argument on a subsequent motion, if they wish.  The motion is otherwise GRANTED as to the August 4 statements, with leave to amend.

### 2.    August 19 Annual Report—Statement 5

Next, the plaintiffs argue that Atlassian's annual report for FY 22, published on August 19, 2022, contained the following misleading statement:

> Other than as disclosed elsewhere in this Annual Report, we are not aware of any trends, uncertainties, demands, commitments or events for the current fiscal year that are reasonably likely to have a material effect on our revenues, income, profitability, liquidity or capital reserves, or that caused the disclosed financial information to be not necessarily indicative of future results of operations or financial conditions.

AC ¶ 94; Ex. A at 66.

Again, context is key.  This statement constituted the final paragraph in the "Trend

United States District Court
Northern District of California

Information" section of the defendants' 150+ page annual report.  A few paragraphs above, the report discusses how macro-economic conditions did not materially impact Atlassian's "financial conditions or results of operations during the fiscal year ended on June 30, 2022," but noted that the future risks posed by the changing macro-economic environment were "uncertain and cannot be predicted at this time."  Ex. A at 66.

The plaintiffs argue that Statement 5 is misleading because it states that the defendants saw no trends for "the current fiscal year," meaning FY23.  *See* Oppo. 16:3-17:13.  Though the parties debate whether "current fiscal year" referred to FY22, the year assessed by the report, or FY23, the year in which the report was published, it does not matter to my analysis.  Regardless of which year the report refers to, the plaintiffs fail to allege that the defendants knew of *any* trend to Paid User Expansion by the time the report was published on August 19.  *Cf. Weston*, 2023 WL 3000583, at *17 (noting that risk disclosures concerning "entirely of as-yet-unrealized risks and contingencies" are plausibly misleading if they "do not alert the reader that some of these risks may already have come to fruition" (quoting *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 703 (9th Cir. 2021)).  As addressed above, the AC and the exhibits show that the Paid User Expansion slowdown trend began mid-quarter, so about August 16 at the earliest.  The plaintiffs do not plead that any slowdown between August 16 and August 19 was a trend or that the defendants could plausibly have added it to the published materials so quickly.  *Cf. Azar v. Yelp, Inc.*, No. 18-CV-00400-EMC, 2018 WL 6182756, at *17 (N.D. Cal. Nov. 27, 2018) (finding that the plaintiffs alleged that the defendants knew of the slowdown "in January" before they made contradictory statements "halfway through the quarter" on February 9).

The plaintiffs do not argue that this statement was false or misleading based on the defendants' knowledge of a trend to Free to Paid Conversions at that time.  *See* AC ¶¶ 94-95; Oppo. 16:3-18:1.  To the extent that this is their basis for their theory of liability, they must clearly identify why Statement 5 contradicted the defendants' knowledge or the state affairs at that time.  *See Khoja*, 899 F.3d at 1008; *Brody*, 280 F.3d at 1006.  The plaintiffs must also address the context of Statement 5, including its qualification that they were unaware of trends and uncertainties "[o]ther than as disclosed elsewhere in this Annual Report," as well as the discussion

of the macroeconomic impacts two paragraphs earlier.  Ex. A at 66.

As pleaded, then, this statement did not "directly contradict" anything the defendants knew, *Khoja*, 899 F.3d at 1008, nor did affirmatively represent the state of Atlassian that materially differed from the one that "actually exist[ed]," *Brody*, 280 F.3d at 1006.  It was therefore not false or misleading and the motion is GRANTED on this basis with leave to amend.

### 3.    September 14 Conference—Statements 6-8

Next, the plaintiffs allege that Bharadwaj made three misleading statements at a conference on September 14, 2022—Statements 6, 7, and 8.  AC ¶¶ 96-99.  The three challenged statements were made in response to two questions, posed in a row and on the same subject.  *See* Ex. G at 8-10.  The statements provide context for each other and contain mostly the same information, and the parties assert essentially the same arguments about each statement, so I address them together.  *See also* Repl. 9:5-19 (collecting cases and arguing that courts must consider the statements in order and context).  The statements are:

> Statement 6:
> [With respect to] overall macroeconomic conditions, . . . no company is immune to it.  But some of the attributes of our product set give us a few advantages in Atlassian.

AC ¶ 96; Ex. G at 9.

