1

**SAXENA WHITE P.A.**
David R. Kaplan (SBN 230144)

2

505 Lomas Santa Fe Drive, Suite 180
Solana Beach, CA 92075

3

Telephone: (858) 997-0860
Facsimile: (858) 369-0096

4

dkaplan@saxenawhite.com

5

*Lead Counsel for Lead Plaintiffs and the Class*

6

*[Additional Counsel Listed on Signature Page]*

7

8

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

9

**SAN FRANCISCO DIVISION**

10

CITY OF HOLLYWOOD FIREFIGHTERS'
PENSION FUND, Individually and on Behalf

Case No. 3:23-cv-00519-WHO

11

of All Others Similarly Situated,

**CLASS ACTION**

12

Plaintiff,

**SECOND AMENDED CLASS ACTION**
**COMPLAINT FOR VIOLATIONS OF**

13

vs.

**THE FEDERAL SECURITIES LAWS**

14

ATLASSIAN CORPORATION, ATLASSIAN
CORPORATION PLC, MICHAEL

**DEMAND FOR JURY TRIAL**

15

CANNON-BROOKES, SCOTT FARQUHAR,
ANU BHARADWAJ, and CAMERON

16

DEATSCH,

17

Defendants.

18

19

20

21

22

23

24

25

26

27

28

**<u>TABLE OF CONTENTS</u>**

I.     NATURE OF THE ACTION ........................................... 1

II.    INTRODUCTION .................................................... 2

III.   JURISDICTION AND VENUE ......................................... 5

IV.    PARTIES ......................................................... 6

       A.     Lead Plaintiffs .......................................... 6

       B.     Defendants ............................................... 6

V.     FACTUAL OVERVIEW OF DEFENDANTS' FRAUD ......................... 11

       A.     "Open Company, No Bullsh*t": Background Of Atlassian And Its
              Purported Commitment To Shareholder Transparency .......... 11

       B.     Atlassian's "Land-And-Expand" Business Strategy Relies On Expanding
              Revenue From The Company's Existing Paying Customers ....... 12

       C.     Defendants Repeatedly Touted Atlassian's "Linear Sales Cycle"—Which
              Defendants Claimed Provided The Company With Great "Predictability
              Of Sales" That Differentiated It From Its Software Industry Peers ..... 13

       D.     Defendants' "Tremendous Visibility" Into Sales Patterns: Defendants
              Repeatedly Tout To Investors That They Personally Monitored Business
              Metrics *Like A Hawk* and Could Spot Sales Issues *With Surgical
              Precision*" ............................................... 17

       E.     In Direct Response To Analyst Concerns That Poor Macroeconomic
              Conditions Could Negatively Impact Atlassian's Business, Defendants
              Repeatedly Deny That The Company Was Experiencing Any Adverse
              Trends ................................................... 20

       F.     The Market Credits Defendants' Representations Denying
              Macroeconomic Impacts And Specifically Highlighted That Defendants'
              Positive Statements Differentiated Atlassian From Its Competitors .... 22

       G.     Defendants Again Represent That There Were No Material Adverse
              Trends Impacting Atlassian For The "Current Fiscal Year" In The
              Company's Annual Report Filed on August 19, 2022 .......... 24

       H.     Throughout The Remainder Of The Class Period, Defendants Concealed
              The Material Adverse Trends Affecting The Company, Specifically
              Representing To Investors That They "*Haven't Really Seen Any
              Discernible Trend*" Significantly Impacting *Any* Part Of Atlassian's
              Business .................................................. 25

I.  *"They Were Not Growing Like Gangbusters"*: Former Employees Confirm That Defendants Knew Full Well Throughout The Class Period That Atlassian's Business Was Suffering From Undisclosed Material Adverse Trends ................................................................................................ 28

J.  *"Project Big Fish"*: Former Employees Confirm That Defendants Were So Concerned About Atlassian's Declining Metrics In July and August 2022 That They Implemented An "All-Hands-On-Deck" Project To Reverse The Material Adverse Trends Affecting The Company's Business .................... 31

K.  The Truth Is Revealed: Atlassian Discloses Poor Financial Results, Missing EPS Guidance For The First Time In Its History, Which Defendants Directly Attribute To "Trends" From "Macro Headwinds" That They Saw *In July 2022* ................................................................... 33

L.  SEC Regulations Required Defendants To Disclose What They Admitted Were Known Adverse Material Trends or Uncertainties ....................................... 38

VI.  DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ........ 41

A.  The August 4, 2022 Conference Call ................................................................ 42

B.  The August 19, 2022 Annual Report ............................................................... 45

C.  The September 14, 2022 Goldman Sachs Conference ........................................... 47

D.  The October 4, 2022 Post-Effective Amendment ................................................ 50

VII.  ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER ............................... 51

VIII.  LOSS CAUSATION ................................................................................................ 56

IX.  PRESUMPTION OF RELIANCE ............................................................................ 58

X.  INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE ....................................................................... 59

XI.  CLASS ACTION ALLEGATIONS .......................................................................... 59

XII.  CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT .......................................... 61

COUNT I ............................................................................................................... 61

COUNT II ............................................................................................................. 63

XIII.  PRAYER FOR RELIEF ........................................................................................ 64

XIV.  JURY DEMAND ................................................................................................. 64

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.      NATURE OF THE ACTION

1.      Court-appointed Lead Plaintiffs City of Hollywood Firefighters' Pension Fund and Oklahoma Firefighters Pension and Retirement System ("Lead Plaintiffs" or "Plaintiffs"), on behalf of themselves and all others similarly situated, allege the following against Defendants (as defined below) upon personal knowledge as to themselves, and upon information and belief as to all other matters, based upon the ongoing investigation of the undersigned Lead Counsel.

2.      Lead Counsel's investigation included, among other things, review and analysis of: (i) the public filings of Atlassian Corporation ("Atlassian U.S.") and Atlassian Corporation Plc ("Atlassian UK," and, together with Atlassian U.S., "Atlassian" or the "Company") with the U.S. Securities and Exchange Commission (the "SEC"); (ii) interviews with former Atlassian employees; (iii) in-depth research reports by securities and financial analysts; (iv) transcripts of Atlassian's conference calls with analysts and investors; (v) presentations, press releases, and media reports regarding Atlassian; (vi) consultation with various experts; (vii) data reflecting Atlassian's stock price; and (viii) review of other publicly available information concerning the Company and the Individual Defendants.  Lead Plaintiffs believe that substantial additional evidentiary support for their allegations will be developed after a reasonable opportunity for discovery, as many of the facts related to Lead Plaintiffs' allegations are known only by Defendants, or are exclusively within Defendants' custody or control.

3.      Lead Plaintiffs assert claims under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder, against Atlassian and its co-founder and co-Chief Executive Officer ("co-CEO") Michael Cannon-Brookes ("Cannon-Brookes"); co-founder and co-CEO Scott Farquhar ("Farquhar"); President Anu Bharadwaj ("Bharadwaj"); and former Chief Revenue Officer ("CRO") Cameron Deatsch ("Deatsch" and, collectively, "Defendants"), and under Section 20(a) of the Exchange Act against the Individual Defendants (defined below), on behalf of all investors who purchased Atlassian ordinary shares and/or common stock between August 5, 2022 and November 3, 2022, inclusive (the "Class Period"), and who were damaged thereby (the "Class").

4.     Plaintiffs' Second Amended Class Action Complaint ("SAC") is filed in response to the Court's January 22, 2024 Order Granting Motion to Dismiss ("MTD Order"; ECF No. 53), which held that Plaintiffs "sufficiently allege[d]" that multiple statements made by Defendant Bharadwaj on September 14, 2022 were "misleading" and "omitted material information" because they "provided no commentary on the Paid User Expansion slowdown that began in mid-August"— but ultimately granted Defendants' motion to dismiss on scienter grounds. *See* MTD Order at 20, 25. In light of the Court's determinations in the MTD Order, the SAC (i) removes allegations regarding some of the statements that the Court determined were not actionable on falsity grounds (MTD Order at 13-14); (ii) adds allegations explaining how the remaining statements were false and misleading and "directly contradict[ed]" information known to Defendants at the time the statements were made (MTD Order at 11-13, 17; *see e.g.* ¶¶72-78, 107-121); (iii) more fully details Plaintiffs' theory of falsity for statements made on October 4, 2022 (MTD Order at 20-21; *see* ¶¶122-123); and (iv) provides numerous additional facts supporting scienter for all Defendants, including for Defendant Bharadwaj's September 14, 2022 statements that the Court previously determined were sufficiently alleged to be materially misleading (MTD Order at 22; *see e.g.* ¶¶72-83, 117-121, 126).

## II.     **INTRODUCTION**

5.     Atlassian develops collaboration and project management software primarily for corporations, and the Company offers standard versions of its software products free of charge to the first ten users of a client's organization. Atlassian generates its revenue in two ways: (i) when a customer converts from a free subscription to a paid subscription by adding more than ten users ("free-to-paid conversions"); and (ii) when existing paying customers add additional users for a fee ("existing paid user expansion"). Of these two segments, by far the most important is existing paid user expansion, which accounts for 90% of Atlassian's revenue, while free-to-paid conversions accounts for the remaining 10% of the Company's revenue.

6.     In the months leading up to the Class Period, the most critical issue facing the Company was whether poor global macroeconomic conditions were negatively impacting

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:23-CV-00519-WHO

Atlassian's business.  To assuage investors' concerns, throughout the Class Period, Defendants emphatically and repeatedly denied that global macroeconomic conditions were having any significant impact on Atlassian's business.  Specifically, on August 4, 2022—in direct response to analysts' inquiries as to whether macroeconomic conditions were affecting Atlassian's performance and outlook—Defendants told shareholders the "*good news*" that "*we have yet to see any specific trend geographically or even in industry segments or in customer size that gives us pause or worry to date*," and that "*there is no new news to share today*."[1]  Similarly, in Atlassian's Annual Report issued two weeks later on August 19, 2022, Defendants again assured investors that Defendants were "*not aware of any trends . . . for the current fiscal year that are reasonably likely to have a material effect*" on the Company's business.

7.     As late as September 14, 2022—just *two weeks* before the end of Atlassian's Q1 2023—Atlassian's then-Chief Operating Officer and current President, Defendant Bharadwaj, spoke at length about the Company's business at a prominent Goldman Sachs conference.  During her over 40-minute session, Bharadwaj assured investors that Defendants were not seeing any macroeconomic trends whatsoever that would have a material impact on Atlassian's business: "*We're not seeing any trends there.  So across the board, across existing and new [customers], that's overall what we are seeing in different parts of our business*."  When Bharadwaj was asked directly whether macroeconomic conditions were having a negative impact on demand for the Company's products, Bharadwaj reiterated, in no uncertain terms, that "*[we] haven't really seen any discernible trend there in terms of the macroeconomic impact*."

8.     Defendants' statements were false.  In reality, by no later than July 2022, Defendants knew full well that Atlassian's critical metrics in free-to-paid conversions and paid user expansion were materially declining precisely because of the macroeconomic environment.  Former high-ranking employees of the Company confirm that the Individual Defendants were "*keenly aware of those metrics*" and recognized in July and August 2022 that they were coming in well below expectations: "*it was clear that the growth rates were not what they [historically] were*," as "*back*

---

[1] Unless otherwise noted, all emphasis is added.

*in June [] things were slowing down*" and Atlassian "*was not growing at 50% year-over-year growth*."  Atlassian's downturn was so pronounced that in the first week of September 2022—after *weeks* of high-level executive meetings aimed at rectifying the problem—Defendants implemented a Company-wide, 100+ employee project called "Project Big Fish," which was specifically designed to reverse the negative trends affecting Atlassian by reassessing business strategies and slimming down operations in order to "*focus[] on getting some of the big fish*."  Notably, Project Big Fish was developed and implemented by the Individual Defendants, including Defendant Bharadwaj, who was intimately involved in the planning and execution of the project: "*Project Big Fish came from the executive team, and it was reviewed by the executive team.  [Defendant Bharadwaj] was very involved because she had 40 people in product strategy that reported to her involved with this project*."  Despite these facts, just weeks later, Bharadwaj did not breathe a word of this material information when she spoke to investors at length at the Goldman Sachs conference.  Instead, Bharadwaj continued to represent that Defendants had not seen "any discernible trend" regarding macroeconomic impacts on the Company.

9.     The truth regarding Defendants' prior misrepresentations was revealed on November 3, 2022, when Atlassian stunned the market by issuing a press release and shareholder letter in which the Company disclosed poor financial results for Q1 2023, including missing its earnings per share guidance for the first time in its history as a public company.  Significantly, contrary to Defendants' repeated representations that they had "yet to see any specific trend[s]" and that there were no "discernible trend[s]" materially affecting Atlassian's business, they now admitted that the exact opposite was true: Atlassian's Q1 financial results *had* been materially and adversely impacted by negative "*trends*" from "*macro headwinds*."  Tellingly, while Defendants initially tried to claim in their shareholder letter that these trends only became apparent "towards the end of the quarter," analysts called into question Defendants' assertion, stating they "*[had] to believe that [Atlassian] had a very early warning*" regarding these trends.  In response, Defendants were forced to clarify the "the timing of things that we saw," admitting that they knew that these

"trends" had existed in "***July and August***"—at the exact same time that Defendants were repeatedly assuring investors that no such material adverse trends existed.

10.     In response to Defendants' stunning revelations, Atlassian's stock price collapsed, falling over $50 per share in a single trading day, from a closing price of $174.17 on November 3, 2022 to $123.73 on November 4, 2022—a decline ***of nearly 30%***, wiping out over $7 billion in shareholder value.

11.     In turn, analysts excoriated the Company, highlighting management's apparent about-face and noting in particular that Defendants' disclosures directly contradicted their repeated assertions throughout the quarter.  For example, Wolfe Research highlighted Defendants' reversal, stating that the slowdown "***took us and investors by surprise***," and that "***this abrupt change in tone and outlook [] puts shares in the penalty box***."  As Wolfe Research put it: "***With shares indicating down ~25% AH [after hours] it is safe to say that the rate of change and surprise factor is high***." Citi also emphasized that the news stood in stark contrast to Defendants' prior statements, highlighting the "***significant and unexpected pivot in demand tone***."  Oppenheimer concluded that Atlassian's "***pronounced reset***" would "***weigh sharply on the shares as investors realign expectations***."  Piper Sandler and Macquarie likewise downgraded Atlassian's rating.

12.     Investors who purchased Atlassian ordinary shares and common stock at artificially inflated prices during the Class Period have suffered substantial losses from Defendants' violations of the federal securities laws. This action seeks redress on behalf of these aggrieved shareholders.

## III.     <u>JURISDICTION AND VENUE</u>

13.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 27 of the Exchange Act (15 U.S.C. § 78aa).

14.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b), Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts and omissions

1   charged herein, including the dissemination of materially false and misleading information to the

2   investing public, and the omission of material information, occurred in substantial part in this

3   Judicial District, as Atlassian had a large employee presence and operations at its U.S. headquarters

4   in San Francisco throughout the Class Period, and the Company's headquarters have been in this

5   District since at least October 3, 2022.  In connection with the acts, transactions, and conduct

6   alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities

7   of interstate commerce, including, but not limited to, the mails, interstate telephone

8   communications, and the facilities of the national securities markets.

