**Pages 1 - 27**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Orrick, Judge Presiding

```
CITY OF HOLLYWOOD              )
FIREFIGHTERS' PENSION FUND,    )
Individually and on Behalf of  )
All Others Similarly Situated, )
                               )
          Plaintiffs,          )
                               )
  VS.                          )     NO. 3:23-cv-00519-WHO
                               )
ATLASSIAN CORPORATION,         )
ATLASSIAN CORPORATION PLC,     )
MICHAEL CANNON-BROOKES, SCOTT  )
FARQUHAR, ANU BHARADWAJ, and   )
CAMERON DEATSCH,               )
                               )
          Defendants.          )
_____)
```

San Francisco, California
Wednesday, January 10, 2024

**TRANSCRIPT OF PROCEEDINGS BY ZOOM WEBINAR**

**APPEARANCES BY ZOOM WEBINAR:**

For Plaintiffs:
                        SAXENA WHITE P.A.
                        7777 Glades Road, Suite 300
                        Boca Raton, Florida  33434
                   **BY:  LESTER R. HOOKER, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Stenographically Reported By:
Kelly Shainline, CSR No. 13476, RPR, CRR
Official Reporter

**APPEARANCES BY ZOOM WEBINAR**:   (CONTINUED)


For Defendants:
                        LATHAM & WATKINS LLP
                        12670 High Bluff Drive
                        San Diego, California  92130
                 BY:   **COLLEEN C. SMITH, ATTORNEY AT LAW**

                        LATHAM & WATKINS LLP
                        140 Scott Drive
                        Menlo Park, California 94025
                 BY:   **DANIEL R. GHERARDI, ATTORNEY AT LAW**

**Wednesday - January 10, 2024**                    **2:29 p.m.**

**P R O C E E D I N G S**

**---oOo---**

THE CLERK:  We will get underway in case number 23-519, City of Hollywood Firefighters Pension Fund versus Atlassian Corporation.

Counsel, if you would state your appearance for the record.

MR. HOOKER:  Good afternoon, Your Honor.  Lester Hooker from the law firm Saxena White on behalf of the lead plaintiffs.

MS. SMITH:  Good afternoon, Your Honor.  Colleen Smith of Latham & Watkins and I'm joined by my colleague Daniel Gherardi, on behalf of the defendants.

THE COURT:  Good afternoon to you all.

So, Mr. Hooker, I'm inclined to grant the motion with leave, and here's why.  With respect to the statements, it seems to me that only one of them is -- would potentially work as being not false but misleading, and that's the -- those were the three actually on September 14th because no information was provided regarding the Paid User Expansion slowdown.

I think the ones on August 4th aren't false or misleading because people were informed about the Free-to-Paid Conversion slowdown and the Paid User Expansion hadn't begun yet.

The one on August 19th doesn't work because there weren't any allegations of slowdown between the 5th and the 19th.  And then the one on October 14th doesn't work because it was incorporating the August 19th statements.

And then with respect to the September statements, I think scienter is missing.  There isn't mode of express for this mid-quarter call which the defendants have a plausible explanation for.

So my plan would be to give you another shot to address those things, but I'm also happy to hear from you now on anything you'd like to tell me.

**MR. HOOKER:**  I appreciate that, Your Honor.

And I guess to start with I'll just set the table by stating that there was one critical issue really facing the company at the start of the class period, and that's whether global macroeconomic conditions were negatively impacting Atlassian.  Analysts called it the elephant in the room.  The company itself said that it was the topic that's top of mind for shareholders.

An analyst directly asked the defendants over and over throughout the class period are you seeing anything in terms of any adverse trends, any macroeconomic impact.  And defendants gave that very assurance to the market each and every time they spoke to investors.

And I'll get to the statements on August 4th, on

August 19th in just a second, but I think it's important to note that analysts repeated verbatim those assurances.  They even noted that those assurances differentiated the company from its peers in the technology industry who were disclosing those impacts throughout this time frame.

And we note a few of them in the complaint, but I'll just highlight a couple of them real quick.

Truist said that while other companies in our coverage have discussed headwinds, by geography, vertical or customer size, Atlassian did not indicate any difference in buyer behaviors.  Raymond James said the same thing.

Wolfe Research even said that the premium to peers is justified.  The company's premium to its peers was justified because they reaffirmed basically zero impacts from macro.

So this was an incredibly important topic.  And at the end of the class period on November 3rd, defendants revealed the exact opposite of what they had assured investors throughout the class period.

