**SAXENA WHITE P.A.**
David R. Kaplan (SBN 230144)
dkaplan@saxenawhite.com
505 Lomas Santa Fe Drive, Suite 180
Solana Beach, CA 92075
Tel.: (858) 997-0860
Fax: (858) 369-0096

*Counsel for Lead Plaintiffs*

*[Additional Counsel Listed on Signature Page]*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| CITY OF HOLLYWOOD FIREFIGHTERS' PENSION FUND, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> ATLASSIAN CORPORATION, ATLASSIAN CORPORATION PLC, MICHAEL CANNON-BROOKES, SCOTT FARQUHAR, ANU BHARADWAJ, and CAMERON DEATSCH, <br><br> Defendants. | Case No. 3:23-cv-00519-WHO <br><br> **OPPOSITION TO MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** <br><br> Hearing Date: August 7, 2024 <br> Time: 2:00 p.m. <br> Judge: Hon. William H. Orrick <br> Courtroom: 2, 17th floor |

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................ 1

II.   STATEMENT OF FACTS ................................................... 5

      A.    Atlassian's "Land-And-Expand" Business Strategy Relied On Increasing Revenue Through Paid User Expansion, Which The Individual Defendants Closely Monitored "*Like A Hawk*" Throughout The Class Period ........................ 5

      B.    Defendants Reiterated To The Market Throughout August 2022 That Atlassian *Was Not "Aware Of Any Trends"* Materially Affecting The Company ........................................................ 6

      C.    Atlassian "*Was Not Growing Like Gangbusters*": To Reverse The Material Adverse Trends Prevalent In Atlassian's Business In July And August 2022, The Individual Defendants Design and Implement "*Project Big Fish*" ................ 7

      D.    Despite Knowing Full Well That Material Trends Were Impacting Atlassian, Bharadwaj Told Investors On September 14, 2022 That Defendants "*Haven't Really Seen Any Discernable Trend*" Affecting The Company's Business ........................ 8

      E.    The Truth Is Revealed: Defendants Disclose That Atlassian's Business Had Been Materially Impacted By Macroeconomic Trends *Since July* ...................... 10

III.  LEGAL STANDARDS ...................................................... 11

IV.   ARGUMENT ................................................................... 11

      A.    Defendant Bharadwaj's Materially Misleading Statements On September 14, 2022 Were Made With Scienter ........................ 11

            1.    The SAC's Detailed Allegations Regarding Project Big Fish Establish Defendant Bharadwaj's Scienter ................. 12

            2.    Bharadwaj's Review Of Declining Metrics Supports Scienter ................. 14

            3.    Defendants' Admissions Support Scienter ..................... 16

            4.    Additional Facts Support That Bharadwaj Acted With Scienter ............. 17

            5.    Plaintiffs' Scienter Theory Is More Plausible Than Defendants' ............ 19

      B.    The Court Correctly Found Bharadwaj's Statements Materially Misleading ........................................................ 20

      C.    Defendants' Other Class Period Statements Were False And Misleading .......... 22

      D.    Defendants Deatsch, Cannon-Brookes and Farquhar Acted With Scienter......... 24

V.    CONCLUSION................................................................ 25

OPPOSITION TO MOTION TO DISMISS
CASE NO. 3:23-CV-00519-WHO

1

<u>**TABLE OF AUTHORITIES**</u>

2

**Page(s)**

3

**CASES**

4      *Azar v. Yelp, Inc.*,
           2018 WL 6182756 (N.D. Cal. Nov. 27, 2018) .................................................................. 17, 23
5
6      *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
           2013 WL 6441843 (N.D. Cal. Dec. 9, 2013) ......................................................................... 23

7      *City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*,
           2019 WL 6877195 (N.D. Cal. Dec. 17, 2019) ....................................................................... 16
8
9      *City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*,
           527 F. Supp. 3d 1151 (N.D. Cal. 2021) ................................................................................. 19
10
11     *Constr. Workers Pension Tr. Fund – Lake Cnty. v. Genoptix, Inc.*,
           2013 WL 12123841 (S.D. Cal. Mar. 22, 2013) ..................................................................... 21

12     *Cutler v. Kirchner*,
           696 F. App'x 809 (9th Cir. 2017) ......................................................................................... 18
13
14     *E. Ohman J:or Fonder AB v. NVIDIA Corp.*,
           81 F.4th 918 (9th Cir. 2023) ................................................................................ 14, 15, 22, 23
15
16     *Elec. Workers Pension Fund, Local 103, I.B.E.W. v. HP Inc.*,
           2021 WL 4199273 (N.D. Cal. Sept. 15, 2021) ...................................................................... 16

17     *Felipe v. Playstudios Inc.*,
           2024 WL 1380802 (D. Nev. Mar. 31, 2024) ......................................................................... 14
18
19     *Ferreira v. Funko Inc.*,
           2021 WL 880400 (C.D. Cal. Feb. 25, 2021) ......................................................................... 22
20
21     *Glazer Capital Mgmt., L.P. v. Forescout Techs., Inc.*,
           63 F.4th 747 (9th Cir. 2023) ................................................................................... 14, 21, 23
22
23     *Huang v. Higgins*,
           2019 WL 1245136 (N.D. Cal. Mar. 18, 2019) ...................................................................... 16

24     *In re Alphabet, Inc. Sec. Litig.*,
           1 F.4th 687 (9th Cir. 2021) ....................................................................... 11, 19, 21, 24
25
26     *In re AnaptysBio, Inc.*,
           2021 WL 4267413 (S.D. Cal. Sept. 20, 2021) ...................................................................... 18
27     *In re Apple Inc. Sec. Litig.*,
           2020 WL 2857397 (N.D. Cal. June 2, 2020) ......................................................................... 16
28

*In re Apple Inc. Sec. Litig.*,
   2020 WL 6482014 (N.D. Cal. Nov. 4, 2020)...................................................................*passim*

*In re BioMarin Pharm. Inc. Sec. Litig.*,
   2022 WL 164299 (N.D. Cal. Jan. 6, 2022) ............................................................... 25

*In re Capstone Turbine Corp. Sec. Litig.*,
   2018 WL 836274 (C.D. Cal. Feb. 9, 2018)............................................................... 15

*In re CBT Group PLC Sec. Group Litig.*,
   2001 WL 1822729 (N.D. Cal. Dec. 28, 2001) ................................................. 13, 21

*In re Facebook, Inc.*,
   986 F. Supp. 2d 487 (S.D.N.Y. 2013).................................................................... 19

*In re FibroGen, Inc. Sec. Litig.*,
   2022 WL 2793032 (N.D. Cal. July 15, 2022)................................................... 15, 18

*In re Finisar Corp. Sec. Litig.*,
   2017 WL 1549485 (N.D. Cal. May 1, 2017) .......................................................... 18

*In re Fusion-io, Inc. Sec. Litig.*,
   2015 WL 661869 (N.D. Cal. Feb. 12, 2015)........................................................... 23

*In re Gilead Scis. Sec. Litig.*,
   536 F.3d 1049 (9th Cir. 2008)............................................................................... 11

*In re Intel Corp. Sec. Litig.*,
   2019 WL 1427660 (N.D. Cal. Mar. 29, 2019)...................................................... 24

*In re Plantronics, Inc. Sec. Litig.*,
   2022 WL 3653333 (N.D. Cal. Aug. 17, 2022)....................................... 13, 14, 15, 21

*In re Quality Sys., Inc. Sec. Litig.*,
   865 F.3d 1130 (9th Cir. 2017)................................................................... 14, 22, 23

*In re SolarCity Corp. Sec. Litig.*,
   274 F. Supp. 3d 972 (N.D. Cal. 2017) .................................................................. 16

*In re Splunk Inc. Sec. Litig.*,
   592 F. Supp. 3d 919 (N.D. Cal. 2022) .................................................................. 19

*In re Syntex Corp. Sec. Litig.*,
   95 F.3d 922 (9th Cir. 1996).................................................................................. 24

*In re Twitter, Inc. Sec. Litig.*,
   506 F. Supp. 3d 867 (N.D. Cal. 2020) .................................................................. 21

*In re VeriFone Holdings, Inc. Sec. Litig.*,
   704 F.3d 694 (9th Cir. 2012)................................................................................ 17

*In re Wet Seal, Inc. Sec. Litig.*,
   518 F. Supp. 2d 1148 (C.D. Cal. 2007) ................................................................. 16

*Indiana Pub. Ret. Sys. v. SAIC, Inc.*,
   818 F.3d 85 (2d Cir. 2016) ..................................................................................... 25

*Khoja v. Orexigen Therapeutics, Inc.*,
   899 F.3d 988 (9th Cir. 2018) ....................................................................... 1, 16, 22

*Lipton v. Pathogenesis Corp.*,
   284 F. 3d 1027 (9th Cir. 2002) ............................................................................. 16

*Macquarie Infrastructure Corp. v. Moab Partners, L. P.*,
   601 U.S. 257 (2024) .............................................................................................. 24

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011) ................................................................................... 11, 13, 19

*Mulderrig v. Amyris, Inc.*,
   492 F. Supp. 3d 999 (N.D. Cal. 2020) .................................................................. 25

*Nguyen v. Endologix, Inc.*,
   962 F.3d 405 (9th Cir. 2020) ................................................................................. 19

*Oklahoma Police Pension & Ret. Sys. v. LifeLock, Inc.*,
   780 F. App'x 480 (9th Cir. 2019) ......................................................................... 13

*Pardi v. Tricida, Inc.*,
   2022 WL 3018144 (N.D. Cal. July 29, 2022) ................................................ 18, 22

