UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF HOLLYWOOD FIREFIGHTERS PENSION FUND, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>ATLASSIAN CORPORATION, et al.,<br><br>Defendants. | Case No. 3:23-cv-00519-WHO<br><br>**ORDER GRANTING MOTION TO DISMISS SAC**<br><br>Re: Dkt. No. 61 |

In this putative securities class action, the lead plaintiffs amended their complaint to attempt to plead that the defendants made materially false and misleading statements to investors and shareholders, and that the defendants had the requisite scienter required under the securities laws. Despite a previous dismissal without prejudice, the plaintiffs added few substantial allegations to their newly amended complaint. The bulk of the new allegations come from a new confidential witness—but the facts related to this witness are confusing, inconsistent, and ultimately unhelpful to the plaintiffs' case. For that and the following reasons, the plaintiffs again fail to plead the requisite elements for this securities case. Because the plaintiffs could plausibly amend their allegations to address the inconsistencies and explain their theory of scienter, they are granted leave to amend—one more time—to do so.

**BACKGROUND**

The background of this case is outlined in detail in my Order Granting the Motion to Dismiss the Plaintiffs' First Amended Complaint. ("Prior Order") [Dkt. No. 53]. This Order assumes familiarity with those facts, and includes new allegations below, as well as some relevant background for context.

Lead plaintiffs City of Hollywood Firefighters Pension Fund and Oklahoma Firefighters

Pension and Retirement Systems ("the plaintiffs") filed this securities lawsuit against defendants Atlassian Corporation, Atlassian Corporation PLC, Atlassian's co-founder and co-CEO Michael Cannon-Brookes, Atlassian's other co-founder and co-CEO Scott Farquhar, Atlassian's current President and former Chief Operating Officer Anu Bharadwaj, and Atlassian's former Chief Revenue Officer Cameron Deatsch.  Second Amended Complaint ("SAC") [Dkt. No. 59] ¶¶ 1, 3, 17–26.

Atlassian is a software company that uses a sales and growth strategy of providing free versions of its software products to up to ten users, and then charging customers for the eleventh and subsequent users.  *Id.* ¶¶ 35-38.  Given this strategy, Atlassian has two main growth metrics: "Free to Paid Conversions," which consist of customers that used the free version of its software and then upgraded to a paid version; and "Paid User Expansion," which consists of customers that used a paid version of the products then added "seats" or "heads"—for example, a customer had 50 paid users at its company and then added 10 more paid users.  *See id.*  About ninety percent of Atlassian's revenue comes from "Paid User Expansion."  *Id.* ¶ 38.

In a nutshell, the plaintiffs allege that the defendants made various false and misleading statements to the market, reproduced below, that said Atlassian was not feeling the impact of the macroeconomic pressure and constraints that other software companies faced throughout 2022.  When the defendants "revealed" the truth to the market in November 2022, announcing that "cloud growth came in at just 49%" and that the company missed its earnings guidance for the first time, the stock price fell, and the plaintiffs lost a collective $7 billion.  *Id.* ¶¶ 84, 93.

Their new allegations, added to the SAC after dismissal of the First Amended Complaint, ("FAC") [Dkt. No. 40], focus on the experience of Confidential Witness 3 ("CW3"), who asserts that he was the Head of Product Strategy & Business Operations, Work Management from June 2022 through June 2023.  SAC ¶ 49 n.6.  He alleges that when he joined in June 2022, "things" were already "slowing down" at Atlassian, "it was clear growth rates were not what they were," and Atlassian "was not growing at 50% year-over-year growth."  *Id.* ¶¶ 72–77.  He also asserts that he was told of a hiring freeze in July 2022, *id.* ¶ 75, and that "paid seat expansion numbers had slowed down" in July or August, *id.* ¶ 76.  He says he reported metrics to "division heads" and

2

"everyone" was aware of the metrics, and that he directly or indirectly presented "these metrics" to Bharadwaj. *Id.* And, he says that "Project Big Fish" was started in July or August to "understand some of the 'big things'" and "find[] ways to increase Atlassian's user expansion." *Id.* ¶¶ 79–80. Bharadwaj was part of Project Big Fish, though CW3 did not join until September. *Id.* ¶¶ 80–81.

The SAC brings two causes of action: first under Section 10(b) of the Securities Exchange Act, and second under 20(a) of the Act. *Id.* ¶¶ 151–66. The defendants moved to dismiss the SAC. ("Mot.") [Dkt. No. 61]. The plaintiffs opposed. ("Oppo.") [Dkt. No. 62]. The defendants replied. ("Repl.") [Dkt. No. 63]. I held a hearing at which counsel for both parties appeared.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure ("FRCP") 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when the plaintiff pleads facts that "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). There must be "more than a sheer possibility that a defendant has acted unlawfully." *Id.* While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 570.