> Statement 7:
> Just in the last shareholder letter, we talked about conversion of users from free to paid.  We are seeing a bit of softness over the past couple of months.  But it's important to illustrate that point in the overall picture as over 90% of our revenue comes from existing customers.  So the conversion from free to paid is really a very small part of our business.  And also, the number of free users that are coming in that create new free instances continues to grow steadily.  We're not seeing any trends there.  So across the board, across existing and new, that's overall what we are seeing in different parts of the business.

AC ¶ 97; Ex. G at 9.

> Statement 8:
> So to address your question, the way our pricing model works is the first 10 users are free and then the 11th user onwards, it's paid.  So in year 1, you can imagine the impact is pretty low.  Going from 10th user to the 11th user is really just adding a paid user there.  So the overall quantum looks pretty low in year 1, but it builds up and compounds over time.  So we think of upsell as really across free to standard, standard to premium, premium to enterprise.  And we've seen some very encouraging progress there over the last 4 quarters, and I haven't really seen any

17

discernible trend there in terms of the macroeconomic impact.
Ex. G at 10.

To the extent that the plaintiffs assert that these statements were misleading because they did not fully convey the slowdown to Free to Paid Conversions, they fail to plausibly allege this. *See* Oppo. 18:2-20.  The plaintiffs concede that the defendants told the market about the Free to Paid slowdown in August, and Bharadwaj's statements in September convey essentially the same information.  The plaintiffs do not plead that the Free to Paid Conversion metric worsened between August 4 and September 14 in a way that would render the "bit of softness" comment in Statement 7 misleading, false, or inaccurate.  They also agree that Paid User Expansion was 90 percent of Atlassian's business, so that too is not misleading or inaccurate.

But I agree that the three statements together were misleading because they provided no commentary on the Paid User Expansion slowdown that began in mid-August.  The defendants say this was not misleading because Bharadwaj only discussed Free to Paid Conversions and Subscription Upgrades and did not purport to speak about Paid User Expansion.  *See* Mot. 17:1-18:4.  But that argument fails for two reasons.

First, the AC does not distinguish between Free to Paid Conversions and Paid User Expansion on the one hand and Subscription Upgrades on the other.  *See* AC ¶¶ 37-39 (defining and explain Free to Paid Conversion and Paid User Expansions).  Given the allegations, Subscription Upgrades are plausibly a sub-category of one of the first two metrics because the AC alleges Paid User Expansion constitutes 90 percent of revenue, *id.* ¶ 39, and Free to Paid Conversions are the remaining 10 percent, so it would make sense that upgrades are part of one of those categories to total 100 percent.  More importantly, though, by asserting that Subscription Upgrades are separate from Paid User Expansion—and by extension that comments about Subscription Upgrades did not relate to Paid User Expansion—the defendants ask me to look beyond the corners of the complaint or even the exhibits they attached.  And I cannot do that on a motion to dismiss.

Second, even if Subscription Upgrades were an entirely different metric from Paid User Expansion, it was—as pleaded—misleading for the defendants to provide positive statements

about Subscription Upgrades and Free to Paid Conversions without discussing the new slowdown in Free to Paid Conversions. The defendants argue that they did not know of the slowdown by September 14, but above I addressed the facts alleging that they knew it began mid-August. The defendants also contend that they had no duty to disclose the slowdown in September, outside of their regular reporting cycle and before Q1 had ended, so long as they did not affirmatively disclose positive results about the metric. *See* Mot. 17:1-22; Repl. 9:20-10:2. But even if they had no affirmative duty to disclose the beginning signs of the slowdown before the quarter ended, they created the duty to disclose by "tout[ing] positive information to the market" about the rest of their business at that time. *Khoja*, 899 F.3d at 1009. By telling the market that there was "very encouraging progress" and "no discernible trend" from the macroeconomic environment for some small parts of business, but failing to tell the market that there was a slowdown to the key majority of their business, the defendants plausibly omitted material information that would make their disclosures "not misleading." *See Matrixx Initiatives*, 563 U.S. at 44; *see also Khoja*, 899 F.3d at 1009 (noting that, under the securities laws, companies can control what they must disclose "by controlling what they [affirmatively] say to the market" (citation omitted)). The defendants fail to address this well-settled case law and show the statements were not misleading.