9   **IV.   PARTIES**

10      **A.   Lead Plaintiffs**

11      15.   Lead Plaintiff City of Hollywood Firefighters' Pension Fund ("Hollywood

12   Firefighters") is a defined benefit public pension fund that provides pension and other benefits for

13   city firefighters. Hollywood Firefighters manages approximately $340 million in assets for the

14   benefit of its nearly 500 active and retired participants and beneficiaries. As reflected in its

15   certification, Hollywood Firefighters suffered a substantial loss as a result of its investments in

16   Atlassian shares during the Class Period.  *See* ECF No. 23-1.

17      16.   Lead Plaintiff Oklahoma Firefighters Pension and Retirement System ("Oklahoma

18   Firefighters") is a defined benefit public pension fund that provides pension and other benefits for

19   firefighters in Oklahoma. Oklahoma Firefighters provides retirement income to these firefighters

20   and their beneficiaries. Oklahoma Firefighters manages approximately $3.3 billion in assets for the

21   benefit of its approximately 25,000 active and retired participants and beneficiaries. As reflected in

22   its certification, Oklahoma Firefighters suffered a substantial loss as a result of its investments in

23   Atlassian shares during the Class Period.  *See* ECF No. 23-1.

24      **B.   Defendants**

25      17.   Defendant Atlassian U.S. is incorporated under the laws of Delaware, with its

26   principal executive offices located in San Francisco, California.  Atlassian U.S. was incorporated

27   by the filing of its original Certificate of Incorporation with the Delaware Secretary of State on July

28

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:23-CV-00519-WHO

1, 2022.  Since October 3, 2022, Atlassian U.S.'s common stock has traded on the Nasdaq Global Select Market (the "NASDAQ") under the ticker symbol "TEAM."  Atlassian U.S. is the ultimate parent company of Atlassian UK.

18.     Defendant Atlassian UK was a public limited liability company incorporated under the laws of England and Wales and was parent of the Company's operating subsidiary, Atlassian, Inc.  Atlassian UK changed its corporate domicile to the United States effective September 30, 2022.  According to Atlassian, the re-domiciliation to the United States was to "increase our access to a broader set of investors, support inclusion in additional stock indices, improve financial reporting comparability with industry peers, streamline [the Company's] corporate structure, and provide more flexibility in accessing capital."  The re-domiciliation would not have an "impact on employees, day-to-day business and operations, or services to customers."

19.     Atlassian UK's Class A ordinary shares were listed on the NASDAQ and registered pursuant to Section 12(b) of the Securities Exchange Act of 1934 following an initial public offering on or around December 10, 2015.  The last day of trading in the Atlassian UK Class A ordinary shares on the NASDAQ was the effective date of the re-domiciliation – Friday, September 30, 2022.  Upon the change of domicile, each outstanding Class A ordinary share of Atlassian UK was exchanged for one share of common stock of Atlassian U.S., and Atlassian UK became a subsidiary of Atlassian U.S., thereby completing the change in domiciliation to the United States.  The Company's shares both before and after the re-domiciliation traded on the NASDAQ under the ticker symbol "TEAM."

20.     Defendant Michael Cannon-Brookes is Atlassian's co-founder and has been the Company's co-CEO and a member of the board of directors (the "Board") since October 2002.  As stated on the Company's website, Cannon-Brookes is a technology investor in the areas of software, fintech, agriculture, and energy.  Cannon-Brookes reviewed, made, approved, or adopted numerous false statements that caused artificial inflation of Atlassian's share price, including statements in Atlassian's 2022 Annual Report on Form 20-F ("2022 Annual Report"), which he signed, and statements in an October 4, 2022 Post-Effective Amendment to the Registration Statement.

21.     Cannon-Brookes is subject to the personal jurisdiction of the Court because he has availed himself of the laws of the United States through his management and control over Atlassian, including Atlassian U.S. and Atlassian UK, as well as the design, distribution, testing, and sale of Atlassian products sold, downloaded, and used across the United States.  Further, Defendant Cannon-Brookes has frequently travelled to the United States to attend and make presentations at various shows across the country in order to promote the sales of Atlassian products.

22.     Defendant Scott Farquhar is Atlassian's co-founder and has been the Company's co-CEO and a member of the Board since October 2002.  Farquhar served as Chair of the Company's Board from December 2016 to April 2018.  From July 1, 2022 through September 5, 2022, Defendant Farquhar also served as Interim Chief Financial Officer of the Company. At Atlassian, Defendant Farquhar supervises legal, human resources, finance, sales, marketing, and customer-support teams.  Under Atlassian's dual CEO structure, both Defendant Cannon-Brookes and Farquhar have run the entire Company at different times.  Defendant Farquhar is also a co-founder of Skip Capital, a private fund investing in technology and infrastructure.  Farquhar reviewed, made, approved or adopted numerous false statements that caused artificial inflation of Atlassian's share price, including statements in Atlassian's 2022 Annual Report, which he signed, and statements in an October 4, 2022 Post-Effective Amendment to the Registration Statement.

23.     Farquhar is subject to the personal jurisdiction of the Court because he has availed himself of the laws of the United States through his management and control over Atlassian, including Atlassian U.S. and Atlassian UK, as well as the design, distribution, testing, and sale of Atlassian products sold, downloaded, and used across the United States.  Further, Farquhar has frequently travelled to the United States to attend and make presentations at various shows across the country in order to promote the sales of Atlassian products.

24.     Defendant Farquhar and Defendant Cannon-Brookes collectively own approximately 40% of Atlassian's outstanding shares which represents approximately 87% of the voting power of the outstanding share capital.

25.     Defendant Anu Bharadwaj is currently the Company's President and has led various projects across product lines at Atlassian, including the enterprise business, cloud platform teams, and operations.  Bharadwaj served as Atlassian's Chief Operating Officer ("COO") from August 2021 to February 2023.  During her time as COO, Bhardwaj personally led the Company's efforts at transitioning on-premises customers to the cloud and was intimately involved in cloud growth initiatives. From January 2014 to July 2021, Bharadwaj served in multiple roles at Atlassian, including Vice President of Product, Head of Product, Atlassian Cloud, Head of Product Strategy, Atlassian, and Head of Product, Jira.  Before Atlassian, she held various leadership roles at Microsoft.  Bharadwaj reviewed, made, approved, or adopted false statements that caused artificial inflation of Atlassian's share price, including statements during a conference with analysts and investors on September 14, 2022.

26.     Defendant Cameron Deatsch served as the Company's Chief Revenue Officer from March 2020 until November 2023.  In his role as CRO, Deatsch ran Atlassian's marketing, sales, customer success, and support organizations.  In December 2021, Deatsch called "sales and marketing customers" his "day-to-day."  Deatsch stated in April 2023 that "a big part of [his] job over the last two years [involved] talking to server and data center customers" and "getting them to start the journey towards" cloud.  From October 2012 to March 2020, Deatsch served in multiple roles at Atlassian, including Senior Director of Advocacy, Head of Server Business, Head of Corporate Development, Head of Server and Enterprise Marketing, and Head of Growth and Online Sales.  Prior to joining Atlassian, Deatsch worked in leadership positions across sales and marketing at Jive Software.  Deatsch reviewed, made, approved, or adopted numerous false statements that caused artificial inflation of Atlassian's share price, including statements during an August 4, 2022 call with analysts.

27.     Defendants Cannon-Brookes, Farquhar, Bharadwaj, and Deatsch are collectively referred to herein as the "Individual Defendants."

28.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Atlassian, were privy to confidential, proprietary and material adverse non-

public information concerning Atlassian, its operations, finances, financial condition and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being actively concealed from, the investing public.

29.     The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Atlassian's business.

30.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts, and through them, to the investing public.  The Individual Defendants were provided with copies of the Company's reports and publicly disseminated documents alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

31.     As senior executive officers and/or directors and as controlling persons of a publicly traded company whose securities were, and are, registered with the SEC pursuant to the Exchange Act, and were traded on the NASDAQ and governed by the federal securities laws, the Individual Defendants had a duty to disseminate promptly accurate and truthful information with respect to Atlassian's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, to correct any previously issued statements that had become materially misleading or untrue, so the market price

1    of Atlassian's ordinary shares and common stock would be based on truthful and accurate

2    information.  The Individual Defendants' misrepresentations and omissions during the Class Period

3    violated these specific requirements and obligations.

4    **V.      FACTUAL OVERVIEW OF DEFENDANTS' FRAUD**

5        **A.      "Open Company, No Bullsh\*t": Background Of Atlassian And Its Purported
                Commitment To Shareholder Transparency**

6

7        32.      Founded in Australia by Defendants Cannon-Brookes and Farquhar in 2002,

8    Atlassian is a software company that develops collaboration products that help business teams work

9    together.  On or around December 10, 2015, Atlassian went public via an initial public offering

10   ("IPO") on the NASDAQ stock exchange, under the symbol "TEAM."  At the time of its IPO,

11   Atlassian's market capitalization was under $4.5 billion, but the Company's market capitalization

12   grew to over $40 billion by the beginning of the Class Period.

13       33.      Atlassian purports to "value transparency and openness as an organization,"

14   particularly with respect to shareholder communications.  In its Annual Reports and, on its website,

15   Atlassian touts its "core values" as a key to its success, depicted through the following image:

16

17       

18

19   **Open company,**     **Play,**        **Build with heart**    **Be the change**    **Don't #@!%**
20   **no bullshit**       **as a team**    **& balance**           **you seek**         **the customer**

21

22       34.      As part of its claimed commitment to transparency, Atlassian issues a shareholder

23   letter each quarter to inform the market about the Company's performance, goals, and expectations.

24   As Defendant Cannon-Brookes made clear in an August 2018 interview, the shareholder letter is

25   what he "spend[s] the most amount of time on in communicating what we're thinking, [and] where

26   we're going."  Furthermore, Cannon-Brookes insisted that the shareholder letters stay true to the

27   Company values as Atlassian remains "open and no bull\*\*\*\* when we write the shareholder letter."

28

**B.     Atlassian's "Land-And-Expand" Business Strategy Relies On Expanding Revenue From The Company's Existing Paying Customers**

35.     Atlassian deploys a unique "land-and-expand" growth strategy.  Atlassian does not have a traditional commissioned direct sales team that is otherwise common in the software industry.  Instead, Atlassian relies on its website to generate sales, with an increasing number of the Company's customers in recent years using its products via the cloud.[2]  Once a group within an organization commences use of a product, Atlassian's goal is to have the product "spread to other technical and non-technical teams through cross-functional collaboration."

36.     There are two key elements to growth in Atlassian's business.  First, because the Company offers standard versions of its products for free to the first ten users of an organization, Atlassian generates revenue (i) when a free user pays for a premium version of one of its products; or (ii) when additional members of an organization beyond the first ten users begin using the Company's products.  Atlassian refers to growth in this area as "free to paid conversions."

37.     Second, the Company separately tracks growth from its ***existing*** paying customers.  Specifically, when a paying customer requires additional members of its organization to use Atlassian's products—either through an increased headcount or increased adoption of Atlassian products across existing team members—the customer will pay for those additional users within its organization.  In Atlassian's words, "[o]nce we have landed within a customer team, the networked nature and flexibility of our products tend to lead to adoption by other teams and departments, resulting in user growth, new use cases, and the adoption of our other products."  Atlassian refers to growth in this area as "paid seat expansion."

38.     Both of these metrics rely on Atlassian adding additional users despite the Company's lack of a sales team.  Of the two elements, paid seat expansion is by far the most significant, representing the primary driver of the Company's growth.  Indeed, ***approximately 90%***

---

[2] In October 2020, Atlassian announced that by February 2022, the Company would completely cease selling "on premises" server-based products—meaning products that are not housed in the cloud but on customers' own servers and hardware—and would cease maintenance and support for on-premises versions of its products by February 2024.  As a result, the vast majority of new customers would have to use Atlassian products via the cloud (or via a data center) and current customers using on-premises server products were forced to migrate to the cloud or risk having their products go un-serviced.  Defendant Bhardwaj personally led the cloud transition.

of Atlassian's revenues come from existing customers (*i.e.*, paid seat expansion), and "seat expansion within existing customers within existing products . . . *[has] always been the biggest driver of growth across all products*," as made clear by Atlassian's Head of Investor Relations during a June 1, 2023 analyst call.  Accordingly, by the Company's own admission, Atlassian's financial "success is dependent on our ability to expand the relationship with our existing base of customers through the addition of more users, teams and products."

39.     Leading up to the Class Period, Defendants highlighted to investors the Company's growth in paid seat expansion revenue, which provided "a lot of runway for long-term growth." For example, on June 28, 2021, Defendant Deatsch explained that Atlassian's "short term revenue" comes from "expanding" its relationships with existing customers, explaining that "the bulk of Atlassian's revenue has nothing to do with the customers we acquire this year, it is about all the customers that have been with us, 2, 3, 5, 10 years and how we continue to expand our footprint with those accounts."   Similarly, on Atlassian's April 28, 2022 earnings call discussing the Company's Q3 2022 results, former CFO James Beer explained: "we land small and expand very significantly over time . . . we gradually get larger and larger in terms of what we do for our customers. And I think that altogether gives us a lot of runway for long-term growth."

**C.     Defendants Repeatedly Touted Atlassian's "Linear Sales Cycle"—Which Defendants Claimed Provided The Company With Great "Predictability Of Sales" That Differentiated It From Its Software Industry Peers**

40.     Significantly, Defendants repeatedly trumpeted, from Atlassian's first day as a publicly-traded company, that the Company's business strategy and sales structure produced a "linear sales cycle," which was "unique" in the industry and set the Company apart from its competitors in the enterprise software industry.  Specifically, in Atlassian's IPO Prospectus, filed with the SEC on December 10, 2015, Defendants touted the Company's "[p]redictability of [s]ales" by explaining "[s]ince we do not rely on an expensive salesforce and complex pricing negotiations to add new customers but focus on a high-velocity online distribution model with affordable pricing, our sales have *grown linearly* as we have attracted new users for our products."  Thus, "[u]nlike traditional enterprise software businesses, we have historically *experienced a linear*

*quarterly sales cycle with approximately a third of our quarterly sales occurring within each month of the respective quarter*."  The prospectus included a graphic depicting this linearity, which showed no seasonal impact on revenue generation *in any quarter*, no slowdown on Company sales in the summer months of July or August, and no "uptick" in September:



41.     From that point forward, Defendants repeatedly and specifically highlighted to investors how Atlassian's quarterly linearity provided "predictability of sales."  For example, in every one of the Company's Annual Reports thereafter—including the 2022 Annual Report filed with the SEC on Form 20-F during the Class Period on August 19, 2022—Atlassian boasted about its advantage of having the same "[p]redictability of sales," explaining that because "we are not dependent on a traditional sales force… *we have historically experienced a linear quarterly sales cycle*."  During a September 13, 2017 Analyst Day conference, Atlassian's former CFO, Murray Demo, highlighted his "favorite slide"—reproduced below, depicting the Company's "[p]redictable sales model" due to its "linearity of sales"—and specifically emphasized to analysts "*that's how linear our business is*," which "*really helps us in-quarter to understand where we're at financially*" and "puts us in a position where we're really in a *no-surprise environment* from a top line perspective":

14

42.     According to Atlassian's former President, Jay Simons, the linearity of sales provided great comfort to management because there was no need to "sweat" the Company's quarter-end period in terms of meeting sales forecasts, as Defendants would know throughout any given quarter how Atlassian was trending operationally and financially and did not need to rely on end of quarter sales to maintain growth.  Indeed, during a UBS Global Technology Conference on November 13, 2017, Simons described Atlassian as "**pretty radically different**" from other companies precisely because it did not have seasonality in its sales.  In his words, Atlassian "plots the linearity of billings, not revenue, but actual billings," and through "the last 8 quarters…**they're just basically straight lines**, like up and to the left."  As a result, the "**leaders of the company [are] not sweating the last 2 or 3 weeks of a quarter trying to figure out whether or not people had forecasted things correctly or if one deal slipped**, trying to figure out how we can pull next deals quarters in to kind of offset."