So I think one good place to start is what they say at the end of the class period because that really frames what defendants knew every single time they talked about this issue.

So Atlassian first issues a shareholder letter in November, and it discusses the first quarter of 2023.  This is where it directly states the topic that's top of mind for shareholders was macro impacts.  It states there were two, as

Your Honor mentioned, one in free-to-paid conversions which represented 10 percent of the company's revenue, and the other in existing customer revenue that was 90 percent of the revenues.

And in that shareholder letter, the company tells a story.  It's a story that defendants latch onto in their motion to dismiss.  With respect to the free-to-paid conversions, the letter makes it sound as though they had fully disclosed that this was a material adverse trend throughout the class period.  This says a, quote/unquote, continuation of the trend discussed last quarter.

And then with respect to the second metric, the second trend, the company story was that the slowdown only took place in the second half of the quarter.  And again defendants focus on this narrative throughout their brief and even in the presentation that they sent to us 10 minutes ago.

What defendants wholly ignore in their motion is what happened during the earnings call that happened right after on that same day.

And during the earnings call, an analyst specifically notes a couple of things about Atlassian that are unique to the company.  And they're actually aspects of the company's business that defendants had repeatedly touted to the market as being factors that differentiated it from its peers and that actually allowed it to excel even in a, quote/unquote,

turbulent macro environment.

And those things that the analyst specifically notes in framing his question, he says, quote, your quarters are typically very linear and you have tremendous visibility into customer buying and usage patterns.  This is in paragraph 68 of our complaint.

So two things.  Quarters are typically very linear. Tremendous visibility in the customer buying and usage patterns.

And then this is the critical question -- or statement that he makes.  He says, quote, I'd have to believe that you had a very early warning of the paid user growth slowdown that began midway through the quarter.  Very early warning.

And in response to that question, defendant Deatsch, the company's chief revenue officer, he says I can also add on to just the timing of things that we saw.  So he's talking about the timing of what defendant saw.

With respect to free-to-paid, he had previously said that the trend definitely came through throughout the quarter. Throughout the quarter.  And now he says it was slowing down going into August.  This is in paragraph 69 of our complaint.

With respect to the existing user growth, he says July and August tend to see user growth slowdown across our customer base.  July and August.  The first two months of Atlassian's quarter.

So this is at the same time that defendants are representing to investors they had yet to see any specific trend geographically or even in industry segments or in customer size that gives us pause or worry to date.  This is what defendant Deatsch said on the very first day of the class period.

Now in November he's saying the opposite, that they were seeing in July and August user growth slowdown across our customer base.  And they were reiterating that over and over throughout the class period.  It's our position that it's exact opposite of what they told the market.

And given that this admission cannot align with what -- with the prior representations, analysts were predictably stunned.  We had BMO say that they were surprised by the magnitude of the slowdown.  It was the first time Atlassian has not exceeded upper end of guidance in at least five years.

Wolfe Research said this was an abrupt change in tone and outlook.  It put shares in the penalty box.  The headwinds took us and investors by surprise.  There was a -- the stock plummeted by $50 per share in a single day, nearly 30 percent.

So I'll take on the falsity element of the statements at the very beginning of the class period, the August 4th earning call.

And just to set the table there, there was a

shareholder letter released that day.  The company had emphasized that it was uniquely positioned in the industry, it had a differentiated business model, and that the turbulent economic environment offered a chance for Atlassian to gain market share.

So these macroeconomic conditions, again, were -- they're crucial, they're critical, top of mind for shareholders.

During the earnings call on the same day, an analyst specifically asks whether the company saw any weakness in its sales given those macro conditions.  And in response, defendants made several important representations that we highlighted in our complaint.

Again, this is defendant Deatsch, the chief revenue officer.  He says that defendants are being exceedingly vigilant across watching all stages of our funnel.  They continue to watch like a hawk these issues.

And then he says he reports the good news, and what I stated just a moment ago, we have yet to see any specific trend that gives us pause or worry to date.  We have not seen any significant shift in customer demand across our product lines.

Again, in November, he says the exact opposite of that.  He says that in July they were seeing the user slowdown. He says that with regard to even the free-to-paid, this was something that was coming through going into August.  That's

necessarily July.  We cite cases that use that exact same language where the court finds that this meant that this was seen at the beginning of the class period or earlier.

And, again, during this earnings call at the very beginning of the class period, this notion is reinforced when an analyst asks during the call about the macro impact that you are seeing in the business and specifically why Atlassian was not seeing kind of the sum of the other impacts other companies are seeing.  You know, what are you learning in real time as you analyze the data in the demand environment in real time?