*Reese v. Malone*,
   747 F.3d 557 (9th Cir. 2014) .......................................................................... 11, 18

*Robb v. Fitbit Inc.*,
   2017 WL 219673 (N.D. Cal. Jan. 19, 2017) ........................................................ 21

*Scheller v. Nutanix, Inc.*,
   450 F. Supp. 3d 1024 (N.D. Cal. 2020) ................................................................ 16

*Shenwick v. Twitter, Inc.*,
   282 F. Supp. 3d 1115 (N.D. Cal. 2017) ................................................................ 22

*Siracusano v. Matrixx Initiatives, Inc.*,
   585 F.3d 1167 (9th Cir. 2009) ............................................................................... 20

*Sneed v. AcelRx Pharm., Inc.*,
   2023 WL 4412164 (N.D. Cal. July 7, 2023) ........................................................ 23

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) .............................................................................................. 11

*Veal v. LendingClub Corp.*,
    423 F. Supp. 3d 785 (N.D. Cal. 2019) ...................................................................... 16

*Weiner v. Tivity Health, Inc.*,
    365 F. Supp. 3d 900 (M.D. Tenn. 2019) .................................................................. 13

*Welgus v. TriNet Group, Inc.*,
    2017 WL 6466264 (N.D. Cal. Dec. 18, 2017) ......................................................... 18

*Weston v. DocuSign, Inc.*,
    669 F. Supp. 3d 849 (N.D. Cal. 2023) .............................................................. 14, 25

*Wozniak v. Align Tech., Inc.*,
    850 F. Supp. 2d 1029 (N.D. Cal. 2012) .................................................................. 16

**REGULATIONS**

17 C.F.R. § 230.414(d) ...................................................................................................... 24

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>STATEMENT OF ISSUES TO BE DECIDED</u>

Whether the SAC alleges facts that, considered holistically, state claims under §10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, and §20(a) of the Securities Exchange Act, 15 U.S.C. §78t(a).

OPPOSITION TO MOTION TO DISMISS
CASE NO. 3:23-CV-00519-WHO

1   **I.    INTRODUCTION**[1]

2        Both leading up to and during the Class Period, the most critical issue facing Atlassian was

3   whether deteriorating global macroeconomic conditions were having a material negative impact on

4   the Company's business.  In turn, Defendants repeatedly and emphatically confirmed that they were

5   not.  Indeed, such statements were so important to investors that Defendants consistently

6   proclaimed that there were no material trends impacting either of Atlassian's two major segments:

7   (i) Paid User Expansion (when a paying customer added additional users), which accounted for

8   90% of the Company's revenue; and (ii) Free-to-Paid Conversions (when a client transitions from

9   a free to a paying subscription), which accounted for the remaining 10%.

10       Thus, for example, on August 4, 2022, Defendants assured investors that they had "***yet to***

11  ***see any specific trend geographically or even in industry segments or in customer size that gives***

12  ***us pause or worry to date***," and that they had "***not seen any significant shift in customer demand***."

13  Similarly, on August 19, 2022, Defendants represented that they were "***not aware of any trends***"

14  affecting "***the current fiscal year***."  And as late as September 14, 2022—a mere two weeks before

15  the end of Atlassian's Q1 2023—Atlassian's then-COO, Defendant Bharadwaj, made clear at a

16  prominent investor conference that global economic conditions were not having any impact on the

17  Company's business, stating that "***[we] haven't really seen any discernible trend there in terms of***

18  ***the macroeconomic impact***."  Significantly, Bharadwaj went so far as to confirm that she had

19  addressed all known macro concerns affecting Atlassian's business: "***So across the board, across***

20  ***existing and new [users], that's overall what we are seeing in different parts of the business***."

21       These statements were false.  On November 3, 2022, Atlassian reported poor financial

22  results for Q1 2023, including missing its EPS guidance for the first time in its history and failing

23

24  ---
[1] All "¶_" references are to the Second Amended Class Action Complaint, ECF No. 59 ("SAC").

25  Unless otherwise specified, capitalized terms have the same meaning as in the SAC.  "Defendants" are Atlassian Corporation and Atlassian Corporation Plc (collectively, "Atlassian" or the

26  "Company"); Michael Cannon-Brookes; Scott Farquhar; Anu Bharadwaj; and Cameron Deatsch. "DM" refers to Defendants' Motion to Dismiss, ECF No. 61. "Ex" refers to the DM exhibits, ECF

27  No. 61-1. Unless otherwise stated, all emphasis is added and internal quotations and citations are omitted. Defendants have also moved for judicial notice of certain documents. Plaintiffs do not

28  object to the Court taking judicial notice of the existence and publication of these documents, however, the Court may not take judicial notice to engage in fact-finding based upon these documents. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018).

to exceed its prior guidance for the first time in five years.  In direct contrast to its Class Period statements that there were *no* trends impacting its business, Defendants admitted that the opposite was true: the poor results were directly attributable to two material "***trends***" from "***macro headwinds***" that had negatively impacted both User Expansion and Conversions.  During the ensuing earnings call, when Defendants predictably tried to claim that they had no idea whatsoever of these trends until the very end of the quarter, analysts pointedly noted that they "***[had] to believe that [Defendants] had a very early warning***" regarding these issues.  In response, Defendants were forced to clarify "the timing of things that we saw," admitting that they saw "***user growth slow down across our customer base***" in "***July and August***"—*i.e.*, by the very start of the Class Period.

On this news, Atlassian's stock price plunged nearly 30% in a single day, from a closing price of $174.17 on November 3, 2022 to $123.73 on November 4, 2022, wiping out over $7 billion in market capitalization.  In turn, analysts excoriated management for their "***significant and unexpected pivot in demand tone***," noting that the slowdown "***took us and investors by surprise***."

In its January 22, 2024 Order, the Court found that Defendant Bharadwaj's September 14 statements were "misleading because they provided no commentary on the Paid User Expansion slowdown," and that it was "misleading for the defendants to provide positive statements about" certain parts of Atlassian's business while "failing to tell the market that there was a slowdown to the key majority of their business." ECF No. 53 ("Order") at 18-19.  However, the Court determined that Plaintiffs had fallen short on scienter grounds because the prior complaint failed to allege that Bharadwaj "knew that there was a slowdown in Paid User Expansion on September 14 but recklessly chose not to reveal that information."  Order at 22.  In addition, because the Court held that the prior complaint only showed that the negative trends started in "mid-August," the Court found that Defendants' early-August statements were not false when made.  Order at 15-16.

The SAC readily cures the deficiencies the Court identified in its Order.  Specifically, the SAC includes detailed new allegations from high-level former Atlassian employees—including the former Head of Product Strategy & Business Operations—establishing that the slowdown in Conversions and Expansions were apparent Company-wide by no later than ***July 2022***.  Indeed, these former employees uniformly reported that these metrics "***were not growing like gangbusters***"

OPPOSITION TO MOTION TO DISMISS
CASE NO. 3:23-CV-00519-WHO

and were "*slower than expected*," to the point where the July and August 2022 results were markedly worse than those from the prior summer and "*it was clear that the growth rates were not what they were*." Further, Defendants were "*keenly aware*" of this slowdown, as they received detailed reports tracking these criteria; convened weekly and monthly meetings where they discussed these exact metrics; received detailed presentations in July and August showing that Atlassian's cloud growth was well below target due to these trends; and even reduced hiring in July and froze hiring in August because of the material deterioration in Atlassian's business.

Significantly, this downturn was so pronounced that the Individual Defendants spearheaded *weeks* of high-level executive meetings in July and August, which culminated in a Company-wide, 100+ employee project called "Project Big Fish." Notably, Project Big Fish was implemented in the first days of September 2022—*two weeks* before Bharadwaj's statements—and the project was specifically designed to reverse the negative trend in Paid User Expansion. The SAC further establishes that the Individual Defendants personally developed and implemented Project Big Fish, with Bharadwaj herself playing a pivotal role in the project: "*Project Big Fish came from the executive team, and it was reviewed by the executive team… [Bharadwaj] was very involved because she had 40 people in project strategy that reported to her involved with this project*." Bharadwaj did not breathe a word of any of this highly material information when she spoke to investors *weeks* later at the highly anticipated investor conference.

Such specific and particularized allegations are more than sufficient to establish that, at a minimum, Bharadwaj knew of the Paid User Expansion slowdown on September 14 but recklessly chose not to reveal that information. In addition, these allegations also establish that Defendants' statements in August 2022 denying that they had seen any "specific trends" were misleading. Indeed, by that time, Defendants were convening numerous meetings amongst the senior-most executives of the Company to discuss ways to reverse the material downturn in Paid User Expansion and Free-to-Paid Conversions—meetings that laid the groundwork for Project Big Fish.

In the face of these allegations, Defendants first ask the Court to reverse its prior holding that Bharadwaj's statements were misleading, claiming that no allegations show that the Expansion slowdown was "material" by September. DM 2, 15-17. Not so. Indeed, the SAC's new allegations

1   from senior former employees establish that the negative trends in Atlassian's business had

2   impacted the Company *for months* by September 14—which was consistent with Defendants' own

3   admission that they saw "*user growth slow down across our customer base*" in "*July and August*."

4   In addition, the scope and magnitude of Project Big Fish—a Company-wide initiative requiring

5   *weeks* of high-level planning aimed at counteracting the Paid User Expansion slowdown—confirms

6   that Defendants knew these trends were highly material *throughout the Class Period*.  Defendants

7   virtually ignore the significance of Project Big Fish in their Motion, relegating their response to

8   two sentences that mischaracterize and downplay the project.  DM 22.  Defendants' avoidance is

9   telling, as the SAC makes clear that Defendants specifically implemented the project to reverse

10  what they knew full well was a material adverse trend affecting 90% of their business.