In deciding whether the plaintiff has stated a claim upon which relief can be granted, the court accepts the plaintiff's allegations as true and draws all reasonable inferences in favor of the plaintiff. *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). However, the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

A complaint alleging a violation of section 10(b) of the Securities Exchange Act "must meet both the heightened pleading requirements for fraud" under FRCP 9(b) and the "exacting pleading requirements" of the PSLRA. *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1140

3

(9th Cir. 2017) (citations omitted). This requires that the complaint "state with particularity the circumstances constituting fraud," to satisfy Rule 9(b), and "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," to meet the PSLRA's standard. *Id.* (citations omitted).

With respect to falsity, "the complaint [must] specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1)(B). With respect to scienter, "the complaint shall, with respect to each act or omission alleged . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). "[F]alsity and scienter in private securities fraud cases are generally strongly inferred from the same set of facts, and the two requirements may be combined into a unitary inquiry under the PSLRA." *In re Daou Sys., Inc.*, 411 F.3d 1006, 1015 (9th Cir. 2005), *abrogated on other grounds as recognized by In re Genius Brands Int'l, Inc. Sec. Litig.*, 97 F.4th 1171, 1183 (9th Cir. 2024) (citation and internal quotation marks omitted).

"To adequately demonstrate that the defendant acted with the required state of mind, a complaint must allege that the defendants made false or misleading statements either intentionally or with deliberate recklessness." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009) (quotation marks and citation omitted). "Facts showing mere recklessness or a motive to commit fraud and opportunity to do so provide some reasonable inference of intent, but are not sufficient to establish a strong inference of deliberate recklessness." *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012) (citation omitted). Accordingly, "a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). "[A]n inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 314.

If the court dismisses the complaint, it "should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000). In making

4

1   this determination, the court should consider factors such as "the presence or absence of undue

2   delay, bad faith, dilatory motive, repeated failure to cure deficiencies by previous amendments,

3   undue prejudice to the opposing party and futility of the proposed amendment." *Moore v. Kayport*

4   *Package Express*, 885 F.2d 531, 538 (9th Cir. 1989).

## DISCUSSION

My Prior Order explained that the plaintiffs plausibly alleged that there was a slowdown to Paid User Expansion in mid-August 2022 based on the defendants' statements to that effect in their November shareholder update. *See* Prior Order. But of the nine statements alleged to be misleading, I determined that the plaintiffs plausibly alleged only that Bharadwaj misleadingly omitted information about the slowdown during a conference in September 2022; the remaining statements were not plausibly pleaded as false or misleading. *See id.* But the plaintiffs failed to plead the requisite scienter for Bharadwaj's statement, so the complaint was dismissed. *See id.*

As I will explain at length below, the plaintiffs' complaint is again insufficient. They rely almost entirely on CW3's allegations to remedy the issues from the FAC, but his assertions do not show that any of the other statements were false or misleading because they are too vague and nonspecific to show that the Paid User Expansion slowdown happened before mid-August 2022. And, his assertions do not show that Bharadwaj had the requisite scienter in making her misleading omissions because CW3 failed to establish his reliability or personal knowledge for the allegations he makes. I address these issues in turn.

## I.   STATEMENTS / FALSITY

### A.   August 4 Statements

The first three statements were made by Deatsch during the August 4, 2022 earnings call.

First:

> The good news as of to date is we have yet to see any specific trend geographically or even in industry segments or in customer size that gives us pause or worry to date. So, something we continue to watch like a hawk, but there is no new news to share today.

SAC ¶ 108; Mot. Ex. B at 6.

Second: "[W]e have not seen any significant shift in customer demand across our product

United States District Court
Northern District of California

lines." SAC ¶ 108; Mot. Ex. B at 7.

The third statement consists of the bolded words below, in context:

> As far as that **slight thing** that we've mentioned in the shareholder letter, just so you all realize that we land all of our net new customers in Free plans. . . . And the one thing that's worth calling out that we've seen literally just in the last month is that the cohort of customers that came in, in the April, May, and June timeframe are converting to those paid plans at a slightly slower rate than what we've seen in previous quarters. . . . There's no specific customer segment there. . . . [T]hose cohort of customers that are signing up in the last quarter are using the products, . . . but they simply just haven't put those credit cards and hit those paid walls yet. So that's one of those areas that we continue to be vigilant. We have multiple analytics teams, multiple growth teams, as well as our onboarding and R&D teams that are focused on ensuring that those customers remain active, and that gives us more chances to convert them to paid plans in the future. **That does not take away from the continued growth we see in our existing customer base. That also drives more than 90% of our revenue in existing year**.

Mot. Ex. B at 9 (emphases added); *see also* SAC ¶ 111. And in the report published alongside the call, the defendants stated:

> As mentioned earlier, we are not insulated from broader macroeconomic impacts. We are seeing a modest decrease in the conversion rates of Free instances upgrading to paid plans, but nothing we are seeing right now is changing our outlook. As a reminder, over 90% of our revenue in FY22 was derived from existing customers, and this dynamic has been consistent in our business over the years. We will remain vigilant and continue to inspect all aspects of our business relying on our well refined analytics and understanding of our funnels.