Finally, the defendants argue that the four weeks between mid-August, when the Paid User Expansion slowdown began, and September 14, when the statements were made, was not enough to show a "trend." *See* Mot. 18:5-23. But that argument misses the forest for the trees. According to the plaintiffs, the defendants knew that a slowdown to Paid User Expansion—90 percent of their business—began in mid-August yet failed to communicate that to investors in mid-September. That was misleading (according to the AC) not only because they otherwise communicated positive business information, but also because of the way that the defendants held themselves out to investors as vigilant monitors and open communicators. In other words, because the defendants specifically and repeatedly told investors over the years that they closely monitored metrics throughout the year, and they told investors that they were closely monitoring these metrics, it was misleading to not communicate relevant information about this specific

metric a month after a change began, even if it was not yet a full-blown "trend."[2]  That is plausible and specific.

Accordingly, the plaintiffs sufficiently allege that Bharadwaj's September 14 statements misleading omitted material information about the Paid User Expansion slowdown.  The motion is DENIED on this basis.

### 4.   October 4 Amendment—Statement 9

Finally, on October 4, 2022, the defendants filed a Post-Effective Amendment to its Form S-8 Registration Statements with the SEC.  *See* AC ¶ 100.  The plaintiffs say that the amendment incorporated the August 19 Annual Report and so was misleading for the same reasons.  *Id.*  The defendants say that they were legally required to incorporate the Annual Report into the Post-Effective Amendment and that doing so merely affirms that the statements were accurate when made.  Mot. 19:4-16.  In turn the plaintiffs assert that the defendants were required to update inaccurate information because it "was false when it was filed," and that incorporated documents must be updated "if no longer accurate."  Oppo. 21:6-20.

As addressed above, *supra* Part II.A.2, the plaintiffs do not plead that the August 19 statements were false when made, so to the extent that their argument relies on that theory, it fails.

With respect to the plaintiffs' second argument about required updates, that is not clearly alleged in the AC.  The AC simply asserts that "the same misstatements" from August 19 were made in the Post-Effective Amendment and so were "materially false and misleading for the same reasons."  AC ¶ 100.  If the plaintiffs want to assert a new theory that the October 4 statements were false or misleading because they failed to update the August 19 statements, they can amend their complaint to make that allegation.  I note that if they make an amendment, they should address the law that requires filers of S-8 Registration Statements to make such updates if the incorporated document was not false or misleading when the document was made.  The plaintiffs'

---

[2] For those reasons, the defendants' citations to cases that purport to define the time period necessary to establish a "trend" are unavailing.  *See* Mot. 18:13-23.  And importantly, the plaintiffs do not plead that the change in Paid User Expansion was a "singular occurrence," *see Sanders v. Realreal, Inc.*, No. 19-CV-07737-EJD, 2021 WL 1222625, at *22 (N.D. Cal. Mar. 31, 2021), but rather that it was a "slow down" beginning in mid-August 2022.

United States District Court
Northern District of California

1    citation to 17 C.F.R § 230.412 provides only that documents incorporated into registration

2    statements are modified or superseded by the information in the registration statement itself, and

3    that incorporated documents *can* be modified or superseded by later filed incorporated documents.

4    But the regulation does not appear to create an affirmative duty for filers to update information

5    that was accurate when stated.

6         Accordingly, the plaintiffs do not plead the October 4 statements were false or misleading.

7    The motion is GRANTED on this argument, with leave to amend.

8         **B.      Scienter**

9         Finally, the defendants argue that the AC should be dismissed because the plaintiffs failed

10   to adequately allege scienter.  Mot. 19:17-25:22.  They make three arguments: failure to plead a

11   motive to defraud; failure to plead any defendant acted with intent to deceive or deliberate

12   recklessness; and, the "non-fraudulent inference is more compelling."  *See id.*

13        The PSLRA requires that plaintiffs "state with particularity facts giving rise to a strong

14   inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A).

15   With respect to false or misleading statements or omissions, "the complaint must plausibly allege,

16   with the particularity required by the PSLRA, that the maker of the statements" knew about the

17   material information and "intentionally or recklessly" failed to disclose it.  *In re Alphabet, Inc.*, 1

18   F.4th at 705.

19        The requisite mental state "not only covers intent to deceive, manipulate, or defraud, but

20   also deliberate recklessness."  *In re Quality Sys., Inc.*, 865 F.3d at 1144 (internal quotation marks

21   and citation omitted).  "[D]eliberate recklessness" requires plaintiff to show that a defendant made

22   "a reckless omission of material facts . . . reflect[ing] some degree of intentional or conscious

23   misconduct."  *In re Alphabet, Inc.*, 1 F.4th at 701 (citations omitted).  This means that the

24   misrepresentations or omissions were "an *extreme* departure from the standards of ordinary care,

25   which presents a danger of misleading buyers or sellers that is either known to the defendant or is

26   so *obvious* that the actor must have been aware of it."  *Id.* (internal citations and quotation marks

27   omitted).