43.     Similarly, during an "Atlassian's Summit" event held on April 10, 2019, the Company's former CFO, James Beer, also touted a slide emphasizing that Atlassian's "**business within a given quarter continues to be remarkably linear**." Significantly, Beer specifically noted

that the "relatively smooth levels of activity **during a quarter**" was "really quite different to the case of so many other enterprise software companies" and "**helps us with predictability**":



44.     Even as macroeconomic conditions worsened leading up to the Class Period, Atlassian management continued to reassure investors that the Company's linear sales cycle insulated it from any global macro concerns.  Indeed, just before the Class Period, on June 2, 2022, an analyst asked Atlassian's Head of Investor Relations, Martin Lam, about the "elephant in the room [that] has been the macro."  To assuage investor concerns in that regard, Lam responded that "we have this **beautiful linearity throughout our quarter** given the bookings on our board," which allows the Company to "look at bookings on an ongoing basis" and thus remain current with its trends throughout its quarters.  Similarly, on June 8, 2022, Defendant Deatsch was unequivocally positive in his remarks about the upcoming summer season, representing to investors that the "next coming months" would see "business [] as usual, **if not getting stronger**."  Neither Lam nor Deatsch gave any indication that July and August 2022 would be seasonally slow, or that the Company would need to rely on a rebound in September to keep its sales growth on track.

45.     Additionally, the accounts of former high-ranking Atlassian employees further confirm the linear nature of the Company's sales cycle.  For example, CW[3] 1, a former Senior Support Engineer for Atlassian,[4] also confirmed the linear nature of Atlassian's sales and that there was no "seasonality" in the Company's software business.  As CW 1 reported, "there is no more or less work done in any month of the year and companies are constantly improving their software."  CW 1 laughed when asked about "software seasonality," stating that in his over 15 years as a software engineer, he has never heard of nor ever experienced software seasonality.

**D.      Defendants' "Tremendous Visibility" Into Sales Patterns: Defendants Repeatedly Tout To Investors That They Personally Monitored Business Metrics "*Like A Hawk*" and Could Spot Sales Issues "*With Surgical Precision*"**

46.     In addition to the "predictability" that Atlassian's linear sales cycle provided, Defendants also made clear to investors that they had complete and "tremendous" real-time visibility into Atlassian's business and operations, going so far as to state that they could identify sales issues "***with surgical precision***" and that they personally monitored the effects of macroeconomic conditions on the Company's business "*like a hawk*."  For example, on March 8, 2022, Defendant Bharadwaj presented at the Morgan Stanley Technology, Media and Telecom Conference, where she explained that Atlassian did everything to "protect and enhance" its sales "flywheel," including "***surgical incremental improvements***" to its business that "really help, in terms of ***expanding and accelerating expansion*** of our customers."  Along the same lines, in the Company's shareholder letter for Q4 2022 ("Q4'22 Shareholder Letter") filed on August 4, 2022, Defendants Cannon-Brookes and Farquhar boasted that "[o]nce customers land with us, we can identify those with the highest expansion potential with ***surgical precision*** and focus our high-touch tactics on those organizations."  Defendants also reassured investors that they would "remain

---

[3] The terms "Confidential Witness" and "CW" refer to the former employees of Atlassian or other individuals with relevant inside information whose reports are discussed in this Complaint.  In order to preserve the CWs' anonymity while maintaining readability, the Complaint uses the pronouns "he," "his," and "him" in referring to CWs, regardless of their gender.

[4] CW 1 worked as a Senior Support Engineer for Atlassian from March 2022 until March 2023, when Atlassian cut 5% of its workforce.  CW 1 and his team of approximately 25 individuals were responsible for onboarding expansion and net new customers.

1   vigilant in this environment. . . Again, **we'll continue to scan the horizon for warning signs and**

2   **be candid with investors as we have throughout our six+ years as a public company**."

3        47.    Similarly, during an August 4, 2022 earnings call, Defendant Deatsch assured

4   investors that Defendants were "**being exceedingly vigilant across watching all stages of our**

5   **funnel**, whether that's migrations funnel, the additions upgrades, retention rates and, of course, our

6   new customers coming in."  Indeed, making sure that investors **knew** that Atlassian's most senior

7   officers were closely and carefully monitoring the impact of macroeconomic conditions on every

8   part of the Company's business was so important to Deatsch, he again personally assured them that

9   the Company would "**continue to watch [these metrics] like a hawk**."  Likewise, Defendant

10  Bharadwaj boasted on September 7, 2022, that the Company had "**more access to telemetry and**

11  **usage patterns of how users consume our products**" in the cloud, which allowed Defendants to

12  "**predict what they're going to do next**."  On September 14, 2022, Bharadwaj told investors that

13  Defendants were keenly focused on customer metrics and would "**continue to monitor**" trends in

14  "user expansion," and confirmed that Defendants felt that this metric was "**an important one to**

15  **look at in the current climate**."

16       48.    Moreover, according to CW 2, a former contractor within the Marketing and

17  Analytics Department at Atlassian from November 2020 to November 2021,[5] "Atlassian had one

18  of the best data monitoring systems" he ever experienced.  As CW 2 reported, Atlassian held weekly

19  video conference meetings every Monday, headed by Amy Ren, the Head of Marketing Analytics.

20  The meetings discussed the Company's trends, including incremental revenue, top line revenue,

21  how many seats were being purchased, and the growth of paying customers in general.  In addition

22  to weekly meetings, each quarter—and sometimes more often—Chief Marketing Officer Robert

23  Chatwani held all-hands meetings with the Sales and Marketing teams to discuss the same topics.

24  CW 2 further explained that the Company metrics were extremely up to date as they were

25

26  _____

27  [5] CW 2 worked as a Data Analyst, and reported to the following managers during his tenure: Vivian
    Wran, Leslie Chaney, and Dylan Lewis, all of whom reported to Amy Ren, Head of Marketing
    Analytics at Atlassian.

28

instantaneously updated in the internal dashboard system used by Atlassian, which was accessible to management.

49.     CW 3[6] corroborated CW 2's account, confirming that Atlassian's monitoring system was exceptionally detailed and that the system's metrics were available to anyone on the Company's internal system, including the Individual Defendants.  CW 3 confirmed that the senior executives, including all Individual Defendants, were intensely focused on the Company metrics throughout the Class Period.  As CW 3 explained, because the Company did not have a traditional sales team, the executives were hyper-focused on the growth metrics as they were the only way of tracking what was working at the Company and what was not.  To that end, CW 3 described that Atlassian's internal systems specifically tracked how many free users started using products, how quickly those customers converted to become paying customers, how many seats paying customers were actively using, and how many seats were being added via expansions by paying customers. In CW 3's own words: "We all looked at users coming in, monthly active users, paid enabled users, users that become active and convert to seats, users coming in from their website, on-premises users getting migrated to the cloud version, users from cross-sell products, and accounts that are expanding."

50.     CW 3 also noted that, unlike other companies who review metrics on a quarterly basis, Atlassian's senior executives, including the Individual Defendants, held *weekly* planning meetings where the metrics were specifically discussed.  In addition to the weekly meetings, the Individual Defendants convened *monthly* meetings with a more expanded group of high-level management to assess how the Company's performance stacked up over the prior month by reviewing "Objectives and Key Results" ("OKRs") and "Key Performance Indicators" ("KPIs"). In addition, CW 3 recalled that, in advance of the monthly meetings, Defendants Cannon-Brookes and Farquhar received detailed and tailored spreadsheets reporting on Company user metrics across

---

[6] CW 3 worked as the Head of Product Strategy & Business Operations, Work Management from June 2022 through June 2023.  He reported to Lilly Ladd, the VP, Strategy and Business Operations, who in turn reported to the Chief Product Officer Joffe Redfern and later directly to Defendant Bharadwaj.

the different products.  The monthly formal review meetings required each Atlassian product head to report detailed metrics about their products.  For example, the head of Atlassian's Jira product would report on the number of users, free, new, expansions, and migrations for all the products in the Jira family.  CW 3's responsibilities included analyzing the metrics and providing insights into how to sustain growth, and therefore, he was present at many of these monthly meetings throughout his tenure, and his team was tasked with preparing slides that reported on paid user expansion and free to paid conversion metrics to be presented at the monthly meetings.

**E.    In Direct Response To Analyst Concerns That Poor Macroeconomic Conditions Could Negatively Impact Atlassian's Business, Defendants Repeatedly Deny That The Company Was Experiencing Any Adverse Trends**

51.    In early 2022, the broader global economy took a downturn.  Inflation took hold across the globe as the world emerged from the COVID-19 pandemic.  As the year progressed, Russia's invasion of Ukraine, disruptions in the global supply chain, and unexpected lockdowns in China all contributed to a challenging macroeconomic environment for businesses globally. Against this backdrop of macroeconomic turmoil, analysts and investors were clamoring for reassurance from Atlassian that its business would not be impeded by these global conditions.

52.    In order to assuage investor concerns, Atlassian issued its Q4'22 Shareholder Letter and its Fourth Quarter and Fiscal Year 2022 Earnings Release ("Q4'22 Earnings Release") after markets closed on August 4, 2022, which made clear that the broader economic decline was not impacting Atlassian, and that, to the contrary, the Company was "uniquely positioned" with its "differentiated business model."  For example, the Q4'22 Shareholder Letter, filed with the SEC on Form 6-K, stated that strong "***secular trends***" reinforced the Company's growth, and that Atlassian would not be impacted by macro factors because it was "uniquely positioned [with] deep-seated momentum and a differentiated business" as compared to its industry peers.  The Q4'22 Earnings Release similarly quoted Defendant Cannon-Brookes as stating "Atlassian is uniquely positioned, with great momentum and a differentiated business model."  Defendants even went so far as to state that the deteriorating macroeconomic environment gave Atlassian a competitive

advantage in the industry: the "turbulent economic environment[] offer[ed] a chance . . . to gain market share – to shake up the leaderboard.  Atlassian intends to seize this moment…."

53.     Significantly, the Q4'22 Shareholder Letter expressly and affirmatively represented to the market that—five weeks into Q1 2023[7]—***there were no negative trends affecting Atlassian's current quarter***, which had started on July 1, 2022.  Indeed, Defendants assured investors that "over 90% of our revenue in FY22 was derived from existing customers and this dynamic has been consistent in our business over the years," and that, as a result, Defendants were "reiterating what we've said previously: approximately 50% year-over-year [growth] for both FY23 and FY24."  To drive home the point that there were no material adverse trends impacting Atlassian's business, the Q4'22 Shareholder Letter confirmed that "***nothing we are seeing right now is changing our outlook***," and, in fact, that the opposite was true:  Defendants "never felt more confident about our strategies . . . ***and the secular trends that reinforce them***."

54.     During the ensuing earnings call held that day, analysts specifically and directly questioned Defendants regarding these assertions, including whether the macroeconomic conditions were affecting Atlassian's performance and outlook and whether Defendants saw any "weakness" in customer demand in any particular geographic area in light of those conditions.  Significantly, in response, Defendants again denied that the Company was experiencing any negative trends in any part of its business (either free-to-paid or existing customers) brought about by the larger macroeconomic environment.  For example, Defendant Deatsch claimed that since the start of the Russian-Ukraine war in February, the Company was "***exceedingly vigilant across watching all stages of our funnel***," including "the additions upgrades, retention rates, and of course, our new customers."  As a direct result of their vigilance, Deatsch was in a position to report the "***good news***" that "***we have yet to see any specific trend geographically or even in industry segments or in customer size that gives us pause or worry to date***," and that "***we have not seen any significant shift in customer demand across our product lines***."  Deatsch promised investors

---

[7] Atlassian's fiscal year begins on July 1 and ends on June 30.  The Company identifies each fiscal year based on the year in which it ends.  For instance, Atlassian's fiscal year 2022 ended on June 30, 2022, and fiscal year 2023 started on July 1, 2022.

that the business trends were something Atlassian would "***continue to watch like a hawk***," and that "***there's no new news to share today***."

55.     While Atlassian had reported a "modest decrease in the conversion rates of Free instances upgrading to paid plans"—the "free to paid" segment that represented just ***10%*** of the Company's business—Defendants made clear that this "modest decrease" was inconsequential to the Company and in no way was an adverse trend that was reasonably likely to materially affect Atlassian's business.  Indeed, when an analyst from Wolfe Research pointedly asked on the call why—other than the "slightly slower conversion of free customers to paid customers" that Defendants had minimized—Atlassian was not "***seeing kind of some of the other impacts [] other companies are seeing***?," Defendants characterized the "slightly slower rate" of conversions as inconsequential and in no way constituted a trend indicative of a negative impact on the Company's business.  Specifically, Defendant Deatsch quashed any macroeconomic-based fears by noting that the "***slight thing***" the Company saw in free-to-paid conversions "***does not take away from the continued growth we see in our existing customer base that also drives more than 90% of our revenue in the existing year***."  Deatsch confirmed that Atlassian's "overall retention continues to be exceedingly strong" "across the many funnels we operate," which had "been supporting our net expansion rate."

F.     **The Market Credits Defendants' Representations Denying Macroeconomic Impacts And Specifically Highlighted That Defendants' Positive Statements Differentiated Atlassian From Its Competitors**

56.     Defendants' representations had their intended effect, as a plethora of analysts relied on and repeated Defendants' claim that the Company had experienced no significant macro effects, and specifically noted that this dynamic differentiated Atlassian from its peers.  For example, on August 4, 2022, Raymond James wrote that Atlassian was "***feeling little impact from macro uncertainty*** that is causing budget tightening around the broader technology space" and "[w]hile top of the funnel free users may not convert to paid users as readily right now, the vast majority of sales come from existing customers and TEAM has world-class retention."  Wolfe Research provided the same message, noting on August 4, 2022, that the "***cherry on top was reaffirmation of basically zero impacts from macro*** (outside of slight decrease in free to pay conversion rates)";

and that as a result, Wolfe Research "believe[d] the ***after hours premium to peers is justified***." Oppenheimer & Co. similarly left the earnings call feeling "bullish" because "***the company is seeing minimal macroeconomic weakness***."

57. Significantly, analysts specifically highlighted Defendants' claim that the Company had not experienced or seen any negative "trends" caused by the macroeconomic environment. For example, SMBC Nikko Securities ("SMBC") emphasized that Atlassian's "***narrative was unabashedly positive***" as "***[m]anagement has 'yet to see any trend' in geographies or customer segments that indicate macro-driven weakness***," and highlighted that Atlassian "***has not seen any broader slowdowns*** among specific products, geographies, industries, or customer sizes." Truist was also reassured by Defendants' representations, noting that Atlassian was "***one of the key companies that we look to for macro commentary***" and that, "[w]hile other companies in our coverage have discussed headwinds by geography, vertical, or customer size, ***[Atlassian] did not indicate any difference in buyer behaviors***." Cowen emphasized that Atlassian saw "consistent demand trends," and "is not seeing any notable macro pressures in pipelines/close rates." Canaccord Genuity likewise described that for Atlassian "all regions, industry segments, product segments, and customer segments remain healthy and are behaving normally."

58. Similarly, Macquarie concluded that Atlassian was "resilient in a downturn" because the Company showed "little to no impacts from the macro environment." Macquarie noted that Atlassian "***provided the strongest print*** of this software earnings season in our coverage as the company handily beat expectations, raised vs. FQ1'23e consensus, reiterated strong cloud growth outlook, and ***provided reassuring commentary about its positioning for a recession***."

59. William Blair also underscored that "[m]acro impact on demand and pipeline was minimal," and emphasized as a "***key highlight[]***" that the Company reported "**No material macro impact coming through the business**." (emphasis in original). William Blair also echoed Defendants' representations concerning their personal monitoring of these issues, stating that Atlassian "has been vigilant in monitoring the macroeconomic environment and ***has not seen any material signs of a slowdown in its data yet***."