And then in response, defendant Deatsch, first he goes out of his way to say that the slowdown in the free-to-paid that was disclosed in the prior quarter, that it was insignificant.  He says in the grand scheme of things, it was a slight thing, he called it.

And then he immediately proceeds to say that this slight thing does not take away from the continued growth we see in our existing customer base that also drives more than 90 percent of our revenue.  This is in paragraphs 54 and 92 of our complaint.

So he assured the market that they had yet to see any trends, had not seen any significant shift in customer demand, free-to-paid was a slight thing, doesn't take away from existing user growth.

And then, again, what the defendants disclose at the

end of the class period, the exact opposite.  They had seen a slowdown across our customer base, is the words that defendant Deatsch uses, the words that the company basically ignores in their motion to dismiss.  Across our customer base in July and August.  In July.  So and defendant Deatsch doesn't breathe a word of this during the August 4th earnings call.

With respect to the next set of false and misleading statements, they came in the annual report.  And again defendant's primary argument on this point is that they meant the prior year ending June 30th, 2022.  That's what they repeatedly say in their motion.

Again, their statement is not -- there's no ambiguity in that statement.  They say we are not aware of any trends, uncertainties, demands, commitments or events for the current fiscal year that are reasonably likely to have a material effect on the business, revenues, income, profitability.  There's no ambiguity in that statement.  That's the only place they say current fiscal year.  Everywhere else in the annual report they said the fiscal year ended June 30th.

And even the diction of that statement, it clearly talks about the time after the prior fiscal year had ended.  It says reasonably likely to have a material effect.  And as I just ran through, by this point defendants had seen these material trends dating back to July.  Even in the shareholder letter, they say that these things were perceived halfway

through the quarter.  This is past halfway through the quarter.

And so there really can be no dispute that defendants knew both of the material adverse trends affecting their business at the time of the filing.

The next set of false statements with respect to defendant Baradwaj is statements at the September 14th investor conference.  Again what she actually said in the context of that statement are incredibly important here.

During that conference, an investor was dying to ask, quote/unquote, dying to ask about the macroeconomic conditions that are not that cooperative and specifically what are you seeing out there with the demand environment.

And first she points to the advantages in the overall macroeconomic environment.  She mentions mission critical software that the company provides, the competitive price point.

But then she discusses, quote, what different parts of our business are seeing what impact.  And first she goes, again just like defendant Deatsch did at the beginning of the class period, she goes out of her way to ensure investors that the slight slowdown in free-to-paid conversions was inconsequential.  She says it's just a bit of softness and that it was important to illustrate the point in the overall picture as over 90 percent of our revenue comes from existing customers.  So the conversion from free-to-paid is really a

very small part of our business.  This is in paragraph 62 and 97 of our complaint.

She doesn't mention either of the trends.  This is September.  This is two weeks before the end of the quarter.  Months after defendant Deatsch said they first perceived this back in July.

And right after she says that statement, she goes on to talk about the number of free users coming into the company, it continues to grow steadily.  And then she says, quote, we're not seeing any trends there so across the board, across existing and new, 100 percent of the business, that's overall what we're seeing in different parts of the business.

And an analyst follows up on this.  And this really illustrates how concerned the market is about these macro conditions and what impact they're having on Atlassian.  The analyst specifically asks the significance of the slowdown and free-to-paid.  And he asks would it require Atlassian to catch up in the future.

And she again reassures that it's not significant.  She says, quote, I want to reiterate that we think of it as both new and existing, and over 90 percent of the revenue comes from existing.

And she says so to address your question, the way our pricing model works is the first ten users are free, and then the eleventh user onward, it's paid.  And then she goes on to

say, quote, so we think of upsell as really across free to standard, standard to premium, premium to enterprise. And we've seen some very encouraging progress there over the last four quarters, and I haven't really seen any discernible trend there in terms of the macroeconomic impact. I haven't really seen any discernible trend.

So, again, and I'll just reiterate this is halfway through September two weeks before the end of the quarter. There's no dispute that defendants were well aware that there were two material adverse trends affecting the entirety of their business at this point.

And she's speaking to the market about macro impact. She's responding to questions directly on this point. She's talking about trends. And she does not breathe a word about the two trends that defendants admit they knew well before this point. They're negatively impacting the company. She says the opposite. She's not seeing any discernible --

**THE COURT:** You're -- get moving. What's next?

**MR. HOOKER:** Okay. So, and Your Honor mentioned scienter. And in most securities cases, plaintiffs establish scienter through external sources, whether it's statements from former employees or inferences from media.