11         Second, Defendants argue that the SAC supposedly does not move the needle on scienter

12  because it does not sufficiently detail when the trends started, by exactly how much these metrics

13  declined, or what exact information Defendants knew.  DM 2, 18-25.  Defendants are wrong.  The

14  SAC provides these precise details and a clear timeline establishing that Defendants knew of the

15  serious impact of the trends *no later than July 2022*, and yet they recklessly chose not to reveal

16  this highly material information to investors.  Moreover, contrary to Defendants' assertions,

17  Plaintiffs need not allege motive to plead scienter.  This is particularly true where, as here, a

18  plethora of facts establish that Defendants knew of information that directly contradicted their

19  public statements—including their contemporaneous planning of a massive internal project aimed

20  at reversing the very trends that Plaintiffs allege were misleadingly concealed.  Similarly,

21  Defendants' contention that scienter is undermined because Defendants supposedly knew that

22  Atlassian would disclose the trends months later is pure conjecture and contrary to the law.  Indeed,

23  it is black letter law that falsity and scienter are measured at the time of the challenged statements,

24  and Defendants' "innocence by hindsight" defense is not an appropriate basis for dismissal.

25         Defendants' motion should be denied in its entirety.

26

27

28

OPPOSITION TO MOTION TO DISMISS
CASE NO. 3:23-CV-00519-WHO

## II.    STATEMENT OF FACTS

### A.    Atlassian's "Land-And-Expand" Business Strategy Relied On Increasing Revenue Through Paid User Expansion, Which The Individual Defendants Closely Monitored "*Like A Hawk*" Throughout The Class Period

Atlassian's "unique" business strategy does not rely on an "expensive salesforce and complex pricing negotiations," but rather a "high-velocity" website where its products are offered free to a client's first ten users. ¶¶35, 36, 40. This "land-and-expand" strategy produced two key metrics in Atlassian's business: (i) "Paid User Expansion" (when already-paying customers added users), which accounted for 90% of Atlassian's revenue; and (ii) "Free-to-Paid Conversions" (when a free user exceeds the ten-user mark or pays for a premium version of a product), which accounted for the remaining 10% of revenue. ¶¶5, 36-38; DM 3.

Prior to and throughout the Class Period, Defendants were intensely focused on trends affecting these two metrics. Indeed, management repeatedly boasted that they had "*visibility into every click*" and would "study" trend "information very carefully," including personally monitoring "bookings," "customer numbers," and "usage and adoption metrics." ¶127. The Head of Investor Relations stated that Atlassian "*look[ed] at bookings on an ongoing basis*" (¶44), and Defendant Bharadwaj emphasized that "access to telemetry and usage patterns" allowed Defendants to "predict what [clients were] going to do next." ¶47. As global conditions soured in summer 2022, Defendants assured investors that they monitored these metrics "*like a hawk*" and could identify user issues "*with surgical precision*." ¶¶46-47. Bharadwaj explained that she paid particular attention to Paid User Expansion—an "*important [metric] to look at in the current climate*." ¶47.

Similarly, the accounts of high-level former employees who had direct access to this data confirm that Defendants reviewed this exact information closely throughout the Class Period. For example, according to CW 3—the former Head of Product Strategy & Business Operations—Defendants closely tracked the number of "users coming in, monthly active users, paid enabled users, users that become active and convert to seats, users coming in from their website, on-premises users getting migrated to the cloud version, users from cross-sell products, and accounts that are expanding." ¶49. Moreover, the Individual Defendants held *weekly meetings* to discuss these exact metrics, convened *monthly meetings* with a broader management group, and received

monthly detailed reports on Free-to-Paid Conversions and Paid User Expansion.  ¶¶50, 76-77.

Notably, from Atlassian's inception as a public company, Defendants boasted that their business produced a "linear sales cycle," which provided great "***predictability of sales***" as "***a third of [Atlassian's] quarterly sales occurr[ed] within each month*** of the respective quarter." *See* ¶¶40-43 (charts depicting ***no*** seasonality).  Atlassian's former CFO explained that this linearity "***really helps us in-quarter to understand where we're at financially***," which creates a "***no-surprise environment***." ¶41. Thus, Atlassian never relied on an end-of-quarter sales uptick to reach its forecasts, or as Atlassian's former President put it, the Company was never "***sweating the last 2 or 3 weeks of a quarter trying to figure out whether or not people had forecasted things correctly***." ¶42; *see also* DM 3 (Atlassian had no "'hockey stick' increase in sales at the end of a quarter"). Even as late as June 2, 2022—just two months prior to the Class Period—Atlassian's Head of Investor Relations addressed the "***elephant in the room [that] has been the macro***" by touting the Company's "***beautiful linearity throughout our quarter***."  ¶44.  Days later, Defendant Deatsch similarly affirmed that the "***next coming months***" would see "***business [] as usual, if not getting stronger***," while never once mentioning an expected seasonal dip in July and August sales. *Id*.

## B. Defendants Reiterated To The Market Throughout August 2022 That Atlassian *Was Not "Aware Of Any Trends"* Materially Affecting The Company

During the Class Period, the question that was top-of-mind for investors was whether macroeconomic conditions were impacting Atlassian.  To assuage investor concerns, Defendants repeatedly assured the market that they were not aware of any macro trends that were materially impacting Atlassian.  Specifically, on August 4, 2022—***five weeks*** into Atlassian's quarter, and the first day of the Class Period—Defendants issued the Q4'22 Shareholder Letter, which staunchly assured investors that there were no macro issues materially impacting the Company.  ¶¶6, 51-55.  Indeed, the Q4'22 Shareholder Letter even represented that "***secular trends [] reinforce[d]***" their positive report, leading Defendants to "reiterat[e] . . . approximately 50% year-over-year [cloud growth] for both FY23 and FY24." ¶53.  Significantly, during the ensuing earnings call, analysts questioned whether Defendants saw any "weakness" in demand considering the macro conditions.  In response, Defendant Deatsch represented that Defendants had "***yet to see any specific trend***

*geographically or even in industry segments or in customer size that gives us pause or worry to date*"; that they had "*not seen any significant shift in customer demand across our product lines*"; and that there was "*no new news to share today*." ¶54. While Atlassian reported a "modest decrease" in Conversions, Defendants assured the market this was a "*slight thing*" that "*does not take away from the continued growth we see in our existing customer base.*" ¶¶55, 92.

The market responded positively to Defendants' representations, with Atlassian's share price soaring to $289.36 per share on August 16, 2022—a 25% increase from just prior to the Class Period. ¶60. Notably, numerous analysts repeated and quoted *verbatim* Defendants' assurance that Atlassian had "'*yet to see any trend*'" and "*has not seen any material signs of a slowdown in its data yet*." Analysts highlighted that, as a result of Defendants' "*reaffirmation of basically zero impacts from macro*," Atlassian's "*premium to peers is justified*." ¶¶56-59.

On August 19, 2022, Defendants reaffirmed these assurances in the 2022 Annual Report, which first noted: "weakening economic conditions…*did not* individually have a material adverse impact … *during the fiscal year ended June 30, 2022*." Then, with respect to the current quarter, the Report unequivocally confirmed that Atlassian was "*not aware of any trends… for the current fiscal year that are reasonably likely to have a material effect* on our revenues." ¶¶62, 114.

## C. Atlassian "*Was Not Growing Like Gangbusters*": To Reverse The Material Adverse Trends Prevalent In Atlassian's Business In July And August 2022, The Individual Defendants Design and Implement "*Project Big Fish*"

Unbeknownst to investors, at the same time Defendants claimed that Atlassian was unaffected by the macroeconomic downturn, the Company was suffering from dramatic declines in both Paid User Expansion and Free-to-Paid Conversions. ¶¶72-78. Indeed, CW 3, who started at Atlassian in June 2022, recalled that "*when I first joined the Company, you could see that they were not growing like gangbusters, and it was slower than expected*." ¶74. By July and August, Atlassian's cloud growth had significantly slowed and was projecting only 30% annual growth rate, well below the 50% annual rate Defendants "reiterated" to the market. ¶¶53, 74, 77. This poor prognosis was directly attributable to slowdowns in Paid User Expansion and Conversions. ¶76. CW 3 even compared the metrics to those from the prior year and "*it was clear that the growth rates were not what they were*." ¶¶74, 77. CW 3 reported these findings to executives. ¶¶76, 77.

In response to these material trends in Atlassian's business, the Individual Defendants held numerous meetings in July and August with senior management to assess the cause of the negative trends and how to reverse them. ¶79. The culmination of these meetings was a Company-wide initiative dubbed "Project Big Fish," which was specifically implemented to reverse the material adverse trends in Paid User Expansion and Free-to-Paid Conversions and jump start cloud growth. ¶¶8, 80-82, 126. Project Big Fish was rolled out prior to Labor Day 2022 (September 5, 2022). ¶80. As part of the project, approximately 100 upper-level employees were syphoned into cross-functional teams to brainstorm and stress-test product features, business strategies, and other potential user enhancements that would entice additional users to Atlassian products. *Id*.

CW 3 was personally added to a Project Big Fish cross-collaboration group in early September 2022. *Id*. In accordance with the project's goals, he and his team worked with product specialists to assess which product enhancements would lead to the largest number of additional users, thereby increasing Paid User Expansion. *Id*. In addition to his own involvement, CW 3 was aware that other top-level managers, including the Senior Vice President of Product, Work Management and the Head of Product, Software Teams, were members of cross-collaboration groups and presented their findings directly to Defendant Bharadwaj. ¶81.