Mot. Ex. C at 14 (emphasis added).

In my Prior Order, I explained that the plaintiffs failed to plead that these were false or misleading for two reasons. First, the defendants clearly told the investors that Free to Paid Conversions were slowing down, and because this was a small part of their business, the plaintiffs did not plead that the "slight thing" comment was misleading. Prior Order 10–15. Second, the defendants' November announcement to shareholders and investors stated that the slowdown to Paid User Conversions did not begin until mid-August—meaning August 16 at the earliest—so the plaintiffs failed to plead that Deatsch's August 4 comments were misleading or false when he failed to inform investors of a slowdown that had not yet begun. *See id.* To remedy these deficiencies, the plaintiffs must have alleged in the SAC that the Free to Paid Conversion slowdown was not a small part of the business, and they must have alleged that the Paid User

Conversion slowdown began before the August 4 statements and that Deatsch knew about the slowdown. *See generally id.*

With respect to Free to Paid Conversion, to remedy the deficiencies in the SAC the plaintiffs again rely on the theory that the defendants' disclosure of this slowdown on August 4 was misleading because the defendants did not specifically label it a "trend." *See* SAC ¶ 112. I rejected this identical argument based on an identical theory and nearly identical allegations in my Prior Order, and it fails for the same reasons here. *See* Prior Order 10:27–11:13. Deatsch's November statements merely confirmed that the Free to Paid Conversion metric "was slowing down going into August." Mot. Ex. G at 12. That is exactly what he told the market in August.

With respect to Paid User Expansion, to remedy the deficiencies in the SAC the plaintiffs rely almost entirely on the new allegations from CW3 that they say show the slowdown began in June or July 2022. CW3 alleges that he started working at Atlassian in June 2022 and saw immediately that "things were slowing down," "they were not growing like gangbusters," "growth rates were not what they were," Atlassian "was not growing at 50% year-over-year growth," and the company was not growing at the same rate as prior years. SAC ¶¶ 8, 72, 74.

The allegations are insufficient for three reasons. First, they are vague. It is unclear from the SAC, the Opposition, and the other context what metric or metrics "things" refers to and what "not growing like gangbusters" means. *See In re Quality Sys.*, 865 F.3d at 1140 (requiring plaintiffs to state fraud with particularity). It is also not clear from the SAC when exactly CW3 thinks the slowdown happened—his allegations about the timing seem to range from June, *see* SAC ¶ 74 ("back in June, things were slowing down"), sometime in June or July, *id.* ¶ 75 ("[I]n June and July, he observed the slowdown in the Company's business"), sometime in July or August, *see id.* ¶ 74 (noting July and August 2022 growth rates "were not what they were" in the prior year), or even September, *id.* ¶ 80 (noting CW3 was not involved in Project Big Fish until Labor Day). Without the requisite specificity, not only do the plaintiffs fail to meet the legal standard, but they also fail to put the defendants (and me) on notice of their theory of liability.

Second, the plaintiffs do not reconcile CW3's allegations with the reported metrics about Q4 FY22 growth. He asserts that Atlassian's summer 2022 growth rates "were not what they

7

were," implying they were much lower. *See* SAC ¶¶ 72, 74. Based on the Opposition—which I look to because, again, CW3's statements are too vague to know for sure what he intended to say—CW3 seems to be referring to revenue growth. *See* Oppo. 7:19–28, 10:16–11:11. But Atlassian reported that its year-over-year ("YOY") revenue for Q4 2022 saw 36 percent growth, while Q4 2021 saw only 30 percent growth.[1] Mot. Ex. C at 11. Without more specifics attached to CW3's statements, then, the only way to reconcile his statement that 2022 growth rates "were not what they were" with the report showing the rates increased is to assume that CW3 was correct—they were not what they were, because they were higher. CW3 also said that Atlassian "was not growing at 50% year-over-year growth," SAC ¶¶ 72, 74, but he does not specify whether he is talking about total revenue or cloud growth. If the former, he fails to explain why the company should have been growing at 50 percent YOY total revenue when it was reporting 36 percent growth to the SEC. If the latter, he fails to explain why Atlassian reported that, during the same time period, its cloud business grew 55 percent. Mot. Ex. C. at 12. These allegations therefore do not support the plaintiffs' theory of falsity or misrepresentations, regardless of the timing of the start of the slowdown.