28        To evaluate scienter, "the court's job is not to scrutinize each allegation in isolation but to

United States District Court
Northern District of California

assess all the allegations holistically." *Tellabs*, 551 U.S. at 326.  The court "must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff."  *Id.* at 324.  The inference of scienter "need not be irrefutable," but "must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations."  *Id.*  The question is: "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?"  *Id.* at 326; *see also Weston*, 2023 WL 3000583, at *19.

The plaintiffs' main argument is that they sufficiently pleaded scienter because they sufficiently pleaded falsity and misleading omissions.  *See* Oppo. 22:11-23.  But cases that found that pleading *falsity* is enough to plead scienter are inapplicable here, where the plaintiffs do not plausibly allege falsity but rather allege *misleading* statements and omissions.  *Supra* Part II.A.3. Their theory of misleading statements and omissions requires the plaintiffs to plead that Bharadwaj knew that there was a slowdown to Paid User Expansion on September 14 but recklessly chose not to reveal that information.  *See In re Alphabet, Inc.*, 1 F.4th at 701.  The plaintiffs do not make these allegations.  Even assuming Bharadwaj knew of the slowdown,[3] there are no allegations that she knew or must have been aware that withholding the information would present a danger of misleading buyers or sellers.  *See id.*

In part the allegations fail because, as the defendants argue, the plaintiffs fail to plead a logical motive.  Though pleading scienter does not necessarily require the plaintiffs to plead motive, *see Tellabs*, 551 U.S. at 325, in this case it is not clear how the complaint shows that Bharadwaj was deliberately reckless in making her statements without any allegation about *why* she made those statements.  The most that the plaintiffs allege regarding motive is that two other defendants sold stocks during the putative class period and "collectively reap[ed] more than $222 million," AC at 39 n.19 (emphasis omitted), but in the same breath the plaintiffs concede this was

---

[3] Because the plaintiffs fail to plead that Bharadwaj recklessly chose to withhold information about the slowdown, I do not need to address the parties' arguments about whether the plaintiffs alleged that she knew about the slowdown.  This includes their arguments about "core operations." *See* Mot. 24:3-18; Oppo. 24:17-26.

United States District Court
Northern District of California

"not dramatically out of line with these Defendants' prior trading practices," *id.*[4]  "[S]tock sales by corporate insiders are suspicious only when they are dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information."  *Weston*, 2023 WL 3000583, at *22 (quoting *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 621 (9th Cir. 2017)).  The stock sales are therefore not sufficient to show that the other defendants had motive to defraud, and without more, it is not logical that these individual defendants would tell Bharadwaj—who did not, as alleged, personally benefit from the misrepresentations—to affirmatively omit the full picture about the status of the company when talking to investors and analysts, and instead reveal the details eight weeks later in a letter to shareholders.  Without more, the plaintiffs do not plead scienter.

For similar reasons, the plaintiffs' reliance on my order in *In re QuantumScape Securities Class Action Litigation*, 580 F. Supp. 3d 714 (N.D. Cal. 2022), is unconvincing.  In that case, the defendant "had spent a decade developing its product," "went public just before the class period," "raised hundreds of millions of dollars" during the period it allegedly made misrepresentations about the development progress of its product, and "personally reported facts about the company that are alleged to be completely at odds with reality."  *Id.* at 741.  I found that the plaintiffs' allegations about falsity and motive were more than sufficient to plausibly and specifically allege that the defendants intended to deceive investors.  *See id.* at 741-42 & n.4.  But as discussed, here the plaintiffs allege neither falsity nor motive.  That case is inapplicable.

The plaintiffs also assert that specific statements made in response to analysts' and investors' questions can contribute to the strong inference of scienter.  Oppo. 24:3-9.  But in their cited case, the Honorable Edward M. Chen found that the defendants had provided "[s]uch specific answers to specific questions" about certain margins and analyses that "suggest[ed] . . . Defendants knew their importance yet consciously attempted to give a favorable impression while hiding their manipulation and unfavorable analyses."  *In re Fibrogen, Inc.*, No. 21-CV-02623-

---

[4] I declined to take judicial notice of the documents that the defendants say are relevant to this theory.  *Supra* Part I.