60.     As a result of Defendants' wholly positive statements, Atlassian's share price skyrocketed to a Class Period high of $289.36 per share on August 16, 2022—a 25.6% increase from the price on August 4, 2022, just prior to the Class Period.

**G.      Defendants Again Represent That There Were No Material Adverse Trends Impacting Atlassian For The "Current Fiscal Year" In The Company's Annual Report Filed on August 19, 2022**

61.     On August 19, 2022, Atlassian filed with the SEC its 2022 Annual Report on Form 20-F, signed by Defendants Cannon-Brookes and Farquhar, which was incorporated that day into Atlassian's Registration Statement on Form S-8 filed in connection with the Company's re-domiciliation to the United States.  In the 2022 Annual Report, Defendants made clear that there were no known current trends impacting Atlassian as of the date of filing.

62.     First, in a section discussing the actual "***Trend Information***" then-known to Atlassian, the Annual Report stated that there had been no macro trends affecting Atlassian in the fiscal year ended June 30, 2022.  Specifically, the Annual Report declared that "weakening economic conditions…***did not*** individually have a material adverse impact on our financial condition or results of operations ***during the fiscal year ended June 30, 2022***," and that "the extent to which any of these risks ***ultimately impacts*** our business…will depend on future developments, which are ***uncertain*** and ***cannot be predicted at this time***."  Second, the Annual Report also confirmed that as of the time the Annual Report was filed—over a month and a half into the current year—there were ***no trends*** affecting operations in the "***current fiscal year***," stating:

> Other than as disclosed elsewhere in this Annual Report, ***we are not aware of any trends, uncertainties, demands, commitments or events for the current fiscal year that are reasonably likely to have a material effect on our revenues, income, profitability, liquidity or capital reserves,*** or that caused the disclosed financial information to be not necessarily indicative of future results of operations or financial conditions.

63.     Moreover, while the Annual Report warned that economic uncertainty "may" impact Atlassian's operations at some undetermined point in the future and "could" hypothetically cause harm, at no point did the report ever disclose that Atlassian was ***currently*** experiencing material adverse trends reasonably likely to affect its business in the two metrics that comprised virtually the entirety of the Company's revenue.

64.     In addition, the 2022 Annual Report once again touted Atlassian's "[p]redictability of [s]ales" due to the Company's unique linear sales cycle, explicitly noting that the Company "historically experienced a linear quarterly sales cycle" and "steady and predictable revenue." The Annual Report did not claim that the Company expected a seasonally slow start to 2023.

**H.     Throughout The Remainder Of The Class Period, Defendants Concealed The Material Adverse Trends Affecting The Company, Specifically Representing To Investors That They "*Haven't Really Seen Any Discernible Trend*" Significantly Impacting *Any* Part Of Atlassian's Business**

65.     Remarkably, even as late as September 14, 2022—just two weeks before the end of Atlassian's Q1 2023—Defendants remained steadfast in their representations to investors that there were no adverse trends materially affecting the Company's finances or performance.  Specifically, Atlassian presented at the Goldman Sachs Communacopia + Technology Conference held over September 12-15, 2022, which, according to a Goldman Sachs representative, was "the largest Goldman Sachs Investor Conference ever."  Market participants flocked to the conference as they were eager to hear how global tech companies were fairing through the uncertain economic times. Yahoo! Finance reported that the Goldman Sachs "conference was packed" as it had "record registration and attendance" where "[m]any presentations were standing room only."  As Business Insider described it, the "conference was heaving with attendees and one Goldman banker noted this was the *busiest version of the event ever*."  According to a Goldman Sachs' representative interviewed by CNBC from the conference on September 12, 2022, "a lot of investors are here at our conference this week" specifically "to check in on *consumer demand* [and] *enterprise demand*" in light of the macroeconomic turmoil affecting many tech companies.

66.     During the conference, on September 14, 2022, Atlassian gave a presentation in which Defendant Bharadwaj spoke for forty-one minutes about the state of the Company's business, including the various markets that Atlassian services and the Company's all-important cloud growth.  Predictably, given that it was the topic that was top of mind for conference attendees, during Bharadwaj's presentation, a member of Goldman Sachs' Research Division noted that an attendee was "*dying to ask*" Defendants about "the macroeconomic conditions [that] are not that cooperative," and specifically "[w]hat are you seeing out there with the demand environment?"  In

response, Defendant Bharadwaj highlighted that Atlassian was well-insulated from any macroeconomic issues, stating that the Company possessed several "advantages in the overall macroeconomic climate" that protected its business from the global conditions, including that Atlassian provided "mission-critical" software for its customers at a "highly, highly competitive" price point.

67.     Then, Defendant Bharadwaj proceeded to discuss "what different parts of our business are seeing what impact."  With respect to Atlassian's "conversion of users from free to paid," Defendant Bharadwaj again unequivocally assured investors that the "slight" slowdown in free-to-paid conversions remained, *as of September*, only a "bit of softness over the past couple of months"; that the slight decrease in no way constituted a trend or had a material impact on the Company; and that it was "important to illustrate" that free-to-paid was "really a very small part of our business," with over 90% of the Company's revenue derived from existing customers. Significantly, Defendant Bharadwaj assured investors that, "across the board, across existing and new" customers, Atlassian was not experiencing a material adverse trend as a result of the macroeconomic environment:

> [W]e look at various different parts, cohorts of a funnel to think about, hey, what different parts of our business are seeing what impact?
>
> Just in the last shareholder letter, we talked about conversion of users from free to paid. We are seeing a ***bit of softness*** over the past couple of months. But it's important to illustrate that point in the overall picture as over 90% of our revenue comes from existing customers. ***So the conversion from free to paid is really a very small part of our business***. And also, the number of free users that are coming in that create new free instances continues to grow steadily. ***We're not seeing any trends there. So across the board, across existing and new, that's overall what we are seeing in different parts of the business***.

68.     Indeed, when analysts asked whether the slowdown in free to paid conversions would require Atlassian to "catch up" in the future when the "demand environment is more stable," Defendant Bharadwaj affirmatively and unequivocally reiterated that the Company was not experiencing ***any*** such issues relative to the demand environment, and that, with respect to ***any*** part of the Company's business, Defendants "***haven't really seen any discernible trend there in terms of the macroeconomic impact***":

26

1  Yes. So from a product perspective, again, I want to reiterate that we think of it as
   both new and existing and over 90% of the revenue comes from existing. So there's
2  a corresponding weightage we think about when we think about, hey, which parts
   of the funnel should we look at and what to optimize from a product perspective?
3  So in the over 90% bucket, which is where most of the revenue comes from, there
   are several different parts of the funnel we look at. So we look at migrations, which
4  is currently on year two of a multiyear journey. That continues to go steadily. It is
   where we would expect to be at this point in the journey. So we monitor the rate of
5  migration, what kinds of customers are migrating and we're pretty pleased with
   where we are there. . . we look at upsell or upgrades. So the people that started out
6  with a free when they switch to standard, what happens?

7  So to address your question, the way our pricing model works is the first 10 users
   are free, and then the 11th user onwards, it's paid. . . ***So we think of upsell as really***
8  ***across free to standard, standard to premium, premium to enterprise. And we've***
   ***seen some very encouraging progress there over the last four quarters. And I***
9  ***haven't really seen any discernible trend there in terms of the macroeconomic***
   ***impact***. And user expansion, which is unique to the Atlassian model of organic
10 growth, user expansion is a place where we don't go off and try to do – try to
   influence that using a bunch of levers. We let that happen organically because that's
11 how we believe we construct our long-term sustainable business model with low
   CAC. That's an area that we continue to monitor. That's not an area where we try
12 to do a lot of product interventions, but that's going to be an important one to look
   at in the current climate.

13     69.     Again, Defendants' repeated assurances had the intended effect, as analysts

14 specifically credited Atlassian's representations.  For example, on September 15, 2022, Morgan

15 Stanley reported that "***Atlassian has seen little impact from the weakened macro environment***."

16 Similarly, on September 21, 2022, Citi analysts noted that Atlassian was impervious to the economy

17 as Citi predicted Atlassian would not "***see slowed adoption***" of its products despite higher prices.

18     70.     On October 4, 2022, as part of Atlassian's domiciliation in the United States, the

19 Company filed a Post-Effective Amendment to its Registration Statement, which was signed by

20 Defendants Cannon-Brookes and Farquhar.  The amendment was filed pursuant to "Rule 414 under

21 the Securities Act of 1933," or 17 C.F.R. § 230.414, which allows a successor entity to continue

22 offering securities registered with the SEC under a prior entity's registration statement.  To avoid

23 having to re-register the securities, Rule 414 allows the successor entity to file a post-effective

24 amendment expressly adopting the prior registration statement(s) as its own.  However, Rule 414

25 provides that when adopting the prior statements, the successor entity must "set[] forth ***any***

26 ***additional information*** necessary to reflect any material changes made in connection with or

27

28

1  resulting from the succession, ***or necessary to keep the registration statement from being***

2  ***misleading in any material respect***."

3      71.    Atlassian's post-effective amendment to the registration statement adopted

4  Atlassian's prior registration statements—which had previously incorporated the 2022 Annual

5  Report—and also expressly re-incorporated the Company's 2022 Annual Report.  Thus, as of

6  October 4, 2022—***after Q1 had concluded***—Atlassian reconfirmed that nothing in the 2022 Annual

7  Statement required amending to "keep the registration statement from being misleading," as

8  required under Rule 414.  Therefore, as of October 4, 2022, through Atlassian's post-effective

9  amendment to the registration statement, Defendants confirmed that they were "***not aware of any***

10  ***trends, uncertainties, demands, commitments or events for the current fiscal year that are***

11  ***reasonably likely to have a material effect on our revenues, income, profitability, liquidity or***

12  ***capital reserves, or that caused the disclosed financial information to be not necessarily***

13  ***indicative of future results of operations or financial conditions***."

14      I.    "***They Were Not Growing Like Gangbusters***": **Former Employees Confirm That**
          **Defendants Knew Full Well Throughout The Class Period That Atlassian's**
15          **Business Was Suffering From Undisclosed Material Adverse Trends**

16      72.    Contrary to Defendants' repeated representations to investors throughout the Class

17  Period that they had "yet to see any specific trend[s]" and that there were no "discernible trend[s]"

18  materially affecting Atlassian's business, in reality, the Company saw its critical metrics in free-to-

19  paid conversions and paid user expansion materially decline ***months*** before they disclosed this

20  information to investors.  Indeed, accounts from former employees confirm what Defendants

21  ultimately admitted—that Defendants closely monitored these metrics at all times and recognized

22  in July and August 2022 that user expansion and free to paid conversion growth rates were coming

23  in well below expectations and below the 50% year-over-year growth that the Company previously

24  predicted.  This downturn was so pronounced that "***it was clear that the growth rates were not***

25  ***what they were***," as these CWs recounted that "***back in June [] things were slowing down. The***

26  ***Company was not growing at 50% year-over-year growth***."

27

28

73.     Specifically, CW 3 began his role as the Head of Product Strategy and Business Operations in the Work Management division at Atlassian in June of 2022, prior to the start of the 2023 fiscal year, which began on July 1, 2022.  CW 3 was responsible for tracking numbers and forecasts for leading growth strategy, business performance analysis, and long-range planning for products.  He first reported to the Global VP Head of Product Strategy and Operations, Lilly Ladd, and after Ms. Ladd became Chief of Staff to the COO, CW 3 reported to the VP of Strategy and Business Operations Jason Wiethe, who reported directly to Defendant Bharadwaj.  Part of CW 3's team's responsibilities included assessing the overall health of the business by looking at Company metrics and analyzing how the business was performing.  In carrying out his duties, CW 3 worked closely with data analytics, including the key metrics tied to Atlassian's revenues—free to paid conversions and paid user expansions—which he and his team reviewed on a *daily* basis.

74.     CW 3 recounted that as soon as he joined Atlassian in the summer of 2022, he saw first-hand that the Company's metrics were declining, that Atlassian was not growing at the same rate that it had in prior years, and that this was a major development that was front-and-center across the entire organization, including in the C-suite.  For example, CW 3 explained that "It was my job to look at the numbers and I was seeing *back in June that things were slowing down. The Company was not growing at 50% year-over-year growth*."  As part of his job responsibilities, CW 3 specifically compared the July and August 2022 results to those of the Company's prior years, including July and August of 2021, and "*it was clear that the growth rates were not what they were*" and the trend lines were slowing down.  In CW 3's words, "*when I first joined the Company, you could see that they were not growing like gangbusters, and it was slower than expected*."

75.     CW 3 also recalled the timeline of the decline because it affected the strategic decisions that Company management was making at the time.  Specifically, when he was hired in June of 2022, CW 3 was told that he needed to build out a much larger team and that he needed to hire ten to fifteen additional employees.  However, in June and July 2022, he observed the slowdown in the Company's business, and by July 2022, he was instructed to refrain from adding

members to his team specifically because of this downturn: "***We were told that things were slowing down, and we are going to put the brakes on hiring***."  The rationale that was provided to him to stop additional hiring for his team was because of the declining metrics in Atlassian's business—namely, Atlassian was noticing that while new users were getting on the Company's platform, there was a downturn in those new users converting to paid subscriptions, as well as a downturn with paid users expanding subscriptions.  CW 3 recalled that the message within the Company was that there was a general slowdown in the economy that was impacting Atlassian's business decisions, and this message was reiterated by the finance department as the Summer of 2022 progressed, with finance instructing him in August and September 2022 that he was no longer authorized to hire additional employees based on those considerations.

76.     CW 3 described the challenges that Atlassian was facing in July and August of 2022 as (i) users had become reluctant to convert from free accounts to paid subscriptions, and (ii) the Company's paid seat expansion numbers had slowed down.  CW 3 confirmed that he and his team saw what was happening in the market and the changes to clients' buying behavior, that he reported on these metrics with division heads, and that these developments were widely discussed within the Company, including with the Individual Defendants.  CW 3 commented: "Everyone was keenly aware of those metrics including the founders. ***The entire executive committee looked at those metrics***."  Furthermore, CW 3 stated that he also presented these metrics to the COO, Defendant Bharadwaj, either directly in meetings or in a report that he submitted for her review, and that on other occasions his team's report was incorporated into a document that was presented to Defendants Bharadwaj, Cannon-Brookes, and Farquhar.

77.     Furthermore, as discussed above in § V.D, the Individual Defendants were aware of and discussed this information through (i) weekly planning meetings where these metrics were discussed; (ii) a formal executive review that occurred monthly, during which team leads reported on the performance of their products or divisions; (iii) a monthly report demonstrating all Company metrics across all products; (iv) a spreadsheet prepared by the finance department with information concerning product and division performance; and (v) dashboards from the analytics department

that contained similar information.  CW 3 confirmed that the Individual Defendants had direct access to this information.  In fact, CW 3 recalled that his team presented data to Atlassian management in July and August of 2022, which showed that while Atlassian was targeting growth at 50% year-over-year, *internal metrics showed that the Company was only growing at a rate of 30% for the year*—a rate that was materially less than prior years, including July and August of 2021.  CW 3 confirmed that his team reported to management that their actual results versus their targets were not at the level that they had expected or wanted to be.

78.     Thus, as CW 3 opined, there was a disconnect between what Defendants were telling the public and what internal metrics were showing at Atlassian.