In our view, this is one of those rare cases where plaintiffs don't need to rely on those external sources. We don't need to rely on what a former employee said. We have the

words of the defendants themselves.

Again, and what I ran through at the beginning of the presentation, it was defendants that said that the company was negatively impacted by those trends.  It was defendants who had to clarify the timing of things that we saw after an analyst said he had to believe that they had an early warning sign. And it was defendants who said that they saw these issues, they perceived them all the way back in July.

So, and it doesn't just stop there.  We think scienter is even more compelling based on what defendants also said that they were looking for these very trends, that they outed their ability to spot these trends in real time.  They said that they could identify sales issues with a surgical precision, that they had visibility into every click, that they would study trend and sales information very carefully.  This is in paragraphs 45 and 103 of the complaint.

Defendant Deatsch said management personally monitored bookings, customer numbers, usage and adoption metrics.  And this is something that's picked on by the analyst.  The analyst said that you had to have an early warning sign because you see these metrics.  You know, you had tremendous visibility into them.

And along the same lines -- this is the second point that the analyst picks up on at the end of the class period -- is defendants had always said from the very first days of the

company's history as a publicly traded company that they had linear quarters and that this gave them predictability of sales, it was a competitive advantage dating back to the IPO prospectus throughout the years.  And we lay these out in paragraphs 41 through 44 of the complaint.

You have the former CFO saying that that linearity, that predictability of sales really helps us in quarter to understand where we're at financially.  It puts us in a position where we're really in a no-surprise environment.

The former president saying we're not sweating the last two or three weeks of a quarter trying to figure out how we can pull next deals quarters in to kind of offset.

The IPO prospectus says that it's so linear, the sales are so linear that approximately a third of our quarterly sales occurred within each month of their respective quarter.  And obviously that's the same impression that the market has because the analyst at the end of the class period is citing that.

Even just two months before the start of the class period -- this is in paragraph 45 and 72 -- you have defendant Deatsch saying in June that the next coming months will see business as usual if not stronger.

And the head of investor relations says we have this beautiful linearity throughout our quarter.  And that's in response to an analyst asking about the elephant in the room.

That's the macro.

So, again, for the same reason that led the analyst to believe that defendants had an early warning sign about these issues, it's the same reason that supports scienter. Defendants say they had the ability to spot these trends. You know, we're not putting those words in their mouth. They're the ones who said it to the market.

**THE COURT:** Okay. Well, thank you, Mr. Hooker. I appreciate it.

Ms. Smith, would you like to respond?

**MS. SMITH:** I would, Your Honor. Thank you. I'll be brief.

First, let me just say this is a quintessential example of a company doing exactly what it is supposed to do under the federal securities laws, which is update its investors on what it's seeing on a quarter-to-quarter basis.

This is a one-quarter class period, which as I'm sure Your Honor knows from years on the bench, that's pretty extraordinary. We don't have a situation where a company is making false statements or allegedly false statements for a long period of time and then a year later the truth is revealed. The company is keeping its investors posted just as it should.

I do want to respond, I think the plaintiffs are relying very heavily on this one statement by Mr. Deatsch in

the November earnings call transcript.

And if I might, with your Court's indulgence, just briefly put that statement up on the screen because I think it's very important to see what it is and what it isn't.  So if I can, I've got a screen share just briefly of the actual statement.

So if -- can you see this, Your Honor?

**THE COURT:**  Not -- here it is, yes.

**MS. SMITH:**  Okay.  Perfect.

So this is the transcript of the first quarter 2023 earnings call that plaintiffs are relying on as an admission that Atlassian knew going into August that there was a slowdown in growth of its existing paid user metric.  And the statement is the one in the second box here.

You know, he does specifically tie this to the free-to-paid conversions, saying I can add on to the timing of the things that we saw.  As we mentioned in August, what we were seeing going into the August time frame was the net new -- was the net new customers.  The free customers converting to paid was slowing down.

That's what he's talking about in this sentence.  And we know that if you would just -- I'm just going to show you one more slide here.  Juxtaposing the November statement with, as we mentioned in August, here's what we saw going into August.

If you look back at the August 22 statement that he makes, he actually does tie it to July.  So we know this is what he's talking about.

The top left box on the screen, this is his statement from the earnings call in August of 2022.  And he says here we've seen literally just in the last month the cohort of customers that came in in the April-May-June timeframe are converting to those paid plans at a slightly slower rate than what we've seen in the prior quarters.