Given the scope and size of Project Big Fish, and the numerous high-level employees involved, the project naturally came from the Company's most senior leadership—the Individual Defendants. As CW 3 explained, "***Project Big Fish came from the executive team, and it was reviewed by the executive team***"—it was "***100% initiated top down***." *Id*. Furthermore, Defendant Bharadwaj played a pivotal role in the project: "***[Bharadwaj] was very involved because she had 40 people in product strategy that reported to her involved with this project***," and she was presented with numerous groups' findings and provided her input thereon. *Id*.

D. **Despite Knowing Full Well That Material Trends Were Impacting Atlassian, Bharadwaj Told Investors On September 14, 2022 That Defendants "*Haven't Really Seen Any Discernable Trend*" Affecting The Company's Business**

On September 14, 2022, just two weeks before the end of Atlassian's quarter, Defendant Bharadwaj presented at a prominent investor conference, the Goldman Sachs Communacopia + Technology Conference. ¶¶65, 117. The "packed" event was "the largest Goldman Sachs investor

conference ever," and was attended by a "record" number of investors and analysts expecting information about how the poor macro conditions were affecting the world's tech companies. *Id*.

During Bharadwaj's forty-minute presentation, an analyst was "dying to ask" about "the macroeconomic conditions" and specifically "[w]hat are you seeing out there with the demand environment?" ¶¶66, 117. In response, Bharadwaj spoke very positively about Atlassian's business, highlighting that the Company was well-insulated from any macro issues due to several "advantages in the overall macroeconomic climate" that protected its business from the global conditions. Significantly, after assuring the market that she would discuss "what different parts of our business are seeing what impact," and without disclosing the material adverse trend that was indisputably impacting 90% of the Company's business at that time, Bharadwaj confirmed: "***We're not seeing any trends there. So across the board, across existing and new, that's overall what we are seeing in different parts of the business***." ¶¶67, 118.[2]

Then, after analysts questioned whether Atlassian would be forced to "catch up" in the future when the "demand environment is more stable," Bharadwaj emphasized that "over 90% of the revenue comes from existing"—***i.e., Paid User Expansion***—and that the "pricing model" is that "the first 10 users are free, and then the 11th user onwards, it's paid." After noting that "we think of upsell as really across free to standard, standard to premium, premium to enterprise," Bharadwaj then confirmed that "***we've seen some very encouraging progress there over the last four quarters***," and that Defendants "***haven't really seen any discernible trend there in terms of the macroeconomic impact***." ¶¶68, 119. Bharadwaj then expressly confirmed to the market that "User Expansion" was a metric she "continue[d] to monitor" and was "***an important one to look at in the current climate***." *Id.* Remarkably, at no point did she disclose that Atlassian was experiencing a material adverse trend in that very metric, despite knowing full well that Defendants had already implemented a Company-wide initiative designed to reverse that exact downturn. *Id.*

---

[2] Notably, while Bharadwaj discussed "conversion of users from free to paid," she minimized any impact on the Company's business, assuring investors that Defendants were seeing just a "***bit of softness over the past couple of months***," that the metric was only "***a very small part of our business***," and that it was "important to illustrate that point in the overall picture as ***over 90% of our revenue comes from existing customers***." ¶67.

9

**E.    The Truth Is Revealed: Defendants Disclose That Atlassian's Business Had Been Materially Impacted By Macroeconomic Trends *Since July***

On November 3, 2022, Defendants shocked the market by announcing that Atlassian had missed its EPS guidance for the very first time, its cloud growth had come in well below analysts' consensus—the first time in five years it failed to exceed guidance—and it was walking back its prior full year cloud growth guidance.  ¶84.  Significantly, while Defendants had for months been denying the import of any macro impacts on Atlassian's business, Defendants now acknowledged that the opposite was true: namely, that the poor results were caused by "***the topic that's top of mind for shareholders: macro impacts***," with "***two trends***" from **macro "*headwinds*"** impacting Atlassian's business.  ¶85.  Specifically, Defendants revealed that Paid User Expansion had been materially impacted by adverse trends, and with respect to Free-to-Paid Conversions, Defendants now admitted that the slowdown was not a mere "slight thing" or "bit of softness," but was in fact a material adverse trend.  *Id.*  Furthermore, while Defendants had previously claimed that there were no negative trends "geographically or even in industry segments" across Atlassian's business, they now revealed that that the "user expansion slow[] down" was experienced "***across our customer base . . . largely across all segments, industries and geographies*."  ¶91.

Although Defendants attempted to claim that they did not see these trends until "the second half of Q1," the market rejected this excuse.  ¶86.  During the earnings call, an analyst noted that he "***[had] to believe that [Atlassian] had a very early warning***" regarding the trends because of Atlassian's "***very linear***" quarters and Defendants' "***tremendous visibility into customer buying and usage patterns*."  ¶86.  In response, Defendant Deatsch was forced to clarify "***the timing of things we saw***," expressly admitting that "***the free customers converted to paid was slowing down going into August***"—*i.e.*, July 2022; and with respect to Paid User Expansion, Defendants saw this trend in "***July and August***," as "***[Atlassian] tend[s] to see user growth slowdown across our customer base***" and "***people are not upgrading instances, <u>adding more users</u>*."  ¶¶87-88.

Recognizing that this admission contradicted Atlassian's prior statements to the market, Defendants tried another excuse, claiming that summer sales were purportedly seasonal, and that they were waiting on a purported "growth uptick" in September to salvage the quarter.  ¶88.  However, as analysts pointedly noted, Atlassian had repeatedly represented that its business was

*not* seasonal but *entirely linear*, with no "hockey stick" uptick and approximately a third of all quarterly sales occurring in each month. ¶¶40-44, 64, 89-90. Indeed, even on the November 3 earnings call, Defendant Farquhar confirmed that Atlassian's quarters had always seen "linearity," and the following year (Q1 2024), Atlassian verified there was no summer seasonality as there "was nothing strange about Q1 from a linearity perspective." ¶¶90, 128. In other words, the only time that "summer seasonality" ever impacted Atlassian was during the first quarter of 2023. ¶128.

In response, Atlassian's share price fell almost 30%, from $174.17 per share on November 3, 2022 to $123.73 on November 4, 2022—a $7 billion decline in market capitalization. ¶¶93, 138. Analysts were shocked. Wolfe Research noted that disclosures "*took us and investors by surprise*" and therefore "*puts shares in the penalty box*;" Citi called out the "*significant and unexpected pivot in demand tone*;" and BMO Capital was "*surprised by the magnitude of the slowdown*." ¶94.

## III.   LEGAL STANDARDS

On a motion to dismiss, courts "accept all factual allegations … as true," and construe them in the light most favorable to the plaintiff. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007). The Court is "not sitting as a trier of fact"; and "so long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008). Thus, a plaintiff "need only allege enough facts to state a claim to relief that is plausible on its face." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 n.12 (2011).

## IV.   ARGUMENT

### A.   Defendant Bharadwaj's Materially Misleading Statements On September 14, 2022 Were Made With Scienter

Recklessness is alleged where a defendant "had reasonable grounds to believe material facts existed that were misstated or omitted," but "failed to obtain and disclose such facts although [s]he could have done so without extraordinary effort." *Reese v. Malone*, 747 F.3d 557, 569 (9th Cir. 2014). The Ninth Circuit recently reiterated that "a reckless omission of material facts satisfies the element of scienter," which can be shown where defendants internally knew of a problem they failed to disclose to investors. *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 701 (9th Cir. 2021).

1    The Court previously found that Bharadwaj's statements on September 14, 2022 "were

2    misleading because they provided no commentary on the Paid User Expansion slowdown."  Order

3    at 18.  The Court reasoned that it was "misleading" for Bharadwaj to "tell[] the market that there

4    was 'very encouraging progress' and 'no discernible trend' from the macroeconomic environment

5    for some small parts of business, but fail[] to tell the market that there was a slowdown to the key

6    majority of their business." *Id.* at 18-19.  The Court also noted that "defendants held themselves

7    out to investors as vigilant monitors and open communicators," yet failed "to communicate relevant

8    information about this specific trend." *Id.* at 19-20.  Despite finding that these statements were

9    "misleading" and "omitted material information," the Court found that Plaintiffs failed to show that

10   Bharadwaj "knew or must have been aware that withholding the [trend] information would present

11   a danger of misleading."  Order at 22.  The SAC more than cures this deficiency.

### 1.    The SAC's Detailed Allegations Regarding Project Big Fish Establish Defendant Bharadwaj's Scienter

14   The SAC establishes that Project Big Fish was a massive, Company-wide initiative that was

15   specifically designed to reverse the material adverse trends in Paid User Expansion and Free-to-

16   Paid Conversions that were impacting Atlassian's business, and that the project ***was implemented***

17   ***weeks before Defendant Bharadwaj made her materially misleading statements to the market***.

18   Furthermore, and significantly, former employees confirm that the project was "***100% initiated top***

19   ***down***"; that "***Project Big Fish came from the executive team, and it was reviewed by the executive***

20   ***team***"; and that Bharadwaj herself was intimately involved in the project's design and

21   implementation, with 40 direct reports involved in Project Big Fish.  ¶81.  Moreover, the project

22   had been planned for weeks in direct response to declining cloud growth, its objective was to

23   increase the Paid User Expansion metric through operational modifications, and product teams

24   were instructed to focus on ways to entice clients to add users.  ¶¶79-81.  Phase two of the project,

25   aptly named "Back to Fifty," underscores the project's underlying purpose was to reverse negative

26   cloud growth trends. ¶¶79, 81, 83.