Third, the plaintiffs do not successfully rely on the existence of Project Big Fish to plausibly allege that there was a slowdown in Paid User Expansion before mid-August. *See* Oppo. 22:24–23:10. For support they cite SAC ¶¶ 72, 77, 79–80, which contain the same confusing and vague allegations addressed above, about how growth rates "were not what they were" and also the 30 percent versus 50 percent rates. These also contain the vague and nonspecific allegations that CW3 said that "[t]he tech market was getting killed at that time" and the executive team was having discussions with other leadership teams to address "slowing" growth and to "understand . . . 'big things' that they could implement to reverse these negative trends." SAC ¶ 79. With respect to Project Big Fish, CW3 said it involved about 100 "upper-level" employees who brainstormed "ways to increase Atlassian's user expansion through product enhancements and

---

[1] I previously took judicial notice of this and other publicly available documents that formed the basis for integral allegations in the complaint. *See* Prior Order 6–8. I took notice of the facts within those documents to show the representations that the defendants made to the market, not for their truth. *Id.* at 7.

1   new features." *Id.* ¶ 80.  It not clear that Big Fish was initiated because of or targeted slowing
2   Paid User Expansion.  Indeed, though CW3 alleges that the project was formed because executives
3   knew they would have to "walk back" earlier statements and guidance during the upcoming
4   November earnings call, his allegations about that earlier guidance are again vague and confusing.
5   *See id.* ¶ 82.  He seems to assert that the executives wanted a plan in place to address the fact that
6   the cloud revenue fell below 50 percent YOY growth, *see id.*, but *again* fails to reconcile that
7   number with the reported number for that time period—55 percent YOY growth, Mot. Ex. C at
8   12—and with the ultimate reported number for Q1 FY23—49 percent YOY, Mot. Ex. F at 11.
9   Finally and importantly, CW3 did not join Big Fish until September and so has no basis for
10  knowledge about what was happening in June, July, or August.  *Cf. In re Plantronics, Inc. Sec.*
11  *Litig.*, No. 19-CV-07481-JST, 2022 WL 3653333, at *14 (N.D. Cal. Aug. 17, 2022) (inferring
12  witness had "reliable information" where they personally participated in the requisite meetings).
13       None of CW3's allegations, then, show that Deatsch's August 4 statement contradicted
14  what he knew at the time, *see Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir.
15  2018), or that these statements created any impression that the state of affairs differed "in a
16  material way from the one that actually exists," *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997,
17  1006 (9th Cir. 2002).  They do not help the plaintiffs to plead falsity or misrepresentations.
18       Finally, the plaintiffs emphasize that Deatsch himself said in November that the slowdown
19  to Paid User Conversion began in July, rather than in mid-August.  *See* SAC ¶¶ 87–88.  But
20  Deatsch did not say this; what he said was that "the net new customers, the free customers
21  converted to paid was slowing down going into August"—confirming that the Free to Paid
22  Conversions were slowing by August—and "July and August tend to see user growth slow down
23  across our customer base"—which says nothing about what happened to Paid User Conversions in
24  July or August.  SAC ¶ 87 (emphases omitted).  He also said, "It just tends to be a normal seasonal
25  trend where July and August are slower as people are not upgrading instances, adding more
26  users," *id.* ¶ 88 (emphases omitted), but again this says nothing about whether or when there *was* a
27  slowdown to Paid User Conversions.  Accordingly, it is not clear how these statements help the
28  plaintiffs' claims.

9

1  The plaintiffs therefore fail to allege that the defendants' August 4 statements about Free to Paid Conversions were false or misleading, and they fail to allege that the slowdown to Paid User Expansion occurred before mid-August 2022. Their challenges to the August 4 statements again fail.

### B. August 19 Statements

Next, the plaintiffs again argue that Atlassian's Annual Report for FY 22, published on August 19, 2022, contained the following misleading statement:

> Other than as disclosed elsewhere in this Annual Report, we are not aware of any trends, uncertainties, demands, commitments or events for the current fiscal year that are reasonably likely to have a material effect on our revenues, income, profitability, liquidity or capital reserves, or that caused the disclosed financial information to be not necessarily indicative of future results of operations or financial conditions.

SAC ¶ 114; Ex. A at 66.

In my Prior Order, I explained that the plaintiffs failed to plead that this statement was misleading regarding any trend to Paid User Expansion because they failed to plead that this metric saw any change before August 16, and they did not plead that the three days between the beginning of the slowdown and the publication of the Annual Report was enough to see or report a trend. Prior Order 15:28–16:21. As explained above, *supra* Part I.A, they again fail to plead that the Paid User Expansion slowdown began before August 16, and so this argument again fails for the same reasons.

I also previously determined that the plaintiffs failed to plead that the Annual Report statements were misleading with respect to Free to Paid Conversions because they failed to explain why these statements contradicted the defendants' knowledge or the state of affairs at that time. Prior Order 16:22–17:1 (citing *Khoja*, 899 F.3d at 1008; *Brody*, 280 F.3d at 1006). It seems that the plaintiffs' theory now is that the defendants called this slowdown a "trend" in November, so they should have specifically labeled it as a trend that was "reasonably likely to have a material effect" in the Annual Report, but instead referred to the slowdown only as "hypothetical." *See* Oppo. 23:22–24:10; SAC ¶¶ 114–15.