United States District Court
Northern District of California

1   EMC, 2022 WL 2793032, at \*24 (N.D. Cal. July 15, 2022).  There simply are no parallel

2   allegations in this case.  The plaintiffs do not assert that anyone at Atlassian manipulated results or

3   hid unfavorable analyses, or that Bharadwaj specifically answered an investor's question in a way

4   that intentionally hid this misinformation.  Indeed, the questions that she was answering when she

5   made the alleged omissions were not "specific[ally]" about the Paid User Conversion metric, nor

6   do the plaintiffs plead that she was "consciously attempt[ing]" to give positive news about

7   Atlassian while hiding the slowdown.  *See id.*[5]  At most, the AC asserts that Bharadwaj

8   misleadingly failed to inform investors that one month prior to their call, a "slowdown" began in

9   Atlassian's Paid User Expansion metric.  *Supra* Part II.A.3.  This argument, too, fails to show that

10  the plaintiffs pleaded scienter.

11      Additionally, the plaintiffs seem to assert that they pleaded scienter by including

12  allegations about the defendants' linear sales cycle.  *See* Oppo. 23:13-24:2.  They cite no case law

13  in support of this argument, and it is not entirely clear how they believe this affects their scienter

14  allegations.  They do not allege, for example, that any defendant intentionally or recklessly

15  withheld information that the linear sales cycle had changed to one with more seasonality.  Nor

16  could they, it seems—the August 4 earnings call shows that the defendants warned the public that

17  their sales would likely experience seasonality.  *See* Ex. B at 8.

18      The plaintiffs also argue that the failure to disclose any trends in the August 19 Annual

19  Report and the October 4 update contributes to the inference of scienter because it violated the

20  defendants' obligations under Item 303.  *See* Oppo. 25:6-12.  Item 303, like SEC Form 20-F,

21  requires disclosure of known material events and uncertainties "that are reasonably likely to cause

22  reported financial information not to be necessarily indicative of future operating results or of

23  future financial condition . . . [or] are reasonably likely . . . to have a material impact on future

24  operations," 17 C.F.R. § 229.303—in other words, as the plaintiffs frame it, Item 303 requires

25

26  _____

27  [5] The plaintiffs also cite this case to assert that they pleaded scienter because they alleged that that
    the defendants repeatedly touted their close monitoring of and real-time visibility into Atlassian's
    business and operations.  *See* Oppo. 22:24-23:12.  But those allegations also differ from those in
28  *In re Fibrogen*, where the plaintiffs alleged that the defendants manipulated results and hid the real
    information from the public.  2022 WL 2793032, at \*24.  The argument is unconvincing.

United States District Court
Northern District of California

1   disclosure of known material trends.  But as discussed at length above, the plaintiffs do not

2   plausibly allege that the defendants failed to disclose known material trends in the August 19 or

3   October 4 reports.  *Supra* Part II.A.1.  Reframing the same argument as a violation of Item 303

4   does not save their deficient allegations.  This argument also fails.

5        Finally, as the defendants note, there is a "plausible, nonculpable explanation" for the

6   defendants' conduct.  *See Tellabs*, 551 U.S. at 326.  The defendants say that by holding

7   Bharadwaj's call mid-quarter on top of required end-of-quarter updates, they were trying to

8   provide open and regular communication to their shareholders during uncertain economic times.

9   *See* Mot. 25:6-22.  There is far more support for this inference in the AC and exhibits than there is

10  any support for an inference of scienter, even accepting all of the plaintiffs' allegations as true and

11  taking them collectively.  *See Tellabs*, 551 U.S. at 324-26.  It is not a "tie" or even a "close

12  question."  *See* Oppo. 22:1-8.  The plaintiffs fail to plead scienter.  For that reason, the complaint

13  is DISMISSED with leave to amend.[6]

### CONCLUSION

14

15       For those reasons, the motion is GRANTED and the complaint is DISMISSED.  The

16  plaintiffs shall file any amended complaint within 21 days of this Order.

17       **IT IS SO ORDERED.**

18  Dated: January 22, 2024

19

20

21  William H. Orrick
    United States District Judge

22

23

24

25

26  _____

27      [6] The parties agree that if the plaintiffs fail to plead a Section 10(b) claim, they also fail to
    plead a Section 20(a) claim.  *See* Mot. 25:24-25; Oppo. 25 n.15.  For the same reasons, then, the

28  Section 20(a) claim is DISMISSED with leave to amend.

*United States District Court*
*Northern District of California*