**J.**     **"*Project Big Fish*": Former Employees Confirm That Defendants Were So Concerned About Atlassian's Declining Metrics In July and August 2022 That They Implemented An "All-Hands-On-Deck" Project To Reverse The Material Adverse Trends Affecting The Company's Business**

79.     The downturn in Atlassian's business that continued throughout July and August 2022 was so significant that it led senior management to conduct numerous meetings concerning steps that the Company needed to take to reverse these material adverse trends.  Specifically, CW 3 recalled that in July and August of 2022, Defendants conducted many conversations about why they were experiencing a negative trend in their business.  He added: "The tech market was getting killed at that time and it felt like a direct correlation to me."  CW 3 stated that the entire executive team was having discussions with the product leadership team, the sales leadership team, and the finance organization, as the Company saw that its growth was slowing down, and they needed to understand some of the "big things" that they could implement to reverse these negative trends.

80.     According to CW 3, the culmination of these in-depth discussions in July and August 2022 was a major, Company-wide initiative called "Project Big Fish," which involved approximately 100 upper-level Atlassian employees who were broken up into cross-functional teams and tasked with finding ways to increase Atlassian's user expansion through product enhancements and new features.  In CW 3's words, "*We were focused on getting some of the big fish*."  CW 3 recalled that he was informed that he and his team were added to Project Big Fish by no later than Labor Day 2022 and that Defendants used the Slack messaging tool to communicate

about the project to employees.  Thereafter, he and his direct reports assisted product teams in assessing what product enhancements could have the biggest results on enticing additional users to what the Company referred to as the "flywheel," as well as additional ways to increase user expansion.

81.   Significantly, CW 3 explained that all the top executives, including the Individual Defendants, had "ownership" of Project Big Fish and were involved in the project from its inception, as the project was ***"100%" initiated top down***.  In CW 3's own words, "***Project Big Fish came from the executive team, and it was reviewed by the executive team***."  Furthermore, CW 3 confirmed that Defendant Bharadwaj was keenly aware of the project and that the rationale underpinning its inception was that the Company needed to address and reverse the negative trends that were affecting its business, and in fact was a driving force and a very active voice behind the project: "***Anu [Bharadwaj] was very involved because she had 40 people in product strategy that reported to her involved with this project***."  Furthermore, CW 3 recalled that Bharadwaj reviewed the recommendations from Project Big Fish—including those made by Erika Trautman, Senior Vice President of Product, Work Management, and Meagan Cook, Head of Product, Software Teams—and provided her opinions on them.

82.   CW 3 further noted that Project Big Fish was instituted because the executive team recognized that the November earnings announcement was approaching and knew the Company would have to walk back its prior guidance based on the July and August results.  Accordingly, Defendants wanted to be in a position to tell the market that Atlassian already had a viable plan to reverse the negative trends and get the Company back to its prior trajectory of over 50% cloud growth.  Further corroborating CW 3's account, another former Atlassian employee, CW 4,[8] similarly confirmed that Atlassian employees were told to "re-direct our efforts" at the Company as management was "taking us off projects and putting us onto revenue driving initiatives."

---

[8] CW 4 was a Sales Operation Program Manager from August 2022 through June 2023 based out of Austin, Texas.  CW 4 was responsible for spearheading the launch of new products by collaborating with product developers, sales leaders, and marketing employees.

83.     These former employees also confirmed that the Company's business had been so materially impacted by these negative trends that after the Class Period, Defendants implemented a second phase of Project Big Fish, which CW 3 and CW 4 both confirmed was called "Project Back to Fifty." According to CW 4, Project Back to Fifty attempted to rebalance priorities in a further effort to get the Company back to reporting 50% year-over-year growth.  Another former Atlassian employee, CW 5, similarly confirmed that the Company took additional steps focused on restoring the Company back to 50% cloud revenue growth.[9]  Likewise, CW 3 explained that with the implementation of Project Back to Fifty, the Company was now in "code red" to get expansion rate back to its historic norms.

**K.     The Truth Is Revealed: Atlassian Discloses Poor Financial Results, Missing EPS Guidance For The First Time In Its History, Which Defendants Directly Attribute To "Trends" From "Macro Headwinds" That They Saw *In July 2022***

84.     Defendants' fraud was revealed after the market closed on November 3, 2022, when Atlassian stunned investors by announcing poor financial results in its Q1 2023 Shareholder Letter, filed with the SEC on Form 8-K ("Q1'23 Shareholder Letter").  The Q1'23 Shareholder Letter disclosed that Atlassian's Q1 2023 cloud growth came in at just 49%—well below analysts' consensus of up to mid-50s percentage growth; that Atlassian had missed its guidance for earnings per share for the first time in its history as a public company; and that the Company was forced to materially walk back its full year cloud growth guidance issued just one quarter prior.  Notably, Atlassian's poor results marked the first time in *five years* that the Company failed to exceed its quarterly guidance.

85.     Significantly, in direct contrast with Defendants' prior statements—including from just *two weeks* earlier—that the Company was *not* facing *any* material negative macroeconomic trends, the Company now disclosed that the exact opposite was true: that *both* elements of the Company's business had been materially impacted by macroeconomic trends throughout Atlassian's quarter.  Indeed, in the Q1'23 Shareholder Letter, Defendants acknowledged that they

---

[9] CW 5 was a Principal Executive Recruiter for Atlassian from March 2022 until May 2023 in the Talent Acquisition Department.  CW 5 was responsible of recruiting engineers to join the Chief Technology Officer's team.

needed to address "the topic that's ***top of mind for shareholders: macro impacts***."  Defendants then admitted that Atlassian's poor financial results were the direct result of "***two trends*** [that were] the result of companies tightening their belts and slowing their pace of hiring."  These trends were (i) "a decrease in the rate of Free instances converting to paid plans," and (ii) "a slowing in the rate of paid user growth from existing customers."  In the Q1'23 Shareholder Letter, Defendants continued to expand on these two trends, making clear that these trends were the result of the macroeconomic environment, and that they had materially and adversely impacted Atlassian's financial results during the quarter:

> [W]e encountered two primary revenue headwinds during the quarter from changes in the macroeconomic environment: 1) We saw a ***more pronounced*** continuation of the ***trend*** discussed last quarter, where fewer Free instances converted to paid plans; and 2) we also saw the growth of paid users from existing customers slow in the second half of Q1, largely due to customers slowing their rate of hiring.

86.     Tellingly, while Defendants initially tried to claim that these trends did not exist until "towards the end of the quarter" or the "second half of Q1," the market was having none of it. Indeed, during the ensuing earnings call, an analyst highlighted that "[i]nvestors were pretty surprised to see results like this from Atlassian," and opined that he "***[had] to believe that [Atlassian] had a very early warning***" regarding the trends precisely because Defendants had previously represented that Atlassian's business was completely ***linear***—which provided a "predictable sales model" that differentiated Atlassian from its peers—and that Defendants had "***tremendous visibility***" into sales patterns:

> Gregg Steven Moskowitz
> Mizuho Securities USA LLC, Research Division
>
> So I think of Atlassian as an unusual software company in a good way, a couple of the reasons being that one, ***your quarters are typically very linear***. And two, ***you have tremendous visibility into customer buying and usage patterns***. And so ***I'd have to believe that you had a very early warning of the paid user growth slowdown*** that began midway through the quarter.

87.     In response to this questioning, Defendant Deatsch was forced to clarify "***the timing of things that we saw***."  Significantly, Deatsch made clear that this "slow down" in user growth was experienced "across our customer base" and was seen ***in July*** and continued into August:

Cameron Deatsch
Chief Revenue Officer

I can also add on to just the timing of things that we saw. As we mentioned in August, what we were seeing in the August time frame was the net new customers, *the free customers converted to paid was slowing down going into August*. We normally through our summer season, the *July and August tend to see user growth slow down across our customer base*, largely due to seasonality, vacations and holidays.

88.     Recognizing that this admission undermined Defendants' assertions that they had not seen any trends in Atlassian's business, Defendant Deatsch now claimed that the reason they did not disclose the slowdown was because their business supposedly experienced a "normal seasonal trend where July and August" were purportedly slower, and the Company experienced growth in September:

It just tends to be a normal seasonal trend where *July and August are slower* as people are *not* upgrading instances, *adding more users*. What we noticed is usually most years when you come back in September, everyone is coming back to work, the holidays wear off and *people start adding users* and upgrading their instances again and that's when we actually *did not see that normal user growth uptick that we normally do in September*.

89.     Defendants' assertion that Atlassian's business was "usually" seasonal was not true. Indeed, Defendants' explanation was contradicted by their representations *dating back to Atlassian's IPO Prospectus*—where the Company represented that "[u]nlike traditional enterprise software businesses, we have historically *experienced a linear quarterly sales cycle with approximately a third of our quarterly sales occurring within each month of the respective quarter*."  On numerous occasions, Atlassian's management specifically touted its "linearity of sales" as providing a "predictable sales model" that gave the Company a competitive advantage, emphasizing that this dynamic "*really helps us in-quarter to understand where we're at financially*" and produced a "*no-surprise environment* from a top line perspective."  In fact, just prior to the start of the Class Period, on June 2, 2022, Atlassian's Head of Investor Relations claimed—in direct response to a question about the "elephant in the room [that] has been the macro"—that the Company had a "*beautiful linearity throughout our quarter*," which would insulate the Company from negative macro trends.  Similarly, on June 8, 2022, Defendant Deatsch was unequivocally positive in his remarks about the upcoming summer season, representing to

investors that the "next coming months" would see "business [] as usual, *if not getting stronger*." Deatsch gave no indication that July and August were expected to be seasonally slow, or that the Company expected that a September rebound would keep its sales on track.

90. Moreover, Defendants continued to make these representations during the Class Period, as the 2022 Annual Report continued to make clear that Atlassian's business was *not* seasonal and that, in fact, the Company had a perfectly "*linear quarterly sales cycle*" that provided "*[p]redictability of [s]ales*," and "*steady and predictable revenue*." And even on the very same November 3, 2022 earnings call in which Deatsch advanced this seasonality excuse, Defendant Farquhar confirmed that Atlassian's sales have always been "*linear*," while stating "there are not many things we do within a quarter to affect the quarter's results, *which is why you see the linearity that you've seen over the years*."

91. Furthermore, Defendants' statements during the earnings call also confirmed the falsity of Defendant Deatsch's prior statement that Atlassian had "yet to see any specific trend geographically or even in industry segments." Specifically, during the call, another analyst sought more information from a "geography perspective" on where the paid user expansion trend was felt during Q1 2023. In response, Deatsch made clear that the July and August slowdown was actually widespread, admitting that "from a geographic perspective," the material adverse trend regarding the "user expansion slowing down" was experienced "across our customer base . . . largely *across all segments, industries and geographies*."

92. In addition, Defendants' excuses were not limited to timing or seasonality. Defendants also attempted to claim that they had previously informed investors that the "modest decrease" in free-to-paid conversions was in fact a material trend, stating "[w]e saw a more pronounced continuation of the *trend discussed last quarter*." But that is most certainly *not* what Defendants represented to the market. Rather, throughout the Class Period, Defendants had made crystal clear to investors that this slowdown was decidedly *not* a "*discernible trend*," and was, in fact, inconsequential, characterizing it as just "*a bit of softness*"; a "*modest decrease*"; a "*slight thing*"; and "*really a very small part of our business*." By contrast, Defendants now labelled the

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:23-CV-00519-WHO

free-to-paid conversion headwind a "trend" and made clear it would "impact…our future revenue growth."

93.     As a result of Defendants' stunning disclosures, Atlassian's stock price plummeted over $50 per share in one trading day, or nearly 30%, declining from a closing price of $174.17 on November 3, 2022 to close at $123.73 on November 4, 2022, wiping out over $7 billion in shareholder value.  Atlassian's share price continued to fall the next trading day as the market continued to digest the news, dropping an additional 4% on November 7, 2022, to close at $119.23.

94.     Analysts were stunned by Defendants' disclosures, and pointedly noted that they directly contradicted Defendants' representations to investors.  For example, BMO Capital lowered its target price for Atlassian by 45%, noting that it was "the first time Atlassian has not exceeded the upper-end of guidance in at least five years," and specifically highlighting that analysts were "***surprised by the magnitude of the slowdown*** in consolidated growth and ***cloud growth more particularly***."  Wolfe Research, who just three-months earlier raved about Defendants' "reaffirmation of basically zero impacts from macro," lowered its price target for Atlassian's shares by 40%, from $290 to $175 per share, while noting the "***abrupt change in tone and outlook likely puts shares in the penalty box***."  Wolfe Research further underscored that management's disclosure of "headwinds from both free to pay conversion and a slowing rate of paid user growth at existing customers" "***took us and investors by surprise, sending shares down ~25% AH [after hours]***."  Citi likewise placed Atlassian "***in the penalty box***" for its "***significant and unexpected pivot in demand tone***," and stated that the "***unfortunate surprise***" regarding negative trends would put "significant pressure" on Atlassian shares, and that the slash in full-year Cloud growth guidance was "***another unfortunate surprise***" that marked a "rough start to FY23."

95.     Other analysts similarly drastically cut their target price for Atlassian shares because the Company's results were significantly lower than expectations.  For example, Piper Sandler pointed out that Atlassian's in-line revenue result was "opposed to typical +5% 'beat'" and was the Company's "lowest beat vs. guide ever," and as a result, downgraded its rating for Atlassian to neutral and lowered its price target by $135 per share, or 48%.  Oppenheimer & Co. lowered its

price target to $200 per share down from $320, as it "expect[ed] the **_pronounced reset of Atlassian's near-term performance… to weigh sharply on the shares as investors realign expectations_**."  Morningstar lowered its price target for Atlassian by 44% due to the "worsening conversions of free users" and "decelerating seat growth."  FBN Securities slashed its Atlassian price target by a whopping 57% from $350 to $150, given the now disclosed "**_macro headwinds_**." While analysts underscored that the Company had consistently beaten the **_upper_** range of guidance, they also noted that Atlassian's results not only fell below analysts' expectations, but they were buoyed by an unexpected boost from its non-cloud, legacy operations.  This development was alarming because, as noted above, the Company was soon set to phase out those legacy operations, and without the surprise non-cloud revenue lift, the Company would have failed to reach even the low end of guidance altogether.  As Truist explained in its November 3, 2022 report, Atlassian's results were "driven by higher than anticipated maintenance revenue from [the Company's] legacy products," while cloud results came in below their expectations.

**L.      SEC Regulations Required Defendants To Disclose What They Admitted Were Known Adverse Material Trends or Uncertainties**

96.      Significantly, at no point did Defendants ever disclose that Atlassian was facing a material adverse trend in any part of its business.  To the contrary, Defendants emphatically and repeatedly denied that there were any material trends affecting the Company.  This information was extraordinarily material to investors.  According to SEC guidance, as discussed below, labeling a business development a "trend" has significant implications to investors as doing so informs the market that management believes the condition is "**_reasonably likely_** to have a material … unfavorable impact on net sales or revenues or income" from the Company's operations. Accordingly, SEC regulations required Defendants to disclose these known adverse material trends to investors.

97.      On January 30, 2020, the SEC proposed amendments to Regulation S-K, and related rules and forms to, in part, "enhance the disclosure requirements in" Management's Discussion and

Analysis ("MD&A") of reported financial information.[10]   The new rules went into effect on February 10, 2021, when the SEC officially amended Item 303 of Regulation S-K, 17 C.F.R. §229.303 ("Item 303")—and made corresponding changes to Item 5 of Form 20-F.  Defendants' representations about the absence of any known trends were extraordinarily material to investors. While historically management only had to disclose uncertainties and trends that "will cause" a material change in a company's operations, under the amendments to Item 303 of Regulation S-K, companies must disclose trends that are "***reasonably likely***" to affect a company's "future financial condition."[11]

98.     In explaining the objective of the amended Item 303 and Form 20-F, the SEC "emphasiz[ed]" that financial disclosures should "enable[] investors to see a registrant through the eyes of management," and therefore the amendments were "expected to better allow investors to view the registrant from management's perspective."[12] Importantly, the SEC stressed that the "amendments are intended to remind" management to "provide an analysis that encompasses ***short term results*** as well as future prospects."[13]

99.     The amended "objective" to Item 303(a) states the following:

> The discussion and analysis must focus specifically on material events and ***uncertainties*** known to management that are ***reasonably likely*** to cause reported financial information not to be necessarily indicative of future operating results or of future financial condition. This includes descriptions and amounts of matters that have had a material impact on reported operations, as well as matters that are ***reasonably likely*** based on management's assessment to have a material impact on future operations.