So that confirms.  These tie together, right?  It shows you what he's talking about back in August.  He said, yeah, we started seeing this in July.

And again very consistently in November, he says the same thing.  Remember, this is what we saw.  We told you in August we started to see this in July.  Now we're seeing a continuation of that trend.

So the idea that this is somehow an admission that Atlassian knew its paid user expansion revenues were slowing down back in August, it doesn't accomplish that.

I would say again this is quite thin for a securities case to be the only thing plaintiff is relying on to establish falsity of these statements back in August.  There's no indication whatsoever that anybody had any idea at that point in time what the metrics were.

What that means is -- and I'll stop the screen share

so we can all see each other -- of course what that means is the analyst statements are totally irrelevant.  They might be relevant to materiality, but they're not relevant to falsity at all.  Right?

Just because an analyst is reacting to something doesn't make it a false statement, particularly when there are no allegations whatsoever that contradict what the company was saying at the time, which of course is the requirement under Ninth Circuit law.  That's *Twitter* and *Welgus* and all of those cases.

I don't need to belabor that point because I know Your Honor -- I think Your Honor understands the issue, but I wanted to highlight that July statement very particularly.

With respect to the August 19th annual report, not only does it not speak to the current time period, it's speaking as of the prior fiscal year.  But even if you thought -- even if one assumes that report were speaking as of August 19th, no alleged facts establish that three days into the second half of the quarter anyone perceived a material negative trend with respect to existing paid users.  That's just not alleged in the complaint.

And by the way, it doesn't make a difference that the company is monitoring its internal metrics.  That, in and of itself, doesn't show you in real time that there's a material negative trend.  Right?

With the benefit of hindsight in November, the company is looking back on its quarter, and all of the data that has come in over the quarter I think we started to see this come in in the second half of the quarter. But that doesn't mean when you're sitting there on August 15th you can see that trend. Right? You need to see it in hindsight and looking back over the metrics that have come in. That's exactly what the company did.

It's why, by the way, companies report their financials on a quarterly basis. It wouldn't make sense for them to have to do that in real time because they can't see those trends. Those are fluctuating on a day-to-day and a week-to-week basis.

And then with respect to the September 14th statement, you know, that statement does need to be taken in its proper context. I know Your Honor expressed a little bit of a question mark around whether that statement was potentially misleading.

I do think it's important to think about that statement in its -- her statements, Ms. Bharadwaj's statements, in context. And again I just want to put the critical language, if Your Honor will indulge me, on the screen.

One second. I'll get it up for you.

So it will be here in a second.

Here is the statement that she made. Now it's a

fairly long statement.  It's a back-and-forth during an investor conference.  And this is a pretty informal investor conference.  It's actually more like a fireside chat.  It's kind of like you're a senior executive woman and pretty highly placed in a tech company, and she's being interviewed in that capacity.

The important part of what she says is at the bottom, of course.  She speaks to user expansion, which is the issue that's being discussed in November of 2022 when the company first perceived a slight slowdown in growth.

Keeping in mind this is not a dropoff in demand.  This is a slowdown in what's already pretty fantastic growth.  And she's very clear.  This is an area we continue to monitor.  It's going to be an important one to look at in the current climate.

So she's not -- she's actually not saying anything about this particular metric.  All she's saying is we're continuing to monitor it.  Puts it squarely in the same category as the statements that were at issue in the Facebook case, the Ninth Circuit Facebook case.  This is just like that.  "Continue to monitor" says nothing to the market other than we're watching this and we're continuing to watch it.  We recognize it's important to watch.  And that's all that she's saying.

One other thing I'll just point out about the

paragraph above this about the subscription upgrades.  The plaintiffs put a lot of emphasis on the statement that she makes here about not seeing any discernible trend with respect to the subscription upgrades and sort of try to expand that beyond what it is.

I will just point out, of course she's speaking only to that issue, but importantly it actually turns out that she's right.  So in the November earnings call, Exhibit G, at page 10, there's a discussion of this issue.

And it lastly reports exactly what she says here which is there was no discernible trend with respect to the subscription upgrades.  So that is correct.  And it's further verification of sort of what she's speaking about here is that metric.  She's not talking about the broader user -- paid user expansion metric as well.

So I'll stop that screen share.

And then, finally, with respect to scienter, I think Your Honor is exactly right.  There is zero motive allegations here, and the plaintiffs don't even try to argue that there are any.