27   There is no question that such detailed and specific allegations establish scienter, showing

28   that Bharadwaj knew at the time that her statements were misleading.  Indeed, under similar

circumstances, courts have regularly held that internal projects aimed at rectifying an undisclosed issue establish scienter. *See In re Plantronics, Inc. Sec. Litig.*, 2022 WL 3653333, at *19 (N.D. Cal. Aug. 17, 2022) (failure to disclose underlying issue "create[s] an obvious danger of misleading investors."). In *Plantronics*, the court found that a change in sales practice caused a shift in the company's "linear" sales cycle, which, in turn, prompted the company to institute a large "ERM Project" to assess the issue. *Id.* at *2. The court found that the defendants' knowledge of the "ERM Project and its purpose" meant the failure "to mention the undisclosed sales practice … was, at the very least, deliberately reckless." *Id.* at *12,*18-19. Similarly, in *In re CBT Group PLC Sec. Group Litig.*, 2001 WL 1822729, at *5 (N.D. Cal. Dec. 28, 2001), the defendants formed an "inner company cross functional task force" to address "continued growth," and "[b]ecause the statements regarding growth … cannot be reconciled with the creation of the task force, plaintiffs' allegations are sufficient to raise a strong inference of scienter." *Id.*; *see also Matrixx,* 563 U.S. at 49 (scienter where company "convened a panel of physicians and scientists in response to [a negative] presentation"); *Oklahoma Police Pension & Ret. Sys. v. LifeLock, Inc.*, 780 F. App'x 480, 484-485 (9th Cir. 2019) (scienter where defendant attempted to "fix" the problem); *Weiner v. Tivity Health, Inc.*, 365 F. Supp. 3d 900, 906, 916 (M.D. Tenn. 2019) (scienter where company "formed a special committee" called "Project Success" to "combat the … threat").

Tellingly, in their motion, Defendants essentially ignore these allegations. Defendants devote all of two sentences to Project Big Fish, and in so doing, they misrepresent and downplay the timing and significance of the project, claiming that it does not "undermine" Bharadwaj's statements. DM 22. The SAC makes clear, however, that Project Big Fish was implemented before Labor Day 2022—thus *two weeks* prior to Bharadwaj's statements; the project was designed after *weeks* of high-level executive meetings; and its goal was to "increase Atlassian's user expansion through product enhancements and new features." ¶¶80-81. Thus, contrary to Defendants' argument, Bharadwaj's statements were materially misleading because she recklessly chose not to disclose the underlying Paid User Expansion slowdown—a choice that "created an obvious danger of misleading investors," which was borne out by the visceral market reaction at the end of the Class Period. *Plantronics*, 2022 WL 3653333 at *19.

1          **2.      Bharadwaj's Review Of Declining Metrics Supports Scienter**

2          The "most direct way to prove scienter" is through Bharadwaj's "access and review of

3    contemporaneous" information at odds with her statements.  *E. Ohman J:or Fonder AB v. NVIDIA*

4    *Corp.*, 81 F.4th 918, 940 (9th Cir. 2023).  The first-hand accounts of high-level former Atlassian

5    employees revealed that Atlassian meticulously tracked the Free-to-Paid Conversion and Paid User

6    Expansion metrics, and that "the entire executive team," including Bharadwaj, "looked at those

7    metrics" and discussed them at weekly and monthly meetings.  ¶¶48-50, 76.  Moreover, the former

8    employees reported that these metrics were in decline from "***June***," that the slide continued

9    throughout "***July and August***," and that management received reports of the drastic slowdown well

10   before September.  ¶¶72, 76-77; *Weston v. DocuSign, Inc.*, 669 F. Supp. 3d 849, 884 (N.D. Cal.

11   2023) (finding scienter where CW accounts alleged that "the individual defendants had access to

12   and monitored data indicating [company's] decline in customer demand"); *In re Quality Sys., Inc.*

13   *Sec. Litig.*, 865 F.3d 1130, 1145 (9th Cir. 2017) (crediting allegations that defendants saw "weekly

14   or monthly" data).  Bharadwaj herself admitted that the User Expansion metric was "an important

15   one to look at" and one she would "continue to monitor." ¶47; *see Felipe v. Playstudios Inc.,* 2024

16   WL 1380802, at *18 (D. Nev. Mar. 31, 2024) (scienter where defendant "himself stated *we'll*

17   *continue* to watch it *very closely*") (emphasis in original).  That Bharadwaj and the C-suite were

18   "hyper- focused" on the metrics further supports the inference.  ¶49; *NVIDIA*, 81 F.4th at 938-940

19   (scienter found where CEO was "obsessed with sales data" and "closely monitored sales data").

20         Defendants' attacks on the former employee accounts fall short, as the SAC's allegations

21   fully support that CW 3 was "in a position to know" what he reported.  DM 10-12, 20.  Indeed, CW

22   3's job responsibilities required him to review Expansion and Conversion metrics daily; he

23   ***personally*** attended meetings where product heads reported on cloud growth; his team prepared

24   slides on these metrics that were presented to Bharadwaj; and he was a member of Project Big Fish.

25   ¶¶50, 74, 76-77, 80; *Plantronics,* 2022 WL 3653333, at *15 (crediting CW where inclusion in

26   internal project and job responsibilities provided "reliable information"); *Glazer Capital Mgmt.,*

27   *L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 771 (9th Cir. 2023) ("Plaintiffs need only provide a

28   basis for each CW's knowledge about the specific statements he made").  While Defendants claim

1    that it is "implausible" that CW 3 reported this information to Bharadwaj (DM 20), this contradicts

2    the SAC's allegations (¶76), and courts often find it common, let alone plausible, for a report for

3    one manager to be sent up the chain. *See Plantronics*, 2022 WL 3653333, at *15 (crediting CW

4    who "reported directly to [someone], who ... reported directly to [individual defendant]").[3]

5            Defendants blatantly ignore the SAC in arguing that the former employees did not describe

6    what "things were slowing," or when they were reported to Defendants. DM 10-11, 20. As the

7    SAC alleges, CW 3 described how "users had become reluctant to convert from free accounts" and

8    "paid seat expansion numbers had slowed down" in June and continued through July and August,

9    that he directly reported these findings to division heads at that time, and that he was present when

10   they were discussed with Defendants before September. ¶¶74, 76-77, 78; *NVIDIA*, 2023 WL

11   5496507, at *16 (CW "personally prepared presentations about sales" and "had frequent

12   communications with high-ranking [company] executives"). The former employees also explained

13   how Atlassian reduced hiring in July, froze hiring in August, and planned then implemented Project

14   Big Fish before Labor Day. ¶¶75, 80. Rather than being "insufficiently particularized as to timing"

15   (DM 11-12, 20), these allegations provide a detailed timeline supporting Bharadwaj's scienter. In

16   arguing that former employees did not report how the metrics "differed from any prior time period"

17   (DM 11), Defendants entirely ignore that CW 3 personally compared the July and August results

18   to those from the prior summer and that they had markedly declined. ¶74. Thus, the argument that

19   CW 3 was new to the Company in June (DM 12) is entirely irrelevant.

20           Similarly, Defendants' claim that the CWs failed to provide "hard numbers" (DM 11) is

21   factually incorrect and legally irrelevant. Even if such quantification were required, the CWs

22   confirmed that cloud growth was on pace for 30% annual growth, well below the target 50% rate,

23   which was reported to management prior to Bharadwaj's statements.[4] ¶77; *In re Capstone Turbine*

24   _____

25   [3] Contrary to Defendants' arguments (DM 10 n.3, 20), that CWs 4 and 5 did not "interact" with
     Defendants does not mean their reports have "no bearing on scienter," especially where CW 3 had
     such interactions. *In re FibroGen, Inc. Sec. Litig.*, 2022 WL 2793032, at *22 (N.D. Cal. July 15,
26   2022) (direct interaction of each CW unnecessary). Furthermore, a Sales Operation Program
     Manager launching new products (CW 4) and a Principal Executive Recruiter responsible for hiring
27   engineers (CW 5) would naturally know of major Company-wide initiatives. ¶¶82, 83.

28   [4] Defendants accuse Plaintiffs of "muddling" the metrics, asserting that CW 3 was not referencing

*Corp. Sec. Litig.*, 2018 WL 836274, at *9 (C.D. Cal. Feb. 9, 2018) ("these types of details can be fleshed out during discovery, their absence at the pleading stage does not undermine Plaintiffs' contention that CW2 has the personal knowledge to credibly assert that the downsize occurred").[5]

### 3. Defendants' Admissions Support Scienter

The SAC's allegations that the slowdown commenced in June and was brought to Defendants' attention in July and August is corroborated by (and entirely consistent with) Defendants' ***own admissions***. Specifically, during the November 3 earnings call, after an analyst noted that he "[had] to believe that [Defendants] had a very early warning of the paid user growth slowdown," Deatsch himself said that he needed to clarify "the timing of things that we saw," and then stated that the Paid User Expansion slowdown was appreciated in "July and August" and was felt "across our customer base" as customers were not "adding more users." ¶¶86-88.