The plaintiffs misread both the November announcement and the Annual Report. In

10

1    November, the defendants told the market, "Last quarter [Q4 FY22], we shared that we saw a
2    decrease in the rate of Free instances converting to paid plans. That trend became more
3    pronounced in Q1 [FY23]." Mot. Ex. F at 2. In other words, the defendants confirmed that Free
4    to Paid Conversions were slowing in Q4 FY22—which they told the market in early August—and
5    they labeled it as a "trend" for Q1 FY23. They did not say it was a trend in Q4 FY22, nor did they
6    say it had a material effect on their revenue or any other metric. And because no other allegations
7    show that this was a trend or had a material effect on their revenue in Q4 FY22, or that the
8    defendants knew either of these, it is not clear how it could be false or misleading to not
9    specifically label it as a material trend in the Annual Report. *See Khoja*, 899 F.3d at 1008; *Brody*,
10   280 F.3d at 1006. Nor does the Annual Report say the slowdown to Free to Paid Conversions was
11   merely "hypothetical," as the plaintiffs assert. Indeed, it says that Atlassian was facing
12   "macroeconomic headwinds and slower revenue growth." Mot. Ex. A at 66. Again, the plaintiffs
13   ignore the context.

14   Accordingly, the plaintiffs again fail to plead that the August 19 statements "directly
15   contradict[ed]" anything the defendants knew, *Khoja*, 899 F.3d at 1008, or affirmatively
16   represented a state of affairs that materially differed from the one that "actually exist[ed]," *Brody*,
17   280 F.3d at 1006. They fail to plead the statements were false or misleading.

18   **C.    October 4 Statements**

19   I previously rejected the plaintiffs' challenges to the defendants' statements in the October
20   4 Post-Effective Amendment to their Form S-8 Registration Statement with the SEC. Prior Order
21   20:6–21:7. Again the plaintiffs fail to plead that the August 19 statements were false or
22   misleading, so again to the extent that their theory relies on the falsity of those statements, the
23   claim fails.

24   The plaintiffs now ground their legal theory in a different regulation from their FAC. It
25   provides in relevant part that a successor issuer must file its registration statement and "set[] forth
26   any additional information . . . necessary to keep the registration statement from being misleading
27   in any material respect." 17 C.F.R. § 230.414(d).

28   The plaintiffs seem to argue that the registration statement was materially misleading

11

1  because it included the Annual Report but did not include what they say the defendants knew by

2  October, which is that a slowdown was affecting its Paid User Expansion metric. *See* SAC

3  ¶¶ 122–23; Oppo. 24:11–19. But it is not clear why this would be materially misleading. The

4  plaintiffs do not allege that the Registration Statement said that there were no slowdowns or trends

5  in October, or that the defendants submitted information about their growth from August to

6  October but not their lower performing metrics. *See Khoja*, 899 F.3d at 1009 ("[O]nce defendants

7  [choose] to tout positive information to the market, they [are] bound to do so in a manner that

8  wouldn't mislead investors, including disclosing adverse information that cuts against the positive

9  information." (citations omitted)). Submitting the Annual Report confirms the defendants'

10 information as of August 19. It does not purport to provide information beyond that point. Nor do

11 the plaintiffs point to law or cases that require anything else. Accordingly, the plaintiffs again fail

12 to plead that the October 4 statements were false or misleading.

13                                  *       *       *

14     Accordingly, the plaintiffs again fail to plead that the August or October statements were

15 false or misleading and so the motion is GRANTED for this argument. I turn next to whether they

16 successfully pleaded scienter for Bharadwaj's September statements.

17 **II.   SCIENTER**

18     **A.    Statements Previously Found Misleading**

19     Bharadwaj's plausibly misleading statements were made on September 14, 2022, at a

20 conference. First:

> Just in the last shareholder letter, we talked about conversion of users from free to paid. We are seeing a bit of softness over the past couple of months. But it's important to illustrate that point in the overall picture as over 90% of our revenue comes from existing customers. So the conversion from free to paid is really a very small part of our business. And also, the number of free users that are coming in that create new free instances continues to grow steadily. We're not seeing any trends there. So across the board, across existing and new, that's overall what we are seeing in different parts of the business.

SAC ¶ 118; Mot. Ex. D at 9. And second:

> So to address your question, the way our pricing model works is the first 10 users are free and then the 11th user onwards, it's paid. So in year 1, you can imagine the impact is pretty low. Going from 10th user to the 11th user is really just adding a

12

>paid user there. So the overall quantum looks pretty low in year 1, but it builds up and compounds over time. So we think of upsell as really across free to standard, standard to premium, premium to enterprise. And we've seen some very encouraging progress there over the last 4 quarters, and I haven't really seen any discernible trend there in terms of the macroeconomic impact.