100.     Item 303 accordingly requires companies to "[d]escribe any known trends or uncertainties that have had or that are ***reasonably likely*** to have a material favorable or unfavorable

---

[10] *See* Management's Discussion & Analysis, Selected Fin. Data, & Supplementary Fin. Info., Release Nos. 33-10890; 34-90459 (Nov. 19, 2020) ("SEC 2020 Guidance") at 5.  According to SEC 2020 Guidance, the disclosure requirements of Form 20-F are "substantively comparable to the MD&A requirements under Item 303 of Regulation S-K," and Item 5 of Form 20-F is intended to "mirror the substantive MD&A requirements in Item 303." *Id.* at 91, 95.

[11] *See id.* at Section II.C.3.

[12] *Id.* at 30, 93.

[13] *Id.* at 31.

impact on net sales or revenues or income from continuing operations." 17 C.F.R. §
229.303(b)(2)(ii).  SEC guidance on Item 303 explains that the "analysis in this area should be
based on *objective reasonableness*."[14]  As the SEC explained, "when applying the 'reasonably
likely' threshold, registrants should consider whether a known trend … is *likely* to come to fruition"
(emphasis in original).[15]  If the trend "would reasonably be likely to have a material effect on the
registrant's future results or financial condition, *disclosure is required*."[16]

101.   Even if management cannot determine whether the trend will "have a material
effect," it nevertheless "should be disclosed if a reasonable investor would consider omission of
the information as significantly altering the mix of information made available in the registrant's
disclosures."[17]  According to the SEC,"[t]his analysis should be made objectively and with a view
to providing investors with a clearer understanding of the potential material consequences of such"
trends.[18]  In other words, "[t]he 'reasonably likely' threshold, which requires that management
evaluate the consequences of the known trend … is grounded in whether disclosure of the event or
uncertainty would be material to investors."[19]  As part of this disclosure obligation, the SEC
demands that companies "determine and carefully review what trends … or uncertainties are known
to management."[20]

102.   Rather than disclose what Defendants themselves admitted were "trends" affecting
Atlassian's business in July and August 2022, as required by Item 303 and Form 20-F, the 2022
Annual Report and the Post-Effective Amendment to the Registration Statement expressly denied

---

[14] *Id.* at 45.

[15] *Id.* at 47.

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] *Id.* at 48.

[20] Management's Discussion & Analysis of Fin. Condition & Results of Operations, Release Nos. 33-6835; 34-26831 at *4 (May 18, 1989).

that any negative trends existed.  The filings did not disclose that macroeconomic pressures were "reasonably likely" to affect Company performance—as required under Item 303 and Form 20-F—but instead reported that the "weakening macroeconomic conditions" did **not** have any impact on Atlassian's operations.

103.    At the time of these statements, Defendants knew that the slowdown in free to paid conversions was a full-blown negative trend affecting operations and that paid user expansion rates had greatly decelerated since July.  Furthermore, Defendants were fully aware that these trends would both affect the Company's short-term results and future prospects.  Indeed, the Post-Effective Registration Statement, which re-adopted the 2022 Annual Statement, was filed on October 4, 2022—***after Q1 2023 had already concluded***—yet it made no mention of these trends that were reasonably likely to have a material impact on revenue and income.  Just one month later, Defendants disclosed poor financial results that they directly attributed to two "macro-related trends," and that Defendants had seen these trends in July and August 2022.

104.    Accordingly, Defendants' material misstatements and omissions in the 2022 Annual Report and the Post-Effective Amendment to the Registration Statement had the cause and effect of creating in the market an unrealistically positive assessment of Atlassian and its business operations.

## VI.    **DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS**

105.    As discussed herein, Defendants made false and misleading statements and material omissions during the Class Period in violation of Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder.  Throughout the Class Period, Atlassian's investor presentations and public filings made with the SEC included material misstatements and/or omissions concerning the Company's financial condition and growth, which included, among other misrepresentations, statements concerning material adverse trends that were significantly impacting the Company's business and future prospects.

106.    Defendants' representations set forth below were false. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically

positive assessment of Atlassian's business, operational status, and future growth prospects as, in truth, Defendants had falsely presented to investors a materially misleading portrayal of Atlassian's business throughout the Class Period.

### A.   The August 4, 2022 Conference Call

107.   On August 4, 2022, Atlassian held a conference call with analysts and investors to discuss the Company's earnings and operations results for the fourth quarter and full fiscal year 2022.   During the call, Piper Sandler analyst Quinton Gabrielli specifically asked about any slowdown in any part of the Company's business.   In response, Defendant Deatsch highlighted that Defendants were personally monitoring all areas of the Company's business, stating: "we are being exceedingly vigilant across watching all stages of our funnel, whether that's migrations funnel, the editions upgrades, retention rates and, of course, our new customers coming in."

108.   Then, Defendant Deatsch explicitly represented that, despite the fact that Defendants were watching Atlassian's operational metrics "like a hawk," the Company was not seeing any material trend in any part of its business, stating: "***The good news as of to date is we have yet to see any specific trend geographically or even in industry segments or in customer size that gives us pause or worry to date***. ***So, something we continue to watch like a hawk, but there is no new news to share today***."   Deatsch later stated, "***we have not seen any significant shift in customer demand across our product lines***. … Jira Software, Confluence, Trello, you name it."

109.   The statements in ¶108 were materially false and misleading, and omitted material facts when made.   Defendants' wholly positive statements that they had "yet to see any specific trend geographically or even in industry segments or in customer size that gives us pause or worry to date"; that they had "not seen any significant shift in customer demand across our product lines"; and that there was "no new news to share today," directly contradicted what Defendants knew at the time.   Indeed, Defendants explicitly ***admitted*** at the end of the Class Period that, ***at the same time*** Defendants were making these statements, they were seeing significant material adverse "***trends***" as a result of "***macro headwinds***" in both key areas of their business: namely, the rate of free instances converting to paid customers, and the rate of paid user growth.   With regard to free-

to-paid conversions, Defendants admitted at the end of the Class Period that "a decrease in the rate of Free instances converting to paid plans" was a in fact a material "***trend***" that was felt "***throughout the quarter;***" and therefore, the trend was expressly expected to have an "***impact***" on "***future revenue growth***."   Defendants also knew of the negative paid user expansion "trend" at the time of the statements.  Indeed, as Deatsch admitted, rather than beginning in mid-August, the sales growth in July was slow "***across our customer base***," with the slowdown in "user expansion" felt "***largely across all segments, industries and geographies***."  The poor start to the quarter in July that continued in August prompted Defendants to rely on a "***user growth uptick***" in September to keep Atlassian's growth on track.

110.   Furthermore, as confirmed by CW 3, the paid user expansion rate and the free to paid conversion rate came in well below the Company's expectations by July 2022 and continuing into August 2022.  In CW 3's words, "***I was seeing back in June that things were slowing down***," and "it was clear that the growth rates were not what they [historically] were" and "***it was slower than expected***."  This downturn in both of these metrics was so pronounced and problematic that it prompted Defendants to hold numerous meetings during July and August 2022 amongst executives to reverse these material adverse trends, which culminated in Defendants implementing Project Big Fish by the first week in September—a project that was "100%" initiated from the top-down and was so large in magnitude that it required the participation of 100+ senior employees across the organization and necessitated weeks, if not months, of internal planning.  Thus, Defendants knew that the poor results in July were significant, ahistorical, and constituted a marked shift in customer demand that negatively impacted the Company's business, and yet they falsely represented to investors that they had yet to see "any specific trend" and that there was "no news to share" at that date.

111.   Also during the August 4, 2022 earnings call, Wolfe Research analyst Alex Zukin directly inquired about the "macro impact that you are seeing in the business," and specifically why "we're not seeing kind of some of the other impacts [that] other companies are seeing . . . what are you learning in real time as you analyze the data in the demand environment?"   In response,

Defendant Deatsch reiterated that the decrease in conversions from free customers to paid customers was a mere "*slight thing*" that "*does not take away from the continued growth we see in our existing customer base that also drives more than 90% of our revenue in the existing year*."

112.    The statements in ¶111 were materially false and misleading, and omitted material facts when made.   Contrary to Defendants' representation that the decrease in free-to-paid conversions was inconsequential and a mere "slight thing" that "does not take away" from the Company's primary business line, in reality, the exact opposite was true.   Indeed, Defendants explicitly *admitted* at the end of the Class Period that—*at the same time* Defendants were making these statements—they were seeing significant material adverse "*trends*" as a result of "*macro headwinds*" that were having a negative impact on the Company's business.   Specifically, Defendants admitted at the end of the Class Period that "a decrease in the rate of Free instances converting to paid plans" was a in fact a material "trend" and "that trend definitely came through *throughout the quarter*;*" therefore, the trend was expressly expected to have an "*impact*" on "*future revenue growth*."   Furthermore, it was misleading for Defendants to point to "*continued growth we see in our existing customer base*" to assuage investors' concern over macroeconomic impacts, when in fact Defendants admitted that they were already seeing a "trend" of a "slowing in the rate of paid user growth" that was felt "*across our customer base*" and was evident in July.   Significantly, Deatsch *admitted* that, rather than in the second half of August, Defendants had seen user growth slowdown "across our customer base" *since July 2022* and Defendants were banking on a "user growth uptick" in September to correct course, as the "user expansion slowing down" in July and August were felt "*largely across all segments, industries and geographies*."

113.    Furthermore, as confirmed by CW 3, the paid user expansion rate and the free to paid conversion rate came in well below the Company's expectations by July 2022 and continuing into August 2022.   In CW 3's words, "*I was seeing back in June that things were slowing down*," and "it was clear that the growth rates were not what they [historically] were" and "*it was slower than expected*."   This downturn in both of these metrics was so pronounced and problematic that it

prompted Defendants to hold numerous meetings during July and August 2022 amongst executives to reverse these material adverse trends, which culminated in Defendants implementing Project Big Fish by the first week in September—a project that was "100%" initiated from the top-down and was so large in magnitude that it required the participation of 100+ senior employees across the organization and necessitated weeks, if not months, of internal planning.  Thus, Defendants knew that the declining metrics they saw in July 2022 were significant, ahistorical, and constituted a marked shift in customer demand that negatively impacted the Company's business, and yet they falsely represented to investors that the decrease in conversions from free customers to paid customers was a mere "***slight thing***" that "***does not take away from the continued growth we see in our existing customer base that also drives more than 90% of our revenue in the existing year***."

### B.    The August 19, 2022 Annual Report

114.    On August 19, 2022, Atlassian filed with the SEC its Annual Report on Form 20-F for the fiscal year ended June 30, 2022, which was signed by Defendants Cannon-Brookes and Farquhar and also contained certifications by the co-CEOs. The Annual Report was also incorporated into the Registration Statement filed in connection with the re-domiciliation. Significantly, the 2022 Annual Report stated that "[o]ther than as disclosed elsewhere in this Annual Report, ***we are not aware of any trends, uncertainties, demands, commitments or events for the current fiscal year that are reasonably likely to have a material effect on our revenues, income, profitability, liquidity or capital reserves, or that caused the disclosed financial information to be not necessarily indicative of future results of operations or financial conditions***."

115.    The statements in ¶114 were materially false and misleading, and omitted material facts when made.  Contrary to Defendants' strong statement that they were "not aware of any trends" in "the current fiscal year that are reasonably likely to have a material effect on our revenues" or "that caused the disclosed financial information to be not necessarily indicative of future results of operations or financial conditions," in reality, the exact opposite was true.  Indeed,

Defendants explicitly **admitted** at the end of the Class Period that, **at the same time** Defendants were making this statement, they were seeing two material adverse "**trends**" as a result of "**macro headwinds**" in both key areas of their business: namely, the rate of free instances converting to paid customers, and the rate of paid user growth.  Although Defendants had previously disclosed the "slight" slowdown in free to paid conversions on August 4, 2022, the Annual Report made no reference to the decline as anything other than completely hypothetical and did not reveal that the slowdown had intensified in July and August as it "**came through throughout the quarter**," or the fact that the headwind was in fact a "**trend**" that  was reasonably likely to have a material adverse impact on the Company's operations in fiscal year 2023.  In addition to the free to paid conversion trend, Deatsch admitted that the paid user expansion trend began in July, rather than mid-August 2022, as growth was slow "**across our customer base**," and that Defendants were relying on a "user growth uptick" in September to keep Atlassian's metrics on track.

116.    Furthermore, as confirmed by CW 3, the paid user expansion rate and the free to paid conversion rate came in well below the Company's expectations by July 2022 and continuing into August 2022.  In CW 3's words, "**I was seeing back in June that things were slowing down**," and "it was clear that the growth rates were not what they [historically] were" and "**it was slower than expected**."  This downturn in both of these metrics was so pronounced and problematic that it prompted Defendants to hold numerous meetings during July and August 2022 amongst executives to reverse these material adverse trends, which culminated in Defendants implementing Project Big Fish by the first week in September—a project that was "100%" initiated from the top-down and was so large in magnitude that it required the participation of 100+ senior employees across the organization and necessitated weeks, if not months, of internal planning.  Thus, Defendants' representation in the Annual Report that they were "not aware of any trends . . . that are reasonably likely to have a material effect on our revenues, income, profitability, liquidity or capital reserves . . ." was materially false and misleading at the time of the report's publication.

1

### C.    The September 14, 2022 Goldman Sachs Conference

117.    On September 14, 2022—approximately two weeks before Atlassian's first quarter ended—Defendant Bharadwaj participated in the Goldman Sachs Communacopia + Technology Conference.  During the question-and-answer session, Goldman Sachs analyst Kasthuri Rangan noted that a conference attendee was "***dying to ask***" a question regarding "***the macroeconomic conditions [that] are not that cooperative***," and asked Defendant Bharadwaj specifically what the Company was "seeing out there with the demand environment."  In response, Defendant Bharadwaj touted the various "attributes" that gave Atlassian "***a few advantages in the overall macroeconomic climate***," including that the Company purportedly provided "mission-critical" software at a price point that was "highly, highly competitive."

118.    Then, Defendant Bharadwaj stated that she would discuss "what different parts of our business are seeing what impact."  While Bharadwaj noted the "***bit of softness***" in the "conversion of users from free to paid" that the Company discussed in the Q4'22 Shareholder Letter, Bharadwaj went to great lengths to assure the market that, even now with only two weeks left in the quarter, this "bit of softness" was in no way a material trend and was inconsequential to Atlassian's overall business, emphasizing: "***it's important to illustrate that point in the overall picture as over 90% of our revenue comes from existing customers. So the conversion from free to paid is really a very small part of our business***."  Then, in no uncertain terms, Defendant Bharadwaj assured investors that Atlassian was not seeing any trends that would affect any part of its business, stating: "***We're not seeing any trends there. So across the board, across existing and new, that's overall what we are seeing in different parts of the business***":

> Just in the last shareholder letter, we talked about conversion of users from free to paid. We are seeing a ***bit of softness*** over the past couple of months. But it's important to illustrate that point in the overall picture as over 90% of our revenue comes from existing customers. ***So the conversion from free to paid is really a very small part of our business***. And also, the number of free users that are coming in that create new free instances continues to grow steadily. ***We're not seeing any trends there. So across the board, across existing and new, that's overall what we are seeing in different parts of the business***.