There also aren't any of the usual scienter allegations that would establish the speaker had knowledge of a material adverse trend at the time that the statements were made, specifically not with respect to Ms. Bharadwaj.  Right?  Who's the COO.  Her main job is R&D.  She's not a salesperson,

she's not the CFO.

Now she may be monitoring metrics, but she's probably not looking at it from the same perspective as the CEO or the CFO. She's looking at it a little bit differently. Regardless the plaintiffs have the burden to prove some knowledge on her part or to allege some knowledge on her part, and they certainly don't -- don't do that.

And I would say again it is true that the company noted in November that in hindsight they started to see this trend emerge in the second half of the quarter. But it doesn't establish that the people who are sitting in real time are seeing that trend quite as clearly as people are seeing it in November and they've got now data for, you know, August, September, and even October. They're not reporting on October, but they've got that data.

And what the company does in November, it hits its guidance for the first quarter. Right? It meets its revenue guidance. What it's doing is telling the market we're concerned about the rest of the year.

So even in quarter -- there's nothing to report with respect to first quarter. But it's very responsibly telling the market, okay, we're starting to see this, we think it's going to impact us for the full year. And so we're revising our guidance downward for the full year. Again, exactly what a responsible company should do.

So unless Your Honor has any questions, those are the key points I thought would be worth hitting.

**THE COURT:** Great. Thank you, Ms. Smith. I appreciate it.

Mr. Hooker, I'll give you no more than five minutes to say whatever it is that you'd like to say now.

**MR. HOOKER:** Well, yeah, I would just address a couple of quick points.

The notion that a lack of motive just automatically defeats scienter, I think it's blown out of the water here given the other scienter points that I mentioned earlier.

I think the *Apple* case is really right on point. It's another case that involves a one-quarter class period. They rejected the same argument so the lack of motive does not defeat an inference of scienter under a holistic analysis.

One really quick part that I just wanted to highlight. This is at star 13 of the opinion, 2020 Westlaw 6482014, the opinion states: Thus the competing inferences require comparing an inference of deliberate recklessness where Cook deliberately disregarded immense risk in representing that macroeconomic factors in China were not affecting Apple's business despite having access to data suggesting otherwise with knowledge that investors may be misled.

And, again, defendants don't address this case at all in their reply. We cited for both falsity and scienter. We

think it's on point.

This notion that with respect to the September 14th statements Ms. Bharadwaj was just talking about subscription upgrades, it really makes no sense.  This is in the context of an analyst asking about macroeconomic impacts.  Defendants' own brief at page 4 of their brief says that 10 percent of their revenue comes from free-to-paid, 90 from existing, and they say additional revenue comes from subscription upgrades.

Why would you be highlighting something that's a fraction of importance as compared to the other two in response to questions about macro impact on the business.

And also in the part that gets highlighted, that we highlight in the complaint, she mentions free to standard.  She never says subscription upgrades.  She says upsell free to standard.

Their own brief at then that same page says that subscription upgrades is only additional services for premium and enterprise plans, not free to standard.

So we think that our allegations are completely consistent with how the market took it.  And if defendants' argument now is that she meant something different, it really is a fact issue that should be -- shouldn't be resolved at this stage.

And the notion that they met guidance, the company met guidance, it really gets blown out of the water if you look

carefully in the complaint.

The market reaction belies this.  The stock lost $50 in a day.  Analysts note the abrupt change in tone and outlook.  And it's contradicted by the facts.  It was the first time in its history that the company did not hit its EPS guidance.  The consensus from the Street versus what they reported was 10 percent below that.  It was also the first time that it did not exceed overall guidance in five years.  We highlight this in paragraph 75 of the complaint.

So I think, Your Honor, we think even though this is a one quarter class period and defendants poke holes in that, we've set forth pretty compelling allegations from defendants' own words that they made false and misleading statements from day one of the class period and that they saw these material adverse trends before that.  They didn't disclose it to the market.  That's scienter straight from the horse's mouth.  That's scienter from defendants' own words.

**THE COURT:**  Thank you, Mr. Hooker and Ms. Smith.  So I'll get an order out as soon as I can.  I appreciate your argument.

**MS. SMITH:**  Thank you, Your Honor.

**MR. HOOKER:**  Thank you.

(Proceedings adjourned at 3:03 p.m.)

---oOo---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:   Friday, March 1, 2024

_Kelly Shainline_

Kelly Shainline, CSR No. 13476, RPR, CRR
U.S. Court Reporter