Under analogous circumstances, courts credit the defendants' admissions at face

---

"*Cloud* revenue growth" but rather "total" growth when discussing his management presentation. DM 11. But CW 3's statement concerned Atlassian's predicted 50% annual growth (¶77)—which Defendants concede was ***only*** provided in regard to the cloud (¶53; DM 5)—and thus CW 3's entire statement was exclusively about cloud growth. *In re Apple Inc. Sec. Litig.*, 2020 WL 6482014, at *6 (N.D. Cal. Nov. 4, 2020) ("Court must draw inferences in favor of plaintiff"). Moreover, that Atlassian reported 49% cloud growth for ***Q1 2023*** (DM 11) is irrelevant, where CW 3's report was in reference to annual growth, not quarterly. ¶77 (growth rate was "***30% for the year***"). In fact, ***Atlassian ultimately reported annual cloud growth of exactly 30% for full fiscal 2023***. Further, the "total revenue" growth figure put forth by Defendants is nowhere in the SAC, and Defendants' attempt to introduce it for its truth is inappropriate. *Khoja*, 899 F.3d at 1000.

[5] Defendants' authorities are inapposite. In *In re SolarCity Corp. Sec. Litig.*, 274 F. Supp. 3d 972, 1011 (N.D. Cal. 2017) (DM 10), plaintiffs attacked the reported numbers ***themselves*** and therefore needed CWs to directly address those metrics. Unlike here, the CWs in *City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, 2019 WL 6877195, at *14 (N.D. Cal. Dec. 17, 2019) (DM 11-12) did not provide ***any*** timeline. The CWs in *Scheller v. Nutanix, Inc.*, 450 F. Supp. 3d 1024, 1036 (N.D. Cal. 2020) (DM 11) were not in a position to have "personal knowledge," and their accounts were refuted by other alleged facts. In *Wozniak v. Align Tech., Inc.*, 850 F. Supp. 2d 1029, 1042 (N.D. Cal. 2012) (DM 11), *Lipton v. Pathogenesis Corp.*, 284 F. 3d 1027, 1036 (9th Cir. 2002) (DM 22), and *In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1175 (C.D. Cal. 2007) (DM 22), the complaints contained no allegations that negative trends were shown in reports. By contrast, CW 3 confirmed he reported that the metrics were less than desired. ¶77. The decisions in both *Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 814 (N.D. Cal. 2019) and *Elec. Workers Pension Fund, Local 103, I.B.E.W. v. HP Inc.*, 2021 WL 4199273, at *8 (N.D. Cal. Sept. 15, 2021) (DM 20) are inapplicable as, unlike here, they involved low-level employees who were completely unconnected from the defendants. In *Huang v. Higgins*, 2019 WL 1245136, at *8 (N.D. Cal. Mar. 18, 2019) (DM 21), the court credited the CW accounts that management encouraged improper behavior, but the CWs did not report that the behavior actually occurred. Finally, Defendants curiously cite *In re Apple Inc. Sec. Litig.*, 2020 WL 2857397, at *24 (N.D. Cal. June 2, 2020) (DM 21), where the CW allegations were ultimately irrelevant because, like here, the defendants admitted to "troubling signs" "as the quarter went on." *See Apple*, 2020 WL 6482014 at *10.

16

value.  Two recent cases are particularly instructive.  In *Apple*, 2020 WL 6482014 at *6, during a mid-quarter interview, the CEO denied that demand in China was being impacted by macroeconomic pressures, but later admitted he saw "troubling signs" of a slowdown "**as the quarter went on**."  The Court found that the admission meant that the macro "pressure" was felt at the time of the statement (one month into the quarter), and that it "constitute[d] an 'I knew it all along' type of admission" supporting scienter.  *Id.* at *10.  Similarly, in *Azar v. Yelp, Inc.*, 2018 WL 6182756, at *17 (N.D. Cal. Nov. 27, 2018), the court found that the company's admission of a "**modest slowdown**" felt "**halfway through the quarter**" supported scienter for statements about customer demand made at "**almost the exact halfway point of**" the quarter and "unquestionably encompass[ed]" later statements.  The inference of scienter was cemented by the fact that the company had formed a "recovery team" to remedy the problem.  *Id.*  Here, the inference is even stronger than in *Apple* and *Yelp*, as Defendants' admission that they saw "user growth slowdown across our customer base" in "July and August," is corroborated by, and consistent with, the CW accounts and Project Big Fish's planning, design, and implementation.

### 4. Additional Facts Support That Bharadwaj Acted With Scienter

Numerous additional facts support a strong inference of Defendant Bharadwaj's scienter.

*First*, Defendants repeatedly touted Atlassian's "linear" sales cycle, which provided great "predictability of sales."  The 2022 Annual Report confirmed that sales remained linear leading up to the Class Period, and post-Class Period, Atlassian confirmed that the following summer, Q1 2024, showed "nothing strange . . . from a linearity perspective."  ¶128.  Thus, the unprecedented slowdown in July and August of 2022 should have been immediately apparent to Defendants.  *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 709 (9th Cir. 2012) (scienter where company experienced "unprecedented increases in inventory").  While Defendants claim that they warned that sales "could become more seasonal" (DM 23), that warning was only issued in regard to "**migrations**" of on-premises clients to cloud clients.  *See* Ex. B at 7 (warning of "seasonality that we might see … in terms of how we think those **migrations** might end up happening").  And as Bharadwaj (who oversaw migrations, ¶25) explained, "migrations … continue[d] to go steadily" at all relevant times, and thus could not explain the slowdown in July and August.  ¶68.

*Second*, Paid User Expansion was by far the most important segment for Atlassian, representing 90% of its revenues, and thus unquestionably constituted the Company's "core operations." Bharadwaj attended weekly meetings beginning in July 2022 to discuss the poor Expansion trend, which was so important that Defendants devoted over 100 top-level employees to help address the slowdown. It would be absurd under these circumstances to suggest that Bharadwaj and other top executives were convening high-level meetings to address the Expansion slowdown, and yet they were unaware of the slowdown's existence or importance. *Cutler v. Kirchner*, 696 F. App'x 809, 815 (9th Cir. 2017) (CW description of regular updates on topic "brings this case within the 'core operations' approach to pleading scienter"); *Apple*, 2020 WL 6482014 at *9 ("Apple's China business was a 'core operation' of the Company to which [the CEO] paid close attention" where China "accounts for nearly 20% of Apple's revenue").[6]

*Third*, the "close timing between misleading statements and disclosure of inconsistent facts suggests that (1) the facts existed at the time the challenged statements were made, and (2) the facts were not caused by intervening factors, such as a shift in consumer demand, that only became evident after the challenged statements were made." *Apple*, 2020 WL 6482014 at *10; *Reese*, 747 F.3d at 575 (noting close proximity between "the statements and the contradictory disclosures").

*Fourth*, analysts' repeated questions regarding macro trends, and their visceral reaction to Defendants' disclosures, support scienter. ¶¶55-59, 94-95; *see In re Finisar Corp. Sec. Litig.*, 2017 WL 1549485, at *7 (N.D. Cal. May 1, 2017) (analysts' "substantial interest" caused "any statement . . . on the topic [to be] of significant interest and importance to the market"); *FibroGen*, 2022 WL 2793032 at *22 (scienter "supported by the reaction of the … financial community"). Contrary to Defendants' argument (DM 24), Bharadwaj's statements concealed that there were material trends impacting Atlassian, as well as Defendants' remedial efforts to reverse those trends.

---

[6] Defendants' authorities are inapposite. DM 23-24. "Notably absent" from the allegations in *Welgus v. TriNet Group, Inc.*, 2017 WL 6466264, at *16-19 (N.D. Cal. Dec. 18, 2017), were any CW reports about the underlying issue, let alone the defendants' "personal involvement in the minutia of the company's operations." The facts here are far more detailed than the "generalized core operations" allegations in *Pardi v. Tricida, Inc.*, 2022 WL 3018144, at *15 (N.D. Cal. July 29, 2022), where the Court ultimately found scienter. *Id.* at *18. In *In re AnaptysBio, Inc.*, 2021 WL 4267413, at *14 (S.D. Cal. Sept. 20, 2021), plaintiffs failed to allege any "contemporaneous information" within the company's operations that undermined the statements.

OPPOSITION TO MOTION TO DISMISS
CASE NO. 3:23-CV-00519-WHO

1    **5.    Plaintiffs' Scienter Theory Is More Plausible Than Defendants'**

2    Contrary to Defendants' assertions (DM 19), Plaintiffs need not plead a financial motive.

3    *See Matrixx,* 563 U.S. at 48; *Alphabet,* 1 F.4th at 707 (financial motive not necessary for scienter);

4    *In re Splunk Inc. Sec. Litig.,* 592 F. Supp. 3d 919, 949 (N.D. Cal. 2022) ("Plaintiff's scienter theory

5    is not predicated on the theory that individual Defendants had an incentive to mislead investors").

6    Regardless, the SAC alleges that Bharadwaj and Defendants did not want to disclose the poor trends

7    until Project Big Fish was implemented and they were ready to put forth a viable solution. ¶82;

8    *Alphabet,* 1 F.4th at 707 (scienter where company's delayed disclosure "successfully bought itself

9    about six months of time," but no allegations of insider selling); *City of Sunrise Firefighters'*

10   *Pension Fund v. Oracle Corp.*, 527 F. Supp. 3d 1151, 1185 (N.D. Cal. 2021) ("Plaintiff does not

11   allege that Defendants engaged in a fraud scheme to cover up the inevitable reveal of a critical

12   problem ... [but] that Defendants attempted to buy themselves time").

13   While Defendants assert that Plaintiffs' scienter theory is "illogical" because Atlassian

14   disclosed the trends the following quarter (DM 18-19), Defendants' argument is pure conjecture.