SAC ¶ 119; Mot. Ex. D at 10.[2]

I previously explained that the plaintiffs plausibly alleged that these statements were misleading because, while the defendants "had no affirmative duty to disclose the beginning signs of a slowdown before the quarter ended, they created the duty to disclose by 'tout[ing] positive information to the market' about the rest of their business at that time." Prior Order 19:3–9 (quoting *Khoja*, 899 F.3d at 1009). Though I did not find that the plaintiffs pleaded there was a "trend" at this point as opposed to merely a slowdown, I found the omission plausibly misleading, particularly when combined with the other allegations that the defendants told investors that they were vigilant monitors and open communicators and that they were monitoring Paid User Expansion. *Id.* 19:17–20:2. But the plaintiffs did not allege scienter because there was no logical motive and the allegations about the comments to analysts, linear sales cycle, and stock trades simply did not show deliberate recklessness. *Id.* at 22:22–24:4.

The defendants ask me to reconsider the finding in my Prior Order that the plaintiffs pleaded these statements were misleading. Mot. 15:17–17:25. They did not file a motion for leave to file a motion for reconsideration, *see* Civ. Loc. R. 7-9(a), let alone a motion for reconsideration, nor do they cite (or meet) the standard for granting one. They do not point to "newly discovered evidence," do not argue that I "committed clear error or the initial decision was manifestly unjust," and they do not assert that there was "an intervening change in controlling law." *Eng. v. Apple Inc.*, No. 14-CV-01619-WHO, 2016 WL 1108929, at *2 (N.D. Cal. Mar. 22, 2016) (citation omitted). Their request is denied. Instead I turn to whether the plaintiffs pleaded Bharadwaj made the statements with the requisite scienter.

---

[2] The plaintiffs appeared to allege another statement was misleading in the first round on the motion to dismiss. *See* Prior Order 17:14–16. But the SAC specifically alleges that the statements in paragraphs 118 and 119 were the misleading statements, and so those are the only ones I address here. SAC ¶ 120.

13

### B. Whether the Plaintiffs Alleged These Statements Were Made With Scienter

The PSLRA requires that plaintiffs "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A); *E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918, 937 (9th Cir. 2023) ("*NVIDIA*"), *cert. granted sub nom. NVIDIA Corp. v. Ohman J*, No. 23-970, 2024 WL 3014476 (U.S. June 17, 2024) (same). With respect to false or misleading statements or omissions, "the complaint must plausibly allege, with the particularity required by the PSLRA, that the maker of the statements" knew about the material information and "intentionally or recklessly" failed to disclose it. *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 705 (9th Cir. 2021).

"[T]he required state of mind is a mental state that not only covers intent to deceive, manipulate, or defraud, but also deliberate recklessness." *NVIDIA*, 81 F.4th at 937 (quoting *In re Quality Sys., Inc.*, 865 F.3d at 1144). "[D]eliberate recklessness" requires plaintiff to show that a defendant made "a reckless omission of material facts . . . reflect[ing] some degree of intentional or conscious misconduct." *In re Alphabet, Inc.*, 1 F.4th at 701 (citations omitted). This means that the misrepresentations or omissions were "an *extreme* departure from the standards of ordinary care, which presents a danger of misleading buyers or sellers that is either known to the defendant or is so *obvious* that the actor must have been aware of it." *Id.* (internal citations and quotation marks omitted).

"Even if no single allegation, standing alone, is 'sufficient to give rise to a strong inference of scienter,' a holistic review of all the allegations may 'combine to give rise to a strong inference of scienter.'" *NVIDIA*, 81 F.4th at 940 (quoting *Glazer Cap. Mgmt. L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 766 (9th Cir. 2023)); *see also Tellabs*, 551 U.S. at 326 ("The court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically."). The court "must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Tellabs*, 551 U.S. at 324. The inference of scienter "need not be irrefutable," but "must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations." *Id.* A "court must compare the malicious and innocent inferences cognizable from the facts pled in the complaint, and only allow the

14

complaint to survive a motion to dismiss if the malicious inference is at least as compelling as any opposing innocent inference." *In re Sorrento Therapeutics, Inc. Sec. Litig.*, 97 F.4th 634, 643 (9th Cir. 2024) (quoting *Zucco*, 552 F.3d at 991).

"Where . . . Plaintiffs' scienter allegations rely on the statements of confidential witnesses, the complaint 'must pass two hurdles to satisfy the PSLRA pleading requirements.'" *NVIDIA*, 81 F.4th at 937 (quoting *Zucco*, 552 F.3d at 995). "First, the confidential witnesses whose statements are introduced to establish scienter must be described with sufficient particularity to establish their reliability and personal knowledge. Second, those statements which are reported by confidential witnesses . . . must themselves be indicative of scienter." *Id.* (quoting *Zucco*, 552 F.3d at 995).

The plaintiffs' new allegations about scienter rely mostly on CW3's allegations that the slowdown started in June (or July, or August, or September), that Bharadwaj participated in Project Big Fish, and that she reviewed declining metrics, so she knew of the slowdown and intentionally withheld that information in September. Oppo. 12:12–16:3. They also add allegations to try to explain why Bharadwaj would withhold this information, only to share it weeks later in the quarterly report. *See* SAC ¶ 82.