119.    After an analyst asked a follow-up question regarding whether the slowdown in free-to-paid conversions in any way would require Atlassian to "catch up" in the future when the

"demand environment is more stable," Defendant Bharadwaj proceeded to discuss the particulars of Atlassian's overall business.  Bharadwaj noted the "several different parts of the funnel we look at" and what Atlassian was seeing in terms of customer "upsell"—meaning, when users transitioned from the Company's free product to its standard paid level, and when existing users upgraded from standard to premium or premium to enterprise—and assured investors that "*we've seen some very encouraging progress there over the last 4 quarters*."  Significantly, Defendant Bharadwaj then expressly and unequivocally represented to the market that Defendants had not seen "*any discernible trend there in terms of the macroeconomic impact*," stating in no uncertain terms:

> So to address your question, the way our pricing model works is the first 10 users are free, and then the 11th user onwards, it's paid. So in year 1, you can imagine the impact is pretty low. Going from 10th user to the 11th user is really just adding a paid user there. So the overall quantum looks pretty low in year 1, but it builds up and compounds over time. So we think of upsell as really across *free to standard*, standard to premium, premium to enterprise. And we've seen some very encouraging progress there over the last four quarters. *And I haven't really seen any discernible trend there in terms of the macroeconomic impact*. And user expansion . . . That's an area that we continue to monitor. That's not an area where we try to do a lot of product interventions. But that's going to be an important one to look at in the current climate.

120.    The statements in ¶¶118-119 were materially false and misleading, and omitted material facts when made.  Contrary to Defendant Bharadwaj's wholly positive statements—with only two weeks left in Atlassian's quarter—that Defendants were "not seeing any trends" and had not "really seen any discernible trend" regarding "the macroeconomic impact," in reality, the exact opposite was true.  Indeed, Defendants explicitly *admitted* at the end of the Class Period that—*at the same time* Defendant Bharadwaj made these statements—Defendants were seeing significant material adverse "*trends*" as a result of "*macro headwinds*" that were having a negative impact on the Company's business.  With respect to "free to standard," rather than an inconsequential "bit of softness" that was not a "discernible trend"—as Defendant Bharadwaj claimed—Defendants ultimately admitted that, at the time of these statements, "a decrease in the rate of Free instances converting to paid plans" was a material "trend" that "*became more pronounced in Q1*" in that it "*definitely came through throughout the quarter*" and would have an "impact" on "future revenue growth."  Thus, despite the fact that the free to conversion trend worsened throughout the quarter,

1    Bhardwaj indicated to the market that, as of mid-September, the slight slowdown had remained just

2    a "bit of softness," as previously falsely reported by Defendants.  Furthermore, it was misleading

3    for Defendant Bharadwaj to assert that there was no "discernible trend" regarding Atlassian's

4    existing customer base when in fact Defendants admitted that they were already seeing a "trend"

5    of a "slowing in the rate of paid user growth" at the time of these statements.  Significantly,

6    Defendants **admitted** that the Company's sales in July and August 2022 were slow "**across our**

7    **customer base**," **including for paid user expansion**, and Defendants were hoping for a "**user**

8    **growth uptick**" in September to keep Atlassian's growth on track.  Moreover, Defendants explicitly

9    admitted at the end of the Class Period that they were fully aware by the "second half of Q1"—*i.e.*,

10   by no later than mid-August 2022, and **weeks** before Bharadwaj's September 14, 2022 statements—

11   that there were material adverse trends impacting the entirety of the Company's business.

12          121.    Furthermore, as confirmed by CW 3, the paid user expansion rate and the free to

13   paid conversion rate came in well below the Company's expectations by July 2022 and continuing

14   into August 2022.  In CW 3's words, "*I was seeing back in June that things were slowing down*,"

15   and "it was clear that the growth rates were not what they [historically] were" and "*it was slower*

16   *than expected*."  This downturn in both of these metrics was so pronounced and problematic that it

17   prompted Defendants to hold numerous meetings during July and August 2022 amongst executives

18   to reverse these material adverse trends, which culminated in Defendants implementing Project Big

19   Fish by the first week in September—a project that was "100%" initiated from the top-down and

20   was so large in magnitude that it required the participation of 100+ senior employees across the

21   organization and necessitated weeks, if not months, of internal planning.  Significantly, Defendants

22   planned for, initiated, and implemented Project Big Fish **well before Bharadwaj made these**

23   **statements**.  In addition, CW 3 confirmed that Defendant Bharadwaj was a pivotal figure in the

24   planning for Project Big Fish, as she was "absolutely" involved in the project and was keenly aware

25   of the poor metrics underpinning the initiative and the need to address and reverse the negative

26   trends that Atlassian was seeing.  Indeed, according to CW 3, Bharadwaj "was very involved

27   because she had 40 people in product strategy that reported to her involved with this project."

28

1    Accordingly, it was false and misleading for Bharadwaj to claim that she disclosed all known macro

2    impacts "***across the board, across existing and new***" and that she revealed "***overall what we are***

3    ***seeing in different parts of the business***," without disclosing these known material adverse trends.

4    Given these known trends and Atlassian's internal efforts to reverse them, Defendants had no basis

5    whatsoever to portray to the market a wholly positive image of Atlassian's financial results and

6    business prospects.

7               **D.      The October 4, 2022 Post-Effective Amendment**

8               122.    On October 4, 2022, Atlassian, in connection with its domestication in the United

9    States, filed the Company's Post-Effective Amendment to its Form S-8 Registration Statements,

10   which was signed by Defendants Cannon-Brookes and Farquhar.  The Post-Effective Amendment

11   adopted Atlassian's registration statements filed prior to the re-domiciliation and incorporated the

12   2022 Annual Report, which included the same misstatements discussed in ¶114.

13              123.    The incorporation of the Annual Report as of October 4, 2022 was materially false

14   and misleading in two respects.  First, the Annual Report was false and misleading at the time it

15   was originally filed for the reasons set forth in ¶115.  Second, by the time of the October 4, 2022

16   incorporation of the Annual Report, Q1 2023 had already passed, and Defendants themselves

17   admitted that they were fully aware of the negative trends affecting their business.  Moreover, by

18   this point, Defendants had already implemented Project Big Fish a full month earlier in the first

19   week of September, and were even presented with Project Big Fish's findings in late September.

20   Moreover, Defendants explicitly admitted at the end of the Class Period that they were fully aware

21   by the "second half of Q1"—*i.e.*, by no later than mid-August 2022, and ***nearly two months*** before

22   the October 4, 2022 filing of the Company's Post-Effective Amendment to its Form S-8—that there

23   were material adverse trends impacting the entirety of the Company's business.  Despite knowing

24   of the material adverse trends, Defendants adopted the prior Registration Statement and

25   incorporated the Annual Report without "setting forth any additional information … necessary to

26   keep the registration statement from being misleading in any material respect," as required under

27   17 C.F.R. § 230.414.

28

## VII.    ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER

124.    As alleged above, numerous factors raise a strong inference that Defendants knew, or were severely reckless in disregarding, the true facts concerning negative trends affecting the Company's business.   In addition to the allegations set forth above, these particularized facts demonstrating Defendants' scienter include the following.

125.    *Defendants' admissions at the end of the Class Period confirm that they had seen material adverse trends as early as July 2022 and continued throughout the quarter*, *raising a strong inference of Defendants' knowing or reckless disregard regarding their Class Period false and misleading statements and omissions*.  Defendants admitted during the Company's November 3, 2022 earnings call that the "timing of things that we saw" began in July 2022.  By admitting to seeing July trends, Defendants implicitly acknowledged that their statements made in August, September and even as late as October 4, 2022, were ***knowingly*** false and misleading.

126.    *The accounts of former high-level Atlassian employees confirm that the Individual Defendants knew of Atlassian's poor results in July and August 2022, and that these results were so significant that they implemented Project Big Fish in the first week of September specifically to reverse these materially adverse trends in the Company's business.*  The accounts of former high-level Atlassian employees confirm that the Individual Defendants regularly reviewed Company metrics concerning paid user expansion and free to paid conversions; that these exact metrics were discussed and analyzed at weekly and monthly executive-level meetings; and that both paid user expansion and free to paid conversions came in well below expectation in July and August of 2022, indicating that the Company was only growing at 30% on a yearly basis and nowhere near the rate necessary to reach its prior guidance.  These developments were so pronounced and problematic for the Company that they prompted Defendants to conduct numerous meetings and conversations between senior leaders of the Company in July and August.  These meetings culminated in the implementation of Project Big Fish in the first week of September 2022, which the Individual Defendants specifically designed to reverse the material adverse trends that were impacting Atlassian's business.  Indeed, Project Big Fish was well underway at the time of Defendant

1    Bharadwaj's September 14, 2022 statements, and Bharadwaj knew full well about this Company-

2    wide initiative as she "absolutely" implemented the project and scores of her team members were

3    directly involved in carrying it out.  Defendants' failure to disclose these material adverse trends

4    during the Class Period, while simultaneously implementing and working on Project Big Fish,

5    strongly supports Defendants' scienter.

6        127.    *Defendants proclaimed that they personally monitored trends and subscriber*

7    *metrics closely—"like a hawk"—thus confirming their direct and detailed knowledge of*

8    *information contradicting their public statements at the time they were made.*  Both before and

9    during the Class Period, Defendants affirmed their direct involvement in monitoring trends and

10   user expansion closely.  For example, Atlassian management represented to the market at an August

11   2021 conference that they had "visibility into every click," and would "study" trend "information

12   very carefully," and in a May 27, 2021 presentation, Defendant Deatsch explained that he and

13   Defendants Farquhar and Cannon-Brookes personally monitored "bookings," "customer numbers,"

14   and "usage and adoption metrics."  During the Class Period, Defendant Deatsch avowed that

15   Defendants were "being exceedingly vigilant across watching all stages of our funnel, whether

16   that's migrations funnel, the additions upgrades, retention rates and, of course, our new customers

17   coming in," and that they would "***continue to watch like a hawk***."  Defendants Farquhar and

18   Cannon-Brookes reassured investors that they would "continue to scan the horizon for warning

19   signs and be candid with investors as we have throughout our six+ years as a public company."[21]

20   Defendant Bharadwaj touted that the Company had "more access to telemetry and usage patterns

21   of how users consume our products" in the cloud, and confirmed that Defendants would "continue

22

---

23   [21] During the Class Period, Defendants Farquhar and Cannon-Brookes materially benefited from
     Atlassian's inflated stock price.  Specifically, Defendants Farquhar and Cannon-Brookes
24   collectively sold nearly 1 million shares of Atlassian stock (approximately 488,699 shares each)
     during the short three-month Class Period, collectively reaping ***more than $222 million*** from their
25   insider sales.  These Defendants each sold 6,315 shares on August 16, 2022—the very day that
     Atlassian shares reached their Class Period high of over $289 per share—and proceeded to sell
26   8,614 shares on every single available trading day throughout the remainder of the Class
     Period.  While these sales are not dramatically out of line with these Defendants' prior trading
27   practices, Defendants' fraud concealed material, adverse information about the Company's
     operations from the market, and thus maintained Atlassian's stock price at inflated levels—
28   resulting in millions in additional proceeds for Defendants Farquhar and Cannon-Brookes.

to monitor" trends in "user expansion," which was "an important one to look at in the current climate." Defendants' assertions were corroborated by the accounts of former Atlassian employees, who confirmed not only that Defendants had full access to a plethora of information concerning these metrics, but they were also repeatedly presented with this information in a variety of avenues, including weekly and monthly meetings, planning sessions, and through the Company's preparations for and implementation of Project Big Fish.

128.    *Defendants repeatedly spoke about and touted the Company's unique "linear sales cycle," which made Defendants immediately aware of negative trends in the business.*  Since the Company's IPO, and in every Annual Report thereafter, Atlassian represented that Atlassian's "linear quarterly sales cycle" provided the Company with great "[p]redictability of sales" and "steady and predictable revenue," which made Atlassian "radically different" than other software companies and insulated it from macroeconomic pressures.  Indeed, just prior to the Class Period, in June 2022, Atlassian assured investors that the "elephant in the room" that was the poor macroeconomic environment was under control by citing the Company's "beautiful linearity throughout our quarter."  Furthermore, during the Class Period, at no point did Defendants disclose that sales were expected to decline during the months of July and August 2022, only to rebound in September 2022.  While Defendant Farquhar noted on August 4, 2022 that the Company may experience a "hint of seasonality," this comment was not referring to free-to-paid conversions or paid user expansion, but rather to "how we think [] **migrations** might end up happening"—a reference to ongoing Company efforts to shift legacy on-premises customers to migrate to the cloud.  In fact, as Atlassian reported the following year in November 2024—the first summer quarter following the Class Period—Q1 2024 was entirely linear and that there was "nothing strange about Q1 from a linearity perspective."  This continued linearity fundamentally undermines Defendants' assertion that there was "a normal seasonal trend where July and August are slower," and that Defendants were relying on a "normal user growth uptick" in September.  Accordingly, taking Defendants' own representations at face value, when cloud growth struggled in July and August of 2022, Defendants were immediately aware of these material adverse trends.

129.   *Defendants were acutely aware that the market was heavily relying on their statements, as both before and during the Class Period, analysts repeatedly asked about the macro impacts on Atlassian—and the fact that Defendants' representations were "diametrically opposite" from the Company's industry peers.*  Even prior to the Class Period, Defendants understood that the market and analysts were keenly interested in the macroeconomic environment's effects on Atlassian's growth.  Indeed, at a June 7, 2022 fireside chat, an analyst specifically wanted "to touch on macro" as "it's something that's obviously on everyone's mind."  The next day, June 8, 2022, an analyst opened another Atlassian discussion by explaining "I got to ask the question on the macro, just to start."  This line of questioning only intensified during the Class Period.  For example, on August 4, 2022, an analyst asked about whether Atlassian saw demand "weakness" given the then-current environment.  During the same call, another analyst expressly asked about the "***macro impact that you are seeing in the business***."  Likewise, the Goldman Sachs conference on September 14, 2022 "was packed" as investors were specifically eager to "to check in on ***consumer demand*** [and] ***enterprise demand***" in light of the economic unrest at the time.  Unsurprisingly, a participating analyst was "***dying***" to ask Bharadwaj about how the "***macroeconomic conditions***" were affecting the "***demand environment***."  In response, not only did Bharadwaj deny any macro impact, she also touted how Atlassian's "unique" and "differentiated" business model distinguished the Company from its peers and gave Atlassian a competitive advantage—despite the fact that the Company had already commenced Project Big Fish specifically to address the slow trends brought about by the demand environment.

130.   As expected, analysts responded favorably to Defendants' strong denials, relying on and repeating Defendants' strident claims.  Furthermore, many of these analysts also emphasized how the lack of macro impacts set Atlassian apart from the market, underscoring how important those assurances were and how they stood out in the industry.  For example, Citi highlighted that Atlassian's positive statements were "***diametrically opposite***" of most of its "***software peers***."  Truist emphasized that unlike "other companies in our coverage" who experienced macro "headwinds," Atlassian "did not indicate any difference in buyer behaviors."  BMO praised

Atlassian for reiterating growth targets "at a time when peers are lowering guidance due to the negative macro backdrop." Wolfe Research deemed Atlassian's "premium to peers" "justified" given this very dynamic, and Macquarie highlighted that Atlassian "provided the strongest print of this software earnings season." Raymond James emphasized that Atlassian was "feeling little impact from macro uncertainty that is causing budget tightening around the broader technology space." Jefferies similarly commended Atlassian for being "more resilient" than its peers "given the tepid start to cyber earnings" shown by other companies.