15   Scienter and falsity are measured at the time of the challenged statement, and there is no evidence

16   whatsoever to support the notion that Bharadwaj knew in mid-September that Atlassian would

17   disclose the trends a month later.  Indeed, courts have rejected this exact argument in analogous

18   circumstances, and once again, the decision in *Apple*, 2020 WL 6482014, is instructive.  There, like

19   here, defendants contended that the theory of fraud "does not make sense," because CEO Tim Cook

20   made intra-quarter statements about China demand, only to announce poor results within two

21   months, with no insider sales.  *Id.* at *12.  The court specifically found that "allegations of motive

22   are *not* required" because while defendants "may have hoped that the situation in China would

23   improve," that "does not justify misleading investors."  *Id.* at *12 & 13 n.12 (emphasis in original).[7]

24   Similarly, here, the fact that Bharadwaj may have hoped that Atlassian could rectify the Paid User

25   Expansion trend does not justify providing investors with materially misleading information at the

26   time she made her statements.  Defendants' "hindsight defense" is thus unavailing.  *See In re*

27   ───────────────────

28   [7] The *Apple* court expressly considered *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 415 (9th Cir. 2020), cited by Defendants (DM 19), and found it does not "require a specific theory of defendants' motives at the pleading stage." *Apple*, 2020 WL 6482014 at *13.

OPPOSITION TO MOTION TO DISMISS
CASE NO. 3:23-CV-00519-WHO

1   *Facebook, Inc.*, 986 F. Supp. 2d 487, 518 n.28 (S.D.N.Y. 2013) (rejecting "[d]efendants' hindsight

2   defense" that "Facebook ultimately reported revenues in line with its original estimates").

3       Defendants' alternative theory—that Defendants "kept investors apprised of developments

4   as soon as they were observed"—is counterfactual.  DM 25.  Defendants do not even attempt to

5   explain, much less justify, how Bharadwaj received reports of a material slowdown in a core metric

6   affecting 90% of Atlassian's business, met numerous times with high-level executives to resolve

7   the situation, and implemented a massive remedial project in response, yet failed to mention these

8   highly material facts when analysts directly asked about them.  These facts support scienter.

9       **B.    The Court Correctly Found Bharadwaj's Statements Materially Misleading**

10      The Court's prior holding that Bharadwaj's statements were misleading apply with even

11  more force to the SAC.  Indeed, Bharadwaj spoke at length about Atlassian's metrics, stated there

12  were no "discernible trends," and even emphasized that the Paid User Expansion metric was "an

13  important one to look at," yet she chose to conceal a slowdown in that very metric that was so

14  significant that Defendants implemented a massive project to stymie the decline.  ¶¶118-121.

15      Defendants ask the Court to "revisit" this ruling, but they provide no credible basis for doing

16  so.  DM 16-18.  Defendants first assert that Plaintiffs do not allege that Paid User Expansion was

17  "slowing down *materially* as of September 14, just four weeks after the alleged slowdown began."

18  DM 16 (emphasis in original).  As an initial matter, not only is it well-settled that materiality is

19  inappropriate to resolve at the pleading stage,[8] but the Court has already rejected this "four weeks"

20  defense, finding this "argument misses the forest for the trees" because Plaintiff's allegation that

21  "it was misleading to not communicate relevant information about this specific metric a month after

22  a change began" was "plausible and specific."  Order at 19-20.

23      Moreover, Defendants' argument ignores the plain allegations of the SAC, which establish

24  that the slowdown in Paid User Expansion began ***months*** prior to Bharadwaj's statements.  As

25  noted above, the slowdown started in "***June***" and continued throughout "***July and August***," and

26  Defendants were personally involved in meetings about these trends ***starting in July***, where they

---

8   *See*, *e.g.*, *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1178 (9th Cir. 2009),
   ("[d]etermining materiality in securities fraud cases should ordinarily be left to the trier of fact").

designed and implemented Project Big Fish.  ¶¶72, 74, 79-80.  These facts confirm both the gravity of the slowdown and Bharadwaj's knowledge thereof.  *See Alphabet*, 1 F.4th at 702 (undisclosed issue was material where company prepared a memo on the topic, executives commenced "internal deliberation based on the" memo, and there were "public concerns" about the issue).[9]  Significantly, the very existence of Project Big Fish—a massive initiative specifically aimed at reversing the Paid User Expansion slowdown—establishes that Defendants considered the slowdown highly material *prior* to Bharadwaj's statements.  Numerous courts in this District are in accord.  *Plantronics*, 2022 WL 3653333 at *12 (the "ERM project" with "more than 100 employees" indicated the problem "was a threat to the Company's financial health"); *CBT Group*, 2001 WL 1822729 at *5 ("statements regarding growth … cannot be reconciled with the creation of the task force").

Further underscoring that Plaintiffs' allegations are plausible and specific is the fact that they are entirely consistent with Deatsch's admissions of a July and August decline.   While Defendants assert that Deatsch meant something entirely different (DM 9, 22-23), the plain allegations of the SAC establish otherwise.  *See Constr. Workers Pension Tr. Fund – Lake Cnty. v. Genoptix, Inc.*, 2013 WL 12123841, at *6 (S.D. Cal. Mar. 22, 2013) (CW reports "combined with the post-class period statement … acknowledging a trend in declining demand" provides an "adequate basis for believing that the Defendants' statements as to continued strong demand … were false or misleading when made").  Lastly, although not required, the SAC alleges figures showing a material decline in cloud growth. ¶77 (noting only 30% projected growth, down from 50%); *see also Glazer*, 63 F.4th at 769 (exact level of slowdown not needed at pleading stage); *Robb v. Fitbit Inc.*, 2017 WL 219673, at *8 (N.D. Cal. Jan. 19, 2017) ("The specificity that [] defendants seek…crosses into territory better evaluated on a motion for summary judgment").

Defendants again assert that Bharadwaj's statements—made in response to a question about the macro environment—did not "trigger[] any obligation to say more."  DM 17.  However, this argument is contrary to well-established Ninth Circuit law and this Court's Order, which held that

---

[9] Defendants' reliance on *In re Twitter, Inc. Sec. Litig.*, 506 F. Supp. 3d 867, 885 (N.D. Cal. 2020) (DM 14, 16), is therefore misplaced.  There, unlike here, the allegations neither showed that the slowdown began months prior, nor that the trend significantly veered from historical norms.  Furthermore, the statement in *Twitter* that the company "continued to sell" the questionable products—which was true—said nothing about how the sales were trending.  *Id.*

OPPOSITION TO MOTION TO DISMISS
CASE NO. 3:23-CV-00519-WHO

"even if [Defendants] had no affirmative duty to disclose the beginning signs of the slowdown before the quarter ended, they created the duty to disclose by 'tout[ing] positive information to the market' about the rest of their business at that time." Order at 19 (citing *Khoja*, 899 F.3d at 1009); *see also NVIDIA*, 81 F.4th at 936 (statements about one metric misleading where defendants "repeatedly failed to mention" that revenues were also affecting another metric); *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1135, 1139 (N.D. Cal. 2017) (withholding metric misleading when contrary to statements about "positive growth and engagement trends"). In fact, Defendants' own authority found it actionable to "inform[] investors of the good news…without including the bad news." *Pardi*, 2022 WL 3018144, at *13 (DM 24).[10]

Further, Defendants are wrong that Bharadwaj "made no affirmative representation" about Expansion. DM 17. She not only highlighted this very metric as "an important one to look at in the current climate," but she expressly stated that she conveyed all news "***across the board, across existing and new [customers]***," that she had fully conveyed "overall what we are seeing in different parts of the business," and she specifically discussed "***discernible trends***" in Atlassian's business. ¶¶118-119, 121; *see Quality Sys*, 865 F.3d at 1143 (statements that pipeline was "greenfield for the most part," and "[t]here is nothing drying up and there is nothing slowing down," were false when trend was affecting company); *see also Apple*, 2020 WL 6482014 at *6 (interpreting statement about China as denying negative trend, as "the Court must draw inferences in favor of plaintiff").

Finally, the new allegations also show that Bharadwaj's statements claiming the Free-to-Paid Conversions were still just "a bit of softness" were materially misleading in light of Project Big Fish and the July and August meetings assessing the slowdown in the metric. *Khoja*, 899 F.3d at 1015 ("having learned new information … [defendant] was obligated to share that information").

## C.    Defendants' Other Class Period Statements Were False And Misleading

<u>August 4, 2022</u>:  On the first day of the Class Period, Defendants affirmatively told the market that they "have yet to see any specific trend geographically or even in industry segments or

---

[10] Defendants misrepresent *Ferreira v. Funko Inc.*, 2021 WL 880400, at *13 (C.D. Cal. Feb. 25, 2021) (DM 17), as in that case it was an ***analyst*** who warned the metric needed to be closely followed, which indicated that the statements ***did not*** mislead the market. That is a far cry from Bharadwaj herself touting "User Expansion" without disclosing the material trend impacting it.

OPPOSITION TO MOTION TO DISMISS
CASE NO. 3:23-CV-00519-WHO

in customer size that gives us pause or worry to date," that they had "not seen any significant shift in customer demand," and only saw "continued growth" from "our existing customer base." ¶¶108, 111. The SAC alleges, however, that the slowdown began in June, and prior to August, Defendants already convened ***multiple meetings*** on the topic, they were designing and planning Project Big Fish, and Defendants had already received a report quantifying the decline. ¶¶72, 77, 79-80. This timeline is confirmed by the post-Class Period admission that Atlassian identified a "***user growth slowdown across our customer base***" starting in ***July***. ¶¶87-88. As the Court previously explained, it is "misleading to not communicate relevant information… a month after a change began, even if it was not yet a full-blown 'trend.'" Order at 19-20; *see also Quality Sys.*, 865 F.3d at 1144 (misleading to claim "pipeline was unchanged, or even growing" when it was contracting).