For many of the reasons explained above, most of CW3's allegations are too nonspecific, vague, or irreconcilable with the published reports to establish reliability and personal knowledge of what Bharadwaj knew and when. *See NVIDIA*, 81 F.4th at 937. The plaintiffs try to show that Bharadwaj had the requisite scienter because of her review of certain reports, and it is true that a plaintiff can allege scienter by pointing to the defendant's "access and review of contemporaneous reports" with the relevant information. *Id.* at 940. But in *NVIDIA*, the confidential witnesses explained in detail how they knew that the defendant knew the relevant information—the first witness personally prepared presentations about the specific information, "had frequent communications" with high-level executives about that information, and wrote weekly sales email related to that information, while the second witness "personally met" with the defendant who the plaintiffs alleged had the requisite knowledge and scienter. 81 F.4th at 940.

In comparison, CW3 says he personally reviewed Paid User Expansion and Free to Paid Conversions on a daily basis, SAC ¶ 73, and attended "monthly" planning meetings where

15

executives generally reviewed objectives, key performance indicators, and metrics for the "Jira" product, *id.* ¶ 50, but he fails to make the connection or allege that Paid User Expansion or Free to Paid Conversions were discussed at those meetings.[3] He also seems to say that these metrics were discussed at Big Fish meetings in June, July, and August, but simultaneously says that he was not a member of Big Fish until September.[4] *Id.* ¶ 80; *cf. In re Plantronics, Inc. Sec. Litig.*, No. 19-CV-07481-JST, 2022 WL 3653333, at *14 (N.D. Cal. Aug. 17, 2022) (inferring the witness had "reliable information" where they personally participated in the requisite meetings). Even if he had personal knowledge about Big Fish, the complaint says the project was designed generally "to increase Atlassian user expansion," not to address *declining* Paid User Expansion. SAC ¶ 80. His personal knowledge of a hiring freeze, *id.* ¶ 75, also does not show that Bharadwaj knew of a slowdown to Paid User Expansion.

And while CW3 says that he or his team "presented" metrics to Bharadwaj that "paid seat expansion numbers had slowed down," he does not say when and is very vague about how— "either directly in meetings or in a report that he submitted for her review, [or] on other occasions his team's report was incorporated into a document that was presented to [her]." *Id.* ¶ 76. These are a far cry from the particular and comprehensive allegations in *NVIDIA* that established the witnesses' personal knowledge and reliability.[5] *See also In re Alphabet*, 1 F. 4th at 705–06 (plausibly pleading scienter where plaintiffs pointed to *specific* memos with *specific* data and alleged that the executives actually read those memos); *Wozniak v. Align Tech., Inc.*, 850 F. Supp.

---

[3] The Opposition says "Bharadwaj attended weekly meetings beginning in July 2022 to discuss the poor Expansion trend, which was so important that Defendants devoted over 100 top-level employees to help address the slowdown." Oppo. 18:3–5. With this sentence, the plaintiffs conflate and confuse their own separate allegations about weekly planning meetings, the metrics discussed, and the 100-person operation (Big Fish), none of which are connected in the SAC itself. Tellingly, the Opposition does not cite the SAC for this proposition.

[4] Because CW3 does not successfully establish his reliability or personal knowledge about Project Big Fish before September, the plaintiffs fail to allege that Big Fish addressed or even was formed to address Paid User Expansion. For this reason, I am unpersuaded by their citations to cases where scienter was established by alleging that defendants instituted various projects in response to issues or problems that they were hiding from the market. *See* Oppo. 12:27–13:17.

[5] The plaintiffs also include allegations from CW4 and CW5, but they merely "confirm[]" what CW3 saw. SAC ¶¶ 82–83. They do not, therefore, remedy the inherent issues of CW3's personal knowledge.

16

2d 1029, 1043 (N.D. Cal. 2012) (failing to plead scienter by pointing to calls, meetings, and reviews of "key metrics" without providing specific numbers or data that "contradict[ed]" the defendant's statements).

The "core operations" theory is also insufficient. Oppo. 18:1–11. In *In re Apple Inc. Securities Litigation*, for example, Tim Cook said that Apple's business in some emerging markets was slowing but its business in China was not and also that iPhone sales were doing well, but soon after, Apple missed its earnings guidance by $9 billion, mostly due to the Chinese iPhone market. No. 19-CV-02033-YGR, 2020 WL 6482014, at *2–3 (N.D. Cal. Nov. 4, 2020). The plaintiffs created a "strong inference" that Cook knew the Chinese iPhone market would materially affect the business by pleading that the Chinese market constituted 20 percent of Apple's revenue, Cook frequently travelled to China, the Chinese economic issues were reported widely in the media so Cook likely knew, and the iPhone was a core operation of Apple's business. *Id.* at *9. Here, the plaintiffs plausibly allege that Paid User Expansion is 90 percent of Atlassian's business, but their facts about Bharadwaj's knowledge and especially the *decline* in this metric—including what the slower growth was, when it occurred, who communicated it, who learned about it, and what impact it had on the business—are insufficiently specific. And while it would be reasonable to infer Apple's CEO would know when his company was about to miss its revenue guidance by $9 *billion*, the plaintiffs here do not point to a similar statistic; the alleged $7 billion impact to the stock price is a wholly different metric, and plaintiffs do not try to assert that Bharadwaj knew or could know the stock price in advance.

Even assuming the plaintiffs plausibly alleged that Bharadwaj knew about the declining Paid User Expansion metric, they again fail to plead "intentional or conscious misconduct" because they do not plausibly allege that Bharadwaj engaged in an "*extreme* departure from the standards of ordinary care" or knew or must have been aware that she was intentionally misleading buyers or sellers. *In re Alphabet, Inc.*, 1 F.4th at 701 (citations omitted). This is in large part due to lack of a coherent theory about why she would mislead the market in mid-September, knowing that the truth would come out at the beginning of November. CW3 asserts that Bharadwaj wanted to "buy time" to get a plan in place to fix the slowdown to Paid User

17

1   Expansion, so that when Atlassian ultimately told the market, it could tell its shareholders and
2   investors that they were already working on the problem.  SAC ¶ 82.  As discussed above, he does
3   not sufficiently allege that Big Fish was intended to address declining Paid User Expansion.  And
4   importantly, he provides no basis whatsoever for his reliability or personal knowledge of this as
5   Bharadwaj's rationale.  *Cf. In re Plantronics*, 2022 WL 3653333, at *14–15 (finding confidential
6   witnesses reliable and with personal knowledge about particular projects they worked on and
7   meetings they attended).

8         The theory itself also does not show the requisite mental state for scienter.  The plaintiffs
9   point to *In re Alphabet*, 1 F.4th at 706–07, where the complaint alleged that Google executives
10  withheld information about severe cybersecurity vulnerabilities for six months, when the
11  (separate) Facebook-Cambridge Analytica data breach scandal was happening at the same time,
12  during which Facebook faced intense public and Congressional backlash.  The Ninth Circuit found
13  plausible the inference that the decision to not tell the market something similar happened at
14  Google was intentional, "to 'buy time' by avoiding putting Google in the spotlight alongside [that
15  scandal] and at the time of heightened public and regulatory scrutiny."  *Id.*  The "competing
16  inference" that the defendants were merely negligent in not disclosing the vulnerabilities for six
17  months was "not plausible."  *Id.*  Here though, the alleged reason to wait to disclose is much
18  flimsier—Bharadwaj wanted a solution in place before announcing an issue—which is
19  substantially less "malicious," *see In re Sorrento*, 97 F.4th at 643, than keeping quiet about "the
20  largest data-security vulnerability" in Facebook's history to avoid regulatory scrutiny for as long
21  as possible, *see In re Alphabet*, 1 F.4th at 706.  And critically, the "competing inference"—that
22  Bharadwaj held this mid-quarter call, not required by law, to try to provide open and regular
23  communication to shareholders during uncertain economic times and was merely negligent in
24  failing to specifically call out Paid User Expansion—is much stronger.  *Compare id.*

25        Indeed, considering all the other allegations in the complaint, the theory of scienter is
26  simply weak "in light of other explanations."  *Tellabs*, 551 U.S. at 324; *see also NVIDIA*, 81 F.4th
27  at 940 (conducting a holistic review of scienter allegations).  The plaintiffs again point to the
28  analysts' reactions to the November statements, the statements about linear sales cycles, the "not

18

dramatically out of line with . . . prior trading practices" stock sales of two other defendants, and the defendants' violation of their obligations under Item 303. But these allegations are unconvincing for all the reasons laid out in my Prior Order, which the plaintiffs failed to address upon amendment. *See* Prior Order 22:22–25:4.

Finally, because the plaintiffs again failed to plead that any statements other than Bharadwaj's were false or misleading, I do not need to address the plaintiffs' arguments or allegations about any other executives having the requisite scienter.

Accordingly, the plaintiffs failed to plead scienter. As for the statements above, it seems possible that the plaintiffs can clarify and replead their allegations, specifically concerning CW3 and their theory of liability, and so they may have leave to amend once more.[6]

**CONCLUSION**

For those reasons, the motion is GRANTED, and the complaint is DISMISSED. The plaintiffs may have one final opportunity to amend their allegations and state a claim. Any amended complaint must be filed within 21 days of the Order.

**IT IS SO ORDERED.**

Dated: August 13, 2024

William H. Orrick
United States District Judge

---

[6] The parties agree that if the plaintiffs fail to plead a Section 10(b) claim, they also fail to plead a Section 20(a) claim. *See* Mot. 25:17–19; Oppo. 25 n.14. For the same reasons, then, the Section 20(a) claim is DISMISSED with leave to amend.

19