131.    *The reactions of prominent analysts to Defendants' disclosures highlighted the stark contrast from Defendants' Class Period representations, supporting a strong, cogent, and compelling inference of scienter.* After Defendants admitted on November 3, 2022 that macroeconomic trends had been affecting Cloud growth beginning in July, market analysts reacted with shock. ¶¶94–95. These sophisticated market participants were surprised by the news, and many excoriated management for their prior contradictory representations, emphasizing that the "significant and unexpected pivot in demand tone" had relegated Atlassian to the "penalty box." The fact that Defendants lost credibility with the market as a result of their misrepresentations is further indicative of their scienter.

132.    *90% of the Company's revenue in any given year comes from existing customers; accordingly, there is no question that Atlassian's most senior officers were well aware of Atlassian's core business.* Defendants repeatedly commented on the significance of Atlassian's existing customers—"the over 90% bucket . . . where most of the revenue comes from" and Atlassian made clear that seat expansion within existing customers within existing products . . . *[has] always been the biggest driver of growth across all products*." The fact that Atlassian's future financial prospects were virtually entirely dependent on success with paid user expansion supports a finding of Defendants' scienter.

133.    *Defendants' violation of Item 303 of Regulation S-K supports scienter.* In the 2021 amendments to Item 303 and the corresponding edits to Form 20-F, the SEC clarified that the

purpose of the rule is to enable investors to view the Company "through the eyes of management."[22] Management, pursuant to SEC guidance, has the "responsibility…to identify and address those key variables and other qualitative and quantitative factors which are peculiar to and necessary for an understanding and evaluation of the individual company."[23]   Indeed, the amended Form 20-F bluntly states that management "***must identify material recent trends***," and "***must discuss, for at least the current financial year, any known trends [or] uncertainties*** … that are reasonably likely to have a material effect on the company's net sales or revenues, income from continuing operations … or that would cause reported financial information not necessarily to be indicative of future operating results."[24]   Importantly, as made clear by the SEC, management must analyze "***short term results*** as well as future prospects."[25]   As such, aside from touting how they closely monitored and disclosed Company trends, Defendants had a ***legal obligation*** to monitor, recognize, consider, and disclose negative trends affecting the Company's results of operations and revenues, including in the short term.  As noted above, Defendants not only failed to disclose the known negative trends, but ***affirmatively misrepresented*** to the market that any negative trends existed.

134.   The foregoing facts, particularly when considered collectively and in the light most favorable to Plaintiffs (as they must be), support a strong inference of Defendants' scienter.

## VIII.   <u>LOSS CAUSATION</u>

135.   During the Class Period, Atlassian's publicly traded ordinary shares and common stock traded on the NASDAQ.  The market for Atlassian ordinary shares and common stock was open, well-developed and efficient at all relevant times.

136.   Throughout the Class Period, the price of Atlassian's ordinary shares and common stock was artificially inflated as a result of Defendants' materially false and misleading statements

---

[22] SEC 2020 Guidance at 93.

[23] *See* Managements Discussion & Analysis of Fin. Condition & Results of Operations, Release No. 6835, at *3 (May 18, 1989).

[24] SEC 2020 Guidance at 184-85.

[25] *Id.* at 31.

and omissions identified above.  Defendants engaged in a scheme to deceive the market, and a course of conduct that operated as a fraud or deceit on Class Period purchasers of Atlassian ordinary shares and common stock, by failing to disclose and misrepresenting the adverse facts detailed herein.  When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Atlassian stock fell precipitously as the prior artificial inflation dissipated.  As a result of their purchases of Atlassian ordinary shares and/or common stock during the Class Period, Lead Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

137.    By issuing materially false and misleading financial statements, among other adverse facts detailed herein, Defendants presented a misleading picture of Atlassian's business. Defendants' false and misleading statements had the intended effect and caused Atlassian's ordinary shares and common stock to trade at artificially inflated levels throughout the Class Period. On November 3, 2022, the last trading day before Defendants' fraud was revealed, Atlassian common stock closed at $174.17 per share.

138.    Defendants' after-market disclosures on November 3, 2022 revealed to the market the false and misleading nature of Defendants' statements and omissions.  On that day, as described above, Defendants finally disclosed the Company had suffered from negative trends in paid user expansion and free to paid conversions due to macroeconomic conditions.  In response to these revelations, the price of Atlassian stock declined almost 29% the following trading day, from a closing price of $174.17 per share on November 3, 2022 to a closing price of $123.73 on November 4, 2022—representing an over $7 billion drop in market capitalization.  Atlassian's share price continued to fall as the market continued to digest the news the next trading day, dropping an additional 4% on November 7, 2022, to close at $119.23.

139.    The decline in Atlassian's stock price was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of the decline in the Company's share price negates any inference that the loss suffered by Plaintiffs

1    and the other Class members was caused by changed market conditions, macroeconomic or industry

2    factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

3    **IX.    PRESUMPTION OF RELIANCE**

4          140.    At all relevant times, the market for Atlassian's ordinary shares and common stock

5    was an open, efficient, and well-developed market for the following reasons, among others:

6          a.    Atlassian's ordinary shares and common stock met the requirements for listing, and
7                was listed and actively traded on the NASDAQ, a highly efficient and automated
                 market;

8          b.    As a regulated issuer, Atlassian filed periodic reports with the SEC and the
9                NASDAQ;

10         c.    Atlassian regularly communicated with public investors via established market
                 communication mechanisms, including through regular disseminations of press
11               releases on the national circuits of major newswire services, and through other wide-
                 ranging public disclosures, such as communications with the financial press and
12               other similar reporting services; and

13         d.    Atlassian was followed by numerous securities analysts employed by major
                 brokerage firms who wrote reports which were distributed to those brokerage firms'
14               sales force and certain customers. Each of these reports was publicly available and
                 entered the public marketplace.

15         141.    As a result of the foregoing, the market for Atlassian's ordinary shares and common

16   stock reasonably and promptly digested current information regarding the Company from all

17   publicly available sources and reflected such information in the price of Atlassian's ordinary shares

18   and common stock.  All investors who purchased the Company's ordinary shares and/or common

19   stock during the Class Period suffered similar injury through their purchase of Atlassian's ordinary

20   shares and/or common stock at artificially inflated prices, and a presumption of reliance applies.

21         142.    A Class-wide presumption of reliance is also appropriate in this action under the

22   U.S. Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128

23   (1972), because the Class's claims are grounded on Defendants' material omissions.  Because this

24   action involves Defendants' failure to disclose material adverse information regarding Atlassian's

25   business and operations—information that Defendants were obligated to disclose— positive proof

26   of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be

27   material in the sense that a reasonable investor might have considered them important in making

28

investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## X.   INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE

143.   The statutory safe harbor or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this Complaint.  The statements alleged to be false or misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false or misleading may be characterized as forward-looking, they were not adequately identified as forward-looking statements when made, and there were no meaningful cautionary statements identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements.

144.   To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, each of these Defendants had actual knowledge that the particular forward-looking statement was materially false or misleading. Defendants are liable for the statements pleaded because, at the time each of those statements was made, Defendants knew the statement was false, and the statement was authorized and/or approved by an executive officer and/or director of Atlassian who knew that such statement was false when made.

## XI.   CLASS ACTION ALLEGATIONS

145.   Lead Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) on behalf of a Class consisting of all persons and entities that purchased Atlassian ordinary shares and/or common stock between August 5, 2022 and November 3, 2022, inclusive (the "Class"), and who were damaged thereby.  Excluded from the Class are Defendants, the officers, and directors of Atlassian at all relevant times, members of their immediate families, and their legal representatives, heirs, agents, affiliates, successors or assigns, Defendants' liability

insurance carriers, and any affiliates or subsidiaries thereof, and any entity in which Defendants or their immediate families have or had a controlling interest.

146.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Atlassian shares were actively traded on the NASDAQ. As of November 3, 2022, Atlassian had more than 148 million shares of common stock outstanding. While the exact number of Class members is unknown to Lead Plaintiffs at this time, and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are at least hundreds-of-thousands of members of the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company, or its transfer agent(s), and may be notified of this class action using a form of notice similar to that customarily used in securities class actions.

147.   Lead Plaintiffs' claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal laws, as complained of herein.

148.   Lead Plaintiffs will fairly and adequately protect Class members' interests, and have retained competent counsel experienced in class actions and securities litigation.

149.   Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of fact and law common to the Class are:

    a.   whether the federal securities laws were violated by Defendants' acts, as alleged herein;

    b.   whether the Defendants made statements to the investing public during the Class Period that were false, misleading, or omitted material facts;

    c.   whether Defendants acted with scienter; and

    d.   the proper way to measure damages.

150.   A class action is superior to all other available methods for the fair and efficient adjudication of this action because joinder of all Class members is impracticable. Additionally, the damage suffered by some individual Class members may be relatively small so that the burden and

1   expense of individual litigation make it impossible for such members to individually redress the

2   wrongs done to them.  There will be no difficulty in the management of this action as a class action.

3   **XII.    CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT**

4   **COUNT I**

5   **For Violations of Section 10(b) of the Exchange Act,**
    **and SEC Rule 10b-5 Promulgated Thereunder**

6   **(Against All Defendants)**

7   151.    Lead Plaintiffs repeat and re-allege each and every allegation set forth above as if

8   fully set forth herein.

9   152.    This Count is asserted on behalf of all members of the Class against Atlassian and

10   the Individual Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b),

11   and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

12   153.    During the Class Period, Defendants disseminated or approved the false statements

13   specified above, which they knew were, or they deliberately disregarded as, misleading in that they

14   contained misrepresentations and failed to disclose material facts necessary in order to make the

15   statements made, in light of the circumstances under which they were made, not misleading.

16   154.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b5 promulgated

17   thereunder in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue

18   statements of material facts or omitted to state material facts necessary in order to make the

19   statements made, in light of the circumstances under which they were made, not misleading; and/or

20   (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead

21   Plaintiffs and other investors similarly situated in connection with their purchases of Atlassian

22   ordinary shares and/or common stock during the Class Period.

23   155.    Defendants, individually and in concert, directly and indirectly, by the use of means

24   or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

25   continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiffs and the other

26   members of the Class; made various untrue and/or misleading statements of material facts and

27   omitted to state material facts necessary in order to make the statements made, in light of the

28

circumstances under which they were made, not misleading; made the above statements intentionally or with a severely reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of Atlassian ordinary shares and common stock, which were intended to, and did: (a) deceive the investing public, including Lead Plaintiffs and the other members of the Class, regarding, among other things, Atlassian's business and operations; (b) artificially inflate and maintain the market price of Atlassian ordinary shares and common stock; and (c) cause Lead Plaintiffs and the other members of the Class to purchase the Company's ordinary shares and/or common stock at artificially inflated prices, and to suffer losses when the true facts became known.

156.    Defendants are liable for all materially false and misleading statements made during the Class Period, as alleged above.

157.    As described above, Defendants acted with scienter throughout the Class Period, in that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness. The misrepresentations and omissions of material facts set forth herein, which presented a danger of misleading buyers or sellers of Atlassian ordinary shares and/or common stock, were either known to the Defendants, or were so obvious that the Defendants should have been aware of them.

158.    Lead Plaintiffs and the other members of the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for Atlassian ordinary shares and common stock, which inflation was removed from its price when the true facts became known. Lead Plaintiffs and the other members of the Class would not have purchased Atlassian ordinary shares and common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by these Defendants' misleading statements.

159.    As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages attributable to the material misstatements and omissions alleged herein in connection with their purchases of the Company's ordinary shares and/or common stock during the Class Period.

### COUNT II

**For Violations of Section 20(a) of the Exchange Act
(Against the Individual Defendants)**

160.    Lead Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

161.    This Count is asserted on behalf of all members of the Class against the Individual Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

162.    During their tenures as officers and/or directors of Atlassian, each of these Individual Defendants was a controlling person of the Company, within the meaning of Section 20(a) of the Exchange Act. *See e.g.* ¶¶20-31.  By reason of their positions of control and authority as officers and/or directors of Atlassian, these Individual Defendants had the power and authority to direct the management and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein.  These Individual Defendants were able to and did control, directly and indirectly, the content of the public statements made by Atlassian during the Class Period, including its materially misleading statements, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

163.    In their capacities as senior corporate officers of the Company, and as more fully described above, the Individual Defendants had direct involvement in the day-to-day operations of the Company, in reviewing and managing its regulatory compliance, accounting, and reporting functions, including overseeing, reviewing, and managing the Company's customer expansion. The Individual Defendants signed the Company's SEC filings during the Class Period, and were directly involved in providing false information, and in certifying and approving the false statements disseminated by Atlassian during the Class Period.  The Individual Defendants were also directly involved in providing false information, and they certified and approved the false statements disseminated by Atlassian during the Class Period.  As a result of the foregoing, the Individual Defendants, together and individually, were controlling persons of Atlassian within the meaning of Section 20(a) of the Exchange Act.

164.     As set forth above, Atlassian violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint.

165.     By virtue of their positions as controlling persons of Atlassian, and as a result of their own aforementioned conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiffs and the other members of the Class, who purchased the Company's ordinary shares and/or common stock.  As detailed above in ¶¶20-31, during the respective times these Individual Defendants served as officers and/or directors of Atlassian, each of these Individual Defendants was culpable for the material misstatements and omissions made by the Company.

166.     As a direct and proximate result of these Individual Defendants' conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchase of Atlassian ordinary shares and/or common stock during the Class Period.

## XIII.   PRAYER FOR RELIEF

167.     WHEREFORE, Lead Plaintiffs pray for relief and judgment as follows:

a. Declaring the action to be a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b. Awarding all damages and other remedies available under the Securities Exchange Act in favor of Lead Plaintiffs and all other members of the Class against Defendants in an amount to be proven at trial, including interest thereon;

c. Awarding Lead Plaintiffs and the other members of the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

d. Such other and further relief as the Court may deem just and proper.

## XIV.   JURY DEMAND

168.     Lead Plaintiffs hereby demand a trial by jury.

Dated: March 1, 2024                              **SAXENA WHITE P.A.**

                                                  */s/ Lester R. Hooker*

                                                  Maya Saxena (*pro hac vice*)
                                                  msaxena@saxenawhite.com
                                                  Lester R. Hooker (SBN 241590)
                                                  lhooker@saxenawhite.com

Dianne M. Pitre (SBN 286199)
dpitre@saxenawhite.com
Jonathan D. Lamet (*pro hac vice*)
jlamet@saxenawhite.com
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Tel.: 561.394.3399
Fax: 561.394.3382

David R. Kaplan (SBN 230144)
dkaplan@saxenawhite.com
505 Lomas Santa Fe Drive, Suite 180
Solana Beach, CA 92075
Telephone: (858) 997-0860
Facsimile: (858) 369-0096

Steven B. Singer (*pro hac vice forthcoming*)
ssinger@saxenawhite.com
Marisa N. DeMato (*pro hac vice forthcoming*)
mdemato@saxenawhite.com
10 Bank Street, Suite 882
White Plains, NY 10606
Telephone: (914) 437-8551
Facsimile: (888) 631-3611

*Counsel for Lead Plaintiffs
and Lead Counsel for the Class*

**KLAUSNER KAUFMAN JENSEN
& LEVINSON**
Robert D. Klausner
Stuart A. Kaufman
7080 NW 4th Street
Plantation, Florida 33317
Tel.: (954) 916-1202
Fax: (954) 916-1232
bob@robertdklausner.com
stu@robertdklausner.com

*Additional Counsel for City of Hollywood
Firefighters' Pension Fund*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify under penalty of perjury that on March 1, 2024, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel or parties of record.

Dated:  March 1, 2024                                      **SAXENA WHITE P.A.**

*/s/ Lester R. Hooker*
Lester R. Hooker (SBN 241590)

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:23-CV-00519-WHO