The August 4 statements were not mere "corporate optimisms." DM 12-13. Analysts asked about and relied on these exact statements and even explained that these representations justified Atlassian's premium market price. *NVIDIA*, 81 F.4th at 936 (statements material when made in response to analyst questions who relied thereon); *Glazer*, 63 F.4th at 770-771 ("statements cannot be discounted as mere 'puffery'" where "made in response to specific questions asked by financial analysts"). While Defendants claim that "adjectives themselves" cannot be misleading (DM 13), Defendants' statements falsely claimed they had "yet to see ***any*** specific trend" in any part of the Company's business at a time when the exact opposite was true. *Quality Sys.*, 865 F.3d at 1143 ("there is nothing slowing down" and "[o]ur pipeline keeps growing" not puffery); *Yelp*, 2018 WL 6182756 at *11 ("modest slowdown" was not puffery or insufficiently quantified).[11]

August 19, 2022: the 2022 Annual Report claimed Atlassian was unaware of any trends affecting its "current fiscal year." ¶114. This was false because Defendants were well aware of

---

[11] Defendants' authorities are distinguishable. DM at 13. In *Sneed v. AcelRx Pharm., Inc.*, 2023 WL 4412164, at *8 (N.D. Cal. July 7, 2023), the statement that the launch was "progressing well" was not made in response to analyst questions and was far more vague than the statements here denying any "discernible trend." The allegations in *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 2013 WL 6441843, at *11 (N.D. Cal. Dec. 9, 2013) dealt with a late goodwill impairment not alleged here. Defendants falsely claim the court in *In re Fusion-io, Inc. Sec. Litig.*, 2015 WL 661869, at *14 (N.D. Cal. Feb. 12, 2015), held that statements reporting "excellent results" and "significant sales gains" are puffery. Not so. The court there actually noted that statements "***projecting***" such items were not actionable.

the material adverse trends in Expansion and Conversion before mid-August, as Defendants concede and as the Court previously held.  Defendants argue that the trends were not "material" at the time of publication (DM 14), but the trends indicated annual growth of just 30%, as opposed to the 50% rate predicted.  ¶77.  Defendants' assertion that the Annual Report did not refer to trends that "post-dated June 30, 2022" (DM 15) is nonsensical where the report already had addressed trends in 2022, and only then transitioned to discuss the "current fiscal year"—the only use of that terminology. ¶62.  Warning that the macro environment was "uncertain and cannot be predicted at this time" (DM 14) does not absolve Defendants of falsely denying known trends.  *Alphabet,* 1 F.4th at 703 ("[r]isk disclosures that speak entirely of as-yet-unrealized risks and contingencies and do not alert the reader that some of these risks may already have come to fruition can mislead").[12]

   October 4, 2022:  After the quarter ended, Atlassian redomiciled to the United States, and incorporated the 2022 Annual Report via a Form S-8 filing.  When a successor entity incorporates a previously filed document, it must "set[] forth any ***additional information***…necessary ***to keep*** the registration statement from ***being misleading***." 17 C.F.R. § 230.414(d).  This regulation's plain language required Atlassian to reassess the Annual Statement at the time of incorporation to ensure its contents still held true.[13]  Because the Annual Statement disavowed trends in the "current fiscal year," it was not "limited" to fiscal 2022 (DM 18), and Atlassian needed to alert investors to the two negative trends admittedly known in October 2022.  Far from "untenable" (DM 18), Atlassian only needed to file a Form 8-K disclosing the trends to comply.  The failure to do so was misleading.

### D.    Defendants Deatsch, Cannon-Brookes and Farquhar Acted With Scienter

   The SAC's allegations readily establish a strong inference of scienter for Deatsch, Cannon-Brookes, and Farquhar. "[T]he statements of the confidential witnesses [] confirm [the Defendants],

---

[12] Given the Annual Report's affirmative denial of trends, the SAC does not rely on Item 303 to implement a duty to disclose.  DM 15.  Thus, the decision in *Macquarie Infrastructure Corp. v. Moab Partners, L. P.*, 601 U.S. 257, 264 (2024), addressing "pure omissions" is irrelevant.  The opinions in *In re Intel Corp. Sec. Litig.*, 2019 WL 1427660, at *10 (N.D. Cal. Mar. 29, 2019), and *In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 929 (9th Cir. 1996) (DM 15) stand for the common sense proposition that context matters, but neither support an argument that a direct denial of any known trends is saved by a warning that trends "may" exist in the future.

[13] Defendants' contrary interpretation (DM 18) does not adhere with the regulation's admonition to "to keep" the document from "being misleading"; the regulation could have, but does not, require the issuer to ensure the document "was not misleading when filed."

OPPOSITION TO MOTION TO DISMISS
CASE NO. 3:23-CV-00519-WHO

in addition to being top executives in the company with access to the financial information by virtue of those positions, were themselves reviewing the revenue numbers monthly or weekly." *Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1026 (N.D. Cal. 2020); ¶¶48-50, 74, 76-79. Further, the SAC establishes that the material trends were readily apparent by no later than July 2022, and therefore there was a disconnect between what Defendants publicly stated and the internal metrics. ¶78; *see In re BioMarin Pharm. Inc. Sec. Litig.,* 2022 WL 164299, at *13 (N.D. Cal. Jan. 6, 2022) (scienter where CW "stated that the company was aware that approval was riskier than they let on publicly"). Moreover, Defendants' own statements confirmed they analyzed the effects of macro conditions on operational metrics "***like a hawk***," and personally monitored "bookings," "customer numbers," and "usage and adoption metrics." ¶46, 127; *DocuSign*, 669 F. Supp. 3d at 883-884 ("executives told investors they had real-time access to, and knowledge of, sales information").

Further, as with Defendant Bharadwaj (§IV.A.4), these Defendants also (i) repeatedly touted Atlassian's linear sales cycle, which meant that any deviation therefrom alerted them to the trends; (ii) were fully aware that investors were laser focused on macro impacts and provided specific answers to analysts' questions on the topic; and (iii) were also fully aware of a material trend affecting 90% of their business, particularly where Deatsch was the Company's Chief Revenue Officer and Cannon-Brookes and Farquhar were Co-CEOs.

Finally, Defendants Cannon-Brookes and Farquhar—both of whom signed the Annual Report and the Form S-8—were not only obligated to disclose known trends, they profited from the fraud to the tune of hundreds of millions of dollars. ¶127 n.21; *Indiana Pub. Ret. Sys. v. SAIC, Inc.,* 818 F.3d 85, 96 (2d Cir. 2016) ("the allegations support the inference that SAIC acted with at least a reckless disregard of a known or obvious duty to disclose when, as alleged, it omitted this material information from its March 2011 10–K in violation of FAS 5 and Item 303").

## V.    CONCLUSION

For all of these reasons, Defendants' motion to dismiss should be denied.[14]

---

[14]  As Plaintiffs have stated a Section 10(b) claim against Defendants, Plaintiffs' Section 20(a) claim should be upheld as well.  *See DocuSign*, 669 F. Supp. 3d at 887.

1  Dated:  June 7, 2024                                Respectfully submitted,

2                                                      **SAXENA WHITE P.A.**

3                                                      */s/ Lester R. Hooker*
                                                       Maya Saxena (*pro hac vice*)
4                                                      msaxena@saxenawhite.com
                                                       Lester R. Hooker (SBN 241590)
5                                                      lhooker@saxenawhite.com
                                                       Dianne M. Pitre (SBN 286199)
6                                                      dpitre@saxenawhite.com
                                                       Jonathan D. Lamet (*pro hac vice*)
7                                                      jlamet@saxenawhite.com
                                                       7777 Glades Road, Suite 300
8                                                      Boca Raton, FL 33434
                                                       Tel.: 561.394.3399
9                                                      Fax: 561.394.3382

10                                                     Steven B. Singer (*pro hac vice forthcoming*)
                                                       ssinger@saxenawhite.com
11                                                     Marisa N. DeMato (*pro hac vice forthcoming*)
                                                       mdemato@saxenawhite.com
12                                                     10 Bank Street, Ste. 882
                                                       White Plains, NY 10606
13                                                     Tel: 914-437-8551

14                                                     David R. Kaplan (SBN 230144)
                                                       dkaplan@saxenawhite.com
15                                                     505 Lomas Santa Fe Drive, Suite 180
                                                       Solana Beach, CA 92075
16                                                     Telephone: (858) 997-0860
                                                       Facsimile: (858) 369-0096
17
                                                       *Counsel for Lead Plaintiffs and*
18                                                     *Lead Counsel for the Class*

19                                                     **KLAUSNER KAUFMAN JENSEN**
                                                       **& LEVINSON**
20                                                     Robert D. Klausner (*pro hac vice forthcoming*)
                                                       Stuart A. Kaufman (*pro hac vice forthcoming*)
21                                                     7080 NW 4th Street
                                                       Plantation, Florida 33317
22                                                     Tel.: (954) 916-1202
                                                       Fax: (954) 916-1232
23                                                     bob@robertdklausner.com
                                                       stu@robertdklausner.com
24
                                                       *Additional Counsel for City of Hollywood*
25                                                     *Firefighters' Pension Fund*

26

27

28

                                        26                    OPPOSITION TO MOTION TO DISMISS
                                                              CASE NO. 3:23-CV-00519-WHO

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on June 7, 2024, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel or parties of record.

*/s/ Lester R. Hooker*
Lester R. Hooker (SBN 241590)

OPPOSITION TO MOTION TO DISMISS
CASE NO. 3:23-CV-00519